UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

JUDGE SCHEINDLIN

------------------------------------------------------------------X

AVA ACUPUNCTURE P.C., OKSLEN
ACUPUNCTURE P.C., Individually and as Assignee
of Leona Deleston, MODEL SUPPLY INC. and
KINGS COUNTY CHIROPRACTIC P.C.,

08 CV 5650

Docket No.:_____

                        Plaintiffs,

        -against-

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, AUTOONE INSURANCE
COMPANY, GENERAL ASSURANCE COMPANY,
ONE BEACON INSURANCE COMPANY,
MCDONNELL & ADELS P.C., MELLI GUERIN &
WALL P.C., KATTEN MUCHIN ROSENMAN LLP,
RIVKIN RADLER LLP, ISEMAN CUNNINGHAM
RIESTER & HYDE LLP, NATIONAL INSURANCE
CRIME BUREAU, ERIC R. DINALLO,
SUPERINTENDENT OF INSURANCE STATE OF
NEW YORK and THE JOHN DOE INSURANCE
COMPANIES,



RECEIVED
JUN 23 2008
U.S.D.C. S.D. N.Y.
CASHIERS

                        Defendants.

------------------------------------------------------------------X

## NOTICE OF REMOVAL

Defendants State Farm Mutual Automobile Insurance Company ("State Farm"), Melli,

Guerin & Wall P.C. and Katten Muchin Rosenman LLP (collectively the "Removing

Defendants"), hereby remove the above-captioned action from the Supreme Court of the State of

New York, County of New York, to the United States District Court for the Southern District of

New York pursuant to 28 U.S.C. §§ 1332, 1441, 1446 and 1453 and respectfully states:

        1.      This action ("Action") was commenced by Plaintiffs in the Supreme Court of the

State of New York, County of New York, on or about June 2, 2008 under Index No. 601655/08.

Annexed hereto as Exhibit "A" is a copy of the Summons and Complaint (the "Complaint").

Exhibit "A" constitutes all the process, pleadings, and orders that have been filed in the Action to date.

2.    This Action is of a civil nature in which the Plaintiffs seek declaratory and injunctive relief against certain No-Fault insurers:  State Farm, Auto-One Insurance Company, General Assurance Company, and One Beacon Insurance Company (the three companies referred to in the Complaint as the "One Beacon Group") (collectively with State Farm referred to hereinafter as the "Insurance Company Defendants").  Plaintiffs also seek mandamus and injunctive relief against the remaining defendants including the Insurer Defendants' attorneys, McDonnell & Adels, P.C., Melli Guerin & Wall, P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP (the "Attorney Defendants"), the National Insurance Crime Bureau ("NICB"),[1] and the New York State Insurance Department, in connection with the Insurer Defendants' fraud investigation activity.

3.    As more fully set out below, this case is properly removed to this Court pursuant to 28 U.S.C. § 1441 because this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 and because the Removing Defendants have satisfied the procedural requirements for removal.

## I.    REMOVAL IS PROPER BECAUSE THIS COURT HAS SUBJECT MATTER JURISDICTION PURSUANT TO THE CLASS ACTION FAIRNESS ACT.

4.    This case is subject to removal pursuant to the recently enacted Class Action Fairness Act ("CAFA").

5.    As set forth below, this is a putative class action in which:  (1) there are 100 or more members in the Plaintiffs' proposed class; (2) at least some members of the proposed class

---

[1]    The NICB is a non-profit, industry-funded organization that works with insurers and law enforcement agencies to combat insurance fraud.

have a different citizenship from some defendants; and (3) the claims of the proposed class members exceed the sum or value of $5,000,000 in the aggregate. Thus, this Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d).

### A.    Class Action Consisting Of More Than 100 Members

6.    Plaintiffs brought this action pursuant to, *inter alia*, CPLR § 901, and seek certification of a class defined as "all claimants and their medical providers/assignees that have submitted, or will submit, No-Fault insurance claims to the Insurance Company Defendants and which claims and entities were subjected to the conduct of Defendants as enumerated within these pleadings." See Complaint at ¶57; see also id. at ¶¶56-90.

7.    As demonstrated in the accompanying Affidavit of Nicole Redd, a Section Manager in the Special Investigations Unit of State Farm, sworn to on June 19, 2008 ("Redd Aff."), the putative class defined by the Complaint – all claimants and healthcare providers who submitted, or will submit, No-Fault claims to the Insurance Company Defendants in the six years preceding the filing of this Action and continuing – includes more than 100 persons with respect to State Farm alone. See Redd Aff. at ¶2.

8.    Based on these and other allegations, the number of class members of the Plaintiffs' proposed class is obviously greater than 100 for purposes of 28 U.S.C. § 1332(d)(5)(B).

### B.    Diversity of Citizenship

9.    At the time this lawsuit was filed and as of the date of this notice, the Defendants were and are citizens of the following states:

- State Farm was and is a citizen of Illinois (it is an Illinois corporation with its principal place of business in Illinois);

- AutoOne Insurance Company was and is a citizen of New York (it is a New York corporation with its principal place of business in New York);

3

- General Assurance Company, which is the predecessor of AutoOne Insurance Company, was a citizen of New York (it was a New York corporation with its principal place of business in New York;

- One Beacon Insurance Company was and is a citizen of Pennsylvania and Massachusetts (it is a Pennsylvania corporation with its principal place of business in Massachusetts);

- McDonnell & Adels, P.C. was and is a citizen of New York (it is a New York professional corporation with its principal place of business in New York);

- Katten Muchin Rosenman LLP was and is a citizen of Illinois (it is an Illinois limited liability partnership with its principal place of business in Illinois);

- Rivkin Radler LLP was and is a citizen of New York (it is a New York limited liability partnership with its principal place of business in New York);

- Iseman Cunningham Riester & Hyde LLP was and is a citizen of New York (it is a New York limited liability partnership with its principal place of business in New York);

- Melli Guerin & Wall, P.C. was and is a citizen of New Jersey (it is a New Jersey professional corporation with its principal place of business in New Jersey);

- The NICB was and is a citizen of Illinois (it is an Illinois not-for-profit corporation with its principal place of business in Illinois);

- The New York State Insurance Department was and is a New York State administrative agency.  See Complaint at ¶¶43-52.

10.    At the time of the commencement of this action and as of the date of this notice, Plaintiff Ava Acupuncture P.C. was and is a citizen of New York because it is a domestic professional corporation whose principal place of business is New York; Plaintiff Okslen Acupuncture P.C. was and is a citizen of New York because it is a domestic professional corporation whose principal place of business is New York; Kings County Acupuncture P.C. was and is a citizen of New York because it is a domestic professional corporation whose principal place of business is New York; Model Supply, Inc. was and is a citizen of New York because it

4

is a domestic corporation whose principal place of business is New York.  See Complaint at ¶¶39-42.

11.    Thus, at the time this lawsuit was commenced and as of the date of this notice, at least one proposed class member and one defendant are diverse.  See 28 U.S.C. § 1332(d)(2)(A) (defining diversity of citizenship under CAFA as including situations where "any member of a class of plaintiffs is a citizen of a state different from any defendant").

### C.    The Amount-In-Controversy Requirement Is Satisfied.

12.    Plaintiffs seek a judgment declaring illegal, null, and void certain practices by the Insurance Company Defendants dating back six years.  Moreover, Plaintiffs seek permanent, broad injunctive relief against these same four insurance companies.  In addition, Plaintiffs seek to enjoin certain other defendants from using information obtained by and/or through the insurance companies.  As set forth more fully below, the amount placed in controversy by Plaintiffs' Complaint easily satisfies CAFA's jurisdictional minimum.

13.    Plaintiffs are medical providers who are allegedly entitled to receive No-Fault medical reimbursement as assignees of patient-insureds.  Plaintiffs bring this action on behalf of a putative class of New York claimants and their medical providers, who have submitted, or will submit, No-Fault Insurance claims to the Insurance Company Defendants.  See Complaint at ¶57. Plaintiffs allege that by denying claims and engaging in claims-related litigation and statutorily mandated fraud investigation activity, the Insurance Company Defendants have violated various New York statutes and regulations relating to, among other things, the qualification of Special Investigative Unit ("SIU") investigators and claim settlement practices.  Plaintiffs seek the following wholesale declaratory relief against the Insurance Company Defendants:

- A declaration that the Insurance Company Defendants' Special Investigative Unit is illegal in that its investigators do not meet the minimum qualifications as set forth by 11 N.Y.C.R.R. § 86.6(c).

- A declaration that each and every denial of claim form (NF-10) issued by the Insurance Company Defendants that is based in whole or in part upon information obtained by the Insurance Company Defendants' SIU be deemed null and void.

- A declaration that the Insurance Company Defendants have engaged in unfair claim settlements practices in violation of multiple statutes and regulations including, N.Y. Insurance Law § 5106, 11 N.Y.C.R.R. §§ 65-3.2(a)(b)(c) and (e), 65-3.5, 65-4.11, 86.6(a)(b)(c) and (d), N.Y. Comp. Codes R. & Regs. Tit. 11 Part 216 (Regulation 64) and N.Y. Insurance Law § 2601(a)(4).

- A declaration that the Insurance Company Defendants are in violation of N.Y. General Business Law § 349.

- A declaration that State Farm is in violation of Penal Law § 200.03 (Bribery in the second degree); Penal Law § 200.00 (Bribery in the third degree); Penal Law § 200.20 (Rewarding official misconduct in the second degree); and Penal Law § 200.30 (Giving unlawful gratuities); or in the alternative, a declaration that State Farm improperly influenced the Suffolk County District Attorney's conduct in Operation BORIS and caused the DA to investigate, arrest and prosecute individuals and corporations.

<u>See</u> Complaint at ¶38(a).

14.     Plaintiffs allege that the foregoing violations have occurred for a period of six years prior to the filing of the complaint, and will continue into the future until remedied. <u>See</u> <u>id</u>. Plaintiffs further seek a permanent injunction enjoining and restraining the Insurance Company Defendants' SIU investigators (as well NICB's investigators) from engaging in any investigative activity unless and until properly qualified. <u>See</u> <u>id</u>. at ¶38(c) and (d).

15.     Additionally, Plaintiffs seek an injunction against all Defendants, including the Insurance Company Defendants' law firms (referred to in the Complaint as "Enforcer Counsel"), enjoining and restraining them from utilizing any information obtained by and/or through the Insurance Company Defendants' Special Investigative Units, the Suffolk County District Attorney or Suffolk County Task Force associated with "Operation BORIS," NICB Special Agents and/or Defendant, McDonnell & Adels, P.C. <u>See</u> <u>id</u>. at ¶38(e)-(h).

6

16.     As against the New York State Insurance Department, Plaintiffs seek an Order of mandamus, pursuant to CPLR § 7803, compelling the Insurance Department to audit and investigate the claims practices of the Insurance Company Defendants and to take all appropriate action to remedy any and all infirmities, deficiencies and misconduct. See id. at ¶38(b).

17.     The claims of the individual class members in a class action are aggregated to determine if the amount in controversy exceeds the sum or value of $5,000,000. See 28 U.S.C. 1332(d)(6). Under this standard, Plaintiffs' claims easily meet the jurisdictional threshold.

18.     The Redd Affidavit demonstrates that the jurisdictional minimum in this case is satisfied. As noted above, Plaintiffs seek, among other things, a declaration that "each and every denial of claim form (NF-10) issued by State Farm that is based in whole or in part upon information obtained by State Farm's SIU and/or One Beacon Group's SIU be deemed null and void" for a six-year period preceding the filing of the Complaint up until the alleged infirmity is remedied. See Complaint at ¶38(a)(3). According to the Redd Affidavit, State Farm has denied more than 27,000 claims in 2007 alone based upon information obtained by its SIU, totaling more than $9,000,000. See id. at ¶3.

19.     CAFA's legislative history makes clear that "in assessing the jurisdictional amount in declaratory relief cases, the federal court should include in its assessment the value of all relief and benefits that would logically flow from the granting of the declaratory relief sought by the claimants." Sen. Rep. 109-14 at 43, Feb. 28, 2005. Prior to the law's enactment, CAFA's sponsor in the House of Representatives reiterated the notion that the amount placed in controversy in a class action seeking declaratory relief must be broadly construed: "a declaration that a defendant's conduct is unlawful or fraudulent will carry certain consequences, such as the

need to cease and desist from that conduct that will often cost the defendant in excess of $5 million." 151 Cong. Rec. H730 (daily ed. Feb. 17, 2005) (statement of Mr. Sensenbrenner).

20.    In addition, under CAFA, for purposes of calculating the amount in controversy, the cost of compliance with an injunction is determined from the viewpoint of either the plaintiff or the defendant. See Sen. Rep. 109-14 at 42 ("the Committee intends that a matter be subject to federal jurisdiction under this provision if the value of the matter in litigation exceeds $5,000,000 either from the viewpoint of the plaintiff or the viewpoint of the defendant, and regardless of the type of relief sought (e.g., damages, injunctive relief, or declaratory relief)"). Calculation of damages in a class action seeking injunctive relief solely from the perspective of the plaintiff was based on the concern that assessing the amount in controversy from defendant's perspective was tantamount to aggregating damages. See id. However, as courts have properly reasoned, CAFA's explicit requirement that damages in a class action are aggregated to calculate the amount in controversy, see 28 U.S.C. § 1332(d)(6), overrules the "plaintiff-only" perspective in calculating such damages. E.g., Tompkins v. Basic Research LL, S-08-244, 2008 WL 1808316, at *4 n.9 (E.D. Cal. Apr. 22, 2008); see also 151 Cong. Rec. H730 (daily ed. Feb. 17, 2005) (statement of Mr. Sensenbrenner) ("a class action seeking injunctive relief that would require a defendant to restructure its business in some fundamental way might cost a defendant well in excess of $75,000 under current law, but might have substantially less value to each plaintiff or even to the class of plaintiffs as a whole. Because S. 5 explicitly allows aggregation for the purposes of determining the amount of controversy in class actions, that concern is no longer relevant.").

8

21.    In short, given the expansive nature of the relief sought and the size of the

putative class, Plaintiffs' request for declaratory and injunctive relief clearly satisfies CAFA's

amount-in-controversy requirement.

## II.    THE REMOVING DEFENDANTS HAVE SATISFIED THE PROCEDURAL REQUIREMENTS FOR REMOVAL.

22.    Removal is timely under 28 U.S.C. §§ 1446(b) because the Complaint is the first

pleading, motion, order or other paper from which it could first be ascertained that this action is

one which is or has become removable.  This Notice of Removal is filed within thirty days of

service on the Removing Defendants, on June 2, 2006, of a copy of the Complaint.  Pursuant to

28 U.S.C. § 1446(a), and Local Civil Rule 81.1, the Complaint is annexed hereto as Exhibit A.

23.    The Removing Defendants will give written notice to the Plaintiffs (through their

counsel) of the filing of this Notice of Removal, as required by 28 U.S.C. § 1446(d).

24.    The Supreme Court of the State of New York, County of New York, is located

within the Southern District of New York.  Thus, venue is proper in this Court pursuant to 28

U.S.C. § 112(b), because it is the "district and division embracing the place where such action is

pending."  See 28 U.S.C. § 1441(a).

25.    Pursuant to CAFA, the Removing Defendants need not obtain the consent of any

other defendant to remove this action.  See 28 U.S.C. § 1453(b) (class actions may be removed

"by any defendant without the consent of all defendants")

26.    A copy of this Notice of Removal and a Notice of Filing the Notice of Removal

will be filed by the Removing Defendants with the Clerk of the Supreme Court of the State of

New York, County of New York, as required by 28 U.S.C. §1446(d).  The Removing Defendants

have thus satisfied the requirements for removal under 28 U.S.C. § 1446 and all applicable rules.

WHEREFORE, the Removing Defendants respectfully request that this Court assume full

jurisdiction over the cause herein as provided by law. The Removing Defendants intend no

admission of liability by this Notice and expressly reserves all defenses, motions, and pleas,

including without limitation objections to the sufficiency of Plaintiffs' pleadings and the

propriety of class certification.

Dated: New York, New York
        June 23, 2008

                            Respectfully submitted,

                            GOLDBERG & SEGALLA, LLP

                            By: _____
                                200 Old Country Road, Suite 210
                                Mineola, New York 11501

                                Counsel for Defendant State Farm Mutual
                                Automobile Insurance Company

MELLI, GUERIN & WALL P.C.

By:_____

240 Frisch Court, Suite 301
Paramus, New Jersey 07652


KATTEN MUCHIN ROSENMAN LLP

By:_____

575 Madison Avenue
New York, New York 10022-2585

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
AVA ACUPUNCTURE P.C., OKSLEN
ACUPUNCTURE P.C., Individually and as Assignee
of Leona Deleston, MODEL SUPPLY INC. and
KINGS COUNTY CHIROPRACTIC P.C.,                         Docket No.:_____

                          Plaintiffs,

        -against-

STATE FARM MUTUAL AUTOMOBILE
INSURANCE COMPANY, AUTOONE INSURANCE
COMPANY, GENERAL ASSURANCE COMPANY,
ONE BEACON INSURANCE COMPANY,
MCDONNELL & ADELS P.C., MELLI GUERIN &
WALL P.C., KATTEN MUCHIN ROSENMAN LLP,
RIVKIN RADLER LLP, ISEMAN CUNNINGHAM
RIESTER & HYDE LLP, NATIONAL INSURANCE
CRIME BUREAU, ERIC R. DINALLO,
SUPERINTENDENT OF INSURANCE STATE OF
NEW YORK and THE JOHN DOE INSURANCE
COMPANIES,

                          Defendants.
-----------------------------------------------------------------X

STATE OF NEW YORK    )
                     ) ss:
COUNTY OF NASSAU     )

        NICOLE REDD, being duly sworn, deposes and says:

        1.      I am a Section Manager in the Special Investigations Unit of State Farm

Mutual Automobile Insurance Company ("State Farm"), and as such, I have personal

knowledge of the facts and circumstances set forth herein.  I submit this Affidavit in

support of State Farm's removal petition.

        2.      In 2007, more than 100 claimants and healthcare providers submitted No-

Fault claims for reimbursement to State Farm.

3.      In 2007, State Farm issued 27,126 denials for all medical providers subject to SIU alert procedures for a total of $9,308,003.27.

NICOLE REDD

Sworn to before me this
19th day of June 2008

Notary Public

GENNIE VANN
Notary Public, State of New York
No. 01VA6011916
Qualified in Nassau County
Certification Filed in Suffolk
Commission Expires 11/25, 2010

2161056 v1

## **CERTIFICATE OF SERVICE**

I hereby certify that the Attached Notice of Removal was served by Federal Express overnight delivery on June 25, 2008 upon counsel for all Parties in this matter:

The Zuppa Firm PLLC
Attorneys for Plaintiffs
53 Herbert Street, Suite 1
Brooklyn, NY 11222

Cozen O'Connor
Attorneys for Defendants
Auto-One Insurance Company,
General Insurance Company and
One Beacon Insurance Company
1900 Market Street
Philadelphia, PA 19103

McDonnell & Adels, P.C.
401 Franklin Avenue
Garden City, New York 11530

Melli Guerin & Wall, P.C.
240 Frisch Court, Suite 301
Paramus, New Jersey 07652

Katten Muchin & Rosenman LLP
575 Madison Avenue
New York, New York 10022-2585

Rivkin Radler LLP
926 RexCorp Plaza
Uniondale, New York 11556-0926

Iseman, Cunningham, Riester & Hyde, LLP
9 Thurlow Terrace
Albany, New York 12203

Wiley Rein, LLP
Attorneys for Defendant
National Insurance Crime Bureau
1776 K Street NW
Washington D.C. 2006

Andrew M. Cuomo
Attorney General of the State of New York
The Capitol
Albany, New York 12224

Dated: June 25, 2008

2160224 v2

13

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------x

AVA ACUPUNCTURE P.C., OKSLEN ACUPUNCTURE P.C. ) SUMMONS
Individually and as Assignee of Leona Deleston, MODEL SUPPLY )
INC. and KINGS COUNTY CHIROPRACTIC P.C. )
                                                    ) INDEX NO.: 601655/08
                 Plaintiffs, )
                                                    ) Date Filed With
                 -against- ) Court: 06/03/08
                                                    )

STATE FARM MUTUAL AUTOMOBILE INSURANCE )
COMPANY, AUTOONE INSURANCE COMPANY, GENERAL )
ASSURANCE COMPANY, ONE BEACON INSURANCE )
COMPANY, MCDONNELL& ADELS P.C., MELLI GUERIN & )
WALL P.C., KATTEN MUCHIN ROSENMAN LLP, RIVKIN )
RADLER LLP, ISEMAN CUNNINGHAM RIESTER & HYDE )
LLP, NATIONAL INSURANCE CRIME BUREAU, ERIC R. )
DINALLO SUPERINTENDENT OF INSURANCE STATE OF )
NEW YORK and THE JOHN DOE INSURANCE COMPANIES )
                                            )
                 Defendants. )

---------------------------------------------------------------x

**TO THE ABOVE NAMED DEFENDANTS:**

         You are hereby summoned and required to serve upon Plaintiff's attorney, at his address

stated below, an answer to the attached complaint.

         If this summons was personally served upon you in the State of New York, the answer

must be served within twenty days after such service of the summons, excluding the date of

service. If the summons was not personally delivered to you within the State of New York, the

answer must be served within thirty days after service of the summons is complete as provided

by law.

         If you do not serve an answer to the attached complaint within the applicable time

limitation stated above, a judgment may be entered against you, by default, for the relief

demanded in the complaint, without further notice to you.

The action will be heard in the Supreme Court of the State of New York, County of New York. This action is brought in the County of New York of the State of New York based upon the residence of certain Defendants and because that is the County in which all Defendants transact business.

Dated: Brooklyn, New York
May 26, 2008

The Zuppa Firm PLLC
By:

Raymond J. Zuppa Esq.
Attorneys for Plaintiffs
53 Herbert Street
Suite 1
Brooklyn, NY 11222
(718) 383-8812

- 2 -

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

|  |  |
|---|---|
| ————————————————————— x | |
| AVA ACUPUNCTURE P.C., OKSLEN ACUPUNCTURE P.C. ) | COMPLAINT |
| Individually and as Assignee of Leona Deleston, MODEL SUPPLY ) | |
| INC. and KINGS COUNTY CHIROPRACTIC P.C. ) | |
| ) | INDEX NO.: |
| ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| -against- ) | |
| ) | |
| STATE FARM MUTUAL AUTOMOBILE INSURANCE ) | |
| COMPANY, AUTOONE INSURANCE COMPANY, GENERAL ) | |
| ASSURANCE COMPANY, ONE BEACON INSURANCE ) | |
| COMPANY, MCDONNELL & ADELS P.C., KATTEN MUCHIN ) | |
| ROSENMAN LLP, RIVKIN RADLER LLP, ISEMAN ) | |
| CUNNINGHAM RIESTER & HYDE LLP, MELLI GUERIN & ) | |
| WALL P.C., NATIONAL INSURANCE CRIME BUREAU, ERIC ) | |
| R. DINALLO SUPERINTENDENT OF INSURANCE STATE OF ) | |
| NEW YORK and THE JOHN DOE INSURANCE COMPANIES ) | |
| ) | |
| **Defendants.** ) | |
| ————————————————————— x | |

Plaintiffs, AVA Acupuncture P.C. ("AVA"), Okslen Acupuncture P.C. Individually and

as Assignee of Leona Deleston ("Okslen"), Model Supply Inc. ("Model") and Kings County

Chiropractic P.C. ("Kings County Chiro") (hereinafter sometimes collectively referred to as the

"Plaintiffs"), by their attorneys, The Zuppa Firm PLLC, for their complaint, against the

Defendants State Farm Mutual Automobile Insurance Company ("State Farm"); and AutoOne

Insurance Company, ("AutoOne") General Assurance Company ("General") and One Beacon

Insurance Company ("One Beacon") (These three companies are collectively referred to herein

as "The One Beacon Group"), The John Doe Insurance Companies (all the insurance companies

listed above are hereinafter sometimes collectively referred to herein as the "Insurance Company

Defendants"), McDonnell & Adels P.C. ("McDonnell & Adels"), Katten Muchin Rosenman LLP

("Katten"), Rivkin Radler LLP ("Rivkin"), Iseman Cunningham Riester & Hyde LLP

("Iseman"), Melli, Guerin and Wall P.C. ("Melli")(hereinafter sometimes collectively referred to as "Enforcer Counsel"), National Insurance Crime Bureau ("NICB"), and Eric R. Dinallo, Superintendent of Insurance State of New York (hereinafter sometimes referred to as the "Insurance Department")(All the above groups of Defendants are sometimes collectively referred to as "Defendants"), allege as follows:

## PRELIMINARY STATEMENT

1. Under *New York's Comprehensive Motor Vehicle Insurance Reparations Act* (*N.Y. Ins. Law § 5101, et seq.*) and Regulation No. 68 (*11 N.Y.C.R.R. § 65, et seq.*) (collectively referred to herein as "the No-Fault law"), the regulations promulgated pursuant thereto, automobile insurers are required to pay up to $50,000 per eligible injured person ("EIP") for, inter alia, necessary expenses incurred for various health care services that result from injuries sustained in an automobile accident.

2. Under the law, EIPs can be reimbursed directly, or may assign such right to reimbursement to medical providers who treat them. 11 N.Y.C.R.R. §65-3.11. This right of assignment enables EIPs who cannot afford to pay for medical treatment up front, and then wait for reimbursement, to do the following: pay nothing and receive the care they need. Under these circumstances, the medical provider – or assignee – then pursues payment from the EIP's – or assignor's – insurance carrier. A laudable goal indeed the Assignee inherits all of the rights and responsibilities of the Assignor and legally stands in the shoes of the claimant/Assignor.

3. No-Fault benefits are not an entitlement program. Rather, this is insurance coverage for which the insurance carrier charges and collects a premium from its insured. Generally said insurance companies reap healthy profits from this arrangement.

- 2 -

4. This action is brought by the named Plaintiffs on behalf of themselves and all other EIPs, including claimants and their assignee medical providers, who submitted No-Fault claims to one or more of the Insurance Company Defendants and/or had their claims or entitlement to reimbursement "investigated" by the NICB, and/or Insurance Company Defendants and/or Enforcer Counsel.

5. The Insurance Company Defendants, the NICB and Enforcer Counsel have worked together to defraud EIPs and their medical provider assignees by engaging in wholesale bad faith in violation of a plethora of New York State Laws and have hijacked law enforcement into indicting and arresting individuals and corporate entities. All of the above was and is being perpetrated to increase profits at the expense of New York State Citizens.

6. The conduct of the Defendants has and continues to, inter alia, force medical providers to abandon their practices, extort claimants into abandoning claims, force those that do not abandon claims to accept lower "settlements" or payments on their claims and fosters and perpetuates an extraordinary amount of needless litigation and arbitration.

7. The Insurance Company Defendants are mandated by law to maintain Special Investigative Units. ("SIU") 11 N.Y.C.R.R. §86, et seq. The Insurance Company Defendants' SIU are staffed by so-called "investigators." The law mandates that such "investigators" must meet certain qualifications in order to receive a position as "investigator," or to perform investigative activities for insurance companies.[1] 11 N.Y.C.R.R. §86.6(c) The Insurance Company Defendants' "investigators" do not meet such qualifications.

8. State Farm's SIU is entirely staffed by "investigators" who do not meet even the minimum qualifications mandated by law.

---

[1] For purposes of this Complaint those members of insurance company SIUs that are given the title of "investigator" by the insurance company and those that may have another title but perform investigative activities will be referred to as "investigators."

9. For example, upon information and belief, the sole experience of one particular State Farm SIU "Investigator" prior to being assigned an "investigator" position in State Farm's SIU was that of "Strip Club Manager." (This presumes that a "Strip Club Manager" has some form of security/investigative element such as protecting dancers and their tips)

10. The One Beacon Group's SIU is staffed by employees of One Beacon, a subsidiary of White Mountain Insurance Company, which holding company owns many insurance companies and is domiciled in Bermuda for tax purposes.

11. The One Beacon Group's SIU is staffed by SIU"investigators" who do not meet even the minimum qualifications mandated by law.

12. State Farm's illegal SIU and State Farm's illicit "Claims Department,"[2] act as a profit center for the company. State Farm employees in its Claims Department have preset monetary quotas that act as goals or bench marks for what should be paid out during a set period of time. Specifically, State Farm Claims Department employees are encouraged to pay out less then the preset monetary amount or to not exceed the preset amount.

13. Instead of judging each claim on the claim's individual merits and paying each claim accordingly as required by law, State Farm's Claims Department employees, acting in concert with State Farm's SIU, intentionally underpay and refuse to pay valid claims in order to generate profits for the company and meet their individual quotas.

14. State Farm Claims Department employees are incentivized to meet their underpay and no pay quotas through a system of rewards bestowed upon them by State Farm. These claims handlers move on to positions in State Farm's SIU with the same profit center/incentivized claims handling mindset that they practiced when claims handlers.

---

[2] An industry term for the unit or department of an insurance company responsible for processing claims.

15. Specifically, State Farm's SIU, in concert with the Enforcer Counsel, provide State Farm's Claims Department employees with "ammunition" to deny claims in the form of manufactured "evidence" of fraud, the manipulation, intimidation and extortion of individuals into giving false statements, and the manipulation of law enforcement through false and misleading information and monetary bribes disguised as "grants."

16. State Farm also wields improper influence over the Insurance Department, evidenced by the Insurance Department's failure to properly police, regulate, and investigate State Farm. Furthermore when the Insurance Department does investigate State Farm it overlooks transgressions that should be further investigated and fails to punish or properly punish State Farm.

17. A favored tactic of State Farm is the retention and use of "Enforcer Counsel" – who refer to themselves as "SIU Counsel" – who, acting in concert with State Farm's SIU, coerce, intimidate and force EIPs and medical providers to give false information that is then siphoned back to State Farm's Claims Department employees to provide "ammunition" for the Claims Department employees to meet their underpay and no pay quotas.

18. Specifically, Enforcer Counsel interrogates EIPs and medical providers without their attorneys present, despite that many of the individuals have retained counsel for their claims against State Farm. During these interrogations, Enforcer Counsel, usually with a representative of State Farm's SIU present, produces papers containing false allegations to be signed by the EIPs and medical providers under the threat of criminal and other prosecution if the EIP or medical provider refuses to sign.

19. Enforcer counsel also engages, or attempts to engage, in repeated Examinations Under Oath or Depositions of the same EIP or medical provider for each and every claim wherein the same questions are asked repeatedly and the outcome – denial of claims – is predetermined.

20. Enforcer Counsel also engages in harassing so-called "mad dog litigation" tactics wherein Enforcer Counsel attempts to wear down claimants through the frivolous use of motion practice, frivolous demands for depositions, and outrageous demands for discovery, in each and every case, without regard for the individual merits of each case or the need for such information in each case.

21. Enforcer Counsel has, and continues to, blithely and relentlessly engage in fraud on various courts through the use of information that it knows to be false, specious, manufactured and obtained through nefarious means. Specifically Enforcer Counsel submits affidavits, statements, documents and other information that has been gathered by Enforcer Counsel and State Farm's SIU that Enforcer Counsel knows to be illegal. Enforcer Counsel has been repeatedly warned and put on notice of the above. Nevertheless, Enforcer Counsel's conduct continues, unabated.

22. The Defendant One Beacon Group engages in the same illegal conduct as State Farm as alleged in Paragraphs 11 through 21 above.

23. The Insurance Company Defendants and Enforcer Counsel utilized and continue to utilize defendant NICB in furtherance of the above-described scheme. The NICB, despite what its name would imply, is neither a law enforcement nor governmental agency. It is not even a quasi-governmental agency. The NICB is a private corporation funded entirely by insurance companies to ostensibly assist insurance companies in the investigation of insurance fraud.

24. NICB investigators are referred to by the NICB as so called "Special Agents" as in law enforcement agents i.e. "FBI Special Agent." These investigators do the bulk of the NICB's work.

25. NICB Agents are required by the law of the State of New York to possess licenses that are issued to private investigators.

26. The bulk of the NICB's "Agents" do not possess private investigator's licenses. As a result the NICB is illegally performing investigations within the State of New York.

27. NICB prods law enforcement into taking police action in specific cases that were brought to the NICB from member insurance companies or cases that were developed by the NICB itself. The requested police action involves investigation and ultimately arrest and restitution. The NICB also ostensibly acts as a representative of insurance companies to law enforcement wherein insurance companies gain a voice in directing police action and to advocate on behalf of insurance companies to law enforcement in general.

28. The NICB knows that their utility to insurance companies comes primarily from its ability to prod police action to have a claim killing effect. The NICB needs to kill claims in order to maintain their insurance company membership. As a result, the NICB engages in the manufacturing of criminal investigations.

29. In one particularly heinously illegal investigation dubbed "Operation BORIS" State Farm funneled money to the Suffolk County District Attorney's Office via the NICB. Specifically State Farm gave a sum(s) of money to the NICB who then passed it on in the form of some type of grant. This money was provided in order to influence the Suffolk County DA into

investigating, arresting, indicting and prosecuting medical providers, which created justifications for claims denials.

30.  Once the money arrived at the Suffolk County District Attorney's Office the money was utilized for the leasing of cars, the purchase of computers, the purchase of cell phones, the hiring of cronies and establishment of slush fund: personal expense accounts wherein meals including alcoholic beverages were purchased and other questionable uses which will be fully developed in discovery.

31.  BORIS was a debacle.  Of approximately 585 indictments, well over half were simply never unsealed.  Rather, they expired.  Of those that were unsealed the only convictions were a few pleas taken by low-level phony accident victims and accident stagers – the ones who cooperated. Most individuals and/or entities that were subject to judicial sanction received an ACD – Adjournment in Contemplation of Dismissal, which is a fancy way of saying: "Case dismissed." In other words droves of felony indictments were simply dismissed.

32.  State Farm and the insurance industry through the NICB had manufactured and purchased BORIS as a means to avoid paying out on claims brought by policy holders who paid premiums.

33.  Enforcer Counsel Defendant McDonnell & Adels, in concert with the Insurance Company Defendants' SIU, in furtherance of the above scheme has utilized the services of a former law enforcement agent involved in the original BORIS investigation.

34.  Enforcer Counsel Defendant McDonnell & Adels acts as the hub through which false/bad faith information obtained through its own nefarious "investigations" and the Insurance Company Defendants' "investigations" is disseminated to other Defendant Insurance Companies (s/h/a "John Doe Insurance Companies"), in violation of the Donnelly Act.

- 8 -

35. The above paragraph 34, as will be demonstrated, is pertinent to this action and will likely be the subject of another action.

36. The Plaintiffs in this action have been harmed by the above and continue to be harmed by the above conduct (Paragraphs 1-35) in that the Insurance Company Defendants and Enforcer Counsel have utilized the fruits of the above conduct against the Plaintiffs and their assignors.

## NATURE OF THE ACTION

37.    This action is brought pursuant to:

    a.    CPLR Sections 3001 and 3017(b);

    b.    CPLR Section 901 and the other provisions under Article 9.

    c.    CPLR Section 7800 "Article 78" specifically CPLR 7803(1)

    d.    New York State Common Law.

## NATURE OF RELIEF SOUGHT

38.    The nature of the relief sought is as follows:

    a.    Plaintiffs seek declaratory Judgment as follows:

        1) A declaration that State Farm's Special Investigative Unit is illegal in that its investigators do not meet the minimum qualifications as set forth by 11 NYCRR 86.6(c). Furthermore the above has been true for six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

        2) A declaration that the One Beacon Group's Special Investigative Unit is illegal in that its investigators do not meet the minimum qualifications as set forth by 11 NYCRR 86.6(c). Furthermore the above has been true for six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

        3) A declaration that each and every denial of claim form (NF-10) issued by State Farm that is based in whole or in part upon information obtained by State Farm's SIU and/or the One Beacon's Group SIU be deemed null and void. Furthermore that the above is

- 9 -

true for six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

4) A declaration that each and every denial of claim form (NF-10) issued by the One Beacon Group that is based in whole or in part upon information obtained by State Farm's SIU and/or the One Beacon Group's SIU be deemed null and void. Furthermore that the above is true for six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

5) A Declaration that State Farm is in violation of the following laws and has been in violation of the following laws since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied:

    (i)    Insurance Law § 5106 "Fair claims settlement", subsection (a).

    (ii)    11 NYCRR §65-3.2 "Claim practice principles to be followed by all insurers" subsection (a).

    (iii)    11 NYCRR §65-3.2 "Claim practice principles to be followed by all insurers" subsection (b).

    (iv)    11 NYCRR §65-3.2 "Claim practice principles to be followed by all insurers" subsection (c).

    (v)    11 NYCRR §65-3.2 "Claim practice principles to be followed by all insurers" subsection (e).

    (vi)    11 NYCRR §65-3.5 "Claim procedure", subsection (e).

    (vii)    11 NYCRR §65-3.11 "Direct payments", subsection (a).

    (viii)    11 NYCRR §86.6(a).

    (ix)    11 NYCRR §86.6(b) subsections 1-7, 9.

    (x)    11 NYCRR §86.6(c).

    (xi)    11 NYCRR §86.6(d).

    (xii)    NY Comp Codes R. & Regs. Tit. 11 Part 216 (Regulation 64) 216.0(a) preamble.

    (xiii)    Insurance Law Section 2601(a) (4) Acts that constitute unfair claims settlement practices.

6) Declaration that One Beacon Group is in violation of the following laws and has been in violation of the following laws since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied:

    (i)    Insurance Law § 5106 "Fair claims settlement", subsection (a).

    (ii)    11 NYCRR §65-3.2 "Claim practice principles to be followed by all insurers" subsection (a).

- 10 -

(iii)   11 NYCRR §65-3.2 "Claim practice principles to be followed by all insurers" subsection (b).

(iv)   11 NYCRR §65-3.2 "Claim practice principles to be followed by all insurers" subsection (c).

(v)   11 NYCRR §65-3.2 "Claim practice principles to be followed by all insurers" subsection (e).

(vi)   11 NYCRR §65-3.5 "Claim procedure", subsection (e).

(vii)   11 NYCRR §65-3.11 "Direct payments", subsection (a).

(viii)   11 NYCRR §86.6(a).

(ix)   11 NYCRR §86.6(b) subsections 1-7, 9.

(x)   11 NYCRR §86.6(c).

(xi)   11 NYCRR §86.6(d).

(xii)   NY Comp Codes R. & NY Regs. Tit. 11 Part 216 (Regulation 64) 216.0(a) preamble.

(xiii)   Insurance Law Section 2601(a) (4) Acts that constitute unfair claims settlement practices.

(xiv)   NY Ins. Law Section 1303

7)   A Declaration that State Farm is in violation of General Business Law Section 349. Furthermore that the above is true for six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

8)   A Declaration that One Beacon Group is in violation of General Business Law Section 349. Furthermore that the above is true for six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

9)   A declaration that McDonnell & Adels' conduct in representing the above insurance companies is in violation of Section 487 of the New York Judiciary Law. Furthermore that the above is true for two years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

10) A declaration that McDonnell & Adels has violated and will continue to violate 22 N.Y.C.R.R. 1200.36(a) [DR-7-105].

11) A declaration that McDonnell & Adels has violated and will continue to violate 22 N.Y.C.R.R. §1200.35(a) (1) [DR 7-104].

12) A declaration that McDonnell & Adels has violated and will continue to violate 22 N.Y.C.R.R. §1200.35(a) (2) [DR 7-104].

13) A declaration that McDonnell & Adels has violated and will continue to violate 22 N.Y.C.R.R. §1200.33(a) (4-8) [DR 7-102].

14) A declaration that McDonnell & Adels has and will continue to violate 22 N.Y.C.R.R. §1200.33(b) (1-2) [DR 7-102].

15) A declaration that McDonnell & Adels, has and will continue to violate 22 N.Y.C.R.R. §1200.40(c) [DR 7-109].

16) A declaration that Melli Guerin & Wall's conduct in representing the above insurance companies is in violation of Section 487 of the New York Judiciary Law. Furthermore that the above is true for six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

17) A declaration that the NICB is in violation of Article 7 of the New York General Business Law. Furthermore that the above is true for six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

18) A Declaration that State Farm is in violation of the following laws and has been in violation of the following laws since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied:

   i)    Penal Law Section 200.03 Bribery in the second degree.
   ii)   Penal Law Section 200.00 Bribery in the third degree.
   iii)  Penal Law Section 200.20 Rewarding official misconduct in the second degree.
   iv)   Penal Law Section 200.30 Giving unlawful gratuities.

Or, in the alternative:

   v)    A Declaration that State Farm improperly influenced the Suffolk County DA's conduct in Operation BORIS by causing said DA to investigate, arrest, indict and prosecute individuals and corporations. Said improper influence was accomplished by monetarily rewarding the Suffolk County DA for its investigation, arrests, indictments and prosecution thereby creating justification for denials. Said improper influence violates: Insurance Law § 5106 "Fair claims settlement", subsection (a); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (a); 11 NYCRR 65 65-3.2 "Claim

- 12 -

practice principles to be followed by all insurers" subsection (b); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (c); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (e); 11 NYCRR 65 65-3.5 "Claim procedure", subsection (e); 11 NYCRR 65 65-3.11 "Direct payments", subsection (a); 11 NYCRR 86.6(a); 11 NYCRR 86.6(b) subsections 1-7, 9; 11 NYCRR 86.6(d)

19) A Declaration that the NICB is in violation of the following laws and has been in violation of the following laws since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied:

    i)     Penal Law Section 200.03 Bribery in the second degree.

    ii)     Penal Law Section 200.00 Bribery in the third degree.

    iii)     Penal Law Section 200.20 Rewarding official misconduct in the second degree.

    iv)     Penal Law Section 200.30 Giving unlawful gratuities.

Or, in the alternative:

    v)     A Declaration that the NICB improperly influenced the Suffolk County DA's conduct in Operation BORIS by causing said DA to investigate, arrest, indict and prosecute individuals and corporations. Said improper influence was accomplished by monetarily rewarding the Suffolk County DA for its investigation, arrests, indictments and prosecution thereby creating justification for denials. Said improper influence assisted the Insurance Company defendants in violating: Insurance Law § 5106 "Fair claims settlement", subsection (a); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (a); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (b); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (c); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all

insurers" subsection (e); 11 NYCRR 65 65-3.5 "Claim procedure", subsection (e); 11 NYCRR 65 65-3.11 "Direct payments", subsection (a); 11 NYCRR 86.6(a); 11 NYCRR 86.6(b) subsections 1-7, 9; 11 NYCRR 86.6(d)

b.    Plaintiff seeks an Order pursuant to CPLR §7803(1) compelling the Insurance Department to audit and investigate the claims practices of the Insurance Company Defendants and take all appropriate action to remedy any and all infirmities, deficiencies and misconduct as enjoined upon the Insurance Department pursuant to Law.

c.    Plaintiffs Seeks a Permanent Injunction Enjoining and Restraining the Insurance Company Defendants' SIU "Investigators" that are not Qualified Under the Law From Engaging in any and all Investigative Activity Unless and Until Properly Qualified.

d.    Plaintiffs seek a permanent injunction enjoining and restraining all the Defendants, and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the Insurance Company Defendants' Special Investigative Units.

e.    Plaintiffs seeks a permanent injunction enjoining and restraining NICB "Agents" and/or "Investigators" from engaging in any and all investigative activity unless and until properly licensed by the State of New York as required by law.

f.    Plaintiffs Seeks a permanent injunction enjoining and restraining all the Defendants, and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the Suffolk County DA or the "Suffolk County Task Force" associated with Operation BORIS.

g.    Plaintiffs seek a Permanent Injunction Enjoining and Restraining All the Defendants, including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall P.C., and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the unethical activities of McDonnell & Adels P.C.

h.    Plaintiffs seek a Permanent Injunction enjoining and restraining all the Defendants, including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall P.C., and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the unlicensed NICB "Special Agents."

- 14 -

# THE PARTIES

### Plaintiffs

39.  AVA Acupuncture P.C. is a professional corporation duly existing under the laws of the State of New York, having its principal place of business in the State of New York.

40.  Okslen Acupuncture P.C. is a professional corporation duly existing under the laws of the State of New York, having its principal place of business in the State of New York.

41.  Kings County Acupuncture P.C. is a professional corporation duly existing under the laws of the State of New York, having its principal place of business in the State of New York.

42.  Model Supply Inc. is a corporation duly existing under the laws of the State of New York, having its principal place of business in the State of New York.

### Defendants

43.  State Farm's home office is located at 1 State Farm Plaza Bloomington, IL 61710-0001. State Farm is literally everywhere doing tremendous business in New York State and the City of New York.  One of the leading US personal lines property/casualty companies (by premiums), State Farm Mutual Automobile Insurance Company is possibly the number one provider of auto insurance.  It also is one of the leading home insurers and offers non-medical health and life insurance through its subsidiary companies. Its products are marketed via some 17,000 agents in the US and Canada. State Farm's efforts to diversify include a federal savings bank charter (State Farm Bank) that offers consumer and business loans through its agents and by phone, mail, and the Internet.  State Farm Mutual Automobile Insurance Company is not registered with the New York State Department of State although it maintains offices in every county of the City of New York including New York County.  A subsidiary, State Farm VP Management Corp., has designated 80 State Street, Albany, New York 11207-2543 as its address for service of process.

- 15 -

44. Technically General Assurance is domiciled in New York State, although it can not be found registered with the New York State Department of State. Until very recently General and AutoOne shared space along with in house counsel for both – the Law Offices of Jeena Belil – at 201 Old Country Road, Melville New York 11747. However, General Assurance has no employees or facilities of its own. Indeed attorneys working at the Law Offices of Jeena Belil which unregistered entity represented both AutoOne and General were paid by One Beacon. All services necessary for the conduct of the company's business are provided for in the amended and restated reinsurance pooling agreement and performed by local pool leader One Beacon. General is wholly owned by One Beacon. One Beacon is in turn owned by White Mountain Insurance Group LTD a vast holding company domiciled in Bermuda. Indeed General's Board of Directors is comprised primarily of persons whose principal business affiliation is with One Beacon. One Beacon is a Pennsylvania Corporation. General does a large volume of business in New York State, the City and County of New York.

45. AutoOne's **Corporate Headquarters** is listed as P.O. Box 9027, Melville, N.Y. 11747 with a telephone number of 631-547-2000. However the joint physical offices that were shared by AutoOne and General in Melville New York appear to be abandoned. Phone calls made to AutoOne and General to determine where to serve process has been rebuffed with the call answerers refusing to give said information or hanging up. AutoOne's pre-recorded message states that the company's address is PO Box 50, Syracuse, NY 13214. Further inquiry including a search of the building finally located AutoOne who appears to be hiding in a different smaller space. They refuse to open their door. Once in a while an employee who can be viewed through thick glass will point to a phone which may be utilized to call into the office. Usually someone will answer the phone and inquire as to your business and finally come to the door. AutoOne is

wholly owned controlled and staffed by One Beacon in the same manner as General. AutoOne transacts a large amount of business in New York State, New York City and New York County in the Assigned Risk Pool. However, said pool is rapidly shrinking severely damaging AutoOne's profits and its future. This is causing said company to deny virtually all claims, to refuse to pay judgments, as well as causing said company to under fund its reserves. The New York State Department of State Division of Corporations website which is designated as the resource to be utilized by the public to determine both foreign and New York State Corporations residence contains no information with regard to AutoOne. However, there is a listing for AutoOne Insurance Agency, Inc. at 201 Old Country Road, Melville, New York. AutoOne Insurance Agency, Inc. lists Paul F. DiFrancesco as its CEO a post that he also holds for AutoOne Insurance Company.

46. One Beacon is a Bermuda based company with its headquarters located at in the Bank of Butterfield Building, 42 Reid Street, 6th Floor, Hamilton, Bermuda, with its principal executive offices located at 601 Carlson Parkway, Minnetonka, Minnesota and its U.S. Headquarters located at 1 Beacon Lane, Canton, Massachusetts. One Beacon transacts a large amount of business both through its massive web of subsidiaries and on its own in the State and City of New York as well as in the County of New York. A One Beacon corporation – One Beacon Risk Management, Inc. – lists as its process address C T Corporation System, 111 Eight Avenue, New York, New York. General and AutoOne are but barely cognizable corporate fictions of One Beacon all of which entities have nebulous residencies and are part of the nebulous White Mountain Group.

47. McDonnell & Adels is a New York State Professional Corporation with its offices located at 401 Franklin Avenue, Garden City, New York. McDonnell & Adels heavily utilizes the

Insurance Defendants' illegal SIU especially State Farm's SIU. McDonnell & Adels has been repeatedly warned that the insurance defendant's SIU is illegal. McDonnell & Adels transacts a large amount of business in the State, County and City of New York.

48. Katten Muchin Rosenman LLP is an Illinois limited liability partnership that has elected to be governed by the Illinois Uniform Partnership Act (1997). Katten maintains offices in New York State at 575 Madison Avenue, New York, New York 10022-2585. Katten primarily brings RICO type litigation on behalf of State Farm in Federal Courts located in the Eastern and Southern Districts of New York. Katten attorney Ross O. Silverman is the chair of the litigation department that handles such litigation. Katten's web site boasts that this team has ten former federal prosecutors on their roster. This does not include a former state prosecutor, one Jay Shapiro. Shortly after his departure from the Kings County District Attorney's Office, Shapiro became Counsel to the NICB's New York Office. Shapiro assisted in the ill-fated BORIS Investigation, which will be detailed infra, even being officially deputized by the Suffolk County District Attorney's Office. Amongst other things, Silverman and another attorney with Katten utilized a former Suffolk County Assistant District Attorney to obtain information from individuals that the former prosecutor had prosecuted and then developed into a confidential informant. This included an introduction from the former Suffolk County Prosecutor to at least one of the individuals which the prosecutor had arranged on behalf of Katten and which occurred in Florida. Katten maintains close ties to the NICB and heavily utilizes State Farm's infirm SIU.

49. Rivkin Radler LLP is a New York partnership with offices at 926 RexCorp Plaza, Uniondale, New York 11556-0926; 555 Madison Avenue, 26th Floor, New York, New York 10022; and Court Plaza South, First Floor, West Wing, 21 Main Street Hackensack, New Jersey 07601. Rivkin maintains a close relationship with State Farm through attorneys Barry

- 18 -

Levy, Michael Sirignanao and others and utilizes material and affidavits provided by State

Farm's illegal SIU in claims verification as well as litigation throughout the State of New York.

50. Iseman Cunningham Riester & Hyde LLP is a New York based partnership with offices at

2649 South Road, Poughkeepsie, NY 12601. Iseman utilizes material generated by State Farm's

SIU in the conducting of relentless and harassing Examinations Under Oath.

51. Melli Guerin & Wall P.C. is a foreign corporation that has offices at 17 Battery Place, Suite

626, New York, New York 10004. Melli heavily relies upon the so called findings and affidavits

of State Farm's illegal SIU in litigating cases on behalf of State Farm throughout the New York

City Civil Courts. Melli has been repeatedly warned that State Farm's SIU is illegal.

52. The New York State Insurance Department is headquartered at One Commerce Plaza,

Albany, New York 12257. The Insurance Department maintains offices in New York City

located at 25 Beaver Street, New York, NY 10004.

53. The NICB is a foreign corporation with offices in Nassau County and a Department of State

process service address of 875 Avenue of the Americas, New York, NY 10001.

## JURISDICTION AND VENUE

54. Venue is appropriate in New York County pursuant to Sections 503(a) and 503(c) in that

certain defendants reside in New York County and others are deemed to reside in New York

County. Venue is also proper for the Insurance Department pursuant to Section 506(a) of the

CPLR.

55. Jurisdiction lies pursuant to CPLR Sections 3001 and 7803(1). Jurisdiction over foreign

entities lies pursuant to Section 302(a) of the New York Civil Practice Law and Rules since the

parties transact business within the County and State of New York and regularly do or solicit

business and derive substantial revenue from the County and State of New York.

- 19 -

## CLASS ALLEGATIONS

**Class Definition**

56. The named Plaintiffs sue on behalf of themselves and all other persons similarly situated, pursuant to CPLR Section 901.

57. The class represented by the named Plaintiffs consists of all claimants and their medical providers/assignees that have submitted, or will submit, No-Fault insurance claims to the Insurance Company Defendants and which claims and entities were subjected to the conduct of the Defendants as enumerated within these pleadings. In summary, said conduct consisting of institutional and wholesale bad faith in violation of a multiplicity of New York State Laws including the utilization of unqualified and illegal SIU, harassing and abusive verification and litigation tactics, the use of preset numerical targets to limit claim payouts, the failure to file certain documents with Department of Insurance, the hijacking of law enforcement to improperly investigate claimants and medical providers and/or subjecting claimants/medical providers to investigation by individuals who are not licensed to perform such activities.

**Numerosity and Impracticality of Joinder**

58. The putative Class is so numerous that it is impracticable to bring all of its members before the Court. The named Plaintiffs allege that there are thousands of Class Members, in that almost every no-fault claimant and medical provider who have had their claims denied by the Insurance Company Defendants' illegal SIU have had their respective rights aggrieved. Likewise, the number of claimants and medical providers investigated directly or indirectly by the Insurance Company Defendants' illegal SIUs numbers in the thousands. In addition, the number of claimants and claims illegally investigated directly or indirectly by the NICB also numbers in the thousands.

- 20 -

59. The exact number of Class Members who have been victimized by the enumerated conduct can only be determined from discovery and review of Defendants' records.

**Common Questions of Law and Fact**

60. This action consists in the main of allegations that the Defendants violated certain enumerated statutory obligations thereby causing class wide injury which in turn creates class wide legal rights, the necessity of injunctive relief and oversight by the Insurance Department. In the main this action asks for Declaratory Relief. Moreover all non Declaratory Judgment Relief sought is based upon the Declaratory Judgment causes of action

61. Simply put the only question of law or fact is whether the Defendants have violated certain enumerated statutory obligations and a multiplicity of New York State Laws and whether Defendants should be enjoined from further violations of said statutory obligations and laws, and the propriety of oversight by the Insurance Department. Therefore, nothing that a named Plaintiff or a Class Member did not, did, or will do, or allegedly did not, did, or will do, has any bearing on the issues raised herein.

62. Concerning commonality, given this action seeks declarations and related injunctive relief as to whether the Defendants violated and continue to violate certain laws to the detriment of all members of the class, the commonality issue is a given.

**The Claims of the Representative Parties are Typical of the Claims of the Class**

63. The claims of the Representative Parties are identical to the Class Members.

64. As already discussed, the various claims are based upon violations of laws by conduct committed wholly and solely by the Defendants in which the specific conduct and circumstance of each named Plaintiff and Class Members plays no role whatsoever. There is no situational difference between the named Plaintiffs and the Class Members pertaining to this action. This

point is enhanced by the fact that monetary damages are not being sought, but rather, only declaratory relief, injunction and mandamus.

65. Individual members of the class would likely prepare, present and argue the case in the same way that the named Plaintiffs are doing. However, said Class Members do not have the resources or knowledge to do such.

**Adequacy of Representation: Protection of the Interests of the Class**

66. The named Plaintiffs will fairly and accurately protect and represent the interest of the Plaintiffs' Class. The interests of the named Plaintiffs are coincidental with, and not antagonistic to, those of the putative Class.

67. As the Plaintiffs' and putative Class' interest are identical, there can be no conflicts between the named Plaintiffs and Class Members. An illustrative analogy would be a class action for the enforcement of laws pertaining to clean drinking water – there is no possible conflict between a class representative in such a case – say a household – and class members – say members of the community in the affected area. The same is true in this action.

68. There can be no rational Class Members who do not prefer enforcement of the subject laws.

69. The named Plaintiffs will vigorously prosecute this action. The named Plaintiffs all have a large stake in the outcome of this case in that they have a large amount of active claims against the Insurance Company Defendants, have been "investigated" by the illegal SIUs, have had their claims denied based upon the so-called investigations of the illegal SIUs, have come under scrutiny by the illegal investigators of the NICB, have been victimized by Operation BORIS, have been the subject of harassing demands for additional verification, have been forced to engage in needless litigation, and have had their claims denied based upon their designation as

"no pay" claimants in order for the Insurance Company Defendants to meet or come in below preset numerical payout quotas.

70. There can be no settlement of this case given the nature of the relief sought and not sought – namely no monetary damages are being sought. As such, the named Plaintiffs must take this case through trial unless the Defendant's voluntarily give up their illegal practices. The corrupting influence of money to settle this case at the expense of the Class Members will never be an issue since no money is being demanded. The named Plaintiffs and the Defendants are figuratively locked in a cage until the outcome.

71. The Plaintiffs quite easily have the means to prosecute this action since according to the law there is no notice requirement for this type of relief in a class action. (See CPLR Section 904(a))

72. The named Plaintiffs only receive benefit if the requested relief is received or if the Defendants voluntarily agree to remedy their own behavior. There is therefore little, if any, incentive for the named Plaintiffs to seek a resolution that does not benefit the class as a whole.

73. This action will be counsel's first class action. Firms that have brought hundreds of class actions all started with their first.

74. Plaintiffs' counsel was admitted to practice law in New York in 1997 under Registration Number 3976198, and is in good standing with the Bar. Plaintiffs' counsel is very well experienced in the field of insurance law and specifically the subject matters of this action. Lead counsel's first experience in the insurance field actually occurred as in house counsel to MetLife wherein counsel handled legal aspects of the company's Long Term Care, Dental and Disability products.

75. Lead counsel's first experience with No-Fault came as a Prosecutor in the Kings County District Attorney's Office wherein counsel, inter alia, prosecuted and investigated No-Fault

insurance fraud. In this capacity, counsel worked with various insurance company SIUs inasmuch as they were representatives of victim insurance companies. Counsel also communicated with, met with and received information from the NICB. Lead counsel also learned the relevant insurance laws and regulations as well as various provisions of the penal code. In addition, lead counsel became well versed in the duties of a prosecutor and the proper role of entities such as insurance company SIUs and the NICB in the investigation and prosecution of possible and alleged insurance fraud. For example, before counsel shared information with the NICB and certain SIUs, counsel screened said individuals and then applied for and received a signed Share Order from the Supreme Court of Kings County.

76. Counsel then moved on to an executive position – Special Counsel -- with the Robert Plan Corporation, which corporation was a third party administrator to various insurance companies. Lead counsel formed and led a specialized unit at the Robert Plan called the Special Litigation Unit wherein counsel created and implemented various programs to combat suspected insurance fraud. In this position lead counsel also provided legal advice, strategies and tactics to in-house counsel responsible for the litigation of No Fault cases in various Courts. Lead counsel's role expanded to compliance/internal investigations into the activity of the various insurance companies and the Robert Plan in order to remedy various legal deficiencies that had been disclosed in various litigations against said entities. Counsel became familiar with the rules and laws regarding requests for addition verifications such as EUOs, documentation, clinic inspections, etc. Counsel learned the laws and rules and also engaged in the above activities or supervised same. In addition, lead counsel also advised and worked with the Robert Plan's SIU Department.

77. After the Robert Plan Corp lead counsel began to prosecute no-fault claims against insurance carriers including the Insurance Company Defendants on behalf of claimants and medical providers. Counsel also successfully defended a lawsuit brought by AIG and a host of other companies in the Supreme Court, Nassau County, against a law firm that worked primarily in the prosecution of No-Fault litigation against insurance companies.

78. Lead counsel has also engaged in ongoing complex plaintiff's litigation involving insurance law, RICO and the common law in the Supreme Court of New York County.

79. Lead counsel lectured to various law enforcement entities including the FBI, IRS, NYPD, the New York City Department of Finance, the New York State Department of Taxation, the Attorney General's Office, various insurance company SIUs and other entities on the subject of insurance fraud and related areas.

80. Finally, lead counsel also assisted the City Council of New York in the creation of Local Law No. 11, the so called "runner's bill" which prohibited the paying of individuals by medical facilities for patient referrals. Lead counsel provided information and testimony.

## A Class Action is Superior to Other Available Methods for the Fair and Efficient Adjudication of the Controversy

81. A class action is superior to other available methods for the fair and efficient adjudication of this matter. Upon solid information and belief there are no other actions pending or even contemplated that are similar to this action. This is due to the fact that the information upon which the action is based is not widely known outside the inner circle of the Defendants. In fact, this information was obtained from what could be termed "former industry insiders."

82. Moreover, as a result of the above, most of the class is unaware that they have been aggrieved. Thus, this action is the only way that the Class Members may obtain relief.

83. Furthermore, as a general matter, denied No-Fault Claims are litigated in the New York City Civil Court or various District Courts with a much smaller percentage litigated in arbitrations. Declaratory judgment cannot be sought in such venues. Moreover, the monetary value of these cases are quite small – a few hundred dollars to a few thousand dollars.

84. As a result of all of the above, individual litigation is impracticable if not impossible. Moreover, the number of aggrieved individuals is massive.

85. This case is infinitely manageable. It is based upon New York State Statutory law, the conduct of the Defendants and nothing else. Any inquiry into the individual named Plaintiffs or Class Members is inherently irrelevant. As such, the matter is simple.

86. The resolution of this case could settle issues of law that will directly affect a multitude of civil court/district court litigations wherein such relief could not be received. The New York City Civil Court and increasingly district courts are being inundated with No-Fault litigation. The declarations sought in the instant action if granted would eliminate much of this litigation. This is especially true of cases involving the Insurance Defendants' illegal SIUs of which there are literally thousands of said cases.

87. Moreover, enjoining and preventing further violations of the various laws will prevent further litigation.

88. All of the above can be achieved through a focused streamlined discovery process in this case, which makes this action extremely efficient.

89. There are no questions of law or fact that affect only individual members. As stated, that is why the Plaintiffs are not even seeking monetary damages in this action. Rather the decisions in this action will allow both the named Plaintiffs and the Class Members to seek their individual

damages with the bulk of litigation already concluded by this matter creating force multiplying efficiency.

90.  A non-class action could still have collateral estoppel effect for all.  However, the issue of collateral estoppel would still be one that the Insurance Company Defendants and their counsel would force Class Members to litigate.  Specifically, amongst other arguments, the Insurance Company Defendants would argue that said decision did not meet the element of identity of parties.  A decision in a Class Action Suit would eliminate any such ambiguity and many others.

91.  Most importantly, only a Class Action would support the breadth and depth of discovery needed to ascertain how broad and pervasive the Defendants' misconduct is and to tailor a proper remedy by the Insurance Department or the Court.  Specifically, a finding that the Defendants – especially the Insurance Company Defendants – perpetrated the alleged misconduct solely as it pertains to the named Plaintiffs would not have the breadth, size and scope to legitimately support a declaration that the Insurance Company Defendants engage in said misconduct on a pervasive institutional wide basis.  Said allegation – insurance company misconduct on a pervasive institutional wide basis – is the heart of this action and the evil that this action intends to remedy.

## THE RELEVANT LAW

92.  Under *New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law § 5101, et seq.*) and Regulation No. 68 (*11 N.Y.C.R.R. § 65, et seq.*) (collectively referred to herein as "the No-Fault law"), the regulations promulgated pursuant thereto, automobile insurers are required to pay up to $50,000 per eligible injured person ("EIP") for, inter alia, necessary expenses incurred for various health care services that result from injuries sustained in an automobile accident.

93. *Insurance Law § 5106. "Fair claims settlement"* states the following:

> (a) Payments of first party benefits and additional first party benefits shall be made as the loss is incurred. Such benefits are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained. If proof is not supplied as to the entire claim, the amount which is supported by proof is overdue if not paid within thirty days after such proof is supplied. All overdue payments shall bear interest at the rate of two percent per month. If a valid claim or portion was overdue, the claimant shall also be entitled to recover his attorney's reasonable fee, for services necessarily performed in connection with securing payment of the overdue claim, subject to limitations promulgated by the superintendent in regulations.

94. *11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers"* states the following, in relevant part:

> (a) Have as your basic goal the prompt and fair payment to all automobile accident victims.
>
> (b) Assist the applicant in the processing of a claim. Do not treat the applicant as an adversary.
>
> (c) Do not demand verification of facts unless there are good reasons to do so. When verification of facts is necessary, it should be done as expeditiously as possible.
>
> ***
>
> (g) Every insurer shall distribute copies of this regulation to every person directly responsible to it for the handling and settlement of claims for first-party benefits, and every insurer shall satisfy itself that all such personnel are thoroughly conversant with this regulation.

95. *11 NYCRR 65-3.5 "Claim procedure"* states in relevant part:

> (e) All examinations under oath and medical examinations requested by the insurer shall be held at a place and time reasonably convenient to the applicant and medical examinations shall be conducted in a facility properly equipped for the performance of the medical examination. The insurer shall inform the applicant at the time the examination is scheduled that the applicant will be reimbursed for any loss of earnings and reasonable transportation expenses incurred in complying with the request. When an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination. Insurer standards shall be available for review by Department examiners.

- 28 -

96. 11 NYCRR *65-3.11 "Direct payments"* provides:

> (a) An insurer shall pay benefits for any element of loss, other than death benefits, directly to the applicant or, when appropriate, to the applicant's parent or legal guardian or to any person legally responsible for necessities, or, upon assignment by the applicant or any of the aforementioned persons, shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law, or to the applicant's employer for loss of earnings from work as authorized under section five thousand one hundred two(a)(2) of the Insurance Law. Death benefits shall be paid to the estate of the eligible injured person.

97. *"NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO INSURANCE FRAUDS BUREAU; REQUIRED WARNING STATEMENTS"* provides in relevant part:

> Section 86.5 is hereby amended to read as follows:
>
> §86.5 Reports of fraudulent acts.
>
> Any person licensed pursuant to the provisions of the Insurance Law who determines that an insurance transaction or purported insurance transaction appears to be fraudulent or suspect shall submit a report thereon to the Insurance Frauds Bureau. Reports shall be submitted on the prescribed reporting form [(IFB-1) contained in this section or upon the form developed by the United States Department of Justice upon a determination that a matter is suspect. The forms annexed hereto are hereby approved for use as specified in this Part] issued by the Insurance Frauds Bureau or upon any other form approved by order of the superintendent. Reporting may also be done by means of any electronic medium or system approved by order of the superintendent.

98. Also:

> Section 86.6 is hereby renumbered to 86.7, and a new section 86.6 is hereby enacted to read as follows:
>
> §86.6 Fraud prevention plans and special investigation units.
>
> a) Every insurer writing private or commercial automobile insurance, workers' compensation insurance, or individual, group or blanket accident and health insurance policies issued or issued for delivery in this state, which writes three thousand or more of such policies in any given year, or in the case of policies issued on a group basis, provides insurance coverage for three thousand or more individuals in any given year, shall develop and file with the superintendent a plan for the

- 29 -

detection, investigation and prevention of fraudulent insurance activities in this state and those fraudulent insurance activities affecting policies issued or issued for delivery in this state. Notwithstanding the foregoing, insurers writing only reinsurance contracts shall not be required to comply with the provisions of this section.

99. Most relevant to this action is the following sections of the above *amended Regulation 95*

(*11 NYCRR 86*):

    b)       The plan shall include the following provisions:

    (1)      Establishment of a full time Special Investigations Unit separate from the underwriting or claims functions of the insurer, which shall be responsible for investigation of cases of suspected fraudulent activity and for implementation of the insurer's fraud prevention and reduction activities under the Fraud Prevention Plan. In the alternative the insurer may contract with a provider of services to perform all or part of this function, but shall remain primarily responsible for the development and implementation of its Fraud Prevention Plan. The agreement under which such services are provided shall be filed with the Insurance Frauds Bureau as part of the Fraud Prevention Plan, and must provide for specified levels of staffing devoted to the investigation of suspected fraudulent claims. In the event that investigators employed by a provider of services will be working for more than one insurer or on cases in states other than New York, the plan must apportion the percentage of the investigator's efforts which will be devoted to working for the insurer on its New York cases. The agreement shall also require that the provider of services cooperate fully with the Department of Insurance in any examination of the implementation of the Fraud Prevention Plan, and provide any and all assistance requested by the Insurance Frauds Bureau, any other law enforcement agency or any prosecutorial agency in the investigation and prosecution of insurance fraud and related crimes.

    (2)      A description of the organization of the Special Investigations Unit, including the titles and job descriptions of the various investigators and investigative supervisors, the minimum qualifications for employment in these positions in addition to those required by this regulation, the geographical location and assigned territory of each investigator and investigative supervisor, the support staff and other physical resources, including database access available to the Unit and the supervisory and reporting structure within the Unit and between the Unit and the general management of the insurer. If investigators employed by the Unit will be responsible for investigating cases in more than one State, the plan must apportion that percentage of the investigators' efforts which will be devoted to New York cases.

(3)    The rationale for the level of staffing and resources being provided for the Special Investigations Unit which may include, but is not limited to the following objective criteria such as number of policies written and individuals insured in New York, number of claims received with respect to New York insureds on an annual basis, volume of suspected fraudulent New York claims currently being detected, other factors relating to the vulnerability of the insurer to fraud, and an assessment of optimal caseload which can be handled by an investigator on an annual basis.

(4)    A description of the relationship between the Special Investigations Unit and the claims and underwriting functions of the insurer, including procedures for detecting possible fraud, criteria for referral of a case to the Unit for evaluation, and the designation of the individuals authorized to make such a referral; and a description of the relationship between the Unit and the Insurance Frauds Bureau, other law enforcement agencies and prosecutors, including procedures for case investigation, detection of patterns of repetitive fraud involving one or more insurers, criteria for referral of a case to the Insurance Frauds Bureau, designation of the individuals authorized to make such referrals, and a policy to avoid duplication of effort due to concurrent referrals by the Unit to more than one law enforcement agency.

(5)    Provision for the reporting of fraud data to a data collection firm to be designated by the Superintendent.

(6)    Provision for in-service training programs for investigative, underwriting and claims personnel in identifying and evaluating instances of suspected insurance fraud, including an introductory training session and periodic refresher sessions. This description shall include course descriptions, the approximate number of hours to be devoted to these sessions and their frequency.

(7)    Provision for coordination with other units of the insurer to further fraud investigations, including a periodic review of claims and underwriting procedures and forms for the purpose of enhancing the ability of the insurer to detect fraud and to increase the likelihood of its successful prosecution, and for initiation of civil actions where appropriate.

(8)    Development of a public awareness program focused on the cost and frequency of insurance fraud, and methods by which the public can prevent it.

(9)    Development of a fraud detection and procedures manual for use by underwriting, claims and investigative personnel.

- 31 -

(10) Timetable for the implementation of the Fraud Prevention Plan, provided however, that the period of implementation shall not exceed six months from the date the Plan is approved.

100. One of the most important provisions of above *amended Regulation 95 (11 NYCRR 86)* to the instant action is subdivision "c" which immediately follows the above quoted subdivision "b" as part of Section 86.6. Subdivision "c" states in full:

> Persons employed by Special Investigations Units as investigators or by an independent provider of investigative services under contract with an insurer shall be qualified by education and/or experience which shall include a bachelor's degree in criminal justice or a related field, or a bachelor's degree and four years of insurance claims investigation experience, or five years of professional investigation experience with law enforcement agencies, or a bachelor's degree and seven years of professional investigation experience involving economic or insurance related matters. For the purposes of evaluation of medical related claims insurers may employ or retain duly licensed or authorized medical professionals. Notwithstanding these minimum requirements anyone employed as an investigator in a special investigation unit or by a provider of investigative services under contract to an insurer as of the effective date of this amendment and who was also so employed on or before September 10, 1996 may continue in such employment provided the insurer identifies such person in writing to the superintendent giving the date such employment began and a description of the person's qualifications, employment history and current job duties.

101. Finally section "d", among other cited to portions of the No-Fault law, demonstrates the Superintendent of Insurance/New York State Insurance Department's obligation to prevent fraud and potential abuse by insurers of the Insurance Regulations designed to combat fraud.

> Every insurer required to file a fraud prevention plan shall file an annual report with the Insurance Frauds Bureau no later than January 15 of each year on a form approved by the superintendent, describing the insurer's experience, performance and cost effectiveness in implementing the plan and its proposals for modifications to the plan to amend its operations, to improve performance or to remedy observed deficiencies. The report shall be reviewed and signed by an executive officer of the insurer responsible for the operations of the Special Investigations Unit.

102. No-fault is intended to secure the prompt payment of bills for injuries resulting from a motor vehicle accident. *Montgomery v. Daniles*, 38 NY2d 41 (1975); *Overly v. Bangs Ambulance, Inc.* 96 NY2d 295 (2001).

- 32 -

103. Then there is a powerful combination of laws: *NY Comp Codes R. & Regs. Tit. 11 Part 216 2006 (Regulation 64) 216.0(a) preamble:*

> (a) Section 2601 of the Insurance Law prohibits insurers doing business in this State from engaging in unfair claims settlement practices proscribed by that section without just cause and with such frequency as to indicate a general business practices. This part contains claim practice rules, which insurers must apply to the processing of all first and third party claims arising under policies subject to this part …

> Insurance Law Section 2601(a) (4) Acts that constitute unfair claims settlement practices.

> (a) No insurer doing business in this state shall engage in unfair claim settlement practices. Any of the following acts by an insurer, if committed without just cause and performed with such frequency as to indicate a general business practice, shall constitute unfair claim settlement practices:

>> (4) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear …

104. In addition:

> NY Ins. Law Section 1303

> Every insurer shall … maintain reserves in an amount estimated in the aggregate to provide for the payment of all loses or claims incurred on or prior to the date of statement, whether reported or unreported, which are unpaid as of such date and or which such insurer may be liable, and also reserves in an amount estimated to provide for the expenses of adjustment or settlement of such losses or claims.

105. According to New York General Business Law Section 81, Article 7. Private Investigators, Bail Enforcement Agents and Watch, Guard and Patrol Agencies the following is true: Section 70. Licenses,

Subdivision 1.

> The Department of State shall have the power to issue separate licenses to private investigators …

Subdivision 2.

> No person, firm, company, partnership, limited liability company or corporation shall engage in the business of private investigator … notwithstanding the name or title used in describing such agency or withstanding the fact that other functions and services may also be performed for a fee, hire or reward, without having first obtained from the

department of state a license so to do, as hereinafter provided, for each bureau, agency, sub agency, office and branch office to be owned, conducted, managed or maintained by such person, firm, company, partnership, limited liability company or corporation for the conduct of such business.

Subdivision 3.

No person, firm, company, partnership, limited liability company or corporation shall engage in the business of furnishing or supplying for a fee, hire or any consideration or reward information as to the personal character or activities of any person, firm, company, or corporation, society or association, or any person or group of persons, or as to the character or kind of business and occupation of any person, firm, company or corporation, or own or conduct or maintain a bureau or agency for the above mentioned purposes ... without having first obtained from the department of state, as hereafter provided, a license so to do as private investigator for each such bureau or agency and for each an every sub agency, office or branch office to be owned, conducted, managed or maintained by such persons, firm, limited liability company, partnership or corporation for the conduct of such business ...

Subdivision 4.

Any person, firm, company, partnership or corporation who violates any provision of this section shall be guilty of a class B misdemeanor.

Section 71. Definitions, 1. defines "Private Investigator":

"Private Investigator" shall mean and include the business of private investigator and shall also mean and include, separately or collectively, the making for hire, reward or for any consideration whatsoever, of any investigation, or investigations for the purpose of obtaining information with reference to any of the following matters, notwithstanding the fact that other functions and services may also be performed for fee, hire or reward; crime or wrongs done or threatened against the government of the United States of America or any state or territory of the United States of America; the identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation or character of any person, group of persons, association, organization, society, other groups of persons, firm or corporation; the credibility of witnesses or other persons; the whereabouts of missing persons; the location or recovery of lost or stolen property; the causes and origin of, or responsibility for fires, or libels, or losses, or accidents, or damage or injuries to real or personal property; ...[etc.]

106.   General Business Law Section 349 provides:

### § 349. Deceptive acts and practices unlawful

(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

\*\*\*

(g) This section shall apply to all deceptive acts or practices declared to be unlawful,

- 34 -

whether or not subject to any other law of this state, and shall not supersede, amend or repeal any other law of this state under which the attorney general is authorized to take any action or conduct any inquiry.

(h) In addition to the right of action granted to the attorney general pursuant to this section, any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice, an action to recover his actual damages or fifty dollars, whichever is greater, or both such actions. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff.

107.  According to Judiciary law **§ 487. Misconduct by attorneys** "An attorney or counselor who: 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party … Is guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

108.  The following provisions of the Penal Law are relevant:

**§ 200.03 Bribery in the second degree**

A person is guilty of bribery in the second degree when he confers, or offers or agrees to confer, any benefit valued in excess of ten thousand dollars upon a public servant upon an agreement or understanding that such public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced. Bribery in the second degree is a class C felony.

**§ 200.00 Bribery in the third degree**

A person is guilty of bribery in the third degree when he confers, or offers or agrees to confer, any benefit upon a public servant upon an agreement or understanding that such public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced. Bribery in the third degree is a class D felony.

**§ 200.20 Rewarding official misconduct in the second degree**

A person is guilty of rewarding official misconduct in the second degree when he knowingly confers, or offers or agrees to confer, any benefit upon a public servant for

- 35 -

having violated his duty as a public servant. Rewarding official misconduct in the second degree is a class E felony.

### § 200.30 Giving unlawful gratuities

A person is guilty of giving unlawful gratuities when he knowingly confers, or offers or agrees to confer, any benefit upon a public servant for having engaged in official conduct which he was required or authorized to perform, and for which he was not entitled to any special or additional compensation. Giving unlawful gratuities is a class A misdemeanor.

109. Finally there are the relevant Disciplinary Rules that are applicable to Enforcer Counsel:

### 22 N.Y.C.R.R. 1200.36(a) [DR-7-105].

A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter.

### 22 N.Y.C.R.R. §1200.35(a) (1) [DR 7-104].

During the course of the representation of a client a lawyer shall not: Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so."

### 22 N.Y.C.R.R. §1200.35(a) (2) [DR 7-104].

During the course of the representation of a client a lawyer shall not: Give advice to a party who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such party are or have a reasonable possibility of being in conflict with the interests of the lawyer's client.

### 22 N.Y.C.R.R. §1200.33(a) (4-8) [DR 7-102].

In the representation of a client, a lawyer shall not: … (4) Knowingly use perjured testimony or false evidence; (5) Knowingly make a false statement of law or fact; (6) Participate in the creation or preservation of evidence when the lawyer knows or it is obvious that the evidence is false; (7) Counsel or assist the client in conduct that the lawyer knows to be illegal or fraudulent; (8) Knowingly engage in other illegal conduct or conduct contrary to a disciplinary rule.

### 22 N.Y.C.R.R. §1200.33(b) (1-2) [DR 7-102].

A lawyer who receives information clearly establishing that: (1) The client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon the client to rectify the same, and if the client refuses or is unable to do so, the lawyer shall reveal the fraud to the affected person or tribunal, except when the

- 36 -

information is protected as a confidence or secret; (2) A person other than the client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal.

**22 N.Y.C.R.R. §1200.40(c) [DR 7-109].**

A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his or her testimony or the outcome of the case.

**22 N.Y.C.R.R. §1200.3(a) (1-5, 7) [DR 1-102].**

A lawyer or law firm shall not: (1) Violate a disciplinary rule; (2) Circumvent a disciplinary rule through actions of another; (3) Engage in illegal conduct that adversely reflects on the lawyer's honesty; trust worthiness or fitness as a lawyer; (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; (5) Engage in conduct that is prejudicial to the administration of justice; . . . (7) Engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer.

## STATEMENT OF THE FACTS

## STATE FARM'S ILLEGAL SIU

110. Insurance companies are mandated by law to maintain Special Investigative Units ("SIU") to fight and prevent fraud. (*See e.g.* 11 NYCRR 86.6) The law also demands that members of insurance company SIU Units have certain minimum qualifications.

111. As noted above 11 NYCRR 86.6(c) provides:

Persons employed by Special Investigative Units as investigators ... shall be qualified by education and/or experience, which shall include:

1)    an associate's or bachelor's degree in criminal justice or a related field or;

2)    five years of insurance claims investigation experience or professional investigation experience with law enforcement agencies; or

3) seven years of professional investigation experience involving economic or insurance related matters; or

4) an authorized medical professional to evaluate medical related claims.

112. State Farm's SIU Department is staffed by individuals – so called "investigators" – that primarily worked for State Farm in the capacity of what is commonly termed "claims handlers" or "claims reps" by the industry.

113. The above referenced State Farm SIU "investigators" after demonstrating a propensity to aggressively deny claims based upon alleged fraud were promoted to the position of "investigator" in State Farm's SIU.

114. **Prior to assignment** to the above State Farm SIU the "investigators" do not have an associate's or bachelor's degree in criminal justice or a related field.

115. **Prior to assignment** to the above State Farm SIU the "investigators" do not have professional investigation experience with law enforcement agencies.

116. **Prior to assignment** to the above State Farm SIU the "investigators" do not have five years of insurance claims investigation experience.

117. **Prior to assignment** to the above State Farm SIU the "investigators" do not have seven years of professional investigation experience involving economic or insurance related matters.

118. **Prior to assignment** to the above State Farm SIU the "investigators" are not medical professionals.

119. State Farm SIU "investigators" attend seminars, view videotapes and read material disseminated by State Farm and other entities including the NICB.

120. The vast majority of the above referenced activities (Paragraph 119) occur after an individual is made an "investigator" in State Farm's SIU.

121. In any event the above referenced activities (Paragraph 119) do not constitute "experience" as contained in *11 NYCRR 86.6(c)*.

- 38 -

122. The above referenced activities (Paragraph 119) do not constitute credits/hours toward an associate's or bachelor's degree in criminal justice or a related field.

123. State Farm "claims handlers" and/or "claims reps" a.k.a. "claims representatives" do not gain real investigative experience in the performance of their jobs.

124. State Farm "claims handlers" and/or "claims reps" a.k.a. "claims representatives" primarily process claims which includes performing customer service, receiving bills, reviewing bills, sending out letters requesting additional verification, paying bills, denying bills, seeing to the timely payment and denial of bills, insuring the timeliness of requests for additional verification, etc.

125. There is absolutely no investigation experience gained as a State Farm "claims handler" or "claims representative" as defined by the context and content of *11 NYCRR 86.6(c)*.

126. A qualified SIU Investigator must have the requisite amount of investigation experience (*11 NYCRR 86.6(c)*) in performing all of the enumerated activities listed herein: detailed claim review with the ability to ascertain relevant issues such as material misrepresentation, coverage, exclusions, fraud and red flags; development of investigative plan of action; the taking of written and recorded statements in the field and by phone; conduct in person interviews; court, public and private records review; prepare written comprehensive investigative reports; locate and find witnesses; clinic/medical provider inspections; and an understanding of how complex fraudulent enterprises operate (how to connect the dots) – i.e. prior exposure to common themes in No Fault fraud such as billing for services not provided, corporate structure from medical clinic through management companies and layperson involvement; runners/steerers; jump-ins; factoring and fee splitting.

127. According to the law described above an insurance company SIU investigator must have the requisite credentials described above before becoming an SIU Investigator.

128. Under the above discussed law one cannot become an SIU Investigator without the requisite credentials and then gain said credentials through "experience" garnered while illegally performing SIU duties.

129. State Farm's SIU Department is not staffed by individuals – "investigators" – qualified under the law (*11 NYCRR 86.6(c)*) to work in such capacity.

130. State Farm SIU "investigations" lack a modicum of professional quality. They are incomplete, sometimes senseless and lack real evidence.

131. For example State Farm SIU expects individuals that forgot what the weather was like at the time of the accident and other trivial matters – as testified to in Examinations Under Oath – to be arrested for insurance fraud.

132. One of State Farm's SIU's favorite methods of claim denial is guilt by association via computer link analysis

133. Such link analysis links individuals involved in accidents to common addresses, common medical providers, common vehicle license plate or registration identifiers, phone numbers etc. in order to ascertain patterns.

134. The above link analysis is based upon records kept and maintained by ISO and State Farm's own database.

135. The above ISO and State Farm records are comprised of multiple layers of hearsay – an unknown individual enters information into the database obtained from documents wherein other individuals entered information themselves or information imparted to them from other individuals or other documents, etc.

- 40 -

136. Another problem with this type analysis is that some addresses are huge containing hundreds of dwellings with rapid turnover rates; vehicles are often bought and sold with great frequency; individuals involved in the same accident and occupying the same car often attend the same medical facilities – this point is exacerbated by the lack of "family doctors" due to the absence of standard health insurance; in urban areas there are fewer cars then people as percentage and as such many individual relatives and friends will often drive the same vehicle; and urban areas due to congestion and other issues tend to have higher per capita accident rates.

137. A "link analysis chart" is a way to start an investigation but such information needs much corroboration before it could be relied upon for any use from claim denial to suspicion of criminal activity.

138. A "link analysis chart" or study is inherently unreliable due to the above-enumerated reasons associated with massive layers of hearsay and the facts enumerated above.

139. Affidavits prepared by or for a State Farm SIU investigator demonstrate the lack of investigative skills in that they contain layers of hearsay including press releases, newspaper articles, ISO Searches. Said Affidavits contain no observations that were personally observed and in the main are nothing but "smear campaigns" drafted by Enforcer Counsel and signed by State Farm SIU "Investigators." In fact the affidavits of State Farm SIU "Investigators" list absolutely no credentials.

140. The Insurance Company Defendants and Enforcer Counsel have utilized the Fruits of State Farm's illegal SIU, including numerous Affidavits prepared by Enforcer Counsel and signed by State Farm SIU "Investigators", against each and everyone of the named Plaintiffs; this conduct is ongoing and will continue into the future unless remedied.

- 41 -

## STATE FARM'S ABYSMAL RECORD OF MISDEEDS THAT SHOULD HAVE WARRANTED GREATER INVESTIGATION AND PUNISHMENT FROM THE INSURANCE DEPARTMENT

141. FOIL Requests made to the New York State Department of Insurance regarding State Farm indicated the following information as of June 2007.

142. First there is the Index of Complaints made by State Farm premium paying customers to the New York State Department of Insurance. These complaints were made as a result of State Farm misconduct. According to the New York State Department of Insurance "Line Of Business" Codes description the overwhelming customer complaints were made in the areas of Auto Coverage – codes 09 through 12. Moreover the vast majority of the Auto Coverage complaints were made in the area of No-Fault – "12". Comparing the "Subject Codes" to the Complaint index one can see that while the complaints vary a number of complaint areas seem to predominate: code 100 Delay In Payment of Claim; code 118 Dispute Over Liability (3rd Party Claims); code 120 Amount of Indemnity; code 134 Denied For Medical Necessity; and the catchall code 132 Other Violations of Law or Regulation.

143. Note the sheer volume of complaints. The last page of the Complaint Index beginning with "05/01/00 06/21/99" states that the total is 3,249. The last page of the Complaint Index beginning with "09/16/03 06/23/03" states that the total is 2,974. The grand total is 6,223 complaints.

144. The above demonstrates a large number of rate paying customers who took the time to formally complain to the New York State Department of Insurance about State Farm. It could also be logically assumed that those who had the knowledge, wherewithal and gumption to complain to the New York State Department of Insurance, as opposed to their spouse/friends etc., comprise just a fraction of those who were aggrieved.

- 42 -

145.  State Farm's disdain for married couples is demonstrated by the Stipulation that they entered into in <u>In the Matter of State Farm Mutual Automobile Insurance Company and State Farm Fire and Casualty Company</u>.  State Farm entered into the Stipulation on October 31, 2005 as the result of an investigation conducted by the New York State Insurance Department.  In the Stipulation State Farm admitted:

> during the period 1996 through 2004, in connection with certain private passenger automobile insurance policies, Respondents [State Farm] failed to provide coverage, beyond the 30 days provided for in policy endorsement 6093M, for additional vehicles as required under Section 60-1.1(d) of Department Regulation 35-A [11 NYCRR 60-1.1(d)], which states that if the named insured under a policy of automobile liability insurance is an individual or husband or wife and the policy affords insurance with respect to a private passenger automobile owned by either, such policy shall afford bodily injury and property damage liability insurance for any other private passenger automobile of which the named insured acquires ownership provided the company insures all automobiles owned by the named insured or his spouse on the delivery date.

146.  The above is a violation that could have grave ramifications including the denial of coverage when such coverage was mandated by law.  Moreover, it is a bit of complexity that one who was victimized by the above violation would not likely be aware of.  This point is made clear by the very wording of the violation of the insurance law.

147.  In the end the Insurance Department required State Farm to pay only a $10,000.00 penalty.  Certainly the sums illegally saved by the violation far exceeded the penalty.

148.  The Memorandum of a Market Conduct Investigation dated June 3, 2003 of State Farm Mutual Automobile Insurance Company contained the following information.  According to the Memorandum a "random sampling technique was utilized" for all findings.

149.  In one study from a population of 2,854 open No-Fault claims, 50 claim files were chosen for review.  The files contained 68 claimants.  The Memorandum listed a number of "significant findings of our review."

> Section 65-3.8(a) &(c) ... of Regulation 68 states that payment and/or denial of claim must be made within 30 calendar days of receipt of relevant information and/or Proof of Claim. The Company was in violation of this section in 169 of the 856 instances viewed. [That is a whopping 20% of the time]

> Section 65-3.9(a) (formerly 65.15(h) requires interest to be paid on all overdue claim payments where the interest due exceeds $5.00. The Company was in violation of this section 17 of the 34 relevant instances. [An incredible 50%]

The Memorandum then refers the reader to the Melville Office of State Farm for a listing of

further violations:

> Payment or denial of claim must be made within 30 calendar days of receipt of relevant information and/or Proof of Claim.

State Farm failed to issue timely payments in 131 out of 656 instances or 20% of the time. Of

course when they are late in issuing payment State Farm does not pay interest anyway. As far as

denials are concerned State Farm fails to issue timely denials in 38 out of 200 instances or 19%

of the time.

150. When it comes to the Assigned Risk Pool State Farm truly is a basket case. "The following

is the most significant finding of our review:"

> Section 65-3.8(a)&(c) (formerly 65.15(g)(1&3) of Regulation 68 states that payment and/or denial of claim must be made within 30 calendar days of receipt of relevant information and/or Proof of Claim. The Company was in violation of this section in 519 of the 1,001 instances reviewed.

In other words State Farm was late in paying or denying claims a mind-boggling 52% of the

time.

151. The final noteworthy statistic must be pointed out. Again a "random sampling technique

was utilized." A review of Independent Medical Examinations included 75 No-Fault claim files.

The 75 files contained 107 claimants of which 19 claimants were scheduled to take a total of 32

Independent Medical Examinations.     One examination was positive.     Thirty-one (31)

examinations were negative.

- 44 -

152. In other words a State Farm Independent Medical Examination found that the patient needed the treatment in 3% of the cases. Approaching this equation from the negative – patients that did not need treatment – we see that State Farm found that 97% of their premium paying claimants were "negative" needing no further treatment. This is inconceivable. *See infra.*

153. The above should have warranted further Insurance Department investigation and sanction but neither occurred.

154. It appears that State Farm premium paying customers purchase peace of mind and little else.

155. As a result of the above described Market Conduct Investigation State Farm also entered into a Stipulation in <u>In the Matter of State Farm Mutual Automobile Insurance Company</u>. The Stipulation was entered into by State Farm on June 23, 2004. In the Stipulation State Farm admitted:

> it violated the following provisions of the Insurance Law and/or Department Regulations:

(a) Section 5106 of the Insurance and Section 65-3.8(a) and (c) (former Section 65.15(g) (1) and (g) (3)) of Department Regulation 68 [11 NYCRR 65-3.8(a) and (c)] which state that payment or denial of claim must be made within 30 calendar days of receipt of relevant information and/or proof of claim;

(b) Section 5106 of the Insurance Law and Section 65-3.9 (former Section 65.15(h)) of the Department Regulation 68 [11 NYCRR 65-3.9] which state that all overdue PIP benefits shall bear interest at a rate of 2 percent per month, compounded and calculated on a pro rata basis using a 30-day month; and

(c) Section 218.5(a) of Department Regulation 90 [11 NYCRR 218.5(a)] which states that redlining notice shall be clearly and prominently set out in boldface type on the front so that it draws the reader's attention on all notices of refusal to issue, cancellation or non-renewal and that the company representative's address and phone number should be listed in the appropriate place on notice.

State Farm was only required to pay a $131,850.00 penalty. Once again the sums illegally saved by the violations probably far exceeded the penalty.

156. Based upon the above Market Conduct Investigation State Farm should have been the subject of further charges, further investigation and a much larger penalty.

157. Based upon the contents of this section and all of the above pleaded facts the Insurance Department abrogated its ministerial duty of properly policing State Farm's conduct for which purpose – the policing of insurance company conduct – said Department was primarily created for.

158. The State Farm conduct enunciated in this section consisting of late denials, the failure to pay interest, and pre-ordained negative findings on IMEs have been committed against each of the Plaintiffs.

## STATE FARM'S ABUSES OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION

159. State Farm engages in multiple abuses of the insurance regulations when requesting additional verification. Indeed State Farm uses the additional verification procedures to harass, intimidate, and financially harm claimants and medical providers – to the point wherein making a claim against State Farm is simply not feasible due to the State Farm's ability to wear down claimants with the additional verification procedures.

160. It must be recalled that 11 NYCRR 65-3.5 "Claim procedure" states in relevant part:

> When an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination. Insurer standards shall be available for review by Department examiners.

11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" states the following:

> (a) Have as your basic goal the prompt and fair payment to all automobile accident victims.

- 46 -

(b) Assist the applicant in the processing of a claim. Do not treat the applicant as an adversary.

(c) Do not demand verification of facts unless there are good reasons to do so. When verification of facts is necessary, it should be done as expeditiously as possible.

(d) Hasten the processing of a claim through the use of a telephone whenever it is possible to do so.

(e) Clearly inform the applicant of the insurer's position regarding any disputed matter.

161. The following conduct is illustrative of State Farm's conduct toward the Class Members.

## I. THE EUO ABUSES

162. Plaintiff Okslen Acupuncture P.C. in the form of Ms. Oksana Lendel Lac. the owner of said P.C. appeared for an Examination Under Oath conducted by Enforcer Counsel McDonnell & Adels P.C. on behalf of State Farm. The Examination Under Oath occurred on March 7, 2006. Ms. Beth Adel's conducted the examination with Ms. Arlene Murray of State Farm's illegal SIU present.

163. Prior to the Examination Under Oath of March 7, 2006, the Law Office of Eva Gaspari PLLC ("Gaspari") and McDonnell & Adels exchanged numerous correspondences pertaining to numerous claimants regarding the issue of Examinations Under Oath. State Farm and McDonnell & Adels continually demanded the production of Ms. Lendel for examinations based on numerous claimant files.

164. McDonnell & Adels' final correspondence prior to the March 7, 2006 Examination Under Oath, dated March 1, 2006, confirmed that the Examination Under Oath of Oksana Lendel, LAc would occur on March 7, 2006. This correspondence specifically listed certain claim files that would be a subject of the examination. In sum the March 1, 2006 letter stated that Ms. Lendel had to appear at an Examination Under Oath on March 7, 2006 concerning twenty-six (26)

- 47 -

separate claims (as per claim numbers) which encompass a total of 28 claimants. For each of the claimants Ms. Lendel was directed to appear with the corresponding claim files.

165. This is a list of the claimants and claimant files that Ms. Lendel was directed to appear on, testify about and produce at the March 7, 2006 Examination Under Oath, according to the McDonnell & Adels' March 1, 2006 correspondence:[3] (1) Nancy Jijon, Claim No. 32-V584-734; (2) Jose Notero, Claim No. 33-0713-195; (3) Hensley M. Hercules, Claim No. 32-V588-670; (4) Joel Ray, Claim No: 11-4790-506; (5) Jamal Trottman, Claim No: 11-4790-506; (6) Vernal G. Haynes, Claim No. 32-V583-644; (7) Anastashia Moore, Claim No. 32-V587-345; (8) Sue-Anne Broomes, Claim No. 32-V587-345; (9) Parbatie Sukhiram, Claim No: 32-V588-609; (10) Allison Walters, Claim No. 32-V578-085; (11) Julius Lawrence, Claim No. 32-V579-225; (12) Martha Guzman and Modesta A. Ramirez, Claim No. 32-V591-471; (13) Carlos Bayas Rosero, Claim No.32-V561-768; (14) Kingsley A. Samuda, Claim No.32-V586-055; (15) Josinah N. King, Claim No. 32-V591-902; (16) John Manning, Claim No. 52-2914-355; (17) Tracey A. Harvey, Claim No. 32-V592-303; (18) James Cerutin, Claim No.32-V590-144; (19) Jerome R. Walker and Wondetta Woodson, Claim No. 32-A058-755; (20) Tameika Williams, Claim No. 32-V576-023; (21) Yamile Cortez, Claim No:52-2940-889; (22) Zulema Morgan., Claim No. 32-V607-702; (23) Horace D. Spruill, Claim No. 32-V606-953; (24) Yesenia Godoy, Claim No. 32-V607-834; (25) Jordanis Nunez, Claim No. 32-V603-841; (26) Roxanne Edwards, Claim No. 32-V583-644.

166. On March 7, 2006 Ms. Lendel and her counsel attended the aforementioned Examination Under Oath with all of the above claim files in tow. Much to Ms. Lendel's shock and chagrin

---

[3] The McDonnell & Adel's correspondences had demanded EUOs of Okslen with regard to other claims/claimants. In return Gaspari correspondences addressed these "other claims/claimants" and directed that all outstanding claims/claimant EUOs would be held in one session even if said session was a continuing one. The correspondence of March 1, 2006 is referred to for brevity in describing the conduct of McDonnell & Adels and State Farm.

the evening prior to the Examination Under Oath it was discovered by her counsel that State

Farm had already denied the claims on twenty-two (22) claim numbers/files and 23 claimants out

of the total of twenty-six (26) claim files (28 claimants) for which she was directed to appear.

167.  In sum McDonnell & Adels informed Gaspari and Ms. Lendel on numerous times that,

amongst others, Ms. Lendel needed to appear at an Examination Under Oath on the above 22

claim numbers/files (23 claimants) or the claims would be denied.  The McDonnell & Adels

letter of March 1, 2006 confirmed the Examination Under Oath for the above 22 claim

numbers/files (23 claimants).  Yet well before the letter of March 1, 2006 State Farm had denied

the subject claims.  This obvious misconduct becomes even more sordid when one looks at the

individual files closely.[4]

168.  For example, with regard to **Kingsley A. Samuda**, Claim No.32-V586-055, all bills – the

entire claim – was first denied on December 7, 2005, because the **claimant** – not the provider –

failed to attend a "EUO and/or recorded statement of the injured party."  If the claim is already

denied there is absolutely no reason, except for the creation of vexation, to call in the Provider

for an Examination Under Oath.  With regard to this claim McDonnell & Adels and State Farm

have added insult to injury by demanding an Examination Under Oath, and various harassing

document requests, on a claim that had already been denied because of the **claimant's** purported

failure to appear at an EUO.

169.  Then there are the equally despicable actions perpetrated by McDonnell & Adels regarding

**Modesta Ramirez**, Claim No. 32V-591-471.  This claim was first denied on December 8, 2006

---

[4] Suffice it to say that all during the laborious process of setting up the EUO of March 7, 2006 it never entered
Gaspari's mind that these files had already been denied.  The reason for this was quite obvious.  Gaspari never
expected an Officer of the Court to continuously send EUO demands on denied files.  Luckily the counsel that was
retained to represent Ms. Lendel had examined the full files closely the night before the Examination Under Oath.

for failing to provide "the requested verification." State Farm denied the same exact claim once again on January 3, 2006, based upon the findings of an IME. The IME was allegedly performed upon the claimant on December 27, 2005 – almost three weeks after the claim was initially denied. As such State Farm took it upon themselves to harass the claimant needlessly. In any event the IME Report stated that the claimant required absolutely no further treatment. Why this claim was denied in the first place is not clear from the documents. Specifically, "the requested verification" is not defined in the denial. Suffice it to say that this failure to provide verification can not be the failure of Ms. Lendel to appear at an Examination Under Oath for two reasons: 1) there are a series of post December 8, 2005 letters seeking an Examination Under Oath of Ms. Lendel including a correspondence of January 11, 2006 and the aforementioned correspondence of March 1, 2006; 2) Ms. Lendel appeared at the Examination Under Oath in this matter on March 7, 2006.

170. In sum with the **Modesta Ramirez** claim, and the below described claims, State Farm, with McDonnell & Adel's assistance, has demonstrated its vicious propensities by lying to and inconveniencing both the claimant and the provider.

171. With **Tracy Ann Harvey** McDonnell & Adels/State Farm continuously demanded an Examination Under Oath, including the correspondence of March 1, 2006, for a claim that was fully denied on November 18, 2005.

172. With **Roxanne Edwards** McDonnell & Adels continuously demanded an Examination Under Oath, including the correspondence of March 1, 2006, for a claim that State Farm fully denied on November 18, 2005.

173. With **Anastashia Moore** State Farm's/McDonnell & Adels actions reached new heights – or lows – of delinquency. They continuously demanded an Examination Under Oath, including

the correspondence of March 1, 2006, for a claim that State Farm first fully denied on September 14, 2005 for the **claimant's** purported failure to appear at an IME on August 8, 2005 and September 12, 2005. As such payment on the acupuncture bills were denied "effective 8/8/05." What gives them the right to thereafter repeatedly demand an Examination Under Oath of Ms. Lendel in this matter wherein they threaten her with denial of all bills as a penalty for non-appearance. Since they had already long ago denied payment on each and every bill associated with the claim the demand letters contain material misrepresentations. It cannot be a mere error since they have done it in twenty-two of the twenty-six claims that are being focused upon here.

174. State Farm's conduct, and by extension McDonnell & Adels conduct, becomes even more grotesque with **Vernal Haynes**. On August 31, 2005 State Farm issued a partial denial that in part stated: "acupuncture benefits are limited to 2X a week for four weeks based on the physical examination by Dr. Xiaoping Zhou performed on August 25, 2005." As such it would seem that by September 25, 2005 all acupuncture benefits were denied in full. However, on October 17, 2005 State Farm issued yet another denial stating that all acupuncture benefits were denied in full effective October 17, 2005, based upon an "independent medical examination performed ... on 10/12/05." On November 3, 2005 and on November 18, 2005 State Farm yet again denies all acupuncture bills on the subject claim for failure "to present a proper proof of claim." Why did they continuously demand an Examination Under Oath, including the correspondence of March 1, 2006, for a claim that State Farm denied as early as August 31, 2005 for a grand total of three distinct denial justifications by the time of its November 18, 2005 denial.

175. The case of **Allison Walters** follows almost the same exact pattern as **Vernal Haynes**, but is even worse because the claim was first denied eons ago according to State Farm's own denial which states: "New York No Fault Acupuncture benefits were denied on 07/28/05 based upon

- 51 -

the physical examination by Dr. Seldin performed on 07/13/05." A host of convoluted denials for other reasons are also found in the file. Why did they continuously demand an Examination Under Oath, including the correspondence of March 1, 2006, for a claim that State Farm denied as early as July 13, 2005.

176. **Carlos Bayas Rosero** is yet another example – it is hard to pick the worst although this is surely in the running – of reprehensible conduct perpetrated by State Farm, with McDonnell & Adels' assistance. In this case there is a denial and explanation of benefits dated March 18, 2005 that denies an entire acupuncture bill (multiple dates of service) because the "diagnosis reported by the provider may represent a condition occurring as a result of a motor vehicle accident or unrelated condition." Then on December 18, 2005 State Farm issues a plethora of total denials for failure to provide the verification that we have requested." Why did they continuously demand an Examination Under Oath, including the correspondence of March 1, 2006, for a claim that State Farm denied as incredibly early as March 18, 2005.

177. Next there is **Sue-Ann Broomes**, a case that is surely in the running for most nauseating abuse of the Insurance Regulations. On October 27, 2005 State Farm issued a full denial of all acupuncture claims for failure to provide verification. There are correspondences dated August 18, 2005, September 22, 2005 and October 25, 2005 from State Farm in which State Farm informs Ms. Lendel that State Farm is demanding – from her – an Examination Under Oath/recorded statement of the **claimant**. In addition State Farm informs Ms. Lendel that the claim is "pending further investigation by our Special Investigative Unit. We have notified the NYS Insurance Department of investigation …" This same exact letter, minus the Special Investigative portion, is repeated on November 29, 2005 and January 31, 2006. However, State Farm had already denied – on October 6, 2005 – all acupuncture bills based upon an

- 52 -

"independent' medical examination performed on … 9/26/05, the injured party is no longer in need of additional Acupuncture treatment." State Farm therefore had no reason to send the above harassing letters – 10/25/05; 11/29/05 and yet again 1/31/06 – to Ms. Lendel demanding that Ms. Lendel produce the **claimant** for an Examination Under Oath/Recorded Statement. Ms. Lendel may inherit all the rights and responsibilities of the claimant via an Assignment of Benefits form, but Ms. Lendel is in no position to force a claimant to appear at an Examination Under Oath. Moreover, in light of all of the above McDonnell & Adels and State Farm engaged in frivolous, harassing and vexatious conduct in continually demanding an Examination Under Oath of Ms. Lendel under threat of denial – including the correspondence of March 1, 2006.

178. **Tamieka Williams** "All No Fault Benefits denied effective 7/11/05 because the claimant failed to attend an IME on 7/11/05 and 7/21/05." Yet State Farm/McDonnell & Adels fought and harassed and harangued Ms. Lendel as late as March 1, 2006 to appear at an Examination Under Oath and to provide privileged and highly sensitive documentation facing the penalty of outright full and complete denial of benefits.

179. The above are just a few examples.

180. Finally at the Examination Under Oath there were four claims/claim numbers and five claimants for which State Farm was given files to be used in questioning of Ms. Lendel. These were the only claims/claimants that State Farm did not already deny. Of the above McDonnell & Adels only questioned the witness on one of these files. Therefore medical documentation for each claim/claim number could only be judged to have little importance to State Farm and McDonnell & Adels.

181. The abuse has gone on unabated.

**Patient:**        .**Tonilla Hurley**

- 53 -

Date of Loss:          10/25/05

Claim No.          32-V601265

Gaspari received a letter dated March 13, 2006, concerning the above claim, in which McDonnell & Adels states:

> As you are aware we previously required that you attend an Examination Under Oath that was scheduled to be held on March 7, 2006. Since you did not attend we are giving one last opportunity for you to attend this Examination Under Oath.

Ms. Lendel appeared at the Examination Under Oath scheduled for March 7, 2006 for the subject claim. In fact in the Gaspari correspondence to McDonnell & Adels office dated February 15, 2006 Gaspari discussed this very claim and agreed to attend an Examination Under Oath covering this and a host of other claims. Gaspari also received a follow up letter to McDonnell and Adels March 13, 2006 correspondence dated March 15, 2006 wherein McDonnell & Adels stated that Ms. Lendel did not attend the Examination Under Oath scheduled for March 7, 2006.

182.  **Patient:          Shaseana Seldon**

Date of Loss:          12/08/2005

Claim No:          11-4897-801

Gaspari received a letter dated March 10, 2006, concerning the above claim, in which McDonnell & Adels states:

> As you are aware we previously required that you attend an Examination Under Oath that was scheduled to be held on March 7, 2006. Since you did not attend we are giving one last opportunity for you to attend this Examination Under Oath.

Ms. Lendel appeared at the Examination Under Oath scheduled for March 7, 2006 for the subject claim. In fact in the Gaspari correspondence to McDonnell & Adel's office dated February 15, 2006 Gaspari discussed this very claim and agreed to attend an Examination Under Oath covering this and a host of other claims.

- 54 -

183.    **Patient:**          **Marisa Pink**

      Date of Loss:          12/08/2005

      Claim No:             11-4897-810

Gaspari received a letter dated March 10, 2006, concerning the above claim, in which McDonnell & Adels states:

> As you are aware we previously required that you attend an Examination Under Oath that was scheduled to be held on March 7, 2006. Since you did not attend we are giving one last opportunity for you to attend this Examination Under Oath.

Ms. Lendel appeared at the Examination Under Oath scheduled for March 7, 2006 for the subject claim.    Gaspari also received a follow up letter to the McDonnell & Adels March 10, 2006 correspondence dated March 15, 2006 wherein McDonnell & Adels once again states that Ms. Lendel did not attend the Examination Under Oath scheduled for March 7, 2006.

184.    **Patient:**          **Oscar Moromta**

      Date of Loss:             7/3/05

      Claim No.             32-V585-063

Gaspari received a letter dated March 10, 2006, concerning the above claim, in which McDonnell & Adels states:

> As you are aware we previously required that you attend an Examination Under Oath that was scheduled to be held on March 6, 2006. Since you did not attend we are giving one last opportunity for you to attend this Examination Under Oath.

Ms. Lendel appeared at the Examination Under Oath on March 7, 2006. In fact in Gaspari's correspondence to McDonnell & Adels' office dated February 15, 2006 Gaspari discussed this very claim and agreed to attend an Examination Under Oath on March 7, 2006, covering this and a host of other claims. Gaspari also received a follow up letter to McDonnell & Adels' March

- 55 -

10, 2006 correspondence wherein McDonnell & Adels basically states the same. Any argument that this particular claim was not contained in McDonnell & Adels **correspondence** of March 1, 2006 and therefore requires a separate Examination Under Oath is disingenuous given the fact that at the Examination Under Oath of March 7, 2006 McDonnell & Adels asked questions about only one claim and the fact that the subject claim was discussed in our correspondences leading to the March 7, 2006 Examination Under Oath; and for other reasons discussed below. Furthermore this entire claim is in what could only be termed "virtual denial." This is demonstrated by the following: On January 13, 2006 State Farm issued four denials. In denial "1" State Farm denied payment of $1283.09 out of total billing of $1620.00. In denial "2" State Farm denied payment of $1920.21 out of total billing of $2430.00. In denial "3" State Farm denied payment of $507.64 out of total billing of $660.00. Finally in denial "4" State Farm denied payment of $951.00 out of total billing of 1215.00. Moreover Ms. Lendel has received a total of six (6) letters demanding that she produce the claimant for a EUO and/or recorded statement. Although for her own selfish reasons Ms. Lendel wishes that every claimant comply with proper EUO demands, it is not within Ms. Lendel's power to make another person attend. This still is, for the time being, a free country. Hopefully, State Farm is sending these letters to the claimant. In any event the letters sent to Ms. Lendel are dated: 09/15/05; 10/14/05; 10/18/05; 10/31/05; 11/18/05 and 12/15/05. This entire claim is in reality already denied for the claimant's failure to attend[5] the EUO first demanded in September of 2005 – some seven (7) months prior.

185.   **Patient:**        **Leona Deleston**

    Date of Loss:        12/11/2005

    Claim No:        52-2940-889

---

[5] Assuming State Farm bothered to send the claimant proper notification – which appears dubious at this point.

Gaspari received a letter dated March 10, 2006, concerning the above claim, in which McDonnell & Adels states:

> As you are aware we previously required that you attend an Examination Under Oath that was scheduled to be held on March 6, 2006. Since you did not attend we are giving one last opportunity for you to attend this Examination Under Oath.

Ms. Lendel appeared at the Examination Under Oath on March 7, 2006. In fact in Gaspari's correspondence to McDonnell & Adels' office dated February 15, 2006 Gaspari discussed this very claim and agreed to attend an Examination Under Oath on March 7, 2006, covering this and a host of other claims. Gaspari also received a follow up letter to McDonnell & Adels' March 10, 2006 correspondence wherein McDonnell & Adels basically states the same. Again any argument that this particular claim was not contained in McDonnell & Adels **correspondence** of March 1, 2006 and therefore requires a separate Examination Under Oath is disingenuous for the reasons cited above.

186. **Leona Deleston** is another case wherein Ms. Lendel received a letter dated January 31, 2006 demanding that Ms. Lendel produce the claimant for a EUO. Most disturbingly is the receipt of one of State Farm's usual SIU Investigation/Notification to the "NYS Insurance Department" letters, which is dated February 13, 2006; and demands that Ms. Lendel produce the claimant for an Independent Medical Examination (where State Farm pays medical professionals to say that claimants do not need treatment).

187. In any event an IME was held wherein **Ms. Deleston** reported that she stopped receiving treatment. The Chiropractor performing the IME stated that Ms. Deleston, a retired police officer and full time student was injured. Ms. Deleston's injuries were casually related to the accident. That Ms. Deleston received acupuncture, chiropractic and physical therapy treatments. That the above-mentioned treatments worked well. The treatments worked so well Ms. Deleston

was cured.   So why the investigation and referral to the New York State Department of

Insurance?  The answer is obvious abuse of the regulations.

188.  Ms. Gaspari also received a denial dated March 10, 2006 on the following file: **Ann T. St.**

**Hill**, Claim No. 32-V602-207.   As a matter background this claim was not mentioned in

McDonnell & Adels' correspondence of March 1, 2006.  However, this claimant was part of the

above-discussed correspondence of February 15, 2006.  In any event the total denial of this claim

was based upon the Examination Under Oath of March 7, 2006:

> Listed owner of Okslen Acupuncture, PC, Oksana Lendel, appeared for an Examination
> Under Oath on March 7, 2006, the testimony did not verify that Okslen Acupuncture,
> P.C. is legally authorized to seek payment for the services billed to State Farm or that the
> individuals who rendered those services are employees of Okslen Acupuncture, P.C.

The denial then makes a seriously sharp turn:

> You have failed to comply with your obligation to present a proper proof of claim, as
> required under 11 N.Y.C.R.R. 65-1.1 by failing to provide the verification that we have
> requested on at least two occasions and failing to establish, among other items, your
> compliance with 11 N.Y.C.R.R. Section 65-3.16 (a) (12).  Therefore you have failed to
> satisfy a condition of coverage, and your claim is denied.  Further the records submitted
> by Okslen Acupuncture, P.C. misrepresent (sic) the services billed to State Farm.  State
> Farm accordingly denies your bill.

First, this demonstrates that State Farm denied a claim based upon the Examination Under Oath

of March 7, 2006 that was not in McDonnell & Adels correspondence of March 1, 2006, but was

covered by the Gaspari correspondence of February 15, 2006.  This lays to rest any credible

argument regarding the claimed failures to appear on March 6, 2006 wherein State Farm may

wish to state that said claims were not covered by the Examination Under Oath of March 7, 2006

because they were not contained in McDonnell & Adels' March 1, 2006 correspondence.

189.  Furthermore, based upon the fact that the Examination Under Oath of March 7, 2006 ended

late in the afternoon and State Farm's denial was issued on March 10, 2006; the language of the

- 58 -

denial itself; and the above enumerated misconduct as well as other misconduct it would appear that the decision on the denial was made sometime well before March 10, 2006.

190. Obviously the portion of the denial addressing the failure to provide verification is at best improperly vague especially given State Farm's history. It can only be assumed that State Farm is referring to the outlandish requests for income tax records; bank statements and profit/loss statements.

191. Finally, the language of the denial demonstrates that State Farm failed to grasp many issues and most importantly ask the questions that would have explained these issues – particularly regarding the American Medical Association's and American Association of Oriental Medicine's mandates on billing and how treatment should be notated for billing purposes.

192. Without getting into meticulous detail as above State Farm, through Enforcer Counsel Melli, Guerin & Wall engage in the same exact above described conduct with regard to Kings County Chiropractic PC. Specifically, State Farm/Melli Guerin pend for EUOs on bills that have already been denied. More specifically on the day that State Farm sends the EUO request letter the subject bill or bills have already been denied.

193. In a manner even more detailed then appears in the above portion of the pleading the Department of Insurance was notified of the above-described misconduct in a correspondence shortly after the March 7, 2006 EUO.

194. The Insurance Department reacted to the above complaint by doing nothing except suggesting that the issue be decided via litigation.

195. The Department of Insurance should have initiated a full investigation of such conduct and their failure to do so is an abrogation of a duty enjoined upon them by law and their very purpose and existence.

- 59 -

196. The above described EUO conduct is pervasive in State Farm and McDonnell & Adels fraudulent scheme to vex, harass and defraud medical providers and claimants and is perpetrated upon many members of the class.

197. Furthermore, State Farm EUO Request letters on a basis demand the following documents on a pervasive routine basis.

In addition, we request you to submit the following information:

(i)    documents evidencing ownership of the P.C., at the time of the treatment for which you seek payment, by one or more licensed professionals, including but not limited to a copy of the certificate of incorporation for the P.C., receipts for filing, stock certificates, and the stock ledger for the P.C. [except for receipts for filing which may or may not be kept the Plaintiffs would have no problem providing the above once – not on every claim as demanded by State Farm]

(ii) documents relating to the income and expenses of the P.C., including but not limited to tax returns and financial statements for the past two years, bank statements and general ledgers of the P.C. for the past twelve months.

(iii) a list of the individuals who provided and/or supervised the health care services for which you seek payment, identification of the type of professional license each individual holds and any practice specialty of each, and documents (i.e., W-2, 1099, etc.) identifying the relationship between the individual and the P.C. (e.g. whether the individual is an employee or independent contractor and how that individual is compensated), (sic)

(iv) a list of days of the week and hours that any owner of the P.C. provides or supervises services for the P.C. during the period which payment is sought for services rendered;

(v) all documents, including all schedules, attachments or addenda, related to the relationship between the P.C., and/or any entity or individual that leases equipment or space to or from the P.C., or provides management, consulting, administrative or billing services to the P.C. and any payments made to any person or entity that rendered such services to the P.C.

(vi) a list of all P.C.s where your PC is rendering services.

(vii) Please complete the enclosed NF-3 form in its entirety including the assignment of benefits section, dates and signatures of patient and provider of health care services.

- 60 -

> We will not pay for any services rendered to the above referenced eligible person relating to this loss until you have provided additional verification that State Farm has required.

198. The message is quite clear:

> Make a claim and you will have to give us "tax returns and financial statements for the past two years, bank statements and general ledgers of the P.C. for the past twelve months"; "W-2, 1099" for employees; "a list of days of the week and hours that any owner of the P.C. provides or supervises services for the P.C. during the period which payment is sought for services rendered;" "all documents ... related to the relationship between the P.C., and/or entity or individual ..." If you do not give us the above you will not get paid.

199. Not only is the above information highly personal and private but the costs of getting the bank to copy the various statements and numerous checks for small denominations that enter and exit the accounts of active P.C.s is prohibitive.

200. In addition in order to comply with the above demands one would need a full time employee who's only purpose would be to respond to State Farm's additional verification demands effectively rendering the claims to costly to ever collect.

201. State Farm and McDonnell & Adels is in essence saying that you are not getting paid, and if you do, it will not be worth your while. This policy if allowed to continue will render State Farm and the other insurance Defendants omnipotent which would render no fault null and void.

202. The above violates the various laws and regulation contained within this pleading.

203. State Farm and McDonnell & Adels justifies the above impossible demands by the decision in State Farm v. Mallela, 4 N.Y.3d 313 (2005). Specifically Mallela held that under 11 NYCRR 65-3.16 (a) (12) insurance carriers may examine whether a professional corporation was fraudulently incorporated prior to the insurance carrier having to pay the claim. Id. at 321. However the Court stated that the investigation had to be based upon "good cause." Id. at 322. Furthermore, the Court also stated that insurance carriers are not permitted to abuse the "truth seeking opportunity that 11 NYCRR 65-3.16 (a) (12) authorizes." Id.

204. The Insurance Department has never investigated one single abuse by insurance companies as enunciated in State Farm v. Mallela, 4 N.Y.3d 313 (2005).

205. In fact the Insurance Department in an Opinion Letter dated December 22, 2006 states that insurance companies do not have to enunciate any reason whatsoever for why an insurance carrier is requiring the EUO. Moreover an insurance carrier while required to maintain standards for when a EUO may be requested does not have to file said standards with the Insurance Department. And finally if an insurance carrier denies a claim for failure to submit to an EUO the insurance carrier need not state why the EUO was demanded in the first place. Good cause does not even have to be mentioned. The above Opinion Letter gives insurance carriers the ability to circumvent the No-Fault law because a medical provider cannot afford to attend a EUO on every single claim or bill. Said opinion letter completely ignores the safeguards enunciated by the Court of Appeals in State Farm v. Mallela, 4 N.Y.3d 313 (2005).

**II. STATE FARM'S IME MISCONDUCT**

206. As cited to earlier in a 2003 market conduct investigation of State Farm a "random sampling technique was utilized" to review Independent Medical Examinations ("IMEs"). The statistical review of Independent Medical Examinations included 75 No-Fault claim files. The 75 files contained 107 claimants of which 19 claimants were scheduled to take a total of 32 Independent Medical Examinations. One examination was positive. Thirty-one (31) examinations were negative.

207. In other words a State Farm Independent Medical Examination found that the patient needed the treatment in 3% of the cases. Approaching this equation from the negative – patients that did not need treatment – we see that State Farm found that 97% of their premium paying claimants were "negative" needing no further treatment.

208. The above is due to the fact that State Farm conducts its so-called "Independent Medical Examinations" fraudulently. Specifically State Farm engages in a conspiracy with companies – hereinafter referred to as "IME Mills" that provide Independent Medical Examination services. Said companies are not owned by medical doctors or any other type of medical professional. Rather said companies are owned by laypersons looking to make a buck.

209. Said IME Mills farm out the "independent medical examinations" to medical professions – usually Medical Doctors – that are a part of the scam denial conspiracy. Said medical professionals – hereinafter referred to as "Miscreant M.D.s" – are generally barely doctors having the poorest qualifications and experience that will permit them to practice medicine, although they rarely do, and thank God for that.

210. An Independent Medical Examination is, as required by the Insurance Laws and Regulations, supposed to consist of a thorough going examination by a medical professional utilized in order to receive a non biased opinion based upon medical science and the condition of the patient as to whether or not a claimant requires further treatment and for how long such treatment should be provided.

211. As already cited to the result of the market conduct investigation reveals that for some reason medical professionals – usually medical doctors – that perform IMEs for State Farm feel that further treatment is practically never needed.

212. State Farm contracts its IME Mills with the mutual understanding that just about every IME conducted will yield a result in which further medical treatment will be deemed medically unnecessary. Specifically the result of the IME is pre-ordained prior to the Miscreant M.D.s alleged examination of the patient. The result, as reflected in the above cited to statistical

analysis, is that in over 97% of the examinations the Miscreant M.D. will write a report claiming that the patient needs no further treatment.

213.  As a result the purported independent medical examination performed by the particular Miscreant M.D. that is hired by a particular IME Mill is really nothing more then theatrics. The Miscreant M.D. is actually acting as if he is performing a medical examination. The examination is a scam.

214.  The examination usually lasts no more then approximately 5 minutes although the Miscreant M.D. will testify in Court that the examination took some 45 minutes.

215.  Medical guidelines mandate that an initial medical evaluation must be not less then 40 minutes in length. Approximately 99% of persons informally polled by one medical provider stated that their particular independent medical examination lasted 5 minutes; the Miscreant M.D. never asked to review the medical records; the examination consisted solely of the Miscreant M.D. asking questions; reflex exams and sensory exams were never performed; and the doctor never asks the patient his or her name during the examination – this indicates that the outcome is preordained.

216.  The IME Mill will instruct the Miscreant M.D. to randomly select approximately 1 out of every 33 examinations in which the Miscreant M.D. will recommend further treatment for a set period of time or further treatment at least until the next IME at which point the poor patient will surely be cut off from all benefits.

217.  The finding that a patient needs no further treatment is known in the industry as an IME cutoff. Its practical effect is that in those claims wherein further treatment is deemed medically unnecessary by the Miscreant M.D. the insurance carrier will simply not pay for any further

treatment. This applies to every possible medical specialty that is allowed to seek reimbursement through No-Fault.

218. The results of IMEs are contained in written reports allegedly prepared by the Miscreant M.D.s. In reality the reports themselves are boilerplate suffering from severe templating. Specifically the reports are for the most part pre-written before the Miscreant M.D.s even examines the patients. There is little substantive variance between reports of IMEs. The only variables are the patient's name, date of birth and date of accident.

219. In many cases said medical reports are not signed by the Miscreant M.D. Instead an electronic signature is applied by the Medical Mill. In addition the Miscreant M.D.s allegedly dictate the medical reports, however it is obvious that the reports contain wording that is not dictated since dictation rarely takes the form of grammatically correct sentence structure. Moreover the report of a fraudulent examination is in and of itself false since no real examination occurred.

220. State Farm, the IME Mills and Miscreant M.D.s advertise themselves to State Farm's premium paying customers, claimants, consumers, citizens, the Courts, and the regulatory bodies as providing truly independent medical examinations. More precisely State Farm, the IME Mills and Miscreant M.D.s represent to all that their evaluations are based upon unbiased analysis of the patient's physical condition with an eye toward doing what is in the patient's best medical interest premised upon the application of sound medical science.

221. State Farm's premium paying customers, claimants, citizens, regulatory bodies and the Courts rely on State Farm's, the IME Mills' and the Miscreant M.D.s' promise that independent medical examinations are based upon unbiased analysis of the patient's physical condition with

an eye toward doing what is in the patient's best medical interest premised upon the application of sound medical science.

222.  Said reports are obviously false.  Even the rare reports wherein further treatment is recommended are false because no real medical examination has occurred.

223.  The above false reports are mailed to medical providers using the United States Mail.  State Farm, the IME Mills and the Miscreant M.D.s are thereby engaging in mail fraud.  This has formed the predicate for recent RICO Actions against State Farm that have recently been filed in the Federal Courts located in New York.

224.  In exchange for its promise to produce Independent Medical Examinations where the results are overwhelmingly negative – that the patient requires no further medical treatment – the IME Mill receives large contracts with State Farm wherein the IME Mill is paid to conduct thousands of "Independent Medical Examinations."  The quid pro quo that drives the fraudulent conspiracy is the large volume of work from State Farm in exchange for findings that the patient requires no further medical treatment.  For the IME Mill "work" means money.  Findings of no further medical necessity means denials for State Farm, which translates into money for State Farm.

225.  Likewise the Miscreant M.D.s utilized by the IME Mills are separate and independent contractors.  The IME Mills and Miscreant M.D.s have an open agreement wherein the Miscreant M.D.s must yield IME results that are overwhelmingly negative – the patient needs no further medical treatment.  The quid pro quo that drives this portion of the illicit conspiracy is work in the form of bogus examinations for the Miscreant M.D.s in exchange for findings of no medical necessity for the IME Mill.  For the Miscreant M.D.s work means easy money for

- 66 -

basically acting like a medical professional. For the IME Mill findings of no medical necessity translate into more work from State Farm, which means more easy money.

226.  When a medical doctor examines a patient to determine which types of treatment, if any, are necessary the doctor is evaluating the patient's medical condition.

227.  The reports of Independent Medical Examinations allegedly drafted by the Miscreant M.D.s actually contain findings as to the patients alleged condition and, in the overwhelming majority of the reports, the patients are allegedly in such good medical condition that they require no further treatment for injuries sustained in automobile accidents.

228.  When a medical doctor examines a patient to determine the state of the patient's health and to make recommendations as to treatment the doctor has entered into a doctor-patient relationship.

229.  The entry into a doctor-patient relationship by a medical doctor places certain legal and ethical responsibilities on the medical doctor very much akin to the Hippocratic Oath. A modern example interpretation of such oath follows:

**THE DUTIES OF A DOCTOR REGISTERED WITH THE GENERAL MEDICAL COUNCIL**

Patients must be able to trust doctors with their lives and health. To justify that trust you must show respect for human life and you must:

- Make the care of your patient your first concern
- Protect and promote the health of patients and the public
- Provide a good standard of practice and care
  - Keep your professional knowledge and skills up to date
  - Recognize and work within the limits of your competence
  - Work with colleagues in the ways that best serve patients' interests

- 67 -

- ■ Treat patients as individuals and respect their dignity

  - o Treat patients politely and considerately

  - o Respect patients' right to confidentiality

- ■ Work in partnership with patients

  - o Listen to patients and respond to their concerns and preferences

  - o Give patients the information they want or need in a way they can understand

  - o Respect patients' right to reach decisions with you about their treatment and care

  - o Support patients in caring for themselves to improve and maintain their health

- ■ Be honest and open and act with integrity

  - o Act without delay if you have good reason to believe that you or a colleague may be putting patients at risk

  - o Never discriminate unfairly against patients or colleagues

  - o Never abuse your patients' trust in you or the public's trust in the profession.

You are personally accountable for your professional practice and must always be prepared to justify your decisions and actions.

230. Based upon the above standard the Miscreant M.D.s are abysmal failures.

231. The Miscreant M.D.s are a danger to the community because they are supposed to assess and monitor the health of patients – even if the assessment is ostensibly to determine whether or not further treatment is necessary – but the Miscreant M.D.s through their sham Independent Medical Examinations are cutting off treatment for patients that may still require treatment, are representing to patients that they are no longer in need of medical treatment when the opposite

may be true, and are representing to other medical professionals that the patient is in need of no further medical treatment when the opposite may be true.

232.  In addition during these sham medical examinations the Miscreant M.D. may be overlooking complications not found or apparent at the time the patient last saw his or her physician or other conditions not associated with the accident that may be serious but detectable by a real medical examination such as skin cancers, etc.

233.  In short the Miscreant M.D.s are giving patients the assurance of a sound medical examination when in reality said examination is a farcical performance of a scam examination.

234.  As a result of the above State Farm, the IME Mills and the Miscreant M.D.s are all acting in concert in perpetrating the crimes of Reckless Endangerment in First and Second Degree as per Penal Law Section 120.20 and 120.25.  As described and detailed above the conduct of State Farm, the IME Mills and Miscreant M.D.s is both reckless and evidences a depraved indifference to human life and said conduct creates a substantial risk of physical injury or even a "grave risk of death" to the patients.

235.  State Farm's hypocritical concern for the corporate practice of medicine that serves as a justification for the above discussed NSA/DIA/CIA type requests for additional verification (bank and tax records), and their misplaced reliance on the Court of Appeals decision in State Farm v. Mallela, 4 N.Y.3d 313 (2005), is belied by the fact that State Farm as described above engages in the corporate practice of medicine.

236.  New York State requires that professional healthcare services be rendered only by individuals who are duly licensed to practice those professions.  Further those duly licensed individuals must be employed by entities that are themselves owned by individuals that are licensed to provide healthcare services.

- 69 -

237.  As demonstrated the Miscreant M.D.s although portraying themselves on paper as the owners of their particular medical entity are actually controlled by the IME Mills and State Farm.

238.  Under the law, as explained in <u>Mallela</u>, it is not enough to be merely a nominal owner of a medical practice. The real issue is who controls the practice.

239.  The laws of the State of New York specifically bar individuals such as IME Mill entity owners and insurance company executives, who are not subject to state professional licensing requirements and ongoing regulatory oversight, from controlling, exercising undue influence over, or deriving economic benefit from the practice of a profession such as medicine.

240. The above is evidenced by the fact that New York State in recognition of the importance of the laws protecting the public's safety, health and welfare has made it a felony offense for any person or entity to circumvent those laws that prevent layperson control and/or ownership of medical entities.  Moreover it is also an act of professional misconduct for any licensed individual or professional service corporation to circumvent laws against layperson control and/or ownership.  See Business Corporation Law Sections 1203 (b), 1503 (b), 1507, 1508, 1511, Education Law Sections 6507 (4)(c), 6512, Sections 6530 (1) and (21), N.Y.C.R.R. Section 29.1(b)(6), Penal Law Article 175 and Limited Liability Company Law Section 1201 et seq.

241.  State Farm, the IME Mills and the Miscreant M.D.s are in violation of the above laws and are guilty of felonious conduct on a day to day basis.

242.  Like parasitical blood sucking leaches State Farm, its IME Mills and its Miscreant M.D.s utilize the New York State No Fault Laws and Regulations to feed off the life force of State Farm premium paying customers, their friends and family members that occupy the vehicles

insured by State Farm. Money that is supposed to be paid for medical treatment that is fraudulently withheld is found money.

243. The above is one more method whereby State Farm's claims department is illegally utilized as a profit center. It is the fuel that makes State Farm super profitable even during times of catastrophe.

## STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FALSELY LABELING WRECKED AUTOMOBILES

244. State Farm also engaged in a heinous scheme to defraud that potentially risked the safety of a large number of New York citizens and still does. Specifically, State Farm would receive cars that were severely damaged in accidents – 'totaled" – from their policyholders. The policyholder would receive the so-called "book value" and State Farm would take the car.

245. The above cars by law must be identified "branded" with "salvage title", which identifies said vehicle as having been seriously damaged.

246. State Farm would not brand the above vehicles with salvage title, but instead presented the cars for sale as having clean title. Cosmetic repairs would hide the serious structural damage.

247. State Farm would receive up to five times the value per car as compared to what they would have received if the car was properly labeled with Salvage Title.

248. Unwary citizens purchased potential death traps.

249. State Farm has recently paid the New York State and other State Attorney Generals' Offices 40 million dollars as a result of this behavior and has made other concessions. In addition owners of such State Farm fraud vehicles still have the right to sue State Farm.

## STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS
## WITH THE INSURANCE DEPARTMENT

250.  *Amended Regulation 95* (*11 NYCRR 86*) provides in §86.6 Fraud prevention plans and special investigation units, subsection a), provides that the Insurance Defendants:

> shall develop and file with the superintendent a plan for the detection, investigation and prevention of fraudulent insurance activities in this state and those fraudulent insurance activities affecting policies issued or issued for delivery in this state."

251.  Subsection b) provides:

> The plan shall include the following provisions: (1) Establishment of a full time Special Investigations Unit separate from the underwriting or claims functions of the insurer, which shall be responsible for investigation of cases of suspected fraudulent activity and for implementation of the insurer's fraud prevention and reduction activities under the Fraud Prevention Plan. (2) A description of the organization of the Special Investigations Unit, including the titles and job descriptions of the various investigators and investigative supervisors, the minimum qualifications for employment in these positions in addition to those required by this regulation, the geographical location and assigned territory of each investigator and investigative supervisor, the support staff and other physical resources, including database access available to the Unit and the supervisory and reporting structure within the Unit and between the Unit and the general management of the insurer. If investigators employed by the Unit will be responsible for investigating cases in more than one State, the plan must apportion that percentage of the investigators' efforts which will be devoted to New York cases. (3) The rationale for the level of staffing and resources being provided for the Special Investigations Unit which may include, but is not limited to the following objective criteria such as number of policies written and individuals insured in New York, number of claims received with respect to New York insureds on an annual basis, volume of suspected fraudulent New York claims currently being detected, other factors relating to the vulnerability of the insurer to fraud, and an assessment of optimal caseload which can be handled by an investigator on an annual basis. (4) A description of the relationship between the Special Investigations Unit and the claims and underwriting functions of the insurer, including procedures for detecting possible fraud, criteria for referral of a case to the Unit for evaluation, and the designation of the individuals authorized to make such a referral; and a description of the relationship between the Unit and the Insurance Frauds Bureau, other law enforcement agencies and prosecutors, including procedures for case investigation, detection of patterns of repetitive fraud involving one or more insurers, criteria for referral of a case to the Insurance Frauds Bureau, designation of the individuals authorized to make such referrals, and a policy to avoid duplication of effort due to concurrent referrals by the Unit to more than one law enforcement agency. (5) Provision for the reporting of fraud data to a data collection firm to be designated by the Superintendent. (6) Provision for in-

service training programs for investigative, underwriting and claims personnel in identifying and evaluating instances of suspected insurance fraud, including an introductory training session and periodic refresher sessions. This description shall include course descriptions, the approximate number of hours to be devoted to these sessions and their frequency. (7) Provision for coordination with other units of the insurer to further fraud investigations, including a periodic review of claims and underwriting procedures and forms for the purpose of enhancing the ability of the insurer to detect fraud and to increase the likelihood of its successful prosecution, and for initiation of civil actions where appropriate. (8) Development of a public awareness program focused on the cost and frequency of insurance fraud, and methods by which the public can prevent it. (9) Development of a fraud detection and procedures manual for use by underwriting, claims and investigative personnel.

252. Upon information and belief State Farm has failed to file an updated plan especially with regard to subsections "b) "(2)", "(4)" and "(7)."

253. In addition, upon information and belief, State Farm has failed to comply with *Amended Regulation 95 (11 NYCRR 86)* §86.6 subsection "d",

Every insurer required to file a fraud prevention plan shall file an annual report with the Insurance Frauds Bureau no later than January 15 of each year on a form approved by the superintendent, describing the insurer's experience, performance and cost effectiveness in implementing the plan and its proposals for modifications to the plan to amend its operations, to improve performance or to remedy observed deficiencies. The report shall be reviewed and signed by an executive officer of the insurer responsible for the operations of the Special Investigations Unit.

## STATE FARM'S ABUSE OF SECTION 86.5

254. NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO INSURANCE FRAUDS BUREAU provides:

§86.5 Reports of fraudulent acts. Any person licensed pursuant to the provisions of the Insurance Law who determines that an insurance transaction or purported insurance transaction appears to be fraudulent or suspect shall submit a report thereon to the Insurance Frauds Bureau. Reports shall be submitted on the prescribed reporting form [(IFB-1) contained in this section or upon the form developed by the United States Department of Justice upon a determination that a matter is suspect. The forms annexed

- 73 -

hereto are hereby approved for use as specified in this Part] <u>issued by the Insurance Frauds Bureau or upon any other form approved by order of the superintendent. Reporting may also be done by means of any electronic medium or system approved by order of the superintendent.</u>

255. State Farm massively over reports apparent fraudulent acts to create justifications for denials.

256. The above is proven by the fact that a review of Insurance Department records will demonstrate that a bare fraction of the State Farm Complaints pursuant to §86.5 are deemed what could be termed founded by the Fraud Bureau of the Insurance Department. Moreover, the vast – incredibly vast – majority of State Farm fraud allegations are either never pursued or proven at trial.

## STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT

<u>Background</u>

257. State Farm Mutual Automobile Insurance Company is the parent or umbrella company for a host of entities that purport to provide insurance services including home, life, health, and auto as well as banking products to the citizens of the State of New York as well as the entire United States of America. These subsidiary companies all carry the "State Farm" brand and include: State Farm Life Insurance Company; State Farm Life and Accident Assurance Company; State Farm Fire and Casualty Company; State Farm Mutual Insurance Company of Texas; State Farm Indemnity Company; State Farm Guaranty Insurance Company; State Farm General Insurance Company; State Farm Florida Insurance Company; State Farm Lloyds; State Farm Bank, F.S.B.; State Farm Investment Management Corp.; and State Farm VP Management Corp.

258. Defendant State Farm has engaged in a long-standing pattern of fraudulent conduct within the State of New York, as well as in all 50 states of the United States of America. This fraudulent conduct targets State Farm's own premium paying policyholders as well as those damaged by conduct covered by State Farm policies –e.g. passengers and drivers of insured cars or negligence on the part of a premium paying State Farm policyholder that injures persons in other vehicles.

259. Simply put, State Farm employs various methods to cheat its policyholders and the public at large by refusing to fulfill State Farm's obligation to pay valid claims made by their premium paying policyholders and other covered injured persons. This State Farm strategy of cheating premium paying policyholders and the public at large is so essential to the operations of State Farm that State Farm has made snake oil tactics part of the State Farm corporate culture.

260. State Farm employees are indoctrinated into the State Farm corporate culture of duplicity to the point wherein said employees believe it is their right and obligation to swindle State Farm premium paying policyholders and other citizens out of the benefits that were paid for with hard earned policyholder premium dollars over the course of – in many cases – years.

261. In fact the State Farm "Code of Conduct" actually couches its language on the subject of "Ethical and Legal Conduct" to hold State Farm above the law as demonstrated in this quote from the State Farm Code of Conduct:

> State Farm expects employees to conduct State Farm's business in an ethical and legal manner, and to recognize that **in all their transactions and at all times they have a duty of undivided loyalty to State Farm.** These obligations demand positive action by all employees to protect the interests of State Farm, and to avoid situations where their self-interests actually or apparently conflict with the interests of State Farm. (Emphasis added)

262. As will be demonstrated by the evidence that will be presented State Farm engages in the following conduct on a nationwide basis as directed by their centralized home office: (i) "State

- 75 -

Farm's undisclosed policy of using its claims-handling process as a profit center to systematically deny benefits owed to consumers including incentivized claims handling wherein claim handlers are given rewards in the form of salary increases, bonuses and promotions in exchange for not exceeding preset limits on claims payouts; (ii) "Systematic destruction of documents, requested in litigation, that reveal the profit scheme"; (iii) "Systematic manipulation of individual claim files to conceal claims mishandling"; (iv) "Systematic manipulation of testimony by employees"; (v) "We keep plaintiffs tied up in law and motion for months. Now that's the old **mad dog defense tactic**, it works."

<u>Examples of State Farm Misconduct in Litigated Cases</u>

263. State Farm's post Katrina conduct has become the poster child of bad faith. An example of State Farm's Katrina related fraud and bad faith is the now famous case of <u>Broussard v. State Farm,</u> United States District Court, Southern District of Mississippi, Southern Divisions (Civil Action No. 1:06CV6 LTS-RHW) which led to the massive punitive damages award against State Farm. The decision on whether State Farm owed the Broussard's coverage was actually made by the court in Federal Rule 50 motions with much of the facts stipulated. The issue was wind versus water. If the Broussard home was destroyed by wind State Farm had to pay. If it was destroyed by water State Farm could exclude coverage. Despite the opinion of State Farm's own expert – a Dr. Gurley – that wind had to have caused at least a portion of the damage, State Farm denied the Broussard's claim. State Farm's alleged concluded that the Broussard home was destroyed by flooding. The court found State Farm's position to be absurd. The court further stated:

> I also find that State Farm lacks a legitimate or arguable reason under Mississippi law and the unambiguous terms of the subject insurance policy for failing to make an unconditional tender of policy benefits for the wind damage in light of the estimates reported to State Farm by Dr. Gurley.

The court then referred the matter to a jury for a determination on the issue of punitive damages. The jury hit State Farm with a devastating damages verdict that had to be reduced to a still significant percentage of the original.

264.  Of particular relevance is a case involving State Farm Mutual Automobile Insurance Company and bad faith that yielded a 145 million dollar punitive damages award that was reduced by the trial court, fully restored by the State of Utah's highest court and ultimately found to be excessive by the United States Supreme Court, who remanded the case for further proceedings regarding punitive damages. See the findings of the trial court visa-vi State Farm's Post Trial motions in CURTIS B. CAMPBELL and INEZ PREECE CAMPBELL v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Third Judicial District Court of Salt Lake County, State of Utah (Civil No. 890905231; the decision of the Supreme Court of Utah in Campbell v. State Farm Mutual Automobile Insurance Company, 65 P.3d 1134 (2001) and the decision of the United States Supreme Court in State Farm Mutual Automobile Insurance Company v. Campbell, 538 U.S. ___ (2003).  (All decisions annexed in Appendix to this Complaint)

265.  State Farm's insured Curtis Campbell caused an accident in which one person was killed and another person permanently disabled.   Campbell, with his wife Inez as a passenger, decided to pass six vans traveling ahead of them on a two-lane mountain highway.  Campbell in order to pass the above string of vans drove on the wrong side of the street toward oncoming traffic.  The deceased Todd Ospital in an effort to avoid a head on collision with the Campbell vehicle swerved onto the shoulder, lost control of his vehicle and ended up colliding with a vehicle driven by a Robert Slusher.  Ospital died while Slusher was rendered permanently disabled. "[A] consensus was reached early on by the investigators and witnesses that Campbell's unsafe

pass caused the crash." State Farm decided to contest liability. Most damning State Farm declined offers by Slusher and Ospital's estate to settle the case for the policy limit of a mere $50,000 – $25,000 per plaintiff. State Farm ignored the advice of its own investigators and took the case to trial. State Farm assured the Campbells that "their assets were safe, that they had no liability for the accident, that State Farm would represent their interests, and that they did not need to procure separate counsel."

266. Campbell was found 100% liable and hit with a judgment of $185,849.00. State Farm, informed the Campbells that they would not cover the $135,849.00 in excess liability. State Farm told the Campbells to move out of the neighborhood: "Its counsel [State Farm's] told the Campbells '[y]ou may want to put for sale signs on your property to get things moving.'" State Farm refused to post an Appeal bond. Campbell was forced to hire his own counsel to pursue his appeal.

267. The Plaintiff's attorneys in an act of kindness and sound strategy reached an agreement with Campbell wherein they would not pursue the Campbell assets if Campbell agreed to bring a bad faith action against State Farm.

268. Both the State Courts and the United States Supreme Court found that State Farm's conduct was "reprehensible." The Courts found that State Farm had an official policy – that later became a hidden policy – of giving its adjusters undisclosed incentives to deny consumers benefits owed them in order to enhance corporate profits by wrongfully turning its claims-handling process into a profit center. The Court stated that based upon:

> a large body of evidence, in the form of State Farm's own internal corporate documents, the testimony of its current and former employees, and credible expert testimony … State Farm has pursued this official policy of using its auto insurance claim-handling process as a profit center, by systematically providing its claims adjusters with unlawful incentives to wrongfully deny benefits owed consumers.

- 78 -

269. The Courts commented in detail on the duty that insurance companies have to their clients to pay claims based upon the merits. The Courts stated the obvious: Insurance companies cannot enhance corporate profits by underpaying or failing to pay claims. However, in the case of State Farm, claims adjusters are given specific numerical targets with regard to average payouts per claim. Meeting these targets leads to better pay and promotional prospects; missing them leads to criticism, retarded prospects at the company and, ultimately, a threat to one's continued employment.

270. The Courts pointed to internal State Farm documents going back as far as the 1970s and 1980s setting out the above profit motive claims handling. One particular document set out the framework for what would be State Farm's profit center claims handling – the Performance Planning and Review" or "PP&R Program." The trial Court pointed out that this "smoking gun" document was not even handed over by State Farm who had aimed to destroy all copies of said document.[6] In fact the head of State Farm's document retention program would not commit in open court to a request to not destroy the document again. In any event the document set forth a blueprint for "all level of employees at State Farm including claims adjusters" wherein employees received financial rewards for meeting preset targets for payouts each year – i.e., targets for payouts that are not tied to the severity and fair value of the claims that are being handled, but rather to State Farm's goals for making profits, by arbitrarily holding down payouts, for that year. (It bears emphasis that such arbitrary payment goals are set for claims that have not yet arisen, concerning accidents that have not yet happened)

271. State Farm's upper management became involved calling the adjusters the "big spenders" … and that it is their responsibility to "shore up the bottom line" i.e., to keep down payouts – in

---

[6] The document was retrieved from a former State Farm claims manager that had retained it.

order to ensure that State Farm has the "most profitable claims service in the industry." The court concluded that State Farm's above described conduct "functions and continues to function, as an unlawful scheme."

272. The court noted that State Farm's unlawful scheme "has applied equally to both third party and first party claims." The Courts further noted that the conduct of State Farm "was a consistent, nationwide feature of State Farm's business operations orchestrated from the highest levels of corporate management." The trial court further noted that although State Farm claimed it officially discontinued the procedures contained in the above discussed "PP&R Program", in reality State Farm continued the same exact conduct – albeit in unwritten clandestine form specifically designed "to make it more difficult to prove how the program operates to injure consumers." In fact the trial Court concluded:

> the record demonstrates in considerable detail the use by State Farm adjusters of wide variety of highly unfair and dishonest methods to drive down average payouts in claims ... including the falsifying or withholding of evidence in claims files.

273. The trial court also noted that the evidence strongly proved that State Farm had developed:

> a nearly impenetrable wall of defense against punishment for its wrongdoing so effective ... that State Farm trains its employees to ignore the threat of punitive damages in making their claims handling decisions.

Specifically State Farm employed five evasion tactics, each of which the Courts deemed reprehensible. First, the trial court noted, and this was based on documentary evidence and the testimony of State Farm employees:

> The record clearly supports the conclusion that State Farm's undisclosed policy of using its claims-handling process as a profit center to systematically deny benefits owed to consumers is deliberately crafted to prey on "the weakest of the herd" – the elderly, the poor, and other consumers who are at least knowledgeable about their rights and thus the most vulnerable to trickery or deceit, or who have little money and hence have no real alternative but to accept an inadequate offer to settle a claim at much less than fair value.

- 80 -

274. The second tactic cited to by both the trial court and the U.S. Supreme Court is State

Farm's: "Systematic destruction of documents, requested in litigation, that reveal the profit

scheme." The trial court flatly stated: "The record contains considerable evidence concerning

State Farm's aggressive efforts to 'manage' documents that might damage it in bad faith

litigation, including evidence of extensive efforts to erase large portions of corporate memory."

In fact a witness from State Farm testified that it was essential for a corporation to have a

"corporate memory" and it would be: "'abhorrent' ... for a corporation to seek out documents on

corporate practices that it views as unfavorable, replace them with new versions and destroy the

original versions ..."; and it would be improper for a corporation to destroy documents in a

completed case that were the subject of document requests in a current case. Yet as the Courts

noted State Farm did all of the above. In fact the U.S. Supreme Court stated:

> "The most important indicium of the reasonableness of a punitive damages award is the
> degree of reprehensibility of the defendant's conduct." ... We have instructed courts to
> determine the reprehensibility of a defendant by considering whether: ... the target of the
> conduct had financial vulnerability; the conduct involved repeated actions or was an
> isolated incident; and the harm was the result of intentional malice, trickery, or deceit or
> mere accident ... Applying these factors in the instant case, we must acknowledge that
> State Farm's handling of the claims against the Campbells merits no praise. The trial
> court found that State Farm's employees altered the company's records to make
> Campbell appear less culpable.

275. In an ironic twist the U.S. Supreme Court actually found State Farm's conduct to be so

reprehensible that it produced a punitive damages award that was excessive. Specifically, the

Campbells presented compelling evidence that State Farm's conduct was national in scope and

the Supreme Court was of the opinion that State Farm was punished by the Court and jury as a

result of this national scope: "The Utah Supreme Court's opinion makes explicit that State Farm

was being condemned for its nationwide policies rather than for that conduct direct[ed] (sic)

toward the Campbells." The U.S. Supreme Court was of the opinion that punitive damages were

- 81 -

justified "but a more moderate punishment for this reprehensible conduct could have satisfied the State's legitimate objectives." In short the Supreme Court acknowledged the nationwide scope of State Farm's illicit conduct, but felt that State Farm should have been punished only inasmuch as it damaged the Campbells and the State of Utah – not the country as a whole.

276. In any event regarding the destruction of documents the trial court noted that "many documents that were critical to the Campbell's proof in this case were obtained not through discovery directed to State Farm, but through the fortuity that State Farm employees happened to retain them after leaving the company ..." The court then summarized the evidence – both documentary and in testimony from former State Farm employees – of State Farm's document destruction activity including, upon orders of top management through an attorney, the instruction "to search their offices and destroy a wide range of material of the sort that had proved damaging bad faith litigation in the past – in particular, old claim-handling manuals, memos, claim school notes, procedure guides and other similar documents." The evidence of State Farm's document destruction efforts became monumental including destruction of documents at corporate headquarters; an admission by State Farm that it had destroyed every single copy of the old claim-handling manuals that it had on file in its historical unit even though these documents could have been maintained at minimal expense; the sending of letters by State Farm to its more than 2,000 current or former outside law firms directing them to destroy or return immediately every copy of a wide range of potentially damaging documents; and settlements of claims where plaintiffs obtained incriminating documents through investigative efforts wherein the terms of the settlements included the return of documents – and then when other plaintiffs requested said documents State Farm would reply that it did not have said documents.

- 82 -

277. The court then focused on State Farm's "aberrant" efforts to insure that no damaging documents were created at all including documents pertaining to excess judgments; bad faith claims; punitive damage awards – which State Farm maintained it had no record of even though such awards had to be reported to the IRS and in some states could not be used to justify rate increases. In fact a regional manager testified that under State Farm policy he was not permitted to report punitive damages awards to upper management, which created plausible deniability.

278. Attached to the Appendix of this Complaint is a copy of an e-mail sent by State Farm management to claims handlers and other individuals, which implored them to destroy – purge – documents and manuals etc. in order to protect the company from bad faith claims. Here is a relevant portion of that e-mail:

> Yesterday in the staff meeting, we talked about the need to purge our desks of all old memo's, notes and procedural guides. With the increase of bad faith suits being filed against State Farm, it is important that you get rid of all your old stuff. Know you have lurking around in your drawers and filing cabinets.
>
> Please get rid of any old memo's, claim school notes, old seminar or claim conference notes, and any old procedure guides you may have. They are trying to avoid having to come up with old records when the "request for production of documents" comes in and they request "all training manuals, memos, procedural guides, etc. that are in the possession of your claims reps and management".
>
> Apparantly, (sic) they had a request like this in Texas and each person had to surrender all their old junk. I guess corporate is not even going to keep old CPG guides, old claim manuals, etc. We will only have what is currently in effect. That way if they subpoena our claim manual for U claims for 1987, for example, we will say we dont have it. This should be easier than trying to produce it or having to defend it.

279. The third State Farm "evasion tactic" that the Courts discussed is what the trial court labeled as "*Systematic manipulation of individual claim files to conceal claims mishandling.*" The trial court succinctly summed up the State Farm practice:

- 83 -

The record also contains ample evidence that State Farm has long directed it claim adjusters to systematically "sanitize" or otherwise manipulate individual claim files to provide a false, innocent picture of how the claim was handled in an effort to minimize exposure to later lawsuits alleging bad-faith claim handling.

280. The court noted that much of the evidence consisted of internal documents that State Farm thought they had destroyed. There was also testimony from former State Farm employees describing how they were required systematically to improperly rewrite documents detailing and manipulating claim files and maintain important information on temporary "buck slips" or "post it" notes, to be removed later, and how their superiors routinely engaged in successive "purges" of any negative information that might remain in a file, prior to being handed over to opposing attorneys in discovery.

281. Specifically the Court pointed to the State Farm "Excess Liability Handbook" which was not obtained from State Farm via discovery – State Farm believing all copies of said handbook had been destroyed. In any event, the Handbook was an instruction manual that makes it clear that State Farm made a conscious business decision to "gamble" – take a hard line – in excess liability cases in order to increase profits. The Handbook notes that State Farm "recognized the need to conceal that it was making conscientious decisions to subject its insureds to the risk of excess verdicts":

> Accordingly, the Handbook has instructions on padding the file with "self-serving" documents, as well as instructions to leave certain critical items out of files, such as evaluations of insured's exposure. Such instructions clearly required manipulation of files to conceal State Farm's misconduct in excess cases and to make it very difficult for an insured who is victimized by an excess verdict to ever hold State Farm accountable.

282. The fourth State Farm "evasion tactic" was dubbed "*Systematic manipulation of testimony by employees*." The trial court reviewed and summarized the evidence of State Farm's "long corporate policy, in defending against cases alleging bad faith claim handling, of aggressively "coaching" its employees to ensure that their testimony will be favorable to the company and

that opposing attorneys will be hindered in their ability to obtain relevant, non-privileged

information from such witnesses." The court viewed evidence that was uniquely damning:

> in the form of transcripts of videotapes of a company wide claims management conference at which State Farm's claim-handling supervisors were told that they should anticipate being potential witnesses for the company in bad faith litigation. The supervisors were taught that in courtrooms, "truth is illusory" how, through extensive coaching, a memory can be "created" for a company witness; and how, by repeating questions and prepared answers "numerous times", State Farm attorneys and witnesses can work together to "totally frustrate" the efforts of opposing attorneys.

283.   In California a former State Farm employee testified about instructions to destroy

documents related to the forged signatures of policy holders – State Farm forged them – omitting

damage from earthquakes and how she was given a script by State Farm detailing each of her

answers to various questions at a deposition.

284.  Finally, the fifth and most commonly viewed, by the New York City Civil Court, State

Farm evasion tactic: "*Systematic efforts to intimidate opposing claimants, witnesses and*

*attorneys*" or as State Farm labels it – "mad dog defense tactics." The basic thrust of this tactic

is to "wear down and outlast plaintiffs and opposing attorneys in lawsuits seeking to punish it for

bad-faith claim handling, by using a variety of tactics to intimidate claimants, witnesses and

attorneys who oppose it."

285. Testimony demonstrated that a common tactic of State Farm was that of "unjustly attacking

the character, reputation and credibility of a claimant and making notations to that effect in the

claim file to create prejudice in the event the claim ever went to a jury." The court pointed out

that in the Campbell case State Farm used this tactic wherein a claims handler was instructed by

his superior to make a notation in the file that the deceased was "speeding because he was on his

way to see a pregnant girlfriend." In reality there was no pregnant girlfriend. State Farm

actually put out a booklet instructing its outside attorneys to ask personal questions as part of an

examination under oath of a claimant, for the purpose of deterring the claimant from continuing with the process, out of a fear of embarrassment. One of State Farm's favorite tactics is the infidelity accusation. Here is some language from the State Farm manual on personal attacks:

> Most of us consider our income, our debts, our domestic problems, how we spend our money, whether we are keeping another woman, and things of this nature to be very personal. We don't like other people asking us questions about these things, and, under normal circumstances, we don't go around asking other people these questions. However … where a punitive damage count is in a lawsuit, these matters become extremely important to the successful defense of that claim. If the insured is paying the expense of keeping some woman in an apartment, that may be extremely personal business, especially if he is married, but if he … charges that we are guilty of conduct for which we should be punished, it is also our business.

286. State Farm's treatment of its former employees that have blown the whistle on their practices is despicable. One former employee was subjected to an extensive investigation that produced an 88-page dossier of her personal life, including a morbid focus on her sex life – "to the point of paying a maid at a hotel to reveal whether or not Delong was having overnight guests." State Farm went as far as assigning a shadow attorney to follow her to cases where she appears as a witness. The attorney's job is to "essentially harass her with unnecessary, repetitive depositions. This former State Farm employee, a Ms. Delong, testified:

> They frequently run from three to five days, where we go over the same things, the same allegations, the same unpleasantness. They're usually videotaped, frequently with in excess of two or three flood lamps, for seven and eight hours at a time.

287. Finally, to the "Mad Dog" litigation tactics proper:

> At a national conference, approximately 200 of State Farm's divisional claims superintendents were instructed "we keep plaintiffs tied up in law and motion for months. Now that's the old mad dog defense tactic, it works." Specifically, State Farm makes the litigation process as time-consuming, expensive and prolonged as possible by, for example, making meritless objections; claiming false privileges; and destroying documents or claiming that they do not exist or would be too expensive to retrieve.

288. The dockets are full of cases involving "institutionalized bad faith" and "incentivized claims handling" on the part of State Farm. For example: <u>Avery v. State Farm Mutual</u>

Automobile Insurance Company, 321 Ill. App. 3d 269 (Ill. App. Ct. 2004) (lowering the total damages award to $1,056,180,000 in class action for fraud wherein State Farm Mutual Insurance Company substituted inferior parts for factory parts called for in Policies)(Decision subsequently over turned by Illinois Supreme Court and Cert. to U.S. Supreme Court denied); and <u>Merrit v. State Farm Mutual Insurance Company</u> wherein the Court of Appeals of Georgia – 4th Division – reversed the trial court's decision to grant State Farm summary judgment in a case where State Farm hid the existence of a one million dollar umbrella automobile insurance policy from plaintiff injured in automobile collision.    This umbrella policy was hidden despite various discovery demands calling for the production of excess insurance to which State Farm responded, "none."

## THE CONFIDENTIAL INFORMANT ADJUSTER

289.  Plaintiffs have gained information from a confidential informant ("C.I.") that worked for State Farm.  The C.I. is a former auto adjuster who worked at an "operations center." The C.I. has provided damning information regarding his supervisor's disagreements with the C.I.'s evaluations regarding injury claims.  The boss supervisor the C.I. adjuster to change items of information, exclude information and as a work around have the C.I. adjuster email her his evaluations first before putting them in the file.  This was done so that the supervisor could delete and modify the adjuster's entries to falsely create a file that reduced or eliminated State Farm's liability.  The C.I. adjuster's boss told all the adjusters what to say and what not say in their reports in order to reduce the State Farm offers on cases evaluated by the adjusters.

290.  The above was a standard everyday practice at the facility where the adjuster worked.

291. The C.I. and other adjusters were forced to attend a weekly team meeting to discuss and to literally make fun of claims. The unit would meet and listen to claims handlers make fun of legitimate claims and then develop strategies to get out of paying on them.

292. The C.I. adjuster explained that the conduct of his supervisor was unethical. The C.I. advised State Farm that the C.I. would not jeopardize the C.I.'s license to be an adjuster by doing what State Farm asked him to do. The evidence of State Farm telling the C.I. to change evaluations is quite strong.

293. The C.I. requested an internal investigation. An internal investigation was performed and the investigation allegedly found nothing. However the investigator never spoke with the witness that the C.I. told the investigator had evidence of State Farm wrongdoing.

294. The Plaintiffs have evidence of how each of the C.I. adjuster's evaluations and requests to settle a claim were responded to with statements such as "we do not do it that way." There is also evidence of State Farm instructing the C.I. Adjuster to exclude items and reduce amounts offered even though said amounts were justified amounts that State Farm should have paid.

295. As a result of blowing the whistle the C.I. Adjuster was fired by State Farm during a two month span of false allegations.

## THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY

### I. THE NICB'S MISCONDUCT AND ABILITY TO HIJACK GOVERNMENT LAW ENFORCEMENT AGENCIES ON BEHALF OF THE INSURANCE INDUSTRY IN ORDER TO KILL INSURANCE CLAIMS

Background

296. As stated, the NICB is a non-profit corporation that is fully funded by the insurance industry through insurance company membership dues that are based upon an assessment of the insurer's market share. The NICB is not a law enforcement agency. It is not a governmental

agency. It is not even a quasi-governmental agency although it often times is ceded such power by law enforcement through nefarious means.

297. The NICB ostensibly assists insurance companies in the investigation of insurance fraud. In reality, the NICB hijacks law enforcement or, in some cases, at least improperly directs law enforcement into taking police action in specific cases that were brought to the NICB from member insurance companies or that were generated by the NICB.

298. The NICB also acts as a representative of insurance companies to law enforcement in order to advocate on behalf of insurance companies to law enforcement in general. The NICB will also indoctrinate law enforcement to the benefit of insurance companies by training law enforcement personnel ostensibly to detect insurance fraud, but in reality to utilize a broad set of criteria to detect insurance fraud which criteria when followed leads to a gross number of false detections of insurance fraud.

299. The NICB lists in its "Key Benefits of NICB Membership" – an advertisement to insurance companies to join the NICB – the following benefit:

> **Law enforcement/insurance industry contacts and relationships.** *Through its relationships with law enforcement* and the insurance industry at all levels, *the NICB helps Members obtain reports and information that they otherwise could not receive* on their own. *The NICB also assists its Members by serving as an outsource solution for their prosecution needs with the ultimate goal of securing restitution. We leverage our law enforcement relationships,* so that Members can focus on identifying new questionable claims and develop future cases. NICB working group meetings nationwide cover a broad array of investigative, information and training topics. They are frequently the only opportunities for investigative professionals to share information and discuss local fraud topics. (Italics added)

The NICB boasts that it provides insurance companies with sensitive law enforcement information. More troublesome is the language: "The NICB also assists its Members by serving as an outsource solution for their prosecution needs ..."

- 89 -

300. Under the law insurance companies do not have recognizable "prosecution needs." No individual or entity of any kind has a recognizable "prosecution need." In the New York State prosecutions are brought on behalf of the "People of the State of New York." In the federal system criminal prosecutions are brought on behalf of the "United States of America."

301. Most brazen is the NICB boast: "We leverage our law enforcement relationships ..." It is illegal and unethical for private industry to "leverage" law enforcement. "Leverage" means "influence", "power", "force", "control." The only legitimate means to "leverage" law enforcement into pursuing prosecutions is through the ballot box.

302. In 2003, the height of BORIS, the NICB had revenues in excess of $30 million dollars primarily through its 1,000 or so members. As of the last available Annual Report the NICB still boasted over a thousand members and had in excess of $34 million dollars.

303. According to Annual Reports of the NICB, several current and former members of the FBI held positions with the NICB. In 2003, Michael Kirkpatrick, then an active assistant director with the FBI, served on the NICB's Board of Advisors. Likewise, in 2001, Dennis M. Lormel, an active member of the FBI, the Section Chief, Financial Crimes Section of the FBI, sat on the Board of Advisors of the NICB. In 2005, active FBI Assistant Director Thomas Bush III, Assistant Director of the Criminal Justice Information Services Division, sat on the Board of Advisors. In 2006, active FBI Assistant Director Bush was on the Board of Advisors. In 2003, Eugene Glenn, a former FBI Special Agent who had a 26-year career with the Bureau including serving as the Special Agent in charge of the Salt Lake City Division, was on the Board of Advisors. In 2003, up to and including the present time, the Chief Executive Officer of the NICB is one Robert "Bear" Bryant. Shortly before coming to the NICB, Bryant was the Deputy Director of the FBI – the second highest-ranking position with FBI – wherein Bryant managed

the day-to-day operations of the FBI. (Bryant has been the CEO of the NICB going as far back as 2000). Likwise, State Farm employees held and hold positions within the NICB, including Frank R. Haines and Susan Q. Hood.

304. FBI ties to the NICB are so pervasive that the NICB refers to its investigators as "Special Agents" wherein the FBI also refers to its investigators as "Special Agents." Of course every line investigator at the FBI and NICB has the title of "Special Agent", which leads to the syllogism that if everyone is "Special" no one is "Special." In fact the NICB's involvement with law enforcement investigations is a nationwide phenomenon that includes a degree of participation that has since the mid 90s with the joint FBI/NICB "Operation Sudden Impact" has come under a significant if not well-publicized scrutiny.

Sudden Impact

305. Sudden Impact was a joint FBI/NICB nationwide fraud sting conducted in the 90s. It targeted physicians, lawyers and business owners allegedly involved in the staging of automobile accidents to collect on insurance policies.

306. Freedom of Information Act requests yielded the following key findings:

- A document called a Memorandum of Understanding ("MOU") outlined the relationship between the FBI and the NICB. According to the document: "The purpose of this MOU is to outline the responsibilities of the FBI and the NICB. In addition this MOU will formalize the relationship between the two organizations with regard to policy, planning, public relations, and the media in order to clarify the role of each organization."

- 91 -

■    As part of Sudden Impact, FBI and NICB agents, acting as a team, interrogated suspects, conducted search warrant raids and had access to medical records, as well as access to a massive insurance company database (ISO discussed *infra*). NICB agents, side by side with FBI agents, actually conducted search warrant raids. That means representatives of insurance companies – say State Farm – were permitted to take down doors and enter into citizens' homes and businesses with the FBI in tow. Representatives of insurance companies – say State Farm – interrogated suspects/citizens. A search warrant wherein corporations take down doors and rifle through citizens' belongings, documents, etc. and wherein citizens are interrogated by corporations is fascist by definition.[7]

■    A series of national and regional meetings were held around the country between November 1993 and April 1995 to plan the Operation Sudden Impact "takedown day." The meetings occurred in such cities as Denver, Tampa and Las Vegas, and involved the participation of FBI agents from local field offices and NICB agents, as well as assistant U.S. attorneys from around the country.

■    The day of the "takedown," May 24, 1995, was designed as a media event that involved FBI headquarters issuing a boiler-plate press release announcing that arrests and indictments were going to be made across the country. FBI field offices were encouraged to customize the press release with input from the NICB.

---

[7] Mussolini: "Fascism should more properly be called corporatism because it is the merger of state and corporate power." Franklin D. Roosevelt in an April 29, 1938 message to Congress warned that the growth of private power could lead to fascism: "The first truth is that the liberty of a democracy is not safe if the people tolerate the growth of private power to a point where it becomes stronger than their democratic state itself. That, in its essence, is fascism--ownership of government by an individual, by a group, or by any other controlling private power."

■   FOIA documents and other sources – newspaper archive research – point to a pattern of racial profiling in Sudden Impact with minorities being targeted by at a rate of nearly 8 to 1.

■   On May 24, 1995 a lawyer's office in San Antonio Texas – one E. Nicholas Milam – was raided. Documents belonging to the attorney and other materials were seized. FOIA documents indicate that the FBI had no record of that lawyer ever being of "investigatory interest to the FBI." The FBI admitted as much through their public relations department. The lawyer to this day has never been charged with a crime yet the negative effect of the publicity destroyed his practice. In January 2002 Mr. Milam received six large boxes from the FBI. These boxes contained the case records and computers confiscated by the FBI some seven years earlier accompanied by a letter signed by Supervisory Special Agent Monte E. Smith. The letter stated: "The attached material obtained from you in connection with an investigative activity of the Federal Bureau of Investigation (FBI) is of no further value to this agency or the Department of Justice. The FBI is prohibited from destroying this material, therefore, it is being returned to you for whatever disposition you deem appropriate."

■   An African American lawyer in Houston claimed that his computer was loaded with racist slurs and threats as part of the FBI/NICB investigation. Charges against this lawyer were dropped.

■   A former FBI informant responsible for infiltrating the Iranian community stated that the FBI specifically targeted Iranians in San Antonio Texas and that the Government spent so much money to get one particular family they were

- 93 -

bound to get them. The same U.S. Attorney's Office that utilized the above informant also came under scrutiny for covering up the fact that another informant utilized by the Office had participated in the murders of dozens of people in Ciudad Juarez, Mexico, dubbed the "House of Death" case.

307.     As a result of the above described, the League of United Latin American Citizens ("LULAC") the largest and oldest Hispanic Organization in the United States, conducted its own investigation and contacted members of the United States House of Representatives. This included Charles Gonzalez, D-Texas and Cynthia McKinney, D-Georgia, amongst others, who formally requested an explanation of how the NICB could have been so heavily involved in an FBI investigation/operation, search warrants and arrests.

308. The FBI responded with a letter signed by one A. Robert Walsh, a legislative counsel with the FBI's Office of Public Records and Congressional Affairs. Walsh stated that its cooperative relationship with the NICB is authorized under the 1996 Health Insurance Portability and Accountability Act, which authorizes information sharing between the NICB and FBI as well as joint insurance-fraud investigations. Walsh stated: "Although the extent of the NICB's involvement in the individual investigations varies, the NICB has commonly provided personnel, insurance industry expertise and liaison contact with the victim insurance companies." Walsh further stated that MOU's are commonly utilized between the FBI and NICB "in order to delineate the specific responsibilities of all parties in long-term cooperative efforts." Walsh denied allegations of racial profiling. Walsh stressed that the "FBI always maintains the responsibility of leading, directing and administering criminal investigations ... NICB agents are not law enforcement officers and are not authorized to execute arrest or search warrants."

- 94 -

309. There are problems with Walsh's response. The 1996 Health Insurance Portability and Accountability Act (HIPPA) pertain to health insurance and related health care fraud. The act is not meant to encompass property and casualty liability insurance claims related to automobile accidents such as those investigated jointly by the FBI and NICB.

310. Furthermore, the McCarran-Ferguson Act of 1945 established the states as regulators of the insurance industry, which means there is virtually no role for the federal government in regulating insurers.

311. The FBI's investigatory and information sharing relationship with the NICB predates HIPPA, which became law in 1996. The relationship between the NICB and the FBI dates back to at least 1993 according FOIA documents. (The NICB was formed in 1992)

312. In a 1996 Court deposition given by NICB Agent Gary Evans, Evans states that he participated with FBI agents in the interrogation of a client represented by the above mentioned victimized attorney E. Nicholas Milam.

313. Also indicative of the falseness of the FBI's response to criticism is the fact that in 2005 hundreds of pages of documents requested pursuant to FOIA were finally released. The documents demonstrated that Sudden Impact was initiated upon information brought to the FBI via the NICB. That NICB agents interrogated witnesses. That NICB agents actually assisted in the execution of search warrants. This directly contradicts the letter signed by A. Robert Walsh stressing, "NICB agents are not law enforcement officers and are not authorized to execute arrest or search warrants."

314. The FBI's website contains a section entitled "Insurance Fraud: A Basic Overview." The section lists the NICB prominently under "Insurance Fraud Resources."

315. The NICB's law enforcement conduct has been continuous nationwide. This includes the activities of NICB Special Agent Ray H. Niblett. Niblett had obtained a badge from the Texas Department of Public Safety under an obscure state law dating back to the early 20th century wherein ranchers and oil field operators had the ability to hire private security guards as "Special Rangers" to protect their property.

316. Niblett would accompany uniformed police officers to citizens' homes. When let inside the premise Niblett would announce that he was a Special Agent with the National Insurance Crime Bureau. (Sounds close enough to the Federal Bureau of Investigation) Niblett would then flash his public safety badge and commence to interrogate the citizen.

317. Indeed, the NICB, its agents and influence have been the subject of further alleged misdeeds including activities involving the Export Office at the Customs and Border Protection port of entry in Nogales Arizona.

318. Part of the duties at this particular office was the processing of paperwork for vehicles being exported from the United States to Mexico. The paperwork had to arrive at the checkpoint at least 72 hours prior to the vehicle to give customs the opportunity to verify that they were not dealing with stolen vehicles. An NICB Special Agent – one Jesus Alvarez – in an agreement between the NICB was assigned to work at the check point. Special Agent Alvarez's duties were to compare the vehicle paperwork with the NICB database of stolen vehicles. NICB Special Agent Alvarez was empowered to sign off on the paperwork of vehicles in line to be exported. As it turned out the NICB Agent was receiving bribes from $100 to $350 dollars for each time he used his stamp to allow non-verified vehicles – unchecked as to status of stolen or not – to pass through the checkpoint. As a result of the sting that uncovered the above a total of 18

individuals were indicted for bribing a public official with a maximum sentence of 25 years. NICB Agent Alvarez was indicted for accepting bribes.

319. The Customs Inspector that made the case faced reprisal from his own department through FBI manipulations in order to chill any future investigation into the FBI's close associates the NICB.

320. All of the above is illustrative of the NICB's conduct in New York.

ISO

321. The NICB works closely with an insurance industry controlled group called the Insurance Services Office Inc. ("ISO"). ISO, as of 2003, the height of BORIS, was 85 percent owned by insurance companies. In 2003 ISO recorded revenues of $485 million dollars.

322. The main feature of ISO is a mega-data base that it sells to insurance companies and makes available to law enforcement as administered by the NICB. In fact the ISO website informs members of law enforcement that are having difficulties with the ISO database to contact the NICB and gives an NICB telephone number that should be called.

323. The ISO database includes hundreds of millions of records for American Citizens including insurance claims, medical records, motor vehicle reports, police records and driver's license numbers. Contained within these documents are the dates of birth; address history; social security numbers; license information; phone numbers; etc, of each citizen.

324. The ISO database is a Pandora's Box of identity theft – a 3D identity theft nightmare wherein dangerous criminals have everything and more then needed to successfully obtain credit; credit cards; private records; etc., using the identity of American citizens to cause financial ruin, credit destruction and grief all along the way.

- 97 -

325. In the year 2002 the Indiana State Senate debated a bill that would have prohibited state agencies from releasing social security numbers unless required by law or under court order. The NICB 2002 Annual Report brags: "When the NICB caught wind of legislation in the Indiana Senate recommending this nondisclosure, we acted quickly to help put the brakes on it." According to the NICB their government affairs team immediately submitted comments and presented testimony. "The bill never came to a vote and no further action was taken on the proposal, thus helping us ensure that social security numbers from Indiana continue to provide clues for our fraud and theft investigation solutions." The NICB's efforts were applauded by the Insurance Institute of Indiana and upon information and belief more than just testimony helped persuade members of the Senate not to submit the bill for a vote. Why on earth would the NICB be entitled to receive Social Security numbers from state agencies.

326. According to ISO their database "serves thousands of insurers (more than 93 percent of the property/casualty insurance industry by premium volume), 25 state worker's compensation insurance funds, 636 self insureds, 452 third-party administrators, several state fraud bureaus and many law enforcement agencies ... [with] more than 8,600 customer sites connect[ing] to the system through the Internet or other high speed telecommunications systems" – unfettered access to citizens' complete identities.

327. According to ISO, insurance companies, self insureds, the NICB, etc., enter information via the customer sites about individuals' claims. We do not know who enters this information. This information is garnered from documents such as the above-mentioned insurance claims, medical records, motor vehicle reports, police records, etc. Often times we do not know where the information contained on these documents came from – i.e. a claimant, witness, medical

personnel, secretaries, office personnel, claims adjusters; we do not know when the entries were made and where the entries were made.

328. The ISO database is the greatest hearsay machine every built and yet in Operation BORIS and countless other so-called operations this information alone was independently used as alleged probable cause to make arrests.

329. In any event, here is how the ISO database works. A claim is submitted by some unknown person – probably an insurance company employee – thereby adding more information to this already humongous database that includes the NICB database. According to ISO, "the ISO Claim Search system searches the database and returns information about other claims filed by the same individuals or businesses (either as claimants or insureds). The system searches for matches in identifying information fields, such as name, address, Social Security number, vehicle identification number, driver's license number, tax identification number or other parties to the loss." Once again, according to ISO, "more than 8,600 customer sites connect to the system through the Internet or other high speed telecommunications systems."

330. BORIS was driven by ISO Reports and State Farm Link Analysis. (*See infra*).

331. Despite the above a State of New York Insurance Department Opinion Letter of May 26, 2005, enunciates that the Superintendent of Insurance has designated ISO to be the centralized organization wherein insurance companies should report private passenger automobile first-party physical damage and third-party property damage losses. According to the Opinion Letter that electronic submission of information to ISO is "pragmatic and acceptable." The above Opinion letter highly calls into question the Insurance Department's faithfulness to its purpose of protecting consumers as well as who actually runs the taxpayer funded governmental entity.

BORIS and New York

332. The NICB is involved in one form or another in almost every criminal investigation of automobile related insurance fraud that occurs in the New York Metropolitan Area. This includes investigations conducted by the various police agencies, district attorney's offices, the Attorney General and the FBI.

333. For example, around the same time that the NICB, State Farm and the Suffolk DA's Office were conducting BORIS, the FBI and NICB were conducting an investigation into a large medical billing corporation located in Brooklyn. This investigation finally led, after years of investigation, to the execution of a search warrant by the FBI, which, upon information and belief, was attended by the NICB. The search warrant was executed approximately 4 years ago with much fanfare but no one has ever been arrested. Yet State Farm and other insurance companies continually used the execution of the search warrant as a justification for denying claims from providers of medical services for whom the billing company had submitted bills.

334. When attached to an investigation the NICB seeks information unearthed by the investigation, which they pass on to member insurance companies. This information allows the member insurance companies to deny claims based upon fraud with a stated justification. In this regard even the execution of a search warrant is big news.

335. The NICB utilizing the fact that many of their so-called "agents" were former members of law enforcement – NYPD, FBI, DA Investigators, etc. – infiltrates even non-FBI law enforcement investigations. This infiltration goes unchallenged in most quarters and if challenged the NICB implicitly lets it be known that it could hand the case over to the FBI effectively killing local jurisdiction. In fact the common refrain from NICB Agents is that "the FBI is going to want to talk to you about this case."

336. NICB Agents are often present for every stage of an investigation including the execution of search warrants, questioning of witnesses and interrogations. These agents have free access to Police Squad Rooms, the Attorney General's Office and District Attorneys' Offices.

337. The NICB knows that their utility to insurance companies comes primarily from the ability of police action to have a claim killing effect. As a result the NICB acted in direct competition with the New York State Insurance Fraud Bureau which bureau consisted of legitimate elite law enforcement members with the power of arrest.

338. The NICB constantly attempts to get insurance companies to avoid the statutory fraud reporting requirements to the State Frauds Bureau in favor of transmitting the information directly to the NICB. The NICB could then push the case upon law enforcement and get credit.

339. Often times the NICB leaks information from law enforcement investigations to insurance companies in order to assist insurance companies in denying claims. This includes sensitive wiretap information.

340. In 1997 the highly treasured NICB database was given to ISO: "The NICB Board of Governors voted … to endorse the migration of the NICB's claims and related databases and software to ISO." In addition in that same year ISO purchased the assets and operations of American Insurance Services Group Inc., which gave ISO that organization's database. In return the NICB did not have to pay for use of the massive combined database and became, in effect, an administrator of the database to law enforcement.

341. For a fee insurance companies now had access to this super database thereby limiting the utility of the NICB immensely. Some insurance companies left the NICB.

342. As a result of their questionable utility the NICB engaged in the above-described behavior in order to kill claims, which in turn maintained their insurance company membership and their existence.

343. The NICB engaged and engages in the manufacturing of evidence. For example the NICB constantly issues "Alerts" about:

> possible questionable activity of which the NICB has either direct or indirect knowledge or has been otherwise informed of its existence. This information is provided as a lead and any further use by member companies or law enforcement should be undertaken at the discretion of those entities or agencies. While this information may be used to supplement and/or initiate independent investigations the NICB recommends that further independent investigation be conducted as follow up to this information for the proactive detection, prevention and deterrence of insurance related crime. Any dissemination of this information outside your organization without the prior written approval of the NICB Law Department is not authorized by the NICB.

As one can ascertain by reading the above the Alerts are useless. In fact in would be foolhardy to act on the "information." The above language is found at the bottom of NICB "Alerts" in small type and acts as a disclaimer. Meanwhile the body of the Alert contains lurid hearsay descriptions of the so-called "questionable activity."

344. The NICB, unlike law enforcement or insurance companies, has no duty to report suspected criminal activity to the Fraud Bureau of the Insurance Department. The Fraud Bureau frowns upon unfounded reports of fraud. But as the NICB is not required to file reports of suspected fraud with the State they can basically say whatever they want.

345. As described in more detail below the NICB participated in the Suffolk County District Attorney's Office Operation to a degree that is unprecedented even in the NICB's storied history.

346. Even prior to BORIS the NICB had set up a permanent office and presence in the Suffolk County District Attorney's Office as part of the DA's Insurance Crimes Unit. This unit consisted

of Suffolk County DA prosecutors, Suffolk County Police Department Detectives and NICB "Special Agents" working side by side in the DA's Hauppauge Offices.

347. These NICB agents were never formally deputized, if such could be done, yet performed investigations in a manner indistinguishable from Suffolk County Police Department Detectives under full color and authority of the Suffolk County DA.

348. The NICB brought the information – mainly ISO reports and State Farm Link Analysis – that would become BORIS to the Suffolk County DA.

349. The NICB in a secret arrangement funneled funds from State Farm to the Suffolk County DA's Office in order to in effect purchase a government investigation designed by State Farm and the NICB to create false justifications for the denial of claims.

350. Once the money was obtained by the Suffolk County DA's Office the Office utilized said funds for the purchase of computer equipment; the payment for cellular phones and the use therein including personal use; the leasing of vehicles that were used for DA business as well as personal use; the hiring of cronies and personal friends; personal expense accounts; dining out including the purchase of alcoholic beverages and other questionable uses.

351. NICB "Special Agents" as well as members of insurance company SIU units were sent out into the field to question witnesses and suspects.

352. NICB "Special Agents" as well as members of insurance company SIU units were sent out into the field to perform surveillance.

353. NICB "Special Agents" as well as members of insurance company SIU units reviewed subpoenaed documents.

- 103 -

354. NICB "Special Agents" as well as members of insurance company SIU units participated in the execution of search warrants.

355. NICB "Special Agents" participated in arrests.

356. The NICB on behalf of State Farm and the insurance industry led the investigation by making key decisions as to who the targets would be, what records would be subpoenaed, who would be indicted and who would be arrested, as well as what locations would be the subject of search warrants. At all times the NICB had as much information as the Suffolk County DA about Operation BORIS.

357. In addition under color of BORIS the NICB and insurance company SIU members would show up unannounced at the execution of search warrants by other non-BORIS law enforcement entities such as the NYPD and Kings County District Attorney's Office.

358. The insurance industry and NICB sought to turn every active law enforcement insurance fraud case in lower New York State into a part of BORIS.

359. During BORIS and in its aftermath NICB "Special Agents" flouted the authority unlawfully given to them by the Suffolk County DA to intimidate, coerce, and through fraud and lie, persuade individuals to sign affidavits that benefited insurance companies.

NICB "Special Agents" Regardless of their Haughty Title are Required to Have and Maintain Private Investigators Licenses; the NICB "Special Agents", do not Possess such Licenses.

360. According to New York General Business Law Section 81, Article 7, Private Investigators, Bail Enforcement Agents and Watch, Guard and Patrol Agencies the following is true: Section 70. Licenses,

Subdivision 1.

The Department of State shall have the power to issue separate licenses to private investigators ...

Subdivision 2.

No person, firm, company, partnership, limited liability company or corporation shall engage in the business of private investigator ... notwithstanding the name or title used in describing such agency or withstanding the fact that other functions and services may also be performed for a fee, hire or reward, without having first obtained from the department of state a license so to do, as hereinafter provided, for each bureau, agency, sub agency, office and branch office to be owned, conducted, managed or maintained by such person, firm, company, partnership, limited liability company or corporation for the conduct of such business.

Subdivision 3.

No person, firm, company, partnership, limited liability company or corporation shall engage in the business of furnishing or supplying for a fee, hire or any consideration or reward information as to the personal character or activities of any person, firm, company, or corporation, society or association, or any person or group of persons, or as to the character or kind of business and occupation of any person, firm, company or corporation, or own or conduct or maintain a bureau or agency for the above mentioned purposes ... without having first obtained from the department of state, as hereafter provided, a license so to do as private investigator for each such bureau or agency and for each an every sub agency, office or branch office to be owned, conducted, managed or maintained by such persons, firm, limited liability company, partnership or corporation for the conduct of such business ...

Subdivision 4.

Any person, firm, company, partnership or corporation who violates any provision of this section shall be guilty of a class B misdemeanor.

361. <u>Section 71. Definitions, 1.</u> defines "Private Investigator":

"Private Investigator" shall mean and include the business of private investigator and shall also mean and include, separately or collectively, the making for hire, reward or for any consideration whatsoever, of any investigation, or investigations for the purpose of obtaining information with reference to any of the following matters, notwithstanding the fact that other functions and services may also be performed for fee, hire or reward; crime or wrongs done or threatened against the government of the United States of America or any state or territory of the United States of America; the identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation or character of any person, group of persons, association, organization, society, other groups of persons, firm or corporation; the credibility of witnesses or other persons; the whereabouts of missing persons; the location or recovery of lost or stolen property; the causes and origin of, or responsibility for fires, or libels, or losses, or accidents, or damage or injuries to.real or personal property; ...[etc.]

- 105 -

362. As demonstrated in NY Gen Bus Section 81, Article 7 a Private Investigator's license is not a mere formality designed to generate income for the state. There is a rigorous background check including fingerprinting. It involves the division of criminal justice services, the FBI, the chief of police and the district attorney in the area the applicant will be practicing, etc.; minimum investigative experience that is rigorous requiring at least three years of prior professional law enforcement investigative experience or experience that is highly comparable (20 years experience for a policeman that did not engage in investigations); and the passing of a rigorous test/exam. If you fail the exam you do not get the license until you pass.

363. In addition to the above Article 7 includes a host of administrative requirements that a private investigator must perform and undergo in order to remain licensed. Furthermore licensed private investigators are subject to a code of conduct and professionalism the violation of which can lead to sanction such as revocation of the license.

364. Certain employees of insurance companies (SIU Departments) are exempt from Article 7 and as demonstrated above are regulated by the insurance laws.

365. NICB "investigators" or "agents" are not employees of insurance companies but are employees of the NICB.

366. NICB "investigators"/"agents" are not licensed by the State of New York as Private Investigators even though their conduct is included in the definitions of private investigator as per Article 7.

367. As a result of the above the NICB and its "agent"/"investigators" are in violation of New York General Business Law Section 7, Article 7 and are, and continue to be, guilty of multiple B misdemeanors on a daily basis.

- 106 -

368. The victims of crime – even violent heinous crimes – have extremely limited control over government prosecutions. In the State of New York prosecutors are trained to assist in any lawful manner to protect a victim through items such as an order of protection or even protective custody. Prosecutors are taught to ask victims what they would like to see as a resolution of a case and to assess whether a victim will cooperate with the prosecution up to and including testifying at trial. Prosecutors are taught to weigh the victim's wishes when deciding how to proceed with a case. But prosecutors also know that they do not represent victims. They represent the People of the State of New York. As such the victim's wishes are just one of a number of criteria that go into a prosecutor's independent decision of how to proceed with a case. If such were not the truth the vast majority of cases would not be disposed of via Plea Bargaining. Indeed a prosecutor may proceed against a dangerous criminal despite of the victim's unwillingness to testify even going as far as subpoenaing the victim and enforcing said subpoena.

369. In no way shape of form does the victim of a crime investigate the crime, participate in questioning of witnesses and suspects, execute search warrants or play any role in decision making.

370. The NICB is not even a crime victim yet they control police investigations and prosecutions. This is unheard of.

371. Insurance companies have all the above enumerated rights of any crime victim and not one iota more despite their economic status.

## II. STATE FARM/NICB SPONSORED OPERATION BIG ORGANIZED RUSSIAN INSURANCE SCAM ("BORIS")

372.   In and around 2001/2002 State Farm SIU commenced a "link analysis" based "investigation" into what State Farm would later claim was an immense insurance fraud conspiracy.

373. In reality State Farm was looking for a method whereby they could generate justification to deny claims for medical benefits under New York State's No Fault Laws by claiming fraud.

374.   In and around late 2001/early 2002 State Farm contacted the NICB with its above mentioned so-called investigation.

375.   In and around the early to middle of 2002 State Farm and the NICB brought the above-mentioned so called investigation to the Suffolk County District Attorney's Office.

376.   In and around the summer of 2002 the NICB and the Suffolk County District Attorney's Office jointly decided to utilize State Farm's "investigation" as well as the information and "evidence" obtained by the State Farm "investigation" – primarily the "link chart" analysis – as well as ISO Reports in order to begin prosecutions of individuals and medical provider corporations contained in the State Farm investigation.

377.   The link chart analysis consisted primarily of charts that a member of the NYPD stated looked like "a map of every star and every galaxy connected by lines in the universe" or as one defense attorney called it "the electronic wiring for a Maserati."  Specifically the "link analysis" was an indecipherable, incomprehensible morass of misinformation.

378.   The information that was the product of State Farm's SIU and formed the basis of the Suffolk County DA investigation was passed on to the Kings County District Attorney's Office via a Civil Court Judge.  When the Kings County District Attorney's Office began reviewing the

- 108 -

link analysis they were informed by the head of State Farm's SIU, one Mr. Gallagher, and the head of the New York Regional Office of the NICB Michael Fella that said investigation would be handled solely by the Suffolk County District Attorney's Office and the NICB.  State Farm paid for the Suffolk County DA's services through disguised bribes and as such State Farm was given unprecedented power over the investigation.  (*See infra*)

379.  In addition the Suffolk County District Attorney's Office decided to use State Farm's SIU as well as the SIU departments of other insurance companies to conduct the Suffolk County DA "investigation."    Eschewing all sense of political correctness this "investigation" and prosecutions were officially named Operation Big Organized Russian Insurance Scam or "BORIS" as it was officially known.  The operation was entitled "Big Organized Russian Insurance Scam" in order to create the acronym "BORIS" because BORIS' subjects were primarily of Russian or former Soviet Republic descent and Boris is a commonly used name by persons of such ethnic background.  In many ways this ethnically based investigation mimics the above-described NICB operations that LULAC and others claimed were based upon ethnic profiling.

380.  In and around the summer of 2002 State Farm's attorneys began disseminating the "link chart" analysis that became the key basis for the Suffolk County DA investigation "BORIS" to judges and their staff in the New York City Civil Courts.

381.  The Suffolk County DA/State Farm/NICB matter morphed into an investigation involving what was termed the "Suffolk County Task Force."  This "task force" was staffed by NICB "Special Agents" that were not licensed private investigators or duly deputized members of law enforcement; investigators from the Suffolk County DA's Office; and a host of insurance

- 109 -

company SIU employees including State Farm SIU, Liberty Mutual SIU, etc. that were not licensed private investigators or duly deputized members of law enforcement.

382. As a result of the above the Suffolk County Investigation ("BORIS") was an illegal melding of government and corporations into an investigation that affected the rights of citizens including the execution of search warrants, subpoenaing and massive arrests. As such these search warrants, subpoenas and arrests were basically corporate search warrants, subpoenas and arrests. State Farm went far beyond their lawful designation as potential victim to the point wherein State Farm was ceded governmental powers of search, seizure and arrest.

383. Almost the entire investigation was based upon the link analysis charts supplied by State Farm and ISO Reports.

384. Members of State Farm's SIU, among other insurance companies, were stationed at the Suffolk County DA's Office. So were members of the NICB. The investigation was characterized by a complete lack of celerity; stealth; focus or even arcane investigative technique. It literally involved a motley crew of what is often termed "buffs" who hit the streets of Brooklyn and elsewhere announcing to all that they were investigating fraud.

385. This group of complete reprobates would arrive in the parking areas surrounding medical clinics in droves. They would hide behind cars, five at a time with each one taking pictures of the clinics, the clinic personnel and the patients. They did this while the NYPD had members of its elite Fraudulent Accident Investigation Squad ("FAIS") unit in certain of the clinics as undercover patients. Moreover, they did this while FAIS was engaged in sensitive wiretap operations and impending search warrants in conjunction with members of the elite Fraud Bureau of the Department of Insurance. This compromised the FAIS investigation immensely.

- 110 -

386. The FAIS Investigation complained repeatedly to the Suffolk DA's Office and the NICB as well as a number of insurance companies, even threatening to arrest a particularly dimwitted individual for obstruction of justice, yet the "Suffolk County Task Force" idiocy did not stop. The task force began to literally shadow the FAIS Investigation to gather details about the FAIS Investigation and to do what is commonly termed in the industry – "Poach the case" – steal it. These misfits would literally show up at FAIS search warrants unannounced attempting to illegally seize items that were contained in Search Warrants drafted by the Kings County DA.

387. "BORIS" ultimately led to approximately 585 indictments. It received accolades in Fortune Magazine and other publications, but it was an investigation without evidence. Simply put the indictments were legally insufficient lacking any real evidence and based upon non-credible uncorroborated testimony of "accomplices" that is insufficient as a matter of law to be the sole basis of an indictment.

388. Suffolk County District Attorney Thomas Spota was informed by a Judge Hudson of the New York State Supreme Court, among others, that the indictments were insufficient.

389. District Attorney Spota was reluctant to drop the indictments and the investigations because of the positive press that BORIS was giving him personally and to his office. Furthermore BORIS also resulted in financial rewards for Spota's Office including legitimate grant money from the State, monies from the NICB and monies – bribes – from State Farm through the NICB.

390. As a result the Suffolk County District Attorney refused to immediately drop all the legally insufficient charges and continued the investigation.

391.  All the main players in BORIS made gushing joint statements to the Press during the

BORIS press day initiated by the DA's Office, the NICB and State Farm.  The Associated Press

piece stated that "Hundreds of people including doctors, lawyers, chiropractors and

psychologists have been indicted on insurance fraud and other charges involving millions of

dollars in claims on staged auto accidents that prosecutors say was part of an organized crime

ring with links to Russia."  The piece had the following quotations:

■      Nearly 600 indictments have been filed in connection with the Brooklyn-based

fraud ring, and further charges are likely, Suffolk County District Attorney Thomas Spota

announced Tuesday.

■      The charges follow a year long investigation into accidents that took place on

Long Island and in New York City Spota said.   Only 86 defendants have been arraigned

so far, but the remaining indictments are expected to be unsealed in the coming days and

weeks he said.

■      In all the alleged accidents announced Tuesday, the insurance company was State

Farm, which allegedly was defrauded out of $48 million.  The average car accident

resulted in claims of nearly $800,000, prosecutors said.

■      Michael Fella, executive director of the National Insurance Crime Bureau, an

industry group, called it "the largest fraud investigation of its type in the country."

■      Karen Garsky, a State Farm spokeswoman, said that insurance fraud in New York

has been estimated at "a billion dollar a year business."

■      Many of those arrested so far are American citizens of Russian descent living in

Brooklyn, said Robert Clifford, a spokesman for Spota.

- 112 -

- Clifford said investigators "definitely know profits gained by the ring ... were accessed by counterparts in Russia. This was an organized criminal enterprise."

392. The Suffolk County DA attempted to enlist the assistance of the rest of law enforcement in order to obtain evidence to support indictments that had already been voted. It was at this point that the true nature of the evidence was revealed. Specifically, State Farm Link Analysis and ISO Reports led the investigation to a few individuals that admitted that they were in staged accidents. Any person or entity that treated these individuals was indicted for insurance fraud. Using ISO Reports and Link Analysis the investigation expanded. Even law firms that had the temerity to represent these medical providers were indicted.

393. At a joint law enforcement meeting when the head of the Queens County District Attorney's Office Rackets Bureau heard the evidence he flatly asked: "Where's your mens rea?" The reply: "typos in the narrative reports that repeat."

394. Discovery Demands sent to the Suffolk County District Attorney's Office by defense attorneys were responded to with the following response: "Call State Farm for the documents."

395. Out of approximately 585 indictments well over half simply were never unsealed. They expired. Of those that were unsealed the only convictions were a few pleas taken by low-level phony accident victims and a runner – the ones who cooperated. Almost everyone else received an ACD – Adjournment in Contemplation of Dismissal, which is a fancy way of saying: "Case dismissed." Some of these ACDs were a sight to behold – instead of the classic 6 months for the charges to be dismissed some of the BORIS ACDs were literally 72 hour ACDs – in that the cases were dismissed in 72 hours.

396.    Massive numbers of individuals were illegally arrested based upon legally insufficient information and coerced statements.

397.    The press coverage of this debacle was not as great as the press coverage of the supposedly successful nature of it.

398.    The 2003 Annual Report the NICB sang their own praises about Operation BORIS. BORIS was placed into the NICB's "Top 25." According to the NICB members could access information and view synopses of the top 25 major cases pursued by our Field Operations group and review your files to determine if you've received claims from individuals listed in these cases."

399.    Here is what the 2003 Annual Report "Brains and Brawn" had to say about Operation BORIS:

> And in New York, more than 500 indictments were handed down in 2003 against medical providers in the Boris case, an Eastern European staged accident ring in Brooklyn, New York. This top 25 case, part of our New York Medical Fraud Task Force efforts, was conducted jointly by the Suffolk County District Attorney's Office and the NICB with tremendous information support from our membership. Its another example of how we worked in concert to achieve significant results.

400.    The individual from the Suffolk County District Attorney's Office "left under a cloud of suspicion." The individual was not invited to attend NICB functions.

401.    The head of State Farm's SIU retired.

402.    The individual in charge of the New York office of the NICB – executive director Michael Fella – was last seen flying out of New York on an airplane for "bigger and better things" with the NICB.

403. Saner members of the insurance industry had had enough. They used their financial clout with the NICB to purge the NICB of its misguided New York leadership.

404. The partnership between the NICB and the Suffolk County DA including the Suffolk County Task Force was disbanded. The BORIS Press Release expunged from the Suffolk County DA web site.

405. The Suffolk County DA no longer engages in any sizeable insurance fraud investigations.

406. The destruction of close to 585 indictments is unparalleled in American Law Enforcement History.

407. State Farm funneled money to the Suffolk County District Attorney's Office during the above-mentioned BORIS investigation via the NICB. Specifically State Farm gave a fairly large sum of money – the exact amount is solely within the possession of State Farm, the NICB and the Suffolk County DA – to the NICB who then passed it on disguised in the form of "grants." Once the money was obtained by the Suffolk County DA's Office the Office utilized said funds for the purchase of computer equipment; the payment for cellular phones and the use therein including personal use; the leasing of vehicles that were used for DA business as well as personal use; the hiring of cronies and personal friends; personal expense accounts; dining out including the purchase of alcoholic beverages and other questionable uses.

408. State Farm and the NICB engaged in the above Paragraph 407 conduct in order to influence the Suffolk County DA's Office to investigate, indict, arrest and attempt to obtain convictions so that State Farm and the insurance industry could both deny claims, but also deny claims without litigation or successfully deny claims if an arrested medical provider had the temerity to utilize the courts or arbitration to collect on unpaid bills.

409.  The arrests and indictments created justification for literally thousands of denials for State Farm and many more for the industry on the whole.  Said indictments also scared off medical providers who decided not to litigate cases for fear of reprisal.  The insurance company Defendants, indeed many insurance companies, refused to pay or settle claims because medical providers were on the list of "indicted providers" circulated by the Suffolk DA, the NICB and members of the insurance company SIU assigned to the "Suffolk County Task Force."

410.    State Farm and the insurance industry purchased a massive law enforcement investigation and prosecutions in order to deny claims.

411.  To this very day State Farm through Enforcer Counsel utilizes the product of Operation BORIS in legal documents including motions and legal memoranda in order to obtain favorable Court rulings and orders from Courts.  The above is done against the Plaintiffs.  This includes the use of press releases, newspaper articles and indictments, etc.  Although this material is rank hearsay Courts that hear No-Fault cases are often lax in the area of evidence and therefore lend evidentiary weight to such dribble.  This is partially due to the fact that the above described material has its source in a District Attorney investigation.

412.  State Farm also attempted to influence the Kings County District Attorney's Office.  Specifically a law firm that acted as outside counsel to State Farm called an Assistant District Attorney who was highly active in large-scale insurance fraud investigations.  The attorney indicated that top executives at State Farm were interested in meeting with upper echelon members of the District Attorney's Office in order to discuss the issue of insurance fraud.  The attorney also stated that State Farm would be willing to contribute "a significant amount of funds … a really significant amount of funds" to the effort to fight insurance fraud.  The proposed

- 116 -

"deal" never progressed because as BORIS unraveled State Farm attempted to distance itself – at least temporarily – from purchased prosecutions.

413. This is part and parcel of State Farm's national conduct as described above.

## THE ONE BEACON GROUP: WHERE BAD FAITH MEETS INADEQUATE RESERVES

### I. THE ONE BEACON GROUP'S ILLEGAL SIU

414. As enunciated insurance companies are mandated by law to maintain Special Investigative Units ("SIU") to fight and prevent fraud. (*See e.g.* 11 NYCRR 86.6) The law also demands that members of insurance company SIU Units have certain minimum qualifications.

415. As noted above 11 NYCRR 86.6(c) provides:

> Persons employed by Special Investigative Units as investigators … shall be qualified by education and/or experience, which shall include: an associate's or bachelor's degree in criminal justice or a related field; or five years of insurance claims investigation experience or professional investigation experience with law enforcement agencies; or seven years of professional investigation experience involving economic or insurance related matters; or an authorized medical professional to evaluate medical related claims.

416. As noted both General Assurance and AutoOne are owned by One Beacon who in turn is owned by Bermuda based White Mountain Insurance. Members of General Assurance's and AutoOne's SIU are employees of One Beacon.

417. General Assurance and AutoOne share the same SIU personnel. Indeed until recently both General Assurance and AutoOne shared the same in house counsel The Law Offices of Jenna Belil, which is a fictitious entity having no registration as a partnership, corporation or company with the Department of State said law firm's employees were paid by One Beacon as per the pay-checks. Indeed General and AutoOne's SIU were paid via One Beacon checks.

418. Unlike State Farm the One Beacon Group SIU have some members that are qualified to be members of insurance company SIU departments. However, many members of the One Beacon Group's SIU are not qualified under the law.

419. **Prior to assignment** to the above One Beacon Group SIU "investigators" do not have an associate's or bachelor's degree in criminal justice or a related field.

420. **Prior to assignment** to the above One Beacon Group SIU "investigators" do not have professional investigation experience with law enforcement agencies.

421. **Prior to assignment** to the above One Beacon Group SIU "investigators" do not have five years of insurance claims investigation experience.

422. **Prior to assignment** to the One Beacon Group SIU "investigators" do not have seven years of professional investigation experience involving economic or insurance related matters.

423. **Prior to assignment** to the above One Beacon Group SIU "investigators" are not medical professionals.

424. One Beacon Group SIU "investigators" attend seminars, view videotapes and read material disseminated by General Assurance/AutoOne and other entities including the NICB.

425. The vast majority of the above referenced activities (Paragraph 424) occur after an individual is made an "investigator" in the One Beacon Group SIU.

426. In any event the above referenced activities (Paragraph 424) do not constitute "experience" as contained in *11 NYCRR 86.6(c)*.

427. The above referenced activities (Paragraph 424) do not constitute "experience" as defined by the contents of *11 NYCRR 86.6(c)*.

428.  The above referenced activities (Paragraph 424) do not constitute credits/hours toward an associate's or bachelor's degree in criminal justice or a related field.

429.  One Beacon Group "claims handlers" and/or "claims reps" a.k.a. "claims representatives" do not gain real investigative experience in the performance of their jobs.

430.  One Beacon Group "claims handlers" and/or "claims reps" a.k.a. "claims representatives" primarily process claims which includes performing customer service, receiving bills, reviewing bills, sending out letters requesting additional verification, paying bills, denying bills, seeing to the timely payment and denial of bills, insuring the timeliness of requests for additional verification, etc.  There is absolutely no investigation experience gained as "claims handler" or "claims representative" as defined by the context of *11 NYCRR 86.6(c)*.

431.  A qualified SIU Investigator must have the requisite amount of investigation experience (*11 NYCRR 86.6(c)*) in performing all of the enumerated activities listed herein: detailed claim review with the ability to ascertain relevant issues such as material misrepresentation, coverage, exclusions, fraud and red flags; development of investigative plan of action; the taking of written and recorded statements in the field and by phone; conduct in person interviews; court, public and private records review; prepare written comprehensive investigative reports; locate and find witnesses; clinic/medical provider inspections including the ability to use different investigative approaches and to recognize elements of fraud; and an understanding of how complex fraudulent enterprises operate (how to connect the dots) – i.e. prior exposure to common themes in No Fault fraud such as billing for services not provided, corporate structure from medical clinic through management companies and layperson involvement; runners/steerers; jump-ins; factoring; fee splitting.

432. According to the law described above an insurance company SIU investigator must have the requisite credentials described above before becoming an SIU Investigator.

433. Under the above discussed law one cannot become an SIU Investigator without the requisite credentials and then gain said credentials through "experience" garnered while illegally performing SIU duties.

434. The One Beacon Group SIU Department is not staffed by individuals – "investigators" – qualified under the law (*11 NYCRR 86.6(c)*) to work in such capacity.

435. One Beacon Group SIU "investigations" lack a modicum of professional quality. They are incomplete, sometimes senseless and lack real evidence.

436. Affidavits prepared by or for One Beacon Group "investigators" demonstrate the lack of investigative skills in that they contain layers of hearsay including press releases, newspaper articles, ISO Searches. Said Affidavits contain no observations that were personally observed and in the main are nothing but "smear campaigns" drafted by Enforcer Counsel and signed by One Beacon Group SIU "Investigators." In fact the affidavits of One Beacon Group SIU "Investigators" list absolutely no credentials.

437. The Insurance Company Defendants and Enforcer Counsel have utilized the Fruits of One Beacon Group's illegal SIU, including numerous Affidavits to the detriment of the Plaintiffs.

**II. THE ONE BEACON GROUP'S ABYSMAL RECORD OF MISDEEDS THAT SHOULD HAVE WARRANTED GREATER INVESTIGATION AND PUNISHMENT FROM THE INSURANCE DEPARTMENT.**

438. Responses to a number of FOIL Requests made to the New York State Department of Insurance regarding General/AutoOne yielded the following. The Market Conduct Investigation in conjunction with an Examination Report demonstrates that General and AutoOne (the

"Assigned Risk" portion of the empire) are part of the One Beacon Group, which in turn is owned by White Mountain.

439.  The Index of Complaints made by General/AutoOne premium paying customers to the New York State Department of Insurance is massive.  These complaints were made as a result of misconduct on the part of General/AutoOne.  According to the New York State Department of Insurance "Line Of Business" Codes description document the overwhelming customer complaints were made in the areas of Auto Coverage – codes 09 through 12.  Moreover the vast majority of the Auto Coverage complaints were made in the area of No-Fault – "12".  Comparing the "Subject Codes" to the Complaint index one can see that while the complaints vary a number of complaint areas predominate: code 100 Delay In Payment of Claim; code 118 Dispute Over Liability; code 120 Amount of Indemnity; code 134 Denied For Medical Necessity; code 200 Amount of Premium; code 302 Cancellation of Policies and the catchall code 132 Other Violations of Law or Regulation.

440.  The total amount of complaints is 2,299.

441.  The above demonstrates a large number of rate paying customers who took the time to formally complain to the New York State Department of Insurance about General/AutoOne.  It could also be logically assumed that those who had the knowledge, wherewithal and gumption to complain to the New York State Department of Insurance, as opposed to their spouse/friends etc., comprise just a fraction of those who were aggrieved.

442.  AutoOne also entered into a Stipulation in In the Matter of AutoOne Insurance Company The Stipulation was entered into by AutoOne on November 9, 2004 as the result of an investigation conducted by the New York State Insurance Department.  In the Stipulation AutoOne admitted:

- 121 -

it violated the following provisions of the Insurance Law and/or Department Regulations:

(a) Section 65-3.4(b) of Department Regulation 68 [11 NYCRR 65-3.4(b)] which state that an insurer must send a no-fault application within 5 business days after receipt of notice of claim at its claim processing office;

(b) Section 5106 of the Insurance and Section 65-3.8(a) and (c) of Department Regulation 68 [11 NYCRR 65-3.8(a) and (c)] which state that payment or denial of claim must be made within 30 calendar days of receipt of relevant information and/or proof of claim; and

(c) Section 65-3.9 of the Department Regulation 68 [11 NYCRR 65-3.9] which state that all overdue PIP benefits shall bear interest at a rate of 2 percent per month, compounded and calculated on a pro rata basis using a 30-day month.

AutoOne was required to pay a paltry penalty of $17,950.00. The sums illegally saved by the violations probably far exceeded the penalty.

443. The July 20, 2004 Memorandum of a Market Conduct Investigation of AutoOne was also received via FOIL. According to the Memorandum a "random sampling technique contained in the Market Conduct Section of the National Association of Insurance Commissioners (NAIC) Examiners Handbook." From a population of 280 files closed in the period 7/1/03 –12/31/03 14 claim files were chosen for review. The files contained 24 claimants. The Memorandum listed a number of "significant findings of the review of claim files."

Section 65-3.8(a)&(c) of Regulation 68 requires that No-Fault benefits should be paid or denied within 30 calendar days after the carrier receives verification of all relevant information requested. Of the 280 instances in which benefits were to be either paid or denied, payments or denials were late in 41 instances, payments were not made in two instances and overpayment was made in one instance. There were also four instances where improper denials were issued.

That means that they were late 14.6 percent of the time. The percentage of improper denials/late payments/late denials – not counting the overpayment – was a whopping 16.8%

Section 65-3.9(a) (formerly 65.15(h) requires interest to be paid on all overdue claim payments where the interest due exceeds $5.00. AutoOne failed to pay interest in nine of the 11 relevant instances.

That is a mind-boggling 83.3 percent of the time wherein AutoOne rips off its premium paying customers out of the interest that the law says AutoOne must pay to them.

444.    The Market Conduct Report left the Melville Offices for the more rural setting of the Syracuse Office where the same shenanigans abounded.  Payments were late or not received within 30 days 17.5% of the time.  Denials were late or not made in 8.7% of the cases.  No Fault applications were sent late 16% of the time.

### III. ONE BEACON GROUP'S LITIGATION BAD FAITH

445.  Both General Assurance and AutoOne engage in wholesale litigation bad faith as per the law in New York State.

446.  As cited above:

> NY Comp Codes R. & Regs. Tit. 11 Part 216 2006 (Regulation 64) 216.0(a) preamble:
>
> (a) Section 2601 of the Insurance Law prohibits insurers doing business in this State from engaging in unfair claims settlement practices proscribed by that section without just cause and with such frequency as to indicate a general business practices.  This part contains claim practice rules, which insurers must apply to the processing of all first and third party claims arising under policies subject to this part ...
>
> Insurance Law Section 2601(a) (4) Acts that constitute unfair claims settlement practices.
>
> (a) No insurer doing business in this state shall engage in unfair claim settlement practices.  Any of the following acts by an insurer, if committed without just cause and performed with such frequency as to indicate a general business practice, shall constitute unfair claim settlement practices:
>
>> (4) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear ...

447.  It is the One Beacon Group's practice and procedure to force providers to litigate denied cases all the way through trial solely on the issue of whether a bill was timely served as per the Insurance Regulations.  However, in each of the above cases One Beacon Group's own denial

and/or interrogatory responses demonstrated that the subject bills for claims were in fact served in a time fashion and remained outstanding.

448.  On each of the above there is no genuine issue in controversy and yet One Beacon Group caused the medical provider to incur the price of a trial.  In addition in most of the cases a reasonable settlement was extended by the Plaintiff medical provider and rejected by General/AutoOne.  This is in direct violation of <u>Insurance Law Section 2601(a) (4)</u> and <u>NY Comp Codes R. & Regs. Tit. 11 Part 216 2006 (Regulation 64) 216.0(a) preamble</u>

449.  Below listed are representative cases that were recently tried wherein there was no genuine issue in controversy.  These cases are merely illustrative of what the One Beacon Group does in a wholesale and pervasive manner: <u>First Help Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. Bronx 083839/06); <u>Down Town Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. Bronx 083863/06); <u>AVA Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct Queens 006284/06); <u>AVA Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. 426/07); <u>AVA Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. 418/07); <u>AVA Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. 416/07); <u>AVA Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. 414/07); <u>AVA Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. 413/07); <u>AVA Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. 410/07); <u>Great Wall Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. 5405/07); <u>Great Wall Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. 5389/07); <u>Great Wall Acupuncture P.C. v. General Assurance Company</u> (NYC Civ. Ct. 5415/07).

450.  In all of the above cases in each of the above cases General's own denial and/or interrogatory responses demonstrated that the subject bills for claims were in fact served in a

timely fashion and remained outstanding. In each of the above claims there was no genuine issue

in controversy and yet General caused the medical provider to incur the price of a trial. In

addition in all – each and everyone – of the cases a very reasonable settlement was extended by

the Plaintiff medical provider and rejected by General. They lost.

451. In each and every one of the above cases Enforcer Counsel McDonnell & Adels tried the

case for General.

452. The above cited cases were just an example. It is the policy and procedure of the One

Beacon Group to follow this practice on almost all of their claims.

**IV. INADEQUATE RESERVES**

453. Upon information and belief AutoOne currently maintains inadequate reserves as defined

by the law and against the law.

> NY Ins. Law Section 1303
>
> Every insurer shall ... maintain reserves in an amount estimated in the aggregate to
> provide for the payment of all loses or claims incurred on or prior to the date of
> statement, whether reported or unreported, which are unpaid as of such date and or which
> such insurer may be liable, and also reserves in an amount estimated to provide for the
> expenses of adjustment or settlement of such losses or claims.

454. Upon information and belief this is being done in order to maximize profits by keeping

cash in investments as opposed to keeping cash in reserves.

455. Upon information and belief the inadequate reserves are a prelude to impending bankruptcy

proceedings. Specifically upon the bankruptcy of AutoOne said company would lose the cash

held in reserve. However the other monies owed on claims would be evaded for years and

through some form of compensation plan administered by the Insurance Department claims

would be literally paid with pennies on the dollar.

456. There are signs of a pre-planned bankruptcy. This includes the dissolution of in house counsel and the scale back of General/AutoOne's chief operations center in Melville, Suffolk County, New York. In addition General/AutoOne is engaging in a line item "no pay" policy on a huge list of providers although, as demonstrated, they are losing.

457. Meanwhile General/AutoOne has enlisted the services of Enforcer Counsel McDonnell & Adel's who is the champion of State Farm inspired "mad dog litigation" to slow down and tie cases up in knots.

458. Plaintiff's FOIL Requests and other investigation have revealed that there has been a severe paucity of monitoring of AutoOne and General Assurance despite an overly healthy volume of complaints when compared to their market share.

459. Perhaps the Insurance Department is unable to figure out what is going on with AutoOne and General Assurance. It is unclear what and who they are because the corporate structure of AutoOne and General Assurance in relation to One Beacon Insurance and its various incarnations and White Mountain Insurance, named after the New England mountains, but located in Bermuda, with its throngs of "wholly owned [but] indirect subsidiaries", is as confusing a morass of squares connected by lines as any State Farm "Link Analysis."

## V. ONE BEACON GROUP'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT

460. Upon information and belief both AutoOne and General has failed to file an updated plan pursuant to *Amended Regulation 95 (11 NYCRR 86)* §86.6 especially with regard to subsections "b) "(2)", "(4)" and "(7)."

461. In addition, upon information and belief, both AutoOne and General has failed to comply with *Amended Regulation 95 (11 NYCRR 86)* §86.6 subsection "d",

– 126 –

Every insurer required to file a fraud prevention plan shall file an annual report with the Insurance Frauds Bureau no later than January 15 of each year on a form approved by the superintendent, describing the insurer's experience, performance and cost effectiveness in implementing the plan and its proposals for modifications to the plan to amend its operations, to improve performance or to remedy observed deficiencies. The report shall be reviewed and signed by an executive officer of the insurer responsible for the operations of the Special Investigations Unit.

## VI. ONE BEACON GROUP'S ABUSE OF SECTION 86.5

462. NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO INSURANCE FRAUDS BUREAU provides:

§86.5 Reports of fraudulent acts. Any person licensed pursuant to the provisions of the Insurance Law who determines that an insurance transaction or purported insurance transaction appears to be fraudulent or suspect shall submit a report thereon to the Insurance Frauds Bureau. Reports shall be submitted on the prescribed reporting form [(IFB-1) contained in this section or upon the form developed by the United States Department of Justice upon a determination that a matter is suspect. The forms annexed hereto are hereby approved for use as specified in this Part] issued by the Insurance Frauds Bureau or upon any other form approved by order of the superintendent. Reporting may also be done by means of any electronic medium or system approved by order of the superintendent.

463. One Beacon Group massively over reports apparent fraudulent acts pursuant to NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) §86.5 to create justifications for denials.

464. The above is proven by the fact that a review of Insurance Department records will demonstrate that a bare fraction of the One Beacon Group Complaints pursuant to §86.5 are deemed what could be termed founded by the Fraud Bureau of the Insurance Department. Indeed, the One Beacon Group rarely, -- incredibly rarely -- proves or attempts to prove fraud at trial.

## MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT

### I.   MCDONNELL & ADELS' – STATE FARM'S SIU COUNSEL – CONTINUOUS VIOLATIONS OF THE JUDICIARY LAW

465.  The Law Office of McDonnell & Adels P.C. has constantly represented and still represents State Farm Insurance in a large quantity of No Fault related matters for a number of years.  In fact McDonnell & Adels refers to itself as State Farm's SIU Counsel.

466.  The Law Office of McDonnell & Adels P.C. has represented GEICO in No Fault related matters for approximately 1 ½ to two years.

467.  The Law Office of McDonnell & Adels P.C. has constantly represented and still represents AutoOne Insurance Company in No Fault related matters for approximately two years.

468.  The Law Office of McDonnell & Adels P.C. has constantly represented and still represents General Assurance Company in No Fault related matters for approximately two years.

469.  The Law Office of McDonnell & Adels P.C. represented AllState Insurance Company in No Fault related matters in and around the fall of 2006 and upon information and belief still does.

470.  McDonnell & Adels has engaged in a campaign of disseminating the Affidavits signed by State Farm SIU Investigators that are unqualified under the law to be SIU "Investigators."  Over the past year and a half to two years these illegal Affidavits have been disseminated to Allstate, GEICO, the One Beacon Group and the John Doe Insurance Companies by McDonnell & Adels with the express permission and encouragement of State Farm.

471.  The above Affidavits were in fact drafted by McDonnell & Adels.

- 128 -

472. In addition McDonnell & Adels have submitted legal papers containing said Affidavits to Courts in Kings County, Queens County, New York County and Bronx County. This includes the New York City Civil Court, the Supreme Court of New York County and the Appellate Term, Second Department. Said Affidavits have also been submitted in various arbitration proceedings.

473. McDonnell & Adels has submitted the above Affidavits of illegal SIU "Investigators" to the above various courts and in Arbitration proceedings on behalf of State Farm, AutoOne, General Assurance, by extension One Beacon, as well as GEICO and Allstate. For purposes of this action said conduct has occurred during the past approximate four years and continues unabated.

474. All of the above-enumerated conduct is also true with regard to information allegedly obtained by State Farm's illegal SIU unit which information has been included in legal submissions drafted and submitted to the above mentioned Courts by McDonnell & Adels on behalf of the Insurance Company Defendants as well as GEICO and Allstate.

475. McDonnell & Adels in the above submissions represents to the various Courts that State Farm's SIU Department is qualified under the law to be an SIU Department.

476. McDonnell & Adels in the above described submissions including the Affidavits that it has drafted, and which members of State Farm's illegal SIU Department have signed, represents that the particular SIU "Investigator(s)" are qualified to act as SIU "Investigators" under the law.

477. As voluminously pled State Farm's entire SIU is unqualified under the insurance regulations to function as such. As a result, aside from the grotesque uses of hearsay, lack of observation and unsupported conclusions contained therein, the Affidavits and information

- 129 -

gathered by State Farm's SIU intrinsically have no worth.  Specifically, as members of State Farm's SIU are not qualified under the insurance regulations to be such the Affidavits of State Farm SIU "Investigators" containing the results of State Farm SIU "investigations" are worthless due to their inherent illegality.

478.   Most importantly McDonnell & Adels is falsely representing to the Court that the information was gathered by a qualified legal SIU and the sworn and signed Affidavits were sworn to and signed by individuals that are qualified under the law to be SIU Investigators.

479.   McDonnell & Adels knows that State Farm's SIU is illegal because they have been informed of this on numerous occasions by the Affidavit of an expert dating back over one and a half years ago.  Below are a few examples.

- ■   AVA Acupuncture P.C. as assignee of Desmond Talbert and Dario Jimenez v. Allstate Insurance Company, New York City Civil Court County of the Bronx (0054121/05). On or about early November of 2006 McDonnell & Adels was informed by Memorandum of Law and the Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such.  The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

- ■   Lexington Acupuncture, P.C. assignee of Catherine Braswell v. GEICO Insurance Company, New York City Civil Court County of the Bronx (076089/06). On or about early May of 2007 McDonnell & Adels was informed by Memorandum of Law and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such.  The Affidavit

- 130 -

also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

■   Crossbay Acupuncture, P.C. assignee of Hersilita Ellyse, Marie Samaxant v. State Farm Mutual Automobile Insurance Company, New York City Civil Court County of the Bronx (048316/06). On or about early September of 2007 McDonnell & Adels was informed by Memorandum of Law and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

■   Crossbay Acupuncture, P.C. assignee of Jean Marseil, Arnold McMayo v. State Farm Mutual Automobile Insurance Company, New York City Civil Court County of the Bronx (048316/06). On or about late September of 2007 McDonnell & Adels was informed by Memorandum of Law and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

■   Great Wall Acupuncture, P.C. assignee of William Wright v. General Assurance Company, New York City Civil Court County of Queens (005388/07). On or about late October of 2007 McDonnell & Adels was informed by Memorandum of Law and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such.

- 131 -

The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

■    Great Wall Acupuncture, P.C. assignee of Danny Diaz v. AutoOne Insurance Company, New York City Civil Court County of Queens (006281/06). On or about late October of 2007 McDonnell & Adels was informed by Memorandum of Law and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

480.  McDonnell & Adels has been informed via multiple correspondences of the illegality of State Farm's SIU and "investigators" as early as November 6, 2006:

> It has come to my attention that the State Farm Special Investigative Unit does not meet the qualifications set forth by 11 NYCRR 86.6(c), which provides:
>
> Persons employed by Special Investigative Units as investigators ... shall be qualified by education and/or experience, which shall include:
>
> 1)  an associate's or bachelor's degree in criminal justice or a related field; or
>
> 2)  five years of insurance claims investigation experience or professional investigation experience with law enforcement agencies; or
>
> 3)  seven years of professional investigation experience involving economic or insurance related matters; or
>
> 4)  an authorized medical professional to evaluate medical related claims.
>
> Moreover, State Farm through its rogue Special Investigative Unit, in conjunction with the NICB and a bungling ethically impaired prosecutor, literally generated its own criminal "investigation" and "prosecution" that by all appearance was gauged to create false justifications for the denial claims and little else. The investigation improvidently named "BORIS" – for "Big Organized Russian Insurance Scam" – led to the false arrest and imprisonment of numerous individuals who were later cleared; as well as numerous – hundreds – of expired indictments. I am currently pursuing this matter further through Freedom of Information Law.

- 132 -

> Furthermore, investigation has revealed that State Farm and their attorneys, on a National level, have pervasively engaged in the following conduct: "regularly" forging customer signatures on insurance applications omitting earthquake coverage; forcing employees to lie under oath; pressuring employees not to testify in legal proceedings; hiding and/or destroying evidence of fraud; refusing to turnover key documents in discovery; pressuring engineers to alter reports on Katrina storm-damaged homes so that claims could be denied; using its claims handling process as a profit center by offering its claims adjusters undisclosed incentives to wrongfully deny benefits i.e. giving its adjusters specific numerical targets with regard to average payouts per claim – meeting these targets leads to promotion and pay increases; targeting "vulnerable and defenseless" customers for fraud etc. etc.
>
> Moreover, I have also learned that State Farm's alleged Special Investigation Unit is similarly "incentivized."

481. For the most part McDonnell & Adels did not even bother to address the point that State Farm's SIU is illegal. More recently McDonnell & Adels has begun to address the argument as per this example culled from papers that McDonnell & Adels recently submitted to the Appellate Term, Second Department:

> Such characterizations were not only submitted by Plaintiff's counsel but also by a non-party, Lt. Hand, retired, who has not met the individuals nor has full knowledge of all the facts and evidence … Notwithstanding plaintiff's counsel's insults to the contrary, State Farm representative (sic) were well within their expertise to present the facts of their investigation.

McDonnell & Adels has noted that they are aware of the allegation that State Farm's SIU is illegal, but they fail to address them. Based upon the contents of the expert affidavit that informed McDonnell & Adels that State Farm's SIU is illegal the above is the most disingenuous statement ever made. First it is clear that the Lt. Hand is an expert. Second the affidavit need not come from a party. Third everything said in counsel's memorandum was merely a summation of what was contained in the Affidavit. Finally McDonnell & Adels spoke of "expertise" but not legal requirements. Witness just a few of the excerpts of what McDonnell & Adels refers to as "such characterizations" in the Hand Affidavit:

## AFFIDAVIT OF LT. (RET) JAMES HAND

- 133 -

STATE OF NEW YORK    )
                          )    ss.:
COUNTY OF KINGS      )

**James Hand**, being duly sworn, deposes and states the following:

1.     I am the owner of Secure & Recover PLLC which company engages in complex investigations. I have personal knowledge of the statements that are set forth in this affidavit, and would testify as to them in a Court of law if called upon to do so. This knowledge is based upon: 1) extensive interviews; 2) multiple surveillances; 3) extensive review of bank records; 4) extensive analysis of public documents including numerous court filings; 4) extensive analysis of No-Fault related documents; 5) review of the applicable sections of the No Fault Insurance Regulations; and 6) other investigative tactics.

## RELEVANT BACKGROUND OF THE AFFIANT

2.     I am a retired Lieutenant in the New York City Police Department. For more than two years, ending in January of 2004, I commanded my own specialized fraud unit – the Fraudulent Accident Investigation Squad ("FAIS"). The Commissioner of the New York City Police Department created the Unit. Throughout the entire nation FAIS was the first ever Police Department unit designed specifically to combat No-Fault Insurance Fraud. I was picked to lead the unit by the Police Commissioner himself. Very early on the New York City Police Department deemed the investigative/arrest/training activities of FAIS to have been so successful that the Unit was expanded to include a new unit named "FAIS North." FAIS North was based in the Bronx and, as a general matter, designed to deal with No-Fault Insurance Fraud in the northern half of New York City. The two units often combined on some of our bigger investigations and mass arrests.

3.     My unit's, and FAIS North's, investigations utilized the following: undercover operations; wiretaps and other forms of electronic eavesdropping; the development and use of confidential informants; search warrants; arrest warrants; subpoenas; financial forensics, in order to detect and prosecute complicated money laundering and tax evasions schemes. As part of my above described assignment I supervised investigations that resulted in well over 500 arrests.

4.     The mass arrest was the hallmark of FAIS Operations in that with each mass arrest there was a concomitant reaction of fear in the fraud community leading many citizens who might be looking to make a quick dollar to want no part of it. In Operation Whiplash I supervised the arrests of over one hundred individuals within a 48-hour period. As part of Operation Gateway FAIS teamed with FAIS North to arrest over 50 people in one day. Gateway involved a ruse wherein we set up a shell company called Gateway Claims Services that allegedly facilitated bulk settlements of personal injury suits. Through active solicitation by phone and mail we were able to lure the above mentioned arrestees that took part in false "paper accidents" to a Long Island City

location.    The arrestees were lured to the location with the promise of a $14,000 settlement check.  The fact that the accidents were fake was established beyond doubt through the use of wiretaps and monitoring of the accident reports entry into the NYPD accident database by civilian employees of the NYPD that had been compromised.  All of the above arrests included accident stagers, individuals that fraudulently held themselves out to be Complainants of accidents, medical professionals including doctors, legal professionals including lawyers, medical professional corporations and their purported management, as well as laypersons that illegally own and illegally sweep funds from medical professional corporations into their own pockets.

5.    Briefly, herein are some examples of other relevant law enforcement activity that I engaged in.  As a patrol officer I responded to well over one hundred motor vehicle accidents.  While in the capacity of supervisor in the Anti Crime Unit I conducted a joint operation with the New York State Insurance Department that resulted in over 270 arrests and three search warrants.  As the Commanding Officer of Pattern Identification Module I analyzed crime pattern trends and alerts for 10 Brooklyn Precincts.  While assigned to the Deputy Commissioner of Operations I wrote directives on police department strategy to combat auto theft.  These directives entailed procedures for patrol and detective personnel in reporting and investigating auto theft as well as the establishment of Borough Auto Larceny Units in each Borough of New York City. These directives either directly or indirectly were responsible for the reduction of auto crime by 11% in the City of New York.  After my promotion to Lieutenant I was assigned to Special Projects where I supervised the unit that obtained and synthesized traffic statistics for the 66th Precinct.  This entailed analysis based upon engineering fundamentals, accident reports, summons activity, accident-prone locations as well as insurance fraud related to vehicle motor accidents.

6.    In addition to my investigative experience I have received extensive training in, and have worked with, the New York State Penal Law as well as the relevant provisions of the Insurance Law and 11 NYCRR 65.

7.    I have also trained, on multiple occasions, the following entities: the Federal Bureau of Investigation; the Internal Revenue Service; the Defense Intelligence Agency; the New York City Police Department; the Office of the New York State Attorney General; the New York State Department of Taxation; the New York City Department of Finance; and the New York State Department of Insurance, amongst other governmental entities.  I have also provided training seminars to a number of insurance companies and attended training seminars provided by insurance companies.   I worked as a consultant to Giuliani Partners LLC wherein I advised the Mexico City Police Department on strategies to reduce auto theft and car jacking.

8. Briefly, herein are some examples of other activity that I engaged in prior to serving in law enforcement.  I served in the United States Navy from 1980 to 1984 wherein I actively participated in the conflicts in Iran, Lebanon and Grenada including several SH-3 helicopter born operations.  While in the Navy I was awarded a significant number of commendations including the Armed Forces Expeditionary Medal, two Navy Expedition Medals; and a letter of Commendation for my early participation in

- 135 -

Operation Urgent Fury wherein I was a member of the crew of a helicopter born rescue of Army Personnel, which entailed several intense firefights. After leaving the Navy I began my law enforcement career with the New York City Department of Corrections before moving on to the NYPD.

\*\*\*

## STATE FARM'S ROLE IN THE BIGGEST FIASCO IN THE HISTORY OF CRIMINAL JUSTICE

119.    Around the beginning of the summer of 2002 I became aware of an investigation into insurance fraud that was being conducted by the State Farm Special Investigative Unit. This came to my attention when an Assistant District Attorney ("ADA") from the Office of the Kings County District Attorney Rackets Bureau showed me some documents from State Farm's SIU unit that had made its way to him via a Judge to Mr. Charles Hynes (District Attorney Kings County) and to the head of the Rackets Bureau. I had a meeting with the ADA in which we looked over the documents for hours trying to frankly ascertain what was going on. The documents looked like a map of all the stars in all the galaxies. As we later learned the insurance industry dubbed the document – a link analysis chart. Such charts link individuals involved in accidents to addresses and to medical providers, etc., in order to ascertain patterns. The problem with this type analysis – as we had long before ascertained ourselves – was that some addresses were huge containing 100s of dwellings with rapid turnover rates.

120.    In any event on the day I had the meeting with the ADA he later called to inform me that he had spoke to the head of State Farm's SIU unit and had been told that the case was being handled by the Suffolk County District Attorney's Office in conjunction with the National Insurance Crime Bureau. ("NICB")

121.    Before proceeding any further let us be clear. The NICB is not a law enforcement agency. It is not a governmental agency. It is not even a quasi-governmental agency. The NICB is a corporation funded by insurance companies to assist insurance companies in the investigation of insurance fraud and to advocate on behalf of insurance companies with the same regard.

122.    In any event the loss of the case was not troublesome as I was involved in a massive case with the same ADA, which ultimately led to over a 100 arrests; wiretaps; search warrants and under-covers. Both FAIS squads worked together on this investigation.

123.    However the Suffolk/State Farm/NICB matter morphed into an investigation involving what was termed the "Suffolk County Task Force." This "task force" was staffed by NICB "agents"; investigators from the Suffolk County DA's Office; and a host of insurance company SIU employees. Almost the entire investigation was based upon the link analysis charts supplied by State Farm. Members of State Farm's SIU unit were stationed at the Suffolk County DA's Office. The investigation was characterized by a complete lack of celerity; stealth; focus or even arcane investigative technique. It literally involved a motley crew of what is often termed

"buffs" who hit the streets of Brooklyn announcing to all that they were investigating fraud.

124.    This group of complete reprobates would arrive in the parking areas surrounding medical clinics in droves. They would hide behind cars, five at a time with each one taking pictures of the clinics, the clinic personnel and the patients. They did this while I personally had members of my unit in the clinics as undercover patients. Moreover, they did this while we were engaged in sensitive wiretap operations and impending search warrants. This compromised our investigation immensely.    We complained repeatedly, even threatening to arrest a particularly dimwitted individual for obstruction of justice, yet they could not stop. They were seemingly addicted to the power of playing cop.

125.    This investigation, eschewing all sense of political correctness or sense of good sense, was dubbed Operation "BORIS" or "Big Organized Russian Insurance Scam." It ultimately led to approximately 585 indictments. It received accolades in Fortune Magazine and other publications, but it was an investigation without evidence. Simply put they were legally insufficient indictments and Suffolk knew it. As a result Suffolk attempted to enlist the assistance of the rest of law enforcement in order to obtain evidence to support indictments that had already been voted. It was at this point that the true nature of the evidence was revealed. Specifically, a few individuals admitted that they were in staged accidents. Any person or entity that treated these individuals was indicted for insurance fraud. Even law firms that had the temerity to represent these medical providers were indicted. At a joint law enforcement meeting when the head of the Queens County District Attorney's Office Rackets Bureau heard this he flatly asked: "Where's your mens rea?" To which the Suffolk County representative stated "typos in the narrative reports that repeat." The representative from the Queens County District Attorney's Office walked out. The ADA from Brooklyn asked me: "Geez Jimmy can we do that too?" I never understood if he meant walk out of the meeting or indict persons for typos.

126.    Discovery Demands sent to the Suffolk County District Attorney's Office by defense attorney's were responded to with the following response: "Call State Farm for the documents."

127.    Out of 585 indictments well over half simply were never unsealed. They expired. Of those that were unsealed the only convictions were a few pleas taken by low-level phony accident victims and a runner – the ones who cooperated. Everyone else received an ACD – Adjournment in Contemplation of Dismissal, which is a fancy way of saying: "Case dismissed." Some of these ACDs were a sight to behold – instead of the classic 6 months for the charges to be dismissed some of the BORIS ACDs were literally 72 hour ACDs – in that the cases were dismissed in 72 hours.

128.    The press coverage of this debacle was not as great as the press coverage of the supposedly successful nature of it. Suffice it to say that I know from personal knowledge the Assistant District Attorney in charge of the operation left under a cloud of suspicion. He was not invited to attend NICB functions. The head of State Farm's SIU Unit retired. And the person in charge of the New York office of the NICB was last seen flying out of New York on an airplane for "bigger and better things" with the NICB.

129.    State Farm and the insurance industry through the NICB had manufactured their Big Organized Russian Insurance Scam as a means to avoid paying out on claims brought by policy holders who paid premiums. I have reviewed motion after motion aimed at Valentina Anikeyeva by State Farm and McDonnell & Adels, which contained articles about the above investigation as evidence. They no longer attach such articles, although they still contain NICB Press Releases and the like. The destruction of close to 585 indictments is unparalleled in American Law Enforcement History.

## STATE FARM'S SPECIAL INVESTIGATIVE UNIT DOES NOT MEET THE STANDARDS SET FORTH BY THE INSURANCE REGULATIONS

130.    Given the above track record it should come as no surprise that State Farm's Special Investigative Unit does not comply with the minimum standards set forth by the Insurance Regulations. I have personal knowledge of this combined with the above anecdotal evidence. In fact one need only read an Affidavit prepared by or for a State Farm SIU investigator to determine that they do not know what they are doing when it comes to conducting investigations. They lack the background, the skills and the experience and should not be relied upon by any entity including State Farm itself.

131.    Insurance companies are mandated by law to maintain Special Investigative Units ("SIU") to fight and prevent fraud. (*See e.g.* 11 NYCRR 86.6) The law also demands that members of insurance company SIU Units have certain minimum qualifications.

132.    11 NYCRR 86.6(c) provides:

Persons employed by Special Investigative Units as investigators … shall be qualified by education and/or experience, which shall include:

1) an associate's or bachelor's degree in criminal justice or a related field; or

2) five years of insurance claims investigation experience or professional investigation experience with law enforcement agencies; or

3) seven years of professional investigation experience involving economic or insurance related matters; or

4) an authorized medical professional to evaluate medical related claims.

I am quite familiar with the legal requirements of maintaining a Special Investigative Unit as well as the qualifications of the individuals that staff these units. I am also familiar with the requirement that insurance companies provide the New York State Department of Insurance Superintendent with a detailed plan "for the detection, investigation and prevention of fraudulent insurance activities in this State."

133.    My familiarity with the above is born out of number of factors. First I have trained insurance company SIU Departments.   Second, I have worked with

Insurance Company SIU Departments. In addition I sat on the Sate Discussion Panel who's purpose was to draft the rules setting forth the role and standards for SIU Departments as well as the qualifications for those individuals that would serve in SIU Departments.

134.    I have personally worked alongside State Farm's SIU Department. Specifically they would refer investigations to my unit. I have trained the State Farm SIU Department. State Farm's SIU Department is primarily comprised of individuals who worked as "claims handlers" or "claims reps" and were then promoted to SIU. State Farm's SIU Department is not staffed by individuals qualified under the law to work in such capacity.

135.    I found this to be true not only from personal knowledge, but from the work performed by State Farm SIU. Their investigations lacked a modicum of quality. They were incomplete, sometimes senseless and lacked real evidence. They expected individuals that testified at EUOs who forgot what the weather was like at the time of the accident to be arrested for insurance fraud. One of their favorite methods was the above-discussed guilt by association via computer link analysis.

136.    The final straw with State Farm came when one of my best Detectives – James Carriddi – while working with the Rackets Bureau of the Kings County District Attorney's Office requested files from State Farm.   When the State Farm SIU Investigator arrived with the file Detective Carriddi and the ADA showed the investigator that an individual involved in a number of accidents was also a main target in a massive investigation. They informed the State Farm SIU Investigator of this point so that he could pull more files containing the individual's name or any of his associates. The SIU Investigator before receiving the information was sworn to secrecy to prevent compromising the investigation. In addition the target was a murderer. Shortly thereafter State Farm submitted an Affidavit from their SIU Unit citing to my Detective and the ADA by name.  The Affidavit stated that the accident was fraudulent based upon the investigation of the Detective Carriddi and the ADA Doe. Not only did that compromise the investigation, it endangered lives. Specifically, the Detective carried a 9mm, but his family did not. Neither the ADA nor his family was armed.

137.    Finally I have reviewed State Farm SIU Affidavits submitted by McDonnell & Adels, P.C. There is never any section devoted to the qualifications of the SIU Investigator. Yet the investigators constantly give opinions.   The contents of the Affidavits seem spoon-fed wherein I know that I spend hours in collaborative effort with the attorney before my Affidavits are drafted. I review each draft and make corrections. As a police officer one cannot sign a document containing false information. Such an act could mean termination without retirement benefits or often time jail.

482.  Since McDonnell & Adels has made the above statement –

Such characterizations were not only submitted by Plaintiff's counsel but also by a non-party, Lt. Hand, retired, who has not met the individuals nor has full knowledge of all the facts and evidence … Notwithstanding plaintiff's counsel's insults to the contrary, State Farm representative (sic) were well within their expertise to present the facts of their investigation.

- 139 -

-- McDonnell & Adels has continued to submit the above-discussed Affidavits of State Farm SIU investigators even though said investigators and the entire SIU are illegal.

483.  McDonnell & Adels had frank and open discussions with State Farm regarding the qualifications of its SIU.  McDonnell & Adel's calls itself State Farm's SIU Counsel. McDonnell & Adels is as aware of the illegality of State Farm's SIU as State Farm.  Yet McDonnell & Adels continues to commit wholesale fraud upon the Courts.

484.  According to Judiciary law § **487. Misconduct by attorneys** "An attorney or counselor who: 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... Is guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

485.  McDonnell & Adels, and its various associates, commit misdemeanors on an almost daily basis.

**II. MCDONNELL & ADELS ILLEGAL AND UNETHICAL CONDUCT INVOLVING THE COERCION OF INDIVIDUALS WHO ARE WITHOUT COUNSEL AND THE SIGNING OF FALSE AFFIDAVITS**

486.  The following is illustrative of the conduct of McDonnell & Adels and has been repeated numerous times involving other individuals.

Arthur Luban

487.  McDonnell & Adels and the One Beacon Group utilized the above-discussed former Suffolk County District Attorney prosecutor that led Operation BORIS.  Said prosecutor obtained information from Arthur Luban, a former medical doctor that was utilized by McDonnell & Adels and the One Beacon Group.  Finally the former BORIS prosecutor actually

provided Luban himself. As described *infra* the conduct of McDonnell & Adels in this matter was criminal and unethical – a tour de force of abuse.

488.  The former BORIS prosecutor had investigated Luban while the prosecutor was still actively working on Operation BORIS.

489.  On or about December 12, 2002 Luban, a Richard Yaldizian M.D. and John Yi were charged with various crimes including insurance fraud, falsifying business records and grand larceny by the Queens County District Attorney's Office. The charges were the result of a sting operation conducted by the Fraudulent Accident Investigation Squad of the New York City Police Department. The Defendants were caught billing for medical treatment that was never provided. In addition Yi posed as a neurologist – he had no medical qualifications whatsoever – and billed for neurological testing that never occurred.

490.  On or about the same period of time the former BORIS prosecutor subpoenaed both Luban and Yi to appear before a Suffolk County Grand Jury that was empanelled solely to hear evidence and issue indictments stemming from Operation BORIS.

491.  Both Luban and Yi testified before the Suffolk Grand Jury.

492.  Both Luban and Yi were subsequently indicted by the Suffolk County Grand Jury for insurance fraud related charges.

493.  At the direction of the former BORIS Prosecutor Arthur Luban was arrested at his Brooklyn home by detectives as part of Operation BORIS. Upon information and belief Yi was also arrested.

494.  The charges against Luban were subsequently dismissed.

495. In 2003 the former BORIS prosecutor while still investigating and indicting individuals in Operation BORIS talked to Luban a number of times and met with Luban and his lawyer outside the offices of the Suffolk County District Attorney's Office.

496. Luban provided the BORIS prosecutor information about alleged fraudulent activity. In addition, the former BORIS prosecutor was aware of the above described Queens charges against Luban. The former BORIS prosecutor also knew that Luban was cooperating with the Queens County District Attorney's Office in their investigations.

497. The BORIS investigation, as pled above, sought to literally grab every investigation of fraud by various law enforcement agencies that were ongoing in the metropolitan area and, in the vernacular of prosecutors, "poach" the cases. In this regard Luban was heavily utilized by the former BORIS prosecutor to gain information about the activities of the Queens County District Attorney's Office and the New York City Police Department with regard to investigations of fraud. Specifically the former BORIS prosecutor wanted to know who the above law enforcement entities were investigating and what information they had about said individuals/entities.

498. The former BORIS prosecutor also gathered a mass of information about alleged fraudulent activities from Luban associate the above-mentioned John Yi.

499. When the former BORIS prosecutor left the Suffolk County District Attorney's Office the prosecutor took a huge file of amassed information about alleged fraudulent activities that the prosecutor gained from multiple "investigators" during Operation BORIS. This was done in order to sell the information to various insurance companies and to use the information to commence lawsuits on behalf of various insurance companies.

- 142 -

500. In order to effectuate the plan the former BORIS prosecutor also utilized individuals such as Luban and Yi that the former prosecutor investigated and indicted while conducting BORIS. These individuals would be utilized for their information and their ability to sign affidavits detailing fraudulent activity that they had allegedly been involved in. This would allow insurance companies to sue the various entities that these individuals had worked for or in association with or kill claims for services rendered by these entities.

501. For example one of the most commonly used insurance company allegations of fraud are claims of fraud in the incorporation. Some medical doctors such as Luban would allegedly "rent out" their medical licenses to lay persons in order to create fraudulently incorporated medical P.C.s, which is technically against the law. This is known as the Doc-In-the-Box Scheme.

502. In 2005 the Court of Appeals reviewed a decision by Judge Sifton of the Eastern District wherein Judge Sifton stated that such an arrangement did not serve as a justification for insurance companies to deny claims from so called Doc-In-The-Boxes as long as the treatment was rendered by medical professionals and was medically necessary. The New York Court of Appeals, in short, held that so called Doc-In-The-Boxes could not collect money on claims to insurers. Furthermore that insurance companies could bring claims to recover monies paid to such medical providers.

503. When a doctor states in an affidavit that he or she was not the true owner of the P.C. the P.C. can be sued and denials of claims justified.

504. After the former BORIS prosecutor left the district attorney's office he regularly spoke with Luban in order to gain information about alleged fraudulent activities. This included multiple meetings between Luban and the former prosecutor at Brooklyn motels and diners. The above occurred in and around the second half of 2004 and through 2005.

505. In exchange for information the former BORIS prosecutor would give Luban cash payoffs in the amount of $500 dollars each. At this point Luban was quite old, had lost his license to practice medicine and was nearly destitute.

506. The former prosecutor primarily utilized Luban for work that the former prosecutor was performing on behalf of the One Beacon Group – according to Luban "the whole One Beacon group."

507. The former prosecutor also stated to Luban that the prosecutor would utilize Luban in work that the prosecutor was doing for AIG. In addition the former prosecutor informed Luban that he would sign a contract with Defendant Katten wherein Luban would also be under contract and would receive a percentage of the monies recovered on behalf of insurance companies.

508. The former prosecutor never delivered Luban to Katten Muchin because Luban contacted them personally. However, the former prosecutor did deliver Luban associate John Yi to Katten in a meeting at a Florida location.

509. The former prosecutor also represented to Luban that the prosecutor would act as his attorney whenever Luban spoke to insurance companies and their attorneys. Simultaneously, the former prosecutor had Luban sign affidavits stating that he did not really own certain medical P.C.s and commenced to have these P.C.s dissolved. This was done in order to kill claims brought by these P.C.s against the former prosecutor's insurance company clients. In addition the former prosecutor had the FBI interview Luban. The former prosecutor also reported Luban to the Office of Professional Conduct. All of this was done to destroy the Luban medical entities ability to recover unpaid claims.

510.   The former prosecutor arranged for McDonnell and Adels to meet with Luban in connection with a suit that McDonnell and Adels was planning to bring against certain medical providers on behalf of AutoOne.

511.   The former prosecutor set-up the actual meeting between Luban and McDonnell & Adels including the date and time.  The former prosecutor stated that he would attend and act as Luban's attorney during the meeting.

512.   On the day of the meeting McDonnell and Adels sent two men to pick up Luban from his Brooklyn home and commence to "whisk" Luban away to the Law Offices of McDonnell & Adels in Garden City, Nassau County.

513.   Once he arrived at the Law Offices of McDonnell & Adels Luban was taken to a room where the two partners of the firm – Pat McDonnell and Beth Adels, met him.

514.   On the day of the meeting Luban was in his 70s and suffering from a severe stomach ailment.

515.   Pat McDonnell and Beth Adels informed Luban that the former BORIS prosecutor would not be there.  Luban stated that he would not talk unless he had his lawyer with him.  Luban asked to be taken home.

516.   Pat McDonnell stated that Luban would not be taken home.  Further that Luban had better give the information that the former prosecutor stated Luban would give or McDonnell would see to it that Luban was criminally charged and arrested.  Furthermore McDonnell stated that Luban would also find himself the subject of a debilitating civil suit if he did not cooperate.

517.   Luban attempted to exit but McDonnell blocked the door.  At this point both Mr. McDonnell and Ms. Adels repeatedly threatened Luban with criminal and civil sanction if he did not give the desired information.

518. After continued coercion and pressure Luban relented and supplied unreliable information that was coaxed and coached out of him by Pat McDonnell and Beth Adels.

519. Luban also, after continued coercion, signed at least one affidavit on behalf of McDonnell & Adels that was drafted by McDonnell & Adels.

520. Despite the above Luban was informed by Pat McDonnell and Beth Adels that he would still be sued.

521. Luban utilized an attorney – not the former prosecutor – to reach a settlement with McDonnell & Adels before said suit was initiated.

522. Every aspect of McDonnell & Adels dealings with Luban is permeated by unethical and indeed criminal conduct – from acquisition through questioning and the use of information coerced from a man in his 70s who did not have an attorney present. Indeed pressuring Luban to sign an Affidavit that had damaging consequences without the presence of an attorney violates the Disciplinary Rules.

Melchias Mukendi

523. As pled McDonnell & Adels, the One Beacon Group and State Farm utilized the above-discussed former Suffolk County prosecutor that led Operation BORIS. Said prosecutor obtained information from Melchias Mukendi, a former medical doctor. This information was, and is, being utilized by McDonnell & Adels primarily on behalf of State Farm, but also the One Beacon Group. Moreover the former BORIS prosecutor actually provided Mukendi himself.

524. The former BORIS prosecutor had investigated Mukendi while the prosecutor was still actively working on Operation BORIS.

525. When the former BORIS prosecutor left the Suffolk County District Attorney's Office the Mukendi information was part of the information that the former prosecutor took with him.

526. In order to effectuate the plan the former BORIS prosecutor also utilized Mukendi for his information and his ability to sign affidavits detailing fraudulent activity that he allegedly had been involved in. This consisted primarily of admissions that Mukendi did not really own various medical P.C.s. As such insurance companies could sue the various entities that these individuals had worked for, or in association with, and/or kill claims for services rendered by these entities.

527. After the former BORIS prosecutor left the district attorney's office he regularly spoke with Mukendi in order to gain information about alleged fraudulent activities. This included multiple meetings in and around the second half of 2004 and through 2005.

528. In exchange for information the former BORIS prosecutor would give Mukendi cash payoffs.

529. The former prosecutor also represented to Mukendi that the prosecutor would act as his attorney whenever Mukendi spoke to insurance companies and their attorneys.

530. The former prosecutor arranged for McDonnell and Adels to meet with Mukendi.

531. Mukendi met with both Pat McDonnell and Beth Adels at the offices of McDonnell & Adels on at least three occasions. On each occasion he was not represented by counsel.

532. In each of the meetings Mukendi was told by both McDonnell and Adels that he needed to cooperate or face a civil suit and possible criminal sanction.

533. At the time of the meetings Mukendi was approximately 62-63 years old. He is a native of the Congo.

534. Mukendi provided information that was coaxed and coached out of him by McDonnell and Adels.

535. The information was placed into the form of an Affidavit, which Mukendi was coerced into signing on July 13, 2005, on behalf of State Farm. As a result of signing that Affidavit Mukendi lost his license to practice medicine when McDonnell & Adels and/or State Farm forwarded a copy of the Affidavit to the State Office of Professional Conduct.

536. Mukendi received no advice or assistance from counsel in his dealings with McDonnell & Adels.

537. Every aspect of McDonnell & Adels dealings with Mukendi is permeated by unethical and indeed criminal conduct – from acquisition through questioning and the use of information coerced from a man in his 70s who did not have an attorney present. For Mukendi the signing of his Affidavit cost him his medical license. The fact that this Affidavit was signed under pressure by McDonnell & Adels without the presence of counsel displays an arrogant flagrant abuse of the Disciplinary Rules.

Yebo Fu

538. On July 19, 2006 one Yebo Fu, a licensed acupuncturist, purportedly signed an Affidavit that was prepared by McDonnell & Adels working in conjunction with both the One Beacon Group and State Farm's alleged SIUs.

539. The Affidavit contained a number of statements that could be construed as harmful to a Ms. Valentina Anikeyeva, the owner of AVA Acupuncture and Ms. Oksana Lendl owner of both Plaintiff Okslen Acupuncture and JOV Acupuncture P.C.

540. The circumstances of the creation and signing of this Affidavit evidence yet more ethically and criminally impaired conduct on the part of McDonnell & Adels.

541. In addition a member of One Beacon Group's SIU also quoted Mr. Fu and his wife Ms. Shu Juan Cui as making certain statements that could be construed as harmful to AVA and Okslen/JOV.

542. On the night of January 10, 2007, an investigator had a meeting with both Ms. Shu Juan Cui and Mr. Yebo Fu at their home. He arrived at said home at approximately 8:15 p.m.   A phone call placed to the residence on January 8, 2007 at approximately 9:55 p.m. succeeded in reaching Mr. Yebo Fu and his wife Shu Juan Cui.  However it was impossible to speak with them because neither of them could understand English.  The call had to be terminated when it became apparent that Mr. Yebo Fu thought that the investigator was interested in buying his house.  This became apparent because out of the blue Mr. Fu stated words to the effect "see house."  The investigator had noted a real estate for sale sign outside his premises on prior occasions when he had tried to make contact with him. The investigator surmised that Yebo Fu thought that he was a potential homebuyer or Real Estate agent.

543.   On the night of January 10, 2007 the investigator rang the doorbell at Mr. Fu's residence. In basic chronological order the following occurred.  A female answered.  The investigator later learned that this female was Ms. Shu Juan Cui.  Ms. Cui let the investigator inside.  The investigator inquired as to the whereabouts of Mr. Fu.  It took some ten full minutes to determine that Mr. Fu went out to pick up some food for dinner.  Ms. Cui could not speak English with any degree of fluency capable of being understood.  In fact the investigator was not sure whether she wanted him to wait or leave until she motioned for the investigator to sit down on the couch. Ms. Cui then turned on the television set changing the channels through a number of English speaking stations finally settling on a Spanish language station.

- 149 -

544.    During the next five or so minutes the investigator questioned Ms. Cui about her husband's Affidavit by showing it to her.  Upon seeing the Affidavit she recalled the events surrounding the Affidavit.  The investigator could tell because she began attempting to communicate. Ms. Cui could not form the words so she simply held up her hand in a swearing position, stood up straight and said "Long Island."  When the investigator gave Ms. Cui the Affidavit she indicated through simple words and gestures that she could not understand it.  Ms. Cui attempted to read the Affidavit, but it became clear that she could not.  She gave back the Affidavit and smiled broadly.

545.    Ms. Cui then went into the kitchen leaving the investigator to watch President Bush's speech on the Spanish Language Station news with simultaneous Spanish translation.  It was the investigator's belief that Ms. Cui could not distinguish between Spanish and English or thought that the investigator was speaking Spanish.  Ten or so minutes later Ms. Cui returned with some tea smiling and laughing.  In fact the majority of the communication consisted of smiles and laughs.

546.    Sometime around 8:45 p.m. Mr. Yebo Fu arrived at his premises.  At first the investigator was not sure that it was him because he rang the doorbell.  When he walked in he was carrying bags of takeout Chinese food.  He immediately asked: "Dinner?"  It became immediately obvious that Mr. Fu could not speak English with any degree of fluency that could be considered reliable for communications purposes.  The investigator was able to communicate the reason for his presence by showing him a copy of his Affidavit, which he did not immediately recognize. When the investigator showed him his signature a sense of memory passed across his face.  The investigator handed Mr. Fu his card.  Then he sat at his dinning room table for what the investigator thought would be a short interview.

547.  The investigator asked Mr. Fu about the circumstances surrounding the signing of the Affidavit.  His response was unclear in two ways.  First the investigator could not understand what he was saying because of the language barrier.  Mr. Fu had immense trouble forming words or more aptly put forming words in his brain.  Secondly the investigator had the distinct impression that Fu was confused as to the events leading to the signing of his Affidavit.  The one solid conclusion that the investigator could reach was that during the events leading to the signing of the Affidavit, and the actual signing, Mr. Fu believed that he was cooperating with the government: "No fault ... law ... law... talk."

548.  What the investigator could gather – put together – after a lengthy period of questioning relying on the limited words he spoke, his gestures, his wife's words and gestures and the investigator's knowledge of the case is as follows: 1) Fu was driven to Long Island by an investigator; 2) a lawyer prepared the Affidavit after Fu was questioned by a number of individuals; 3) at points during the questioning a person who could speak Chinese would enter the room to help out and then leave; 4) before signing the Affidavit Fu was given the opportunity to read the Affidavit which he indicated that he did; 5) Mr. Fu had no attorney for the above present or at all.

549.  The investigator then handed Mr. Fu his Affidavit.  The investigator asked him if he understood the contents – this took several minutes.  After Fu understood the gist of the investigator's question Fu began to silently read portions of the Affidavit.  Even from his silent reading the investigator could tell that Fu had trouble reading it.  After a lengthy period of time Fu would complete silently reading about three or four sentences.  He would then try to explain what the sentences meant but had trouble coming up with the words.

550.    The investigator finally asked Fu to read the Affidavit out loud.  The process was painful if not painstaking.  Mr. Fu had to sound out each word before saying it.  Some words he could not say at all.  During the entire time period he had a quizzical appearance on his face.  It became apparent that if Mr. Fu read the entire Affidavit it would take approximately one hour to complete.  Furthermore, he simply did not comprehend what he was reading.  In frustration Mr. Fu went upstairs returning shortly thereafter with the original Affidavit containing his original signature.  He compared the copy with the original and seemed to be attempting to determine whether or not they contained the same contents.  Even though they were exactly the same Mr. Fu could not reach that conclusion until the investigator showed him signature sections.

551.    Mr. Fu did not have any concept of what a notary or notary stamp was.

552.    At one point as Fu read the original Affidavit out loud – paragraph 8 – he got to the numerals "1099" and stopped.  He stated: "No ... 1999."  He then corrected his original Affidavit with a pen writing "1999" in the margin next to the two places where "1099" appeared in the paragraph.  It became clear that Mr. Fu did not understand what a 1099 was.  At this point the investigator stopped requesting that Yebo Fu read portions of his Affidavit.

553.    The investigator then inquired as to how Yebo Fu was paid by the acupuncture entities referred to in the Affidavit.  He stated, "check."  The investigator asked from whom.  Mr. Fu then attempted to explain.  Again some time elapsed until the investigator could determine that the gist of this explanation was that Andrey Anikeyev, Valentina Anikeyeva's husband, would give him or mail him checks.  The checks were from acupuncture companies or a company the name of which he could not remember.

554.    The investigator next showed Mr. Yebo Fu and his wife the Department of State Division of Corporation Entity Information Print Out for Chun Zhu Tang Acupuncture.  The investigator

pointed out that the document listed the name Chu Zhu Tang as in "C/O" of the company for purposes of service. The investigator also pointed out that the document listed Shu Juan Cui as the Chairman or Chief Executive Officer of the Company and it listed Yebo Fu as the Principal Executive Office. Ms. Shu Juan Cui then stated: "I make company." Mr. Yebo Fu stated: "My wife ... my ... company."

555.    The following happened in exact chronological order. The investigator inquired as to whether Mr. Yebo Fu knew "Valentina." The investigator's exact words were one word: "Valentina." Mr. Fu responded: "She my boss ... Acupuncturist." The investigator then asked "she your boss?" Mr. Fu repeated: "She my boss." The investigator then asked: "Valentina owner Acupuncture?" Mr. Fu stated: "Owner acupuncture company."

556.    Mr. Fu was then shown the portion of the Affidavit dealing with the delivery of acupuncture supplies – Paragraph 9. He was asked about supplies at the same time as he looked at the Affidavit. The words "supplies", "needles", etc. was constantly used along with hand gestures showing a needle entering an arm, neck and back. Mr. Fu stated: "Valentina give supplies ... Valentina and Andrey give supplies." Through further questioning the investigator was able to determine that the supplies were brought in person or sent.

557.    The investigator then showed Fu the last two paragraphs regarding the stamp issue. The investigator told him to read it. He had a tremendous amount of difficulty. The investigator asked him to read it to himself and then explain what he was saying. After some time Yebo Fu stated words to the effect "they make stamp." The investigator asked for him to elaborate – "anything else", "what else"; "any problem" etc. He seemed puzzled and did not respond. The investigator was able through words and gesture to ask him if he was ever shown bills with his stamp prior to the signing of his Affidavit. He said "no." The investigator then asked him – and

this took some time and much gesturing – whether bills ever had his stamp where he did not do

the actual acupuncture. Yebo Fu began saying: "notes ... I sign." Through yet more interplay

the investigator was able to understand that Yebo Fu was explaining that the bills were based on

his treatment notes, which he did sign. The investigator then said, "Any bills ... your stamp

[gesture] no acupuncture." He said: "No."

558. Aside from his inability to understand the Affidavit the statements Yebo Fu did articulate

contradicted the Affidavit prepared by McDonnell & Adels. The investigator's meeting was

reduced to Affidavit form. What follows are the investigator's, a retired and decorated

Lieutenant with the NYPD, conclusions:

> 168.    It is my professional conclusion as a retired Lieutenant, a Licensed Private
> Detective, as well as a Notary that the creation and especially the signing of the Affidavit
> by Yebo Fu was criminal. Mr. Yebo Fu is not to blame. Rather AutoOne and/or General
> is to blame. Yebo Fu obviously signed an Affidavit that he could not understand. Due to
> his lack of understanding of the English language, his cooperativeness and quite probably
> the degree of intimidation presented by what appeared to him to be a governmental
> investigation Mr. Yebo Fu signed this Affidavit. In so doing he swore that its contents
> was true when he in fact did not understand the contents of the Affidavit. This lack of
> understanding of the Affidavit has been demonstrated above. In fact some of his
> statements to me purely contradicted the contents of the Affidavit. This is especially true
> with regard to his spontaneous statement that Valentina Anikeyeva was his boss and the
> owner of the acupuncture company(s) that he worked for.

> 169.    It is important to note that in my experience with the Asian community
> especially recent émigrés I have come to understand that these individuals have a
> tremendous respect and fear of law enforcement or governmental authority. This is a
> product of the authoritarian governments that control some Asian countries such as China
> where Mr. Yebo Fu and his wife originate. (He mentioned the fact that he and his wife
> were from China) This was demonstrated by the fact that Ms. Cui invited me to enter her
> premises at such a late hour when she was alone. I have been told that I look like a "cop"
> and always will.

> 170.    One does not have an individual sign an Affidavit that he does not
> understand. The presence of someone who can allegedly translate the Affidavit from
> English to Chinese is of no consequence. First Mr. Yebo Fu was told to read the
> Affidavit before he signed it. Secondly no matter the translation the Affidavit itself is in
> English a language that he could not understand anywhere sufficiently enough to sign –
> especially given the nature of an Affidavit. The proper course – the course that I used
> when I was in law enforcement and had witnesses sign confessions or statements -- was to

- 154 -

put the statement in the language that the witness could understand. For example Yebo Fu's Affidavit should have been drafted in Chinese. That is the way that I would have handled it. The Affidavit could then be translated into English along with a sworn statement from the translator that said translation from Chinese to English is a true and accurate translation of the Affidavit of Yebo Fu dated and July 19, 2006.

171. It is for the above reasons that I conclude that AutoOne and all others involved in the above described events have committed the following criminal activity: Penal Law Section 175.35 Offering A False Instrument For Filing in the First Degree (an E Felony); Penal Law Section 175.30 Offering A False Instrument For Filing in the Second Degree (an A Misdemeanor); and various perjury offenses located in Section 210 of the Penal Law including Conspiracy to Commit Perjury.

559. The above findings were contained in the aforementioned investigator's Affidavit that was submitted in various Oppositions to the Insurance Defendant's motions or cross motions for summary judgment and/or to compel discovery.

560. As a result McDonnell & Adels sought to take remedial measures, which has come to the undersigned's attention in various legal papers submitted on behalf of the One Beacon Group.

561. According to the unsigned transcript of an Examination Before Trial on March 13, 2007 Yebo Fu and, for some reason his wife, were once again brought to the offices of McDonnell & Adels. Mr. Fu once again signed the same exact Affidavit. Then according to the unsigned deposition transcript Mr. Fu submitted to the Examination Under Oath pursuant to subpoena. Although Ms. Adels is well aware of the fact, and has even acknowledged it in her own submissions, the undersigned is General Counsel to all the Anikeyeva Acupuncture P.C.s including the Plaintiff in the case wherein Mr. Fu was subpoenaed. Yet the undersigned never received notice of said deposition despite the fact that the deposition was held directly as a result of the above discussed interview and Affidavit regarding Mr. Fu's Affidavit.

562. The above-discussed deposition occurred on behalf of the Defendant State Farm.

563. Ms. Adels asks Mr. Fu if he went over an Affidavit "that we prepared for your today, that you just signed." In actuality the Affidavit was prepared some 8 months prior in July of 2006.

- 155 -

564. The fact that Mr. Fu's wife was present the deposition is indicative of fear on both their parts. There was no counsel for either of them present.

565. Adels asks Mr. Fu whether a Mandarin interpreter had translated the entire Affidavit for him. Fu answers in the affirmative. Adels asks Fu if everything stated in the Affidavit is true. Fu answers in the affirmative. Adels asks Fu if he signed it. Fu answers in the affirmative.

566. It is a 5 page 22 paragraph Affidavit.

567. Fu is then questioned about his signature stamp. The questioning does not go well for Ms. Adels even though she is asking leading questions that are allegedly being translated into Mandarin. Basically Fu states that he cannot tell whether an exhibit contains his signature. Then he states that it contains his signature stamp. He is then asked:

> Q. Is it true that you did not authorize a stamp of your signature for that bill?
> A. No.
> Q. You didn't say that was okay to use a stamp, correct?
> A. My boss not tell me.
> Q. The stamp of your signature was without your permission, right?
> A. No.

568. At this point Ms. Adels commands: "Off the record. (Whereupon, an off the record discussion was held)."

569. When they come back on the record the stumbling continues for another page with Ms. Adels repeatedly asking the same leading question:

> Q. Again, you did not give anyone permission to make a stamp of your signature or use it on a bill, right?
> A. No. I never get any permission to have anyone to have my rubber stamp signature.

570. At this point Ms. Adels ends the fiasco. As of March 2008 the Deposition transcript had still not been signed.

571.  There are other instances of the above conduct committed by McDonnell & Adels. Specifically, the firm and its Insurance Company Defendant cohorts have bullied medical professionals to come to the offices of McDonnell & Adels wherein the principals of the firm have pressured said medical professionals to sign affidavits that they did not understand.  In all cases the medical representatives were unrepresented even though the signing of said affidavit could, and in many cases, did have adverse legal consequences to the Affiant.

572.  For example, on June 12, 2005 a medical doctor called McDonnell & Adels in response to a subpoena to appear in Court the following day.  The doctor was not fluent in English.  In fact his English was severely limited as his native language is a rare one indeed – Tagalog.  Moreover the doctor had lived in the Philippines for the majority of his life.

573.  The doctor attempted to communicate to the signor of the subpoena, Ms. Allison Berdnik that he could not testify because he could not locate the medical records.  Ms. Berdnik was able to communicate that the doctor needed to come to the office of McDonnell & Adels.

574.  On June 14, 2005 the doctor went to the offices of McDonnell & Adels wherein he met with either Ms. Berdnik or Ms. Adels and Patrick McDonnell.  Also present was a representative of State Farm who upon information and belief was a member of State Farm's illegal SIU.

575.  The attorneys communicated to the doctor that he needed to sign "a pile of documents", which they had prepared.

576.  The doctor came under pressure to sign the documents.  Specifically, to the best of the doctor's understanding the lawyers communicated that he would be in trouble if he did not sign the documents.

577. The doctor ended up signing one Affidavit which he later learned stated that he did not hire or authorize his counsel to bring actions on behalf of his medical P.C. In fact the doctor thought he was signing an affidavit stating that he did not authorize a lawsuit in the case for which the subpoena was issued. The doctor did not recognize the patients name and, as stated, did not have records to refresh his recollection.

578. During this hour long interrogation the doctor did not have a translator or attorney.

### III. ENFORCER COUNSELS' ILLEGAL AND UNETHICAL CONDUCT IN GENERAL

579. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – violate 22 N.Y.C.R.R. 1200.36(a) [DR-7-105]. That section provides, "A lawyer shall not present, participate in presenting, or threaten to present criminal charges solely to obtain an advantage in a civil matter."

580. Specifically, Enforcer Counsel, especially McDonnell & Adels, have – and continue to – present, participate in presenting, and threaten to present, in concert with the NICB and/or the Insurance Company Defendants, criminal charges against plaintiffs and the putative class members in order to obtain an advantage in the civil actions brought by plaintiffs and the putative class members to recover no-fault benefits.

581. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – violate 22 N.Y.C.R.R. §1200.35(a) (1) [DR 7-104]. That section provides, "During the course of the representation of a client a lawyer shall not: Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so."

- 158 -

582. Specifically, Enforcer Counsel, especially McDonnell & Adels, have – and continue to – communicate with – or caused the NICB and/or the Insurance Company Defendants to communicate with – individuals, specifically medical professionals and claimants, that Enforcer Counsel knows to be represented by counsel.

583. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – violate 22 N.Y.C.R.R. §1200.35(a) (2) [DR 7-104]. That section provides, "During the course of the representation of a client a lawyer shall not: Give advice to a party who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such party are or have a reasonable possibility of being in conflict with the interests of the lawyer's client."

584. Specifically, Enforcer Counsel, especially McDonnell & Adels, have – and continue to – give advice to individuals, specifically medical professionals and claimants, who are not represented by counsel where the interests of such individuals are or have a reasonable possibility of being in conflict with the interest of Enforcer Counsel's clients.

585. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – violate 22 N.Y.C.R.R. §1200.33(a) (1-8) [DR 7-102]. That section provides, "In the representation of a client, a lawyer shall not: (1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of the client when the lawyer knows or when it is obvious that such action would serve merely to harass or maliciously injure another; (2) Knowingly advance a claim or defense that is unwarranted under existing law, except that the lawyer may advance such claim or defense if it can be supported by good faith argument for an extension, modification, or reversal of existing law; (3) Conceal or knowingly fail to disclose that which the lawyer is required by law to reveal; (4) Knowingly use perjured testimony or false evidence; (5) Knowingly make a false statement of law or fact; (6) Participate in the creation or preservation of

evidence when the lawyer knows or it is obvious that the evidence is false; (7) Counsel or assist the client in conduct that the lawyer knows to be illegal or fraudulent; (8) Knowingly engage in other illegal conduct or conduct contrary to a disciplinary rule."

586. Specifically, Enforcer Counsel, especially McDonnell & Adels, have – and continue to – assert defenses, delay trials, and take action on behalf of the NICB and Insurance Company Defendants, that Enforcer Counsel, especially McDonnell & Adels, knows that such action serves merely to harass and/or maliciously injure plaintiffs and the putative class members. Moreover, Enforcer Counsel, especially McDonnell & Adels, have – and continue to –conceal and knowingly fail to disclose that the Insurance Company Defendants' SIUs are illegal. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – knowingly use perjured and false testimony against plaintiffs and the putative class members. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – knowingly make false statements of law and fact concerning the propriety of the Insurance Company Defendants' SIUs. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – counsel the NICB and the Insurance Company Defendants in conduct that Enforcer Counsel knows to be illegal and/or fraudulent.

587. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – violate 22 N.Y.C.R.R. §1200.33(b) (1-2) [DR 7-102]. That section provides, "A lawyer who receives information clearly establishing that: (1) The client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon the client to rectify the same, and if the client refuses or is unable to do so, the lawyer shall reveal the fraud to the affected person or tribunal, except when the information is protected as a confidence or secret;

A person other than the client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal.

588. Specifically, Enforcer Counsel, especially McDonnell & Adels, have – and continue to – receive information clearly establishing that the Insurance Company Defendants and the NICB are illegal and have perpetrated a fraud upon plaintiffs and the putative class members. Nevertheless, Enforcer Counsel, especially McDonnell and Adels, have failed to reveal the fraud to the affected persons and the Courts.

589. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – violate 22 N.Y.C.R.R. §1200.40(c) [DR 7-109]. That section provides, "A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his or her testimony or the outcome of the case."

590. Specifically, Enforcer Counsel, especially McDonnell & Adels, have – and continue to – in concert with the NICB and/or Insurance Company Defendants, offer monetary compensation to witnesses to give false information concerning the plaintiffs and putative class members.

591. Enforcer Counsel, especially McDonnell & Adels, have – and continue to – violate 22 N.Y.C.R.R. §1200.3(a) (1-5, 7) [DR 1-102]. That section provides, "A lawyer or law firm shall not: (1) Violate a disciplinary rule; (2) Circumvent a disciplinary rule through actions of another; (3) Engage in illegal conduct that adversely reflects on the lawyer's honesty; trust worthiness or fitness as a lawyer; (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; (5) Engage in conduct that is prejudicial to the administration of justice; . . . (7) Engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer."

592. Specifically, Enforcer Counsel, especially McDonnell & Adels, have – and continue to – violate the above section through all of the activities described and complained of herein.

- 161 -

## MELLI GUERIN'S CONTINUOUS VIOLATIONS OF THE JUDICIARY LAW

593. Melli Guerin has constantly represented and still represents State Farm Insurance in a large quantity of No Fault related matters for a number of years.

594. Melli Guerin has engaged in a campaign of disseminating the Affidavits signed by purported State Farm SIU Investigators that are unqualified under the law to be SIU "Investigators."

595. The above Affidavits were in fact drafted by Melli Guerin.

596. Melli Guerin has submitted legal papers containing said Affidavits to Courts in Kings County, Queens County and Bronx County.

597. Melli Guerin has submitted the above Affidavits of illegal SIU "Investigators" to the above courts on behalf of State Farm.

598. All of the above-enumerated conduct is also true with regard to information allegedly obtained by State Farm's illegal SIU unit which information has been included in legal submissions drafted and submitted to the above mentioned Courts by Melli Guerin on behalf of State Farm.

599. Melli Guerin in the above submissions represents to the various Courts that State Farm's SIU Department is qualified under the law to be an SIU Department.

600. Melli Guerin in the above described submissions including the Affidavits that it has drafted, and which members of State Farm's illegal SIU Department have signed, represents that the particular SIU "Investigator(s)" are qualified to act as SIU "Investigators" under the law.

601.   As voluminously pled State Farm's entire SIU is unqualified under the insurance regulations to function as such.  As a result, aside from the grotesque uses of hearsay, lack of observation and unsupported conclusions contained therein, the Affidavits and information gathered by State Farm's SIU intrinsically has no worth.  Specifically, as members of State Farm's SIU are not qualified under the insurance regulations to be such the Affidavits of State Farm SIU "Investigators" containing the results of State Farm SIU "investigations" are worthless due to their inherent illegality.

602.  Most importantly Melli Guerin is falsely representing to the Court that the information was gathered by a qualified legal SIU and the sworn and signed Affidavits were sworn to and signed by individuals that are qualified under the law to be SIU Investigators.

603.  Melli Guerin knows that State Farm's SIU is illegal because they have been informed of this on numerous occasions by the Affidavit of an expert dating back over one and a half years ago.  Below are a few examples.

- ■   MODEL SUPPLY, INC. as assignee of ANDREJS KUSTOVS v. STATE FARM MUTUAL AUTOMOBILE INSURANCE CO., NYC Civ. Ct. Queens Co. (Index No.: 86598/04).  On or about February 20 of 2007 Melli Guerin was informed by Affirmation and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such.  The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

- ■   MODEL SUPPLY, as assignee of FLORIO MACIAS v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, NYC Civ. Ct. Queens Co. (Index No.:96767/03). On or about June 19, 2007 Melli Guerin was informed

- 163 -

by Affirmation and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

- MODEL SUPPLY, as assignee of NUKRI PALAGASHVILI v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, NYC Civ. Ct. Queens Co. (Index No.: 86710/04). On or about June 27, 2007 Melli Guerin was informed by Affirmation and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

- MODEL SUPPLY, as assignee of MARK STOLBERG v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, NYC Civ. Ct. Queens Co. (Index No.: 50710/04). On or about August 2, 2007 Melli Guerin was informed by Affirmation and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

- MODEL SUPPLY, as assignee of JOHN MANIGOULT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, NYC Civ. Ct. Queens Co. (Index No.:096814/03). On or about June 19, 2007 Melli Guerin was informed by Affirmation and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as

- 164 -

such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

■ <u>MODEL SUPPLY, as assignee of MALIKA ASKAROVA v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY</u>, NYC Civ. Ct. Queens Co. (Index No.: 86538/04). On or about October 30, 2007 Melli Guerin was informed by Affirmation and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

■ <u>MODEL SUPPLY CORP., As assignee of ANDUJAR MILDRE v. STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY</u>, NYC Civ. Ct. Queens Co. (Index No.: 145010/04). On or about April 4, 2007 Melli Guerin was informed by Affirmation and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by the above discussed Operation BORIS.

■ <u>MODEL SUPPLY, INC. as assignee of CORTICCIA ANTHONY, v. STATE FARM INSURANCE COMPANY</u>, NYC Civ. Ct. Queens Co. (Index No.: 96200/03). On or about February 14, 2008 Melli Guerin was informed by Affirmation and the detailed Affidavit of an Expert that State Farm's SIU "investigators" did not meet legal requirements for acting and functioning as such. The Affidavit also detailed the failings of State Farm's SIU to function properly as evidenced by. the above discussed Operation BORIS.

- 165 -

604. Melli Guerin has been informed via multiple correspondences of the illegality of State

Farm's SIU and "investigators" as early as November 11, 2006 when a letter sent to Melli set

forth:

## STATE FARM'S ROGUE SIU DEPARTMENT

It has come to my attention that the State Farm Special Investigative Unit does not meet the qualifications set forth by 11 NYCRR 86.6(c), which provides:

Persons employed by Special Investigative Units as investigators … shall be qualified by education and/or experience, which shall include:

1) an associate's or bachelor's degree in criminal justice or a related field; or
2) five years of insurance claims investigation experience or professional investigation experience with law enforcement agencies; or
3) seven years of professional investigation experience involving economic or insurance related matters; or
4) an authorized medical professional to evaluate medical related claims.

Moreover, State Farm through its rogue Special Investigative Unit, in conjunction with the NICB and a bungling/ethically-impaired prosecutor, literally generated its own criminal "investigation" and "prosecution" that by all appearance was gauged to create false justifications for the denial claims and little else. The investigation improvidently named "BORIS" – for "Big Organized Russian Insurance Scam" – led to the false arrest and imprisonment of numerous individuals who were later cleared; as well as numerous – hundreds – of expired indictments. I am currently pursuing this matter further through Freedom of Information Law.

Furthermore, investigation has revealed that State Farm and their attorneys, on a National level, have pervasively engaged in the following conduct: "regularly" forging customer signatures on insurance applications omitting earthquake coverage; forcing employees to lie under oath; pressuring employees not to testify in legal proceedings; hiding and/or destroying evidence of fraud; refusing to turnover key documents in discovery; pressuring engineers to alter reports on Katrina storm-damaged homes so that claims could be denied; using its claims handling process as a profit center by offering its claims adjusters undisclosed incentives to wrongfully deny benefits i.e. giving its adjusters specific numerical targets with regard to average payouts per claim – meeting these targets leads to promotion and pay increases; targeting "vulnerable and defenseless" customers for fraud etc. etc.

Moreover, I have also learned that State Farm's alleged Special Investigative Unit is similarly "incentivized."

- 166 -

I have also found that State Farm – in a similar vein to "BORIS" – has disseminated to law enforcement and prosecutors booklets about Arson that contain false information. The booklets go so far as informing law enforcement to automatically target the policyholder, but to treat said policyholder as a witness in order to avoid Constitutional implications – the 5th Amendment, *Miranda*, etc.   The above type conduct is recommended by State Farm despite the fact that most studies demonstrate that the policyholder actually commits arson in only 10% or less of all provable arsons.

605.  Melli Guerin has never even bothered to address the point that State Farm's SIU is illegal even though it has been repeatedly been brought before the New York City Civil Court in a persuasive manner in Affidavits similar to the one excerpted at Paragraph 481 above.

606.   Melli Guerin has had frank and open discussions with State Farm regarding the qualifications of its SIU.    Melli Guerin is therefore as aware of the SIU's illegality as State Farm. Yet Melli Guerin continues to commit wholesale fraud upon the Courts.

607.  According to Judiciary law **§ 487. Misconduct by attorneys** "An attorney or counselor who: 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party … Is guilty of a misdemeanor, and in addition to the punishment prescribed therefore by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action."

608.  Melli Guerin, and its various associates, commit misdemeanors on an almost daily basis.

## STATEMENT OF CLAIMS

### STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

#### FIRST CLAIM FOR RELIEF

#### AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

#### (Declaratory Judgment: Illegal SIU)

609.    The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 608 above as though fully set forth herein.

610.    *11 NYCRR 86* Section 86.6 (c) states:

> Persons employed by Special Investigations Units as investigators ... shall be qualified by education and/or experience which shall include a bachelor's degree in criminal justice or a related field, or a bachelor's degree and four years of insurance claims investigation experience, or five years of professional investigation experience with law enforcement agencies, or a bachelor's degree and seven years of professional investigation experience involving economic or insurance related matters. For the purposes of evaluation of medical related claims insurers may employ or retain duly licensed or authorized medical professionals ...

611.    Defendant State Farm's SIU "Investigators", as described in the section entitled "**STATE FARM'S ILLEGAL SIU**", at Paragraphs 110-140 above, and throughout this Complaint, do not meet the minimum qualifications enunciated by the law to hold such positions.

612.    The Plaintiffs seek judgment declaring that State Farm's Special Investigative Unit is illegal in that its investigators do not meet the minimum qualifications as set forth by 11 NYCRR 86.6(c).  Furthermore the above has been true for six years prior to the date of the filing of this complaint and continuing into the future until remedied.

## SECOND CLAIM FOR RELIEF

## AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

### (Declaratory Judgment: Denials Null and Void)

613.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 612 above as though fully set forth herein.

614.  Defendant State Farm's SIU "Investigators", as described in the section entitled "**STATE FARM'S ILLEGAL SIU**", at Paragraphs 110-140 above, and throughout this Complaint, do not meet the minimum qualifications enunciated by the law to hold such positions.

615.  As a result Plaintiffs seek judgment declaring that each and every denial of claim form (NF-10) issued by State Farm that is based in whole or in part upon information obtained by State Farm's SIU be deemed null and void.  Furthermore that the above is applicable for the time period of six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

## THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

### (Declaratory Judgment: § 349. Deceptive acts and practices unlawful)

616.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 615 above as though fully set forth herein.

617.  General Business Law Section 349 provides in relevant part:

§ 349. Deceptive acts and practices unlawful

(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

- 169 -

618. By virtue of the conduct described in those sections pertaining to State Farm by section titles: **"THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY"**, especially **"STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)"**; **"STATE FARM'S ILLEGAL SIU"**; **"STATE FARM'S ABYSMAL RECORD OF MISDEEDS"**; **"STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"**; **"STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"**; **"STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"**; **"THE CONFIDENTIAL INFORMANT ADJUSTER"**; **"STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"**; **"STATE FARM'S ABUSE OF SECTION 86.5"**, (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled **"MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT"** at Paragraphs 465-592, State Farm has violated General Business Law Section 349.

619. Plaintiffs seek judgment declaring that State Farm is in violation General Business Law Section 349 and has been in said violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

**FOURTH CLAIM FOR RELIEF**

## AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

**(Declaratory Judgment: Bribery)**

620.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 619 above as though fully set forth herein.

621.  The following provisions of the Penal Law – the "Bribery Statutes" provide:

§ 200.03 Bribery in the second degree

A person is guilty of bribery in the second degree when he confers, or offers or agrees to confer, any benefit valued in excess of ten thousand dollars upon a public servant upon an agreement or understanding that such public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced. Bribery in the second degree is a class C felony.

§ 200.00 Bribery in the third degree

A person is guilty of bribery in the third degree when he confers, or offers or agrees to confer, any benefit upon a public servant upon an agreement or understanding that such public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced. Bribery in the third degree is a class D felony.

§ 200.20 Rewarding official misconduct in the second degree

A person is guilty of rewarding official misconduct in the second degree when he knowingly confers, or offers or agrees to confer, any benefit upon a public servant for having violated his duty as a public servant. Rewarding official misconduct in the second degree is a class E felony.

§ 200.30 Giving unlawful gratuities

A person is guilty of giving unlawful gratuities when he knowingly confers, or offers or agrees to confer, any benefit upon a public servant for having engaged in official conduct which he was required or authorized to perform, and for which he was not entitled to any special or additional compensation. Giving unlawful gratuities is a class A misdemeanor.

622.    Based upon the conduct described in the section **"THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY"** at Paragraphs 296-413 State Farm has violated the Bribery Statutes.

623.    The Plaintiffs seek judgment declaring that State Farm, by virtue of its conduct in Operation BORIS, violated the following laws:

> 1.    Penal Law Section 200.03 Bribery in the second degree.
> 2.    Penal Law Section 200.00 Bribery in the third degree.
> 3.    Penal Law Section 200.20 Rewarding official misconduct in the second degree.
> 4.    Penal Law Section 200.30 Giving unlawful gratuities.

And that State Farm's violation of the above bribery laws violated: Insurance Law § 5106 "Fair claims settlement", subsection (a); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (a); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (b); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (c); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (e); 11 NYCRR 65 65-3.5 "Claim procedure", subsection (e); 11 NYCRR 65 65-3.11 "Direct payments", subsection (a); 11 NYCRR 86.6(a); 11 NYCRR 86.6(b) subsections 1-7, 9; 11 NYCRR 86.6(d)

624.    In the alternative Plaintiffs seek judgment declaring that State Farm improperly influenced the Suffolk County DA's conduct in Operation BORIS by causing said DA to investigate, arrest, indict and prosecute individuals and corporations. Said improper influence was accomplished by monetarily rewarding the Suffolk County DA for its investigation, arrests, indictments and prosecution thereby creating justification for denials.    Said improper influence violates: Insurance Law § 5106 "Fair claims settlement", subsection (a); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (a); 11 NYCRR 65 65-3.2 "Claim

practice principles to be followed by all insurers" subsection (b); 11 NYCRR 65 65-3.2 "Claim

practice principles to be followed by all insurers" subsection (c); 11 NYCRR 65 65-3.2 "Claim

practice principles to be followed by all insurers" subsection (e); 11 NYCRR 65 65-3.5 "Claim

procedure", subsection (e); 11 NYCRR 65 65-3.11 "Direct payments", subsection (a); 11

NYCRR 86.6(a); 11 NYCRR 86.6(b) subsections 1-7, 9; 11 NYCRR 86.6(d).

### FIFTH CLAIM FOR RELIEF

### AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

#### (Declaratory Judgment: Insurance Law § 5106(a))

625.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 624 above as

though fully set forth herein.

626.  *Insurance Law § 5106. "Fair claims settlement"* states the following:

> (a) Payments of first party benefits and additional first party benefits shall be made as the
> loss is incurred. Such benefits are overdue if not paid within thirty days after the claimant
> supplies proof of the fact and amount of loss sustained. If proof is not supplied as to the
> entire claim, the amount which is supported by proof is overdue if not paid within thirty
> days after such proof is supplied. All overdue payments shall bear interest at the rate of
> two percent per month. If a valid claim or portion was overdue, the claimant shall also be
> entitled to recover his attorney's reasonable fee, for services necessarily performed in
> connection with securing payment of the overdue claim, subject to limitations
> promulgated by the superintendent in regulations.

627.  No-fault is intended to secure the prompt payment of bills for injuries resulting from a

motor vehicle accident.   Montgomery v. Daniles, 38 NY2d 41 (1975); Overly v. Bangs

Ambulance, Inc. 96 NY2d 295 (2001).

628.  By virtue of the conduct described in those sections pertaining to State Farm by section

titles: "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**", especially

"**STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM**

- 173 -

(BORIS)"; "STATE FARM'S ILLEGAL SIU"; "STATE FARM'S ABYSMAL RECORD

OF MISDEEDS"; "STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN

THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION";

"STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY

FASLELY LABELING WRECKED AUTOMOBILES"; "STATE FARM: A

CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT

CONDUCT"; "THE CONFIDENTIAL INFORMANT ADJUSTER"; "STATE FARM'S

FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE

DEPARTMENT"; "STATE FARM'S ABUSE OF SECTION 86.5", (paragraphs for each

section are respectively -- Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288;

289-295; 250-253; 254-256) as well as the section entitled "**MCDONNELL & ADELS: THE**

**HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS'**

**CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, State Farm has violated

Insurance Law § 5106(a).

629. Plaintiffs seek judgment declaring that State Farm is in violation of Insurance Law § 5106

"Fair claims settlement", subsection (a) and has been in violation since 6 years prior to the filing

of this Complaint and continuing into the future until the infirmities are remedied.

### SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

### (Declaratory Judgment: 11 NYCRR 65 65-3.2(a))

630. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 629 above as

though fully set forth herein.

631. *11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers"* states the following, in relevant part: "(a) Have as your basic goal the prompt and fair payment to all automobile accident victims."

632. By virtue of the conduct described in those sections pertaining to State Farm by section titles: **"THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY"**, especially **"STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)"**; **"STATE FARM'S ILLEGAL SIU"**; **"STATE FARM'S ABYSMAL RECORD OF MISDEEDS"**; **"STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"**; **"STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"**; **"STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"**; **"THE CONFIDENTIAL INFORMANT ADJUSTER"**; **"STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"**; **"STATE FARM'S ABUSE OF SECTION 86.5"**, (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled **"MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT"** at Paragraphs 465-592, State Farm has violated 11 NYCRR 65 65-3.2(a)

633. Plaintiffs seek judgment declaring that State Farm is in violation of 11 NYCRR 65 65-3.2(a) "Claim practice principles to be followed by all insurers" subsection (a) and has been in

violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

### SEVENTH CLAIM FOR RELIEF

### AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

### (Declaratory Judgment: 11 NYCRR 65 65-3.2(b))

634. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 633 above as though fully set forth herein.

635. *11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers"* states the following, in relevant part: "(b) Assist the applicant in the processing of a claim. Do not treat the applicant as an adversary."

636.    By virtue of the conduct described in those sections pertaining to State Farm by section titles: "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**", especially "**STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)**"; "**STATE FARM'S ILLEGAL SIU**"; "**STATE FARM'S ABYSMAL RECORD OF MISDEEDS**"; "**STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION**"; "**STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES**"; "**STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT**"; "**THE CONFIDENTIAL INFORMANT ADJUSTER**"; "**STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT**"; "**STATE FARM'S ABUSE OF SECTION 86.5**", (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288;

- 176 -

289-295; 250-253; 254-256) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, State Farm has violated 11 NYCRR 65 65-3.2(b)

637. Plaintiffs seek judgment declaring that State Farm is in violation of 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (b) and has been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

### EIGHTH CLAIM FOR RELIEF

### AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

**(Declaratory Judgment: 11 NYCRR 65 65-3.2(c))**

639. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 637 above as though fully set forth herein.

640. *11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers"* states the following, in relevant part: "(c) Do not demand verification of facts unless there are good reasons to do so. When verification of facts is necessary, it should be done as expeditiously as possible."

641. By virtue of the conduct described in those sections pertaining to State Farm by section titles: "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**", especially "**STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)**"; "**STATE FARM'S ILLEGAL SIU**"; "**STATE FARM'S ABYSMAL RECORD OF MISDEEDS**"; "**STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION**"; "**STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY**

FASLELY LABELING WRECKED AUTOMOBILES"; "STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"; "THE CONFIDENTIAL INFORMANT ADJUSTER"; "STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"; "STATE FARM'S ABUSE OF SECTION 86.5", (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled "MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT" at Paragraphs 465-592, State Farm has violated 11 NYCRR 65 65-3.2(c)

642. Plaintiffs seek judgment declaring that State Farm is in violation of 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (c) and has been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

### NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

### (Declaratory Judgment: 11 NYCRR 65 65-3.5(e))

643. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 642 above as though fully set forth herein.

644. *11 NYCRR 65-3.5 "Claim procedure"* states in relevant part:

> (e) All examinations under oath and medical examinations requested by the insurer shall be held at a place and time reasonably convenient to the applicant and medical examinations shall be conducted in a facility properly equipped for the performance of the medical examination. The insurer shall inform the applicant at the time the examination is scheduled that the applicant will be reimbursed for any loss of earnings

and reasonable transportation expenses incurred in complying with the request. When an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination. Insurer standards shall be available for review by Department examiners.

645. By virtue of the conduct described in those sections pertaining to State Farm by section titles: "THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY", especially "STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)"; "STATE FARM'S ILLEGAL SIU"; "STATE FARM'S ABYSMAL RECORD OF MISDEEDS"; "STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"; "STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"; "STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"; "THE CONFIDENTIAL INFORMANT ADJUSTER"; "STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"; "STATE FARM'S ABUSE OF SECTION 86.5", (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled "MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT" at Paragraphs 465-592, State Farm has violated 11 NYCRR 65 65-3.5(e)

646. Plaintiffs seek judgment declaring that State Farm is in violation of 11 NYCRR 65 65-3.5 "Claim procedure" subsection (e) and has been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

## TENTH CLAIM FOR RELIEF

### AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

**(Declaratory Judgment: 11 NYCRR 65 65-3.11(a))**

647. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 646 above as though fully set forth herein.

648. 11 NYCRR *65-3.11 "Direct payments"* provides:

> (a) An insurer shall pay benefits for any element of loss, other than death benefits, directly to the applicant or, when appropriate, to the applicant's parent or legal guardian or to any person legally responsible for necessities, or, upon assignment by the applicant or any of the aforementioned persons, shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law, or to the applicant's employer for loss of earnings from work as authorized under section five thousand one hundred two(a)(2) of the Insurance Law. Death benefits shall be paid to the estate of the eligible injured person.

649. By virtue of the conduct described in those sections pertaining to State Farm by section titles: **"THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY"**, especially **"STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)"**; **"STATE FARM'S ILLEGAL SIU"**; **"STATE FARM'S ABYSMAL RECORD OF MISDEEDS"**; **"STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"**; **"STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"**; **"STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"**; **"THE CONFIDENTIAL INFORMANT ADJUSTER"**; **"STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"**; **"STATE FARM'S ABUSE OF SECTION 86.5"**, (paragraphs for each

section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, State Farm has violated 11 NYCRR 65 65-3.11(a)

650. Plaintiffs seek judgment declaring that State Farm is in violation of 11 NYCRR 65 65-3.11 "Direct payments" subsection (a) and has been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

**ELEVENTH CLAIM FOR RELIEF**

**AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY**

**(Declaratory Judgment: 11 NYCRR 86 86.5)**

651. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 650 above as though fully set forth herein.

652. "*NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO INSURANCE FRAUDS BUREAU; REQUIRED WARNING STATEMENTS*" provides in relevant part:    §86.5 Reports of fraudulent acts.

> Any person licensed pursuant to the provisions of the Insurance Law who determines that an insurance transaction or purported insurance transaction appears to be fraudulent or suspect shall submit a report thereon to the Insurance Frauds Bureau. Reports shall be submitted on the prescribed reporting form [(IFB-1) contained in this section or upon the form developed by the United States Department of Justice upon a determination that a matter is suspect. The forms annexed hereto are hereby approved for use as specified in this Part] issued by the Insurance Frauds Bureau or upon any other form approved by order of the superintendent. Reporting may also be done by means of any electronic medium or system approved by order of the superintendent.

653. By virtue of the conduct described in those sections pertaining to State Farm by section title "**STATE FARM'S ABUSE OF SECTION 86.5**": (Paragraphs 254-256) State Farm has violated 11 NYCRR 86 86.5.

654. Plaintiffs seek judgment declaring that State Farm is in violation of 11 NYCRR 86 86.5 "Reports of fraudulent acts" and has been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

## TWELFTH CLAIM FOR RELIEF

## AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

### (Declaratory Judgment: 11 NYCRR 86 86.6(a))

655. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 654 above as though fully set forth herein.

656. *"NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO INSURANCE FRAUDS BUREAU; REQUIRED WARNING STATEMENTS"* provides in relevant part: §86.6 Fraud prevention plans and special investigation units.

    a) Every insurer writing private or commercial automobile insurance, workers' compensation insurance, or individual, group or blanket accident and health insurance policies issued or issued for delivery in this state, which writes three thousand or more of such policies in any given year, or in the case of policies issued on a group basis, provides insurance coverage for three thousand or more individuals in any given year, shall develop and file with the superintendent a plan for the detection, investigation and prevention of fraudulent insurance activities in this state and those fraudulent insurance activities affecting policies issued or issued for delivery in this state. Notwithstanding the foregoing, insurers writing only reinsurance contracts shall not be required to comply with the provisions of this section.

657. By virtue of the conduct described in those sections pertaining to State Farm by section title: "**STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH**

**THE INSURANCE DEPARTMENT**" (Paragraphs 250-253) State Farm has violated 11 NYCRR 86 86.6(a)

658. Plaintiffs seek judgment declaring that State Farm is in violation of 11 NYCRR 86 86.6 "Fraud prevention plans ..." subsection (a) and has been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

<h3 style="text-align:center">THIRTEENTH CLAIM FOR RELIEF</h3>

<h3 style="text-align:center">AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY</h3>

<strong>(Declaratory Judgment: 11 NYCRR 86.6(b) subsections 1-7, 9.)</strong>

659. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 658 above as though fully set forth herein.

660. "*NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO INSURANCE FRAUDS BUREAU; REQUIRED WARNING STATEMENTS*" provides in relevant part:

661. 11 NYCRR 86(b) provides in relevant part:

    b)    The plan shall include the following provisions:

    (1)    Establishment of a full time Special Investigations Unit separate from the underwriting or claims functions of the insurer, which shall be responsible for investigation of cases of suspected fraudulent activity and for implementation of the insurer's fraud prevention and reduction activities under the Fraud Prevention Plan. In the alternative the insurer may contract with a provider of services to perform all or part of this function, but shall remain primarily responsible for the development and implementation of its Fraud Prevention Plan. The agreement under which such services are provided shall be filed with the Insurance Frauds Bureau as part of the Fraud Prevention Plan, and must provide for specified levels of staffing devoted to the investigation of suspected fraudulent claims. In the event that investigators employed by a provider of services will be working for more than one insurer or on cases in states other than New York, the plan must apportion the percentage of the investigator's efforts which will be devoted

to working for the insurer on its New York cases. The agreement shall also require that the provider of services cooperate fully with the Department of Insurance in any examination of the implementation of the Fraud Prevention Plan, and provide any and all assistance requested by the Insurance Frauds Bureau, any other law enforcement agency or any prosecutorial agency in the investigation and prosecution of insurance fraud and related crimes.

(2)    A description of the organization of the Special Investigations Unit, including the titles and job descriptions of the various investigators and investigative supervisors, the minimum qualifications for employment in these positions in addition to those required by this regulation, the geographical location and assigned territory of each investigator and investigative supervisor, the support staff and other physical resources, including database access available to the Unit and the supervisory and reporting structure within the Unit and between the Unit and the general management of the insurer. If investigators employed by the Unit will be responsible for investigating cases in more than one State, the plan must apportion that percentage of the investigators' efforts which will be devoted to New York cases.

(3)    The rationale for the level of staffing and resources being provided for the Special Investigations Unit which may include, but is not limited to the following objective criteria such as number of policies written and individuals insured in New York, number of claims received with respect to New York insureds on an annual basis, volume of suspected fraudulent New York claims currently being detected, other factors relating to the vulnerability of the insurer to fraud, and an assessment of optimal caseload which can be handled by an investigator on an annual basis.

(4)    A description of the relationship between the Special Investigations Unit and the claims and underwriting functions of the insurer, including procedures for detecting possible fraud, criteria for referral of a case to the Unit for evaluation, and the designation of the individuals authorized to make such a referral; and a description of the relationship between the Unit and the Insurance Frauds Bureau, other law enforcement agencies and prosecutors, including procedures for case investigation, detection of patterns of repetitive fraud involving one or more insurers, criteria for referral of a case to the Insurance Frauds Bureau, designation of the individuals authorized to make such referrals, and a policy to avoid duplication of effort due to concurrent referrals by the Unit to more than one law enforcement agency.

(5)    Provision for the reporting of fraud data to a data collection firm to be designated by the Superintendent.

(6) Provision for in-service training programs for investigative, underwriting and claims personnel in identifying and evaluating instances of suspected insurance fraud, including an introductory training session and periodic refresher sessions. This description shall include course descriptions, the approximate number of hours to be devoted to these sessions and their frequency.

(7) Provision for coordination with other units of the insurer to further fraud investigations, including a periodic review of claims and underwriting procedures and forms for the purpose of enhancing the ability of the insurer to detect fraud and to increase the likelihood of its successful prosecution, and for initiation of civil actions where appropriate.

(9) Development of a fraud detection and procedures manual for use by underwriting, claims and investigative personnel.

662. By virtue of the conduct described in those sections pertaining to State Farm by section title: "**STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT**" (Paragraphs 250-253) State Farm has violated 11 NYCRR 86 86.6(b) (1-7, 9)

663. Plaintiffs seek judgment declaring that State Farm is in violation of 11 NYCRR 86 86.6 "Fraud prevention plans ..." subsection (b) and has been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

### FOURTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

#### (Declaratory Judgment: 11 NYCRR 86.6(d))

664. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 663 above as though fully set forth herein.

665. "NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO

- 185 -

INSURANCE FRAUDS BUREAU; REQUIRED WARNING STATEMENTS" provides in relevant part: 11 NYCRR 86.6(d):

> Every insurer required to file a fraud prevention plan shall file an annual report with the Insurance Frauds Bureau no later than January 15 of each year on a form approved by the superintendent, describing the insurer's experience, performance and cost effectiveness in implementing the plan and its proposals for modifications to the plan to amend its operations, to improve performance or to remedy observed deficiencies. The report shall be reviewed and signed by an executive officer of the insurer responsible for the operations of the Special Investigations Unit.

666.  By virtue of the conduct described in those sections pertaining to State Farm by section title: "**STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT**" (Paragraphs 250-253) State Farm has violated 11 NYCRR 86.6(d).

667.  Plaintiffs seek judgment declaring that State Farm is in violation of 11 NYCRR 86 86.6 "Fraud prevention plans ..." subsection (d) and has been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

### FIFTEENTH CLAIM FOR RELIEF

### AGAINST DEFENDANT STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY

**(Declaratory Judgment: (Regulation 64 216.0(a) preamble/ Insurance Law Section 2601(a) (4))**

668.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 667 above as though fully set forth herein.

669.  The following laws provide in relevant part: NY Comp Codes R. & Regs. Tit. 11 Part 216 2006 (Regulation 64) 216.0(a) preamble:

> (a) Section 2601 of the Insurance Law prohibits insurers doing business in this State from engaging in unfair claims settlement practices proscribed by that section without just cause and with such frequency as to indicate a general business practices.  This part

contains claim practice rules, which insurers must apply to the processing of all first and third party claims arising under policies subject to this part ...

Insurance Law Section 2601(a) (4) Acts that constitute unfair claims settlement practices.

(a) No insurer doing business in this state shall engage in unfair claim settlement practices. Any of the following acts by an insurer, if committed without just cause and performed with such frequency as to indicate a general business practice, shall constitute unfair claim settlement practices:

(4) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear ...

670. By virtue of the conduct described in those sections pertaining to State Farm by section titles: **"THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY"**, especially **"STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)"**; **"STATE FARM'S ILLEGAL SIU"**; **"STATE FARM'S ABYSMAL RECORD OF MISDEEDS"**; **"STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"**; **"STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"**; **"STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"**; **"THE CONFIDENTIAL INFORMANT ADJUSTER"**; **"STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"**; **"STATE FARM'S ABUSE OF SECTION 86.5"**, (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled **"MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT"** at Paragraphs 465-592, State Farm has violated Regulation 64 216.0(a) preamble/ Insurance Law Section 2601(a) (4).

- 187 -

671. Plaintiffs seek judgment declaring that State Farm is in violation of 64 216.0(a) preamble/

Insurance Law Section 2601(a) (4) and has been in violation since 6 years prior to the filing of

this Complaint and continuing into the future until the infirmities are remedied.

## THE ONE BEACON GROUP

### SIXTEENTH CLAIM FOR RELIEF

### AGAINST ONE BEACON GROUP DEFENDANTS

### (Declaratory Judgment: Illegal SIU)

672.    The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 671 above

as though fully set forth herein.

673.    *11 NYCRR 86* Section 86.6 (c) states:

> Persons employed by Special Investigations Units as investigators … shall be qualified
> by education and/or experience which shall include a bachelor's degree in criminal
> justice or a related field, or a bachelor's degree and four years of insurance claims
> investigation experience, or five years of professional investigation experience with law
> enforcement agencies, or a bachelor's degree and seven years of professional
> investigation experience involving economic or insurance related matters. For the
> purposes of evaluation of medical related claims insurers may employ or retain duly
> licensed or authorized medical professionals …

674.    The One Beacon Group "Investigators", as described in the section entitled: "**THE ONE**

**BEACON GROUP'S ILLEGAL SIU**", at Paragraphs 414-437 above, and throughout this

Complaint, do not meet the minimum qualifications enunciated by the law to hold such positions.

675.    The Plaintiffs seek judgment declaring that the One Beacon Group's Special Investigative

Unit is illegal in that its investigators do not meet the minimum qualifications as set forth by 11

NYCRR 86.6(c). Furthermore the above has been true for six years prior to the date of the filing

of this complaint and continuing into the future until remedied.

- 188 -

SEVENTEENTH CLAIM FOR RELIEF

AGAINST ONE BEACON GROUP DEFENDANTS

(Declaratory Judgment: Denials Null and Void)

676. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 675 above as though fully set forth herein.

677. The One Beacon Group's "Investigators", as described in the section entitled "**THE ONE BEACON GROUP'S ILLEGAL SIU**", at Paragraphs 414-437 above, and throughout this Complaint, do not meet the minimum qualifications enunciated by the law to hold such positions.

678. Plaintiffs seek judgment declaring that each and every denial of claim form (NF-10) issued by the One Beacon Group Defendants that is based in whole or in part upon information obtained by One Beacon Group's SIU be deemed null and void. Furthermore that the above is applicable for the time period of six years prior to the date of the filing of this complaint and continuing into the future until the infirmity is remedied.

EIGHTEENTH CLAIM FOR RELIEF

AGAINST ONE BEACON GROUP DEFENDANTS

(Declaratory Judgment: § 349. Deceptive acts and practices unlawful)

679. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 678 above as though fully set forth herein.

680. General Business Law Section 349 provides in relevant part:

§ 349. Deceptive acts and practices unlawful

(a) Deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful.

681. By virtue of the conduct described in those sections pertaining to the One Beacon Group Defendants by section title: "**THE ONE BEACON GROUP: WHERE BAD FAITH MEETS**

- 189 -

**INADEQUATE RESERVES"** and the subsections therein, (Paragraphs 414-464) as well as the section entitled **"MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT"** at Paragraphs 465-592, the One Beacon Defendants have violated General Business Law Section 349.

682.  Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation General Business Law Section 349 and have been in said violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

**NINETEENTH CLAIM FOR RELIEF**

**AGAINST THE ONE BEACON GROUP DEFENDANTS**

**(Declaratory Judgment: Insurance Law § 5106(a))**

683.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 682 above as though fully set forth herein.

684.  *Insurance Law § 5106. "Fair claims settlement"* states the following:

> (a) Payments of first party benefits and additional first party benefits shall be made as the loss is incurred. Such benefits are overdue if not paid within thirty days after the claimant supplies proof of the fact and amount of loss sustained. If proof is not supplied as to the entire claim, the amount which is supported by proof is overdue if not paid within thirty days after such proof is supplied. All overdue payments shall bear interest at the rate of two percent per month. If a valid claim or portion was overdue, the claimant shall also be entitled to recover his attorney's reasonable fee, for services necessarily performed in connection with securing payment of the overdue claim, subject to limitations promulgated by the superintendent in regulations.

685.  No-fault is intended to secure the prompt payment of bills for injuries resulting from a motor vehicle accident.  <u>Montgomery v. Daniles</u>, 38 NY2d 41 (1975); <u>Overly v. Bangs Ambulance, Inc.</u> 96 NY2d 295 (2001).

686. By virtue of the conduct described in those sections pertaining to the One Beacon Group Defendants by section title: "**THE ONE BEACON GROUP: WHERE BAD FAITH MEETS INADEQUATE RESERVES**" and the subsections therein, (Paragraphs 414-464) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, the One Beacon Defendants have violated Insurance Law § 5106(a).

687. Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation of Insurance Law § 5106 "Fair claims settlement", subsection (a) and have been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

**TWENTIETH CLAIM FOR RELIEF**

**AGAINST THE ONE BEACON GROUP DEFENDANTS**

**(Declaratory Judgment: 11 NYCRR 65 65-3.2(a))**

688. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 687 above as though fully set forth herein.

689. *11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers"* states the following, in relevant part: "(a) Have as your basic goal the prompt and fair payment to all automobile accident victims."

690. By virtue of the conduct described in those sections pertaining to the One Beacon Group Defendants by section title: "**THE ONE BEACON GROUP: WHERE BAD FAITH MEETS INADEQUATE RESERVES**" and the subsections therein, (Paragraphs 414-464) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE**

**INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at

Paragraphs 465-592, the One Beacon Group Defendants have violated 11 NYCRR 65 65-3.2(a).

691. Plaintiffs seek judgment declaring that the One Beacon Defendants are in violation of 11

NYCRR 65 65-3.2(a) "Claim practice principles to be followed by all insurers" subsection (a)

and have been in violation since 6 years prior to the filing of this Complaint and continuing into

the future until the infirmities are remedied.

TWENTY-FIRST CLAIM FOR RELIEF

**AGAINST THE ONE BEACON GROUP DEFENDANTS**

(Declaratory Judgment: 11 NYCRR 65 65-3.2(b))

692. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 691 above as

though fully set forth herein.

693. *11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers"* states the

following, in relevant part: "(b) Assist the applicant in the processing of a claim. Do not treat the

applicant as an adversary."

694. By virtue of the conduct described in those sections pertaining to the One Beacon Group

Defendants by section title: "**THE ONE BEACON GROUP: WHERE BAD FAITH MEETS**

**INADEQUATE RESERVES**" and the subsections therein, (Paragraphs 414-464) as well as the

section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE**

**INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at

Paragraphs 465-592, the One Beacon Group Defendants have violated 11 NYCRR 65 65-3.2(b)

695. Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation

of 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (b)

- 192 -

and have been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

**TWENTY-SECOND CLAIM FOR RELIEF**

**AGAINST THE ONE BEACON GROUP DEFENDANTS**

**(Declaratory Judgment: 11 NYCRR 65 65-3.2(c))**

696. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 695 above as though fully set forth herein.

697. *11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers"* states the following, in relevant part: "(c) Do not demand verification of facts unless there are good reasons to do so. When verification of facts is necessary, it should be done as expeditiously as possible."

698. By virtue of the conduct described in those sections pertaining to the One Beacon Group Defendants by section title: **"THE ONE BEACON GROUP: WHERE BAD FAITH MEETS INADEQUATE RESERVES"** and the subsections therein, (Paragraphs 414-464) as well as the section entitled **"MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT"** at Paragraphs 465-592, the One Beacon Group Defendants have violated 11 NYCRR 65 65-3.2(c)

699. Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation of 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (c) and have been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

## TWENTY-THIRD CLAIM FOR RELIEF

## AGAINST THE ONE BEACON GROUP DEFENDANTS

### (Declaratory Judgment: 11 NYCRR 65 65-3.5(e))

700. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 699 above as though fully set forth herein.

701. *11 NYCRR 65-3.5 "Claim procedure"* states in relevant part:

> (e) All examinations under oath and medical examinations requested by the insurer shall be held at a place and time reasonably convenient to the applicant and medical examinations shall be conducted in a facility properly equipped for the performance of the medical examination. The insurer shall inform the applicant at the time the examination is scheduled that the applicant will be reimbursed for any loss of earnings and reasonable transportation expenses incurred in complying with the request. When an insurer requires an examination under oath of an applicant to establish proof of claim, such requirement must be based upon the application of objective standards so that there is specific objective justification supporting the use of such examination. Insurer standards shall be available for review by Department examiners.

702. By virtue of the conduct described in those sections pertaining to the One Beacon Group Defendants by section title: **"THE ONE BEACON GROUP: WHERE BAD FAITH MEETS INADEQUATE RESERVES"** and the subsections therein, (Paragraphs 414-464) as well as the section entitled **"MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT"** at Paragraphs 465-592, the One Beacon Group Defendants have violated 11 NYCRR 65 65-3.5(e)

703. Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation of 11 NYCRR 65 65-3.5 "Claim procedure" subsection (e) and have been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

## TWENTY-FOURTH CLAIM FOR RELIEF

## AGAINST DEFENDANT THE ONE BEACON GROUP DEFENDANTS

### (Declaratory Judgment: 11 NYCRR 65 65-3.11(a))

704. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 703 above as though fully set forth herein.

705. 11 NYCRR *65-3.11 "Direct payments"* provides:

> (a) An insurer shall pay benefits for any element of loss, other than death benefits, directly to the applicant or, when appropriate, to the applicant's parent or legal guardian or to any person legally responsible for necessities, or, upon assignment by the applicant or any of the aforementioned persons, shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law, or to the applicant's employer for loss of earnings from work as authorized under section five thousand one hundred two(a)(2) of the Insurance Law. Death benefits shall be paid to the estate of the eligible injured person.

706. By virtue of the conduct described in those sections pertaining to the One Beacon Group Defendants by section title: **"THE ONE BEACON GROUP: WHERE BAD FAITH MEETS INADEQUATE RESERVES"** and the subsections therein, (Paragraphs 414-464) as well as the section entitled **"MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT"** at Paragraphs 465-592, the One Beacon Group Defendants have violated 11 NYCRR 65 65-3.11(a)

707. Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation of 11 NYCRR 65 65-3.11 "Direct payments" subsection (a) and have been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

## TWENTY-FIFTH CLAIM FOR RELIEF

## AGAINST THE ONE BEACON GROUP DEFENDANTS

### (Declaratory Judgment: 11 NYCRR 86 86.5)

708. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 707 above as though fully set forth herein.

709. *"NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO INSURANCE FRAUDS BUREAU; REQUIRED WARNING STATEMENTS"* provides in relevant part:  §86.5 Reports of fraudulent acts.

> Any person licensed pursuant to the provisions of the Insurance Law who determines that an insurance transaction or purported insurance transaction appears to be fraudulent or suspect shall submit a report thereon to the Insurance Frauds Bureau. Reports shall be submitted on the prescribed reporting form [(IFB-1) contained in this section or upon the form developed by the United States Department of Justice upon a determination that a matter is suspect. The forms annexed hereto are hereby approved for use as specified in this Part] issued by the Insurance Frauds Bureau or upon any other form approved by order of the superintendent. Reporting may also be done by means of any electronic medium or system approved by order of the superintendent.

710. By virtue of the conduct described in those sections pertaining to the One Beacon Group Defendants by section title: **"THE ONE BEACON GROUP: WHERE BAD FAITH MEETS INADEQUATE RESERVES"** and the subsections therein, (Paragraphs 414-464), the One Beacon Group Defendants have violated 11 NYCRR 86 86.5

711. Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation of 11 NYCRR 86 86.5 "Reports of fraudulent acts" and have been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

## TWENTY-SIXTH CLAIM FOR RELIEF

## AGAINST DEFENDANT GENERAL ASSURANCE COMPANY

### (Declaratory Judgment: 11 NYCRR 86 86.6(a))

712. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 711 above as though fully set forth herein.

713. *"NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO INSURANCE FRAUDS BUREAU; REQUIRED WARNING STATEMENTS"* provides in relevant part:   §86.6 Fraud prevention plans and special investigation units.

   a) Every insurer writing private or commercial automobile insurance, workers' compensation insurance, or individual, group or blanket accident and health insurance policies issued or issued for delivery in this state, which writes three thousand or more of such policies in any given year, or in the case of policies issued on a group basis, provides insurance coverage for three thousand or more individuals in any given year, shall develop and file with the superintendent a plan for the detection, investigation and prevention of fraudulent insurance activities in this state and those fraudulent insurance activities affecting policies issued or issued for delivery in this state. Notwithstanding the foregoing, insurers writing only reinsurance contracts shall not be required to comply with the provisions of this section.

714. By virtue of the conduct described in those sections pertaining to the One Beacon Group Defendants by section title: **"THE ONE BEACON GROUP: WHERE BAD FAITH MEETS INADEQUATE RESERVES"** and the subsections therein, (Paragraphs 414-464) the One Beacon Group Defendants have violated 11 NYCRR 86 86.6(a)

715. Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation of 11 NYCRR 86 86.6 "Fraud prevention plans ..." subsection (a) and have been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

- 197 -

## TWENTY-SEVENTH CLAIM FOR RELIEF

### AGAINST THE ONE BEACON GROUP DEFENDANTS

**(Declaratory Judgment: 11 NYCRR 86.6(b) subsections 1-7, 9.)**

716.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 715 above as though fully set forth herein.

717.  *"NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO INSURANCE FRAUDS BUREAU; REQUIRED WARNING STATEMENTS"* provides in relevant part:    11 NYCRR 86(b) provides in relevant part:

b)   The plan shall include the following provisions:

(1)    Establishment of a full time Special Investigations Unit separate from the underwriting or claims functions of the insurer, which shall be responsible for investigation of cases of suspected fraudulent activity and for implementation of the insurer's fraud prevention and reduction activities under the Fraud Prevention Plan. In the alternative the insurer may contract with a provider of services to perform all or part of this function, but shall remain primarily responsible for the development and implementation of its Fraud Prevention Plan. The agreement under which such services are provided shall be filed with the Insurance Frauds Bureau as part of the Fraud Prevention Plan, and must provide for specified levels of staffing devoted to the investigation of suspected fraudulent claims. In the event that investigators employed by a provider of services will be working for more than one insurer or on cases in states other than New York, the plan must apportion the percentage of the investigator's efforts which will be devoted to working for the insurer on its New York cases. The agreement shall also require that the provider of services cooperate fully with the Department of Insurance in any examination of the implementation of the Fraud Prevention Plan, and provide any and all assistance requested by the Insurance Frauds Bureau, any other law enforcement agency or any prosecutorial agency in the investigation and prosecution of insurance fraud and related crimes.

(2)    A description of the organization of the Special Investigations Unit, including the titles and job descriptions of the various investigators and investigative supervisors, the minimum qualifications for employment in these positions in addition to those required by this regulation, the geographical location and assigned territory of each investigator and investigative supervisor, the support staff and other physical resources,

- 198 -

including database access available to the Unit and the supervisory and reporting structure within the Unit and between the Unit and the general management of the insurer. If investigators employed by the Unit will be responsible for investigating cases in more than one State, the plan must apportion that percentage of the investigators' efforts which will be devoted to New York cases.

(3)    The rationale for the level of staffing and resources being provided for the Special Investigations Unit which may include, but is not limited to the following objective criteria such as number of policies written and individuals insured in New York, number of claims received with respect to New York insureds on an annual basis, volume of suspected fraudulent New York claims currently being detected, other factors relating to the vulnerability of the insurer to fraud, and an assessment of optimal caseload which can be handled by an investigator on an annual basis.

(4)    A description of the relationship between the Special Investigations Unit and the claims and underwriting functions of the insurer, including procedures for detecting possible fraud, criteria for referral of a case to the Unit for evaluation, and the designation of the individuals authorized to make such a referral; and a description of the relationship between the Unit and the Insurance Frauds Bureau, other law enforcement agencies and prosecutors, including procedures for case investigation, detection of patterns of repetitive fraud involving one or more insurers, criteria for referral of a case to the Insurance Frauds Bureau, designation of the individuals authorized to make such referrals, and a policy to avoid duplication of effort due to concurrent referrals by the Unit to more than one law enforcement agency.

(5)    Provision for the reporting of fraud data to a data collection firm to be designated by the Superintendent.

(6)    Provision for in-service training programs for investigative, underwriting and claims personnel in identifying and evaluating instances of suspected insurance fraud, including an introductory training session and periodic refresher sessions. This description shall include course descriptions, the approximate number of hours to be devoted to these sessions and their frequency.

(7)    Provision for coordination with other units of the insurer to further fraud investigations, including a periodic review of claims and underwriting procedures and forms for the purpose of enhancing the ability of the insurer to detect fraud and to increase the likelihood of its successful prosecution, and for initiation of civil actions where appropriate.

- 199 -

> (9) Development of a fraud detection and procedures manual for use by
> underwriting, claims and investigative personnel.

718. By virtue of the conduct described in those sections pertaining to the One Beacon Group

Defendants by section title: **"THE ONE BEACON GROUP: WHERE BAD FAITH MEETS

INADEQUATE RESERVES"** and the subsections therein, (Paragraphs 414-464) the One

Beacon Group Defendants have violated 11 NYCRR 86 86.6(b) (1-7, 9)

719. Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation

of 11 NYCRR 86 86.6 "Fraud prevention plans ..." subsection (b) and have been in violation

since 6 years prior to the filing of this Complaint and continuing into the future until the

infirmities are remedied.

**TWENTY-EIGHTH CLAIM FOR RELIEF**

**AGAINST DEFENDANT GENERAL ASSURANCE COMPANY**

**(Declaratory Judgment: 11 NYCRR 86.6(d))**

720. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 719 above as

though fully set forth herein.

721. "NEW YORK STATE INSURANCE DEPARTMENT SECOND AMENDMENT TO

REGULATION 95 (11 NYCRR 86) REPORT OF SUSPECTED INSURANCE FRAUDS TO

INSURANCE FRAUDS BUREAU; REQUIRED WARNING STATEMENTS" provides in

relevant part: 11 NYCRR 86.6(d):

> Every insurer required to file a fraud prevention plan shall file an annual report with the
> Insurance Frauds Bureau no later than January 15 of each year on a form approved by the
> superintendent, describing the insurer's experience, performance and cost effectiveness in
> implementing the plan and its proposals for modifications to the plan to amend its
> operations, to improve performance or to remedy observed deficiencies. The report shall
> be reviewed and signed by an executive officer of the insurer responsible for the
> operations of the Special Investigations Unit.

- 200 -

722.  By virtue of the conduct described in those sections pertaining to the One Beacon Group

Defendants by section title: **"THE ONE BEACON GROUP: WHERE BAD FAITH MEETS**

**INADEQUATE RESERVES"** and the subsections therein, (Paragraphs 414-464) the One

Beacon Group Defendants have violated 11 NYCRR 86.6(d).

723.  Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation

of 11 NYCRR 86 86.6 "Fraud prevention plans ..." subsection (d) and have been in violation

since 6 years prior to the filing of this Complaint and continuing into the future until the

infirmities are remedied.

**TWENTY-NINTH CLAIM FOR RELIEF**

**<u>AGAINST THE ONE BEACON GROUP OF DEFENDANTS</u>**

**(Declaratory Judgment: (Regulation 64 216.0(a) preamble/ Insurance Law Section 2601(a) (4))**

724.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 723 above as

though fully set forth herein.

725.  The following laws provide in relevant part: NY Comp Codes R. & Regs. Tit. 11 Part 216

2006 (Regulation 64) 216.0(a) preamble:

> (a) Section 2601 of the Insurance Law prohibits insurers doing business in this State from engaging in unfair claims settlement practices proscribed by that section without just cause and with such frequency as to indicate a general business practices.  This part contains claim practice rules, which insurers must apply to the processing of all first and third party claims arising under policies subject to this part ...

Insurance Law Section 2601(a) (4) Acts that constitute unfair claims settlement practices.

> (a) No insurer doing business in this state shall engage in unfair claim settlement practices.  Any of the following acts by an insurer, if committed without just cause and performed with such frequency as to indicate a general business practice, shall constitute unfair claim settlement practices:

> > (4) not attempting in good faith to effectuate prompt, fair and equitable settlements of claims submitted in which liability has become reasonably clear ...

- 201 -

726. By virtue of the conduct described in those sections pertaining to the One Beacon Group Defendants by section title: "**THE ONE BEACON GROUP: WHERE BAD FAITH MEETS INADEQUATE RESERVES**" and the subsections therein, (Paragraphs 414-464) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, the One Beacon Group Defendants have violated Regulation 64 216.0(a) preamble/ Insurance Law Section 2601(a) (4).

727. Plaintiffs seek judgment declaring that the One Beacon Group Defendants are in violation of 64 216.0(a) preamble/ Insurance Law Section 2601(a) (4) and have been in violation since 6 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

## MCDONNELL & ADELS P.C.

### THIRTIETH CLAIM FOR RELIEF

### AGAINST DEFENDANT MCDONNELL & ADELS P.C.

#### (Declaratory Judgment: Judiciary law § 487. Misconduct by attorneys)

728. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 727 above as though fully set forth herein.

729. According to *Judiciary law § 487.* "Misconduct by attorneys": "An attorney or counselor who: 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... Is guilty of a misdemeanor ..."

730. By virtue of the conduct described in section titles: "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**", especially "**STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)**"; "**STATE**

FARM'S ILLEGAL SIU"; "STATE FARM'S ABYSMAL RECORD OF MISDEEDS";

"STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY

AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"; "STATE

FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY

LABELING WRECKED AUTOMOBILES"; "STATE FARM: A CENTRALLY

CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"; "THE

CONFIDENTIAL INFORMANT ADJUSTER"; "STATE FARM'S FAILURE TO FILE

THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT";

"STATE FARM'S ABUSE OF SECTION 86.5", (paragraphs for each section are respectively

– Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-

256) as well as the section entitled **"MCDONNELL & ADELS: THE HUB AND**

**FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS'**

**CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, McDonnell & Adels has

violated Judiciary Law § 487.

731. Plaintiffs seek judgment declaring that McDonnell & Adels is in violation of Judiciary Law

§ 487 and has been in violation since 2 years prior to the filing of this Complaint and continuing

into the future until the infirmities are remedied.

### THIRTY-FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANT MCDONNELL & ADELS P.C.

**(Declaratory Judgment: 22 NYCRR Section 1200.35(a) (1) [DR 7-104 (A) (1)])**

732. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 731 above as

though fully set forth herein.

- 203 -

733. According to 22 N.Y.C.R.R. §1200.35(a) (1) [DR 7-104 (A) (1)]: "During the course of the representation of a client a lawyer shall not: Communicate or cause another to communicate on the subject of the representation with a party the lawyer knows to be represented by a lawyer in that matter unless the lawyer has the prior consent of the lawyer representing such other party or is authorized by law to do so."

734. By virtue of the conduct described by section titles: "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**", especially "**STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)**"; "**STATE FARM'S ILLEGAL SIU**"; "**STATE FARM'S ABYSMAL RECORD OF MISDEEDS**"; "**STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION**"; "**STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES**"; "**STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT**"; "**THE CONFIDENTIAL INFORMANT ADJUSTER**"; "**STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT**"; "**STATE FARM'S ABUSE OF SECTION 86.5**", (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, McDonnell & Adels has violated 22 N.Y.C.R.R. §1200.35(a)(1)[DR 7-104 (A)(1)].

- 204 -

735.   Plaintiffs seek judgment declaring that McDonnell & Adels is in violation of 22 N.Y.C.R.R. §1200.35(a) (1) [DR 7-104 (A) (1)] and has been in violation since 2 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

### THIRTY-SECOND CLAIM FOR RELIEF

### AGAINST DEFENDANT MCDONNELL & ADELS P.C.

**(Declaratory Judgment: 22 NYCRR Section 1200.35(a) (2) [DR 7-104])**

736.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 735 above as though fully set forth herein.

737. According to 22 N.Y.C.R.R. §1200.35(a) (2) [DR 7-104]: 22 N.Y.C.R.R. §1200.35(a) (2) [DR 7-104]: "During the course of the representation of a client a lawyer shall not: Give advice to a party who is not represented by a lawyer, other than the advice to secure counsel, if the interests of such party are or have a reasonable possibility of being in conflict with the interests of the lawyer's client."

738.  By virtue of the conduct described by section titles: **"THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY"**, especially **"STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)"**; **"STATE FARM'S ILLEGAL SIU"**; **"STATE FARM'S ABYSMAL RECORD OF MISDEEDS"**; **"STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"**; **"STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"**; **"STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"**; **"THE CONFIDENTIAL INFORMANT ADJUSTER"**; **"STATE FARM'S FAILURE TO FILE**

- 205 -

THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT";

"STATE FARM'S ABUSE OF SECTION 86.5", (paragraphs for each section are respectively

– Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-

256) as well as the section entitled "MCDONNELL & ADELS: THE HUB AND

FACILITATOR    OF    THE    INSURANCE    COMPANY    DEFENDANTS'

CONSPIRATORIAL MISCONDUCT" at Paragraphs 465-592, McDonnell & Adels has

violated 22 N.Y.C.R.R. §1200.35(a)(2)[DR 7-104].

739.    Plaintiffs seek judgment declaring that McDonnell & Adels is in violation of 22

N.Y.C.R.R. §1200.35(a) (2) [DR 7-104] and has been in violation since 2 years prior to the filing

of this Complaint and continuing into the future until the infirmities are remedied.

## THIRTY-THIRD CLAIM FOR RELIEF

## AGAINST DEFENDANT MCDONNELL & ADELS P.C.

### (Declaratory Judgment: 22 N.Y.C.R.R. 1200.36(a) [DR 7-105])

740.    The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 739 above as

though fully set forth herein.

741.    According to 22 N.Y.C.R.R. 1200.36(a) [DR 7-105]: "A lawyer shall not present,

participate in presenting, or threaten to present criminal charges solely to obtain an advantage in

a civil matter."

742.    By virtue of the conduct described by section titles: "THE NICB, STATE FARM,

SUFFOLK    COUNTY    DA    CONSPIRACY", especially    "STATE    FARM/NICB

SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)"; "STATE

FARM'S ILLEGAL SIU"; "STATE FARM'S ABYSMAL RECORD OF MISDEEDS";

"STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY

AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"; "STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"; "STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"; "THE CONFIDENTIAL INFORMANT ADJUSTER"; "STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"; "STATE FARM'S ABUSE OF SECTION 86.5", (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, McDonnell & Adels has violated 22 N.Y.C.R.R. 1200.36(a)[DR 7-105].

743.    Plaintiffs seek judgment declaring that McDonnell & Adels is in violation of 22 N.Y.C.R.R. 1200.36(a) [DR 7-105] and has been in violation since 2 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

### THIRTY-FOURTH CLAIM FOR RELIEF

### AGAINST DEFENDANT MCDONNELL & ADELS P.C.

### (Declaratory Judgment: 22 N.Y.C.R.R. §1200.33(a) (4-8) [DR 7-102])

744.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 743 above as though fully set forth herein.

745.  22 N.Y.C.R.R. §1200.33(a) (4-8) [DR 7-102] provides: "In the representation of a client, a lawyer shall not: ... (4) Knowingly use perjured testimony or false evidence; (5) Knowingly make a false statement of law or fact; (6) Participate in the creation or preservation of evidence

when the lawyer knows or it is obvious that the evidence is false; (7) Counsel or assist the client in conduct that the lawyer knows to be illegal or fraudulent; (8) Knowingly engage in other illegal conduct or conduct contrary to a disciplinary rule."

746.   By virtue of the conduct described by section titles: "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**", especially "**STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)**"; "**STATE FARM'S ILLEGAL SIU**"; "**STATE FARM'S ABYSMAL RECORD OF MISDEEDS**"; "**STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION**"; "**STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES**"; "**STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT**"; "**THE CONFIDENTIAL INFORMANT ADJUSTER**"; "**STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT**"; "**STATE FARM'S ABUSE OF SECTION 86.5**", (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, McDonnell & Adels has violated 22 N.Y.C.R.R. §1200.33(a)(4-8)[DR 7-102].

747.   Plaintiffs seek judgment declaring that McDonnell & Adels is in violation of 22 N.Y.C.R.R. §1200.33(a) (4-8) [DR 7-102] and has been in violation since 2 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

**THIRTY-FIFTH CLAIM FOR RELIEF**

**AGAINST DEFENDANT MCDONNELL & ADELS P.C.**

**(Declaratory Judgment: 22 N.Y.C.R.R. §1200.33(b) (1-2) [DR 7-102])**

748. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 747 above as though fully set forth herein.

749. 22 N.Y.C.R.R. §1200.33(b)(1-2)[DR 7-102] provides: "A lawyer who receives information clearly establishing that: (1) The client has, in the course of the representation, perpetrated a fraud upon a person or tribunal shall promptly call upon the client to rectify the same, and if the client refuses or is unable to do so, the lawyer shall reveal the fraud to the affected person or tribunal, except when the information is protected as a confidence or secret; 2) A person other than the client has perpetrated a fraud upon a tribunal shall promptly reveal the fraud to the tribunal."

750. By virtue of the conduct described by section titles: **"THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY"**, especially **"STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)"**; **"STATE FARM'S ILLEGAL SIU"**; **"STATE FARM'S ABYSMAL RECORD OF MISDEEDS"**; **"STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"**; **"STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"**; **"STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"**; **"THE CONFIDENTIAL INFORMANT ADJUSTER"**; **"STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"**;

- 209 -

"STATE FARM'S ABUSE OF SECTION 86.5", (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, McDonnell & Adels has violated 22 N.Y.C.R.R. §1200.33(b)(1-2)[DR 7-102].

751. Plaintiffs seek judgment declaring that McDonnell & Adels is in violation of 22 N.Y.C.R.R. §1200.33(b) (1-2) [DR 7-102] and has been in violation since 2 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

### THIRTY-SIXTH CLAIM FOR RELIEF

### AGAINST DEFENDANT MCDONNELL & ADELS P.C.

### (Declaratory Judgment: 22 N.Y.C.R.R. §1200.3(a) (1-5, 7) [DR 1-102])

752. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 751 above as though fully set forth herein.

753. 22 N.Y.C.R.R. §1200.3(a)(1-5, 7)[DR 1-102] provides, "A lawyer or law firm shall not: (1) Violate a disciplinary rule; (2) Circumvent a disciplinary rule through actions of another; (3) Engage in illegal conduct that adversely reflects on the lawyer's honesty; trust worthiness or fitness as a lawyer; (4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation; (5) Engage in conduct that is prejudicial to the administration of justice; . . . (7) Engage in any other conduct that adversely reflects on the lawyer's fitness as a lawyer."

754. By virtue of the conduct described by section titles: "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**", especially "**STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)**"; "**STATE**

FARM'S ILLEGAL SIU"; "STATE FARM'S ABYSMAL RECORD OF MISDEEDS"; "STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"; "STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"; "STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"; "THE CONFIDENTIAL INFORMANT ADJUSTER"; "STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"; "STATE FARM'S ABUSE OF SECTION 86.5", (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled "**MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT**" at Paragraphs 465-592, McDonnell & Adels has violated 22 N.Y.C.R.R. §1200.3(a)(1-5, 7)[DR 1-102].

755.    Plaintiffs seek judgment declaring that McDonnell & Adels is in violation of 22 N.Y.C.R.R. §1200.3(a) (1-5, 7) [DR 1-102] and has been in violation since 2 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

### THIRTY-SEVENTH CLAIM FOR RELIEF

### AGAINST DEFENDANT MCDONNELL & ADELS P.C.

### (Declaratory Judgment: 22 N.Y.C.R.R. §1200.3(a) (1-5, 7) [DR 1-102])

756.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 755 above as though fully set forth herein.

757. 22 N.Y.C.R.R. §1200.40(c) [DR 7-109] provides: "A lawyer shall not pay, offer to pay, or acquiesce in the payment of compensation to a witness contingent upon the content of his or her testimony or the outcome of the case."

758. By virtue of the conduct described by section titles: **"THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY"**, especially **"STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)"; "STATE FARM'S ILLEGAL SIU"; "STATE FARM'S ABYSMAL RECORD OF MISDEEDS"; "STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION"; "STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES"; "STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT"; "THE CONFIDENTIAL INFORMANT ADJUSTER"; "STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT"; "STATE FARM'S ABUSE OF SECTION 86.5"**, (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled **"<u>MCDONNELL & ADELS: THE HUB AND FACILITATOR OF THE INSURANCE COMPANY DEFENDANTS' CONSPIRATORIAL MISCONDUCT</u>"** at Paragraphs 465-592,McDonnell & Adels has violated 22 N.Y.C.R.R. §1200.40(c)[DR 7-109].

759. Plaintiffs seek judgment declaring that McDonnell & Adels is in violation of 22 N.Y.C.R.R. §1200.40(c) [DR 7-109] and has been in violation since 2 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

## MELLI GUERIN & WALL P.C.

### THIRTY-EIGHTH CLAIM FOR RELIEF

### AGAINST DEFENDANT MELLI GUERIN & WALL P.C.

**(Declaratory Judgment: Judiciary law § 487. Misconduct by attorneys)**

760.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 759 above as though fully set forth herein.

761.  According to *Judiciary law § 487.* "Misconduct by attorneys": "An attorney or counselor who: 1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party ... Is guilty of a misdemeanor ..."

762.  By virtue of the conduct described by section titles: "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**", especially "**STATE FARM/NICB SPONSORED BIG ORGANIZED RUSSIAN INSURANCE SCAM (BORIS)**"; "**STATE FARM'S ILLEGAL SIU**"; "**STATE FARM'S ABYSMAL RECORD OF MISDEEDS**"; "**STATE FARM'S ABUSE OF THE INSURANCE REGULATIONS IN THEIR POLICY AND PROCEDURES REGARDING ADDITIONAL VERIFICATION**"; "**STATE FARM'S HEINOUS AND DANGEROUS SCHEME TO DEFRAUD BY FASLELY LABELING WRECKED AUTOMOBILES**"; "**STATE FARM: A CENTRALLY CONTROLLED NATIONWIDE PATTERN OF MALEVOLENT CONDUCT**"; "**THE CONFIDENTIAL INFORMANT ADJUSTER**"; "**STATE FARM'S FAILURE TO FILE THE APPROPRIATE DOCUMENTS WITH THE INSURANCE DEPARTMENT**"; "**STATE FARM'S ABUSE OF SECTION 86.5**", (paragraphs for each section are respectively – Paragraphs: 296-413; 110-140; 141-158; 159-243; 244-249; 257-288; 289-295; 250-253; 254-256) as well as the section entitled "**MELLI GUERIN'S CONTINUOUS VIOLATIONS OF**

- 213 -

**THE JUDICIARY LAW"** at Paragraphs 593-608, Melli Guerin & Wall P.C. has violated Judiciary Law § 487.

764.   Plaintiffs seek judgment declaring that Melli Guerin & Wall P.C. is in violation of Judiciary Law § 487 and has been in violation since 2 years prior to the filing of this Complaint and continuing into the future until the infirmities are remedied.

## NATIONAL INSURANCE CRIME BUREAU

### THIRTY-NINTH CLAIM FOR RELIEF

### AGAINST DEFENDANT NATIONAL INSURANCE CRIME BUREAU

#### (Declaratory Judgment: Bribery)

765.  The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 763 above as though fully set forth herein.

766.   The following provisions of the Penal Law -- the "Bribery Statutes" provide:

> § 200.03 Bribery in the second degree

> A person is guilty of bribery in the second degree when he confers, or offers or agrees to confer, any benefit valued in excess of ten thousand dollars upon a public servant upon an agreement or understanding that such public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced. Bribery in the second degree is a class C felony.

> § 200.00 Bribery in the third degree

> A person is guilty of bribery in the third degree when he confers, or offers or agrees to confer, any benefit upon a public servant upon an agreement or understanding that such public servant's vote, opinion, judgment, action, decision or exercise of discretion as a public servant will thereby be influenced. Bribery in the third degree is a class D felony.

> § 200.20 Rewarding official misconduct in the second degree

> A person is guilty of rewarding official misconduct in the second degree when he knowingly confers, or offers or agrees to confer, any benefit upon a public servant for having violated his duty as a public servant. Rewarding official misconduct in the second degree is a class E felony.

- 214 -

§ 200.30 Giving unlawful gratuities

A person is guilty of giving unlawful gratuities when he knowingly confers, or offers or agrees to confer, any benefit upon a public servant for having engaged in official conduct which he was required or authorized to perform, and for which he was not entitled to any special or additional compensation. Giving unlawful gratuities is a class A misdemeanor.

767.   Based upon the conduct described in the section "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**" at Paragraph 296-413 the NICB has violated the Bribery Statutes.

768.   The Plaintiffs seek judgment declaring that the NICB, by virtue of its conduct in Operation BORIS, violated the following laws:

(i)     Penal Law Section 200.03 Bribery in the second degree.
(ii)    Penal Law Section 200.00 Bribery in the third degree.
(iii)   Penal Law Section 200.20 Rewarding official misconduct in the second degree.
(iv)    Penal Law Section 200.30 Giving unlawful gratuities.

769.   In the alternative Plaintiffs seek judgment declaring that the NICB improperly influenced the Suffolk County DA's conduct in Operation BORIS by causing said DA to investigate, arrest, indict and prosecute individuals and corporations. Said improper influence was accomplished by assisting State Farm in monetarily rewarding the Suffolk County DA for its investigation, arrests, indictments and prosecution thereby creating justification for denials. Said improper influence aided State Farm in violating: Insurance Law § 5106 "Fair claims settlement", subsection (a); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (a); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (b); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (c); 11 NYCRR 65 65-3.2 "Claim practice principles to be followed by all insurers" subsection (e); 11 NYCRR 65 65-3.5 "Claim procedure", subsection (e); 11 NYCRR 65 65-3.11 "Direct payments", subsection (a); 11 NYCRR 86.6(a); 11 NYCRR 86.6(b) subsections 1-7, 9; 11 NYCRR 86.6(d).

## FORTIETH CLAIM FOR RELIEF

## AGAINST DEFENDANT NATIONAL INSURANCE CRIME BUREAU

### (Declaratory Judgment: Private Investigator License)

770. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 793 above as though fully set forth herein.

771. According to <u>New York General Business Law Section 81, Article 7, Private Investigators, Bail Enforcement Agents and Watch, Guard and Patrol Agencies</u> the following is true: <u>Section 70, Licenses,</u>

Subdivision 1.

> The Department of State shall have the power to issue separate licenses to private investigators ...

Subdivision 2.

> No person, firm, company, partnership, limited liability company or corporation shall engage in the business of private investigator ... notwithstanding the name or title used in describing such agency or withstanding the fact that other functions and services may also be performed for a fee, hire or reward, without having first obtained from the department of state a license so to do, as hereinafter provided, for each bureau, agency, sub agency, office and branch office to be owned, conducted, managed or maintained by such person, firm, company, partnership, limited liability company or corporation for the conduct of such business.

Subdivision 3.

> No person, firm, company, partnership, limited liability company or corporation shall engage in the business of furnishing or supplying for a fee, hire or any consideration or reward information as to the personal character or activities of any person, firm, company, or corporation, society or association, or any person or group of persons, or as to the character or kind of business and occupation of any person, firm, company or corporation, or own or conduct or maintain a bureau or agency for the above mentioned purposes ... without having first obtained from the department of state, as hereafter provided, a license so to do as private investigator for each such bureau or agency and for each an every sub agency, office or branch office to be owned, conducted, managed or maintained by such persons, firm, limited liability company, partnership or corporation for the conduct of such business ...

Subdivision 4.

Any person, firm, company, partnership or corporation who violates any provision of this section shall be guilty of a class B misdemeanor.

Section 71. Definitions, 1. defines "Private Investigator":

"Private Investigator" shall mean and include the business of private investigator and shall also mean and include, separately or collectively, the making for hire, reward or for any consideration whatsoever, of any investigation, or investigations for the purpose of obtaining information with reference to any of the following matters, notwithstanding the fact that other functions and services may also be performed for fee, hire or reward; crime or wrongs done or threatened against the government of the United States of America or any state or territory of the United States of America; the identity, habits, conduct, movements, whereabouts, affiliations, associations, transactions, reputation or character of any person, group of persons, association, organization, society, other groups of persons, firm or corporation; the credibility of witnesses or other persons; the whereabouts of missing persons; the location or recovery of lost or stolen property; the causes and origin of, or responsibility for fires, or libels, or losses, or accidents, or damage or injuries to real or personal property; …[etc.]

772. Based upon the conduct described in the section "**THE NICB, STATE FARM, SUFFOLK COUNTY DA CONSPIRACY**" at Paragraphs 296-413 especially the subsection entitled: "NICB "Special Agents" Regardless of their Haughty Title are Required to Have and Maintain Private Investigators Licenses; the NICB "Special Agents", do not Possess such Licenses" the NICB has violated New York General Business Law Section 81, Article 7. Private Investigators, Bail Enforcement Agents and Watch, Guard and Patrol Agencies: Section 70. Licenses,

773. The Plaintiffs seek judgment declaring that the NICB has violated New York General Business Law Section 81, Article 7. Private Investigators, Bail Enforcement Agents and Watch, Guard and Patrol Agencies: Section 70. Licenses, and has been in violation of said law for the period of time commencing six years prior to the filing of this Complaint and continuing until the future until remedied.

## ERIC R. DINALLO SUPERINTENDENT OF INSURANCE STATE OF NEW YORK

### FORTY-FIRST CLAIM FOR RELIEF

### AGAINST DEFENDANT ERIC R. DINALLO SUPERINTENDENT OF INSURANCE STATE OF NEW YORK

### (Article 78)

774. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 773 above as though fully set forth herein.

775. Based upon the conduct of the Insurance Company Defendants as described above the Plaintiff seeks an Order pursuant to Article 78 of the New York State Civil Practice Law and Rules compelling Eric R. Dinallo Superintendent of Insurance State of New York to audit and investigate the claims practices of the Insurance Company Defendants and take all appropriate action to remedy any and all infirmities, deficiencies and misconduct as enjoined by New York State law upon Eric R. Dinallo Superintendent of Insurance State of New York.

## CLAIMS FOR INJUNCTIVE RELIEF

### FORTY-SECOND CLAIM FOR RELIEF

### AGAINST THE INSURANCE COMPANY DEFENDANTS

### (Permanent Injunction)

776. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 775 above as though fully set forth herein.

777. Plaintiffs seek a Permanent Injunction enjoining and restraining the Insurance Company Defendants SIU "Investigators" that are not qualified under the law from engaging in any and all investigative activity unless and until properly qualified.

- 218 -

## FORTY-THIRD CLAIM FOR RELIEF

### AGAINST DEFENDANT NATIONAL INSURANCE CRIME BUREAU

#### (Permanent Injunction)

778. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 777 above as though fully set forth herein.

779. Plaintiffs seek a Permanent Injunction Enjoining and Restraining NICB "Agents" and/or "Investigators" From Engaging in any and all Investigative Activity Unless and Until Properly Licensed by the State of New York.

## FORTY-FOURTH CLAIM FOR RELIEF

### AGAINST ALL DEFENDANTS

#### (Permanent Injunction)

780. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 779 above as though fully set forth herein.

781. Enforcer Counsel utilizes information and material gathered by the Insurance Company Defendants' illegal SIUs in order to conduct Examinations Under Oath and as evidence in legal actions against the Plaintiffs and Class Members in various State and Federal Courts located within the State of New York.

782. Plaintiffs seek a Permanent Injunction enjoining and restraining all the Defendants, including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall P.C., and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the Insurance Company Defendants Special Investigative Units.

## FORTY-FIFTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### (Permanent Injunction)

783. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 782 above as though fully set forth herein.

784. Plaintiffs seek a Permanent Injunction Enjoining and Restraining All the Defendants, including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall P.C., and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the Suffolk County DA or the "Suffolk County Task Force" associated with Operation BORIS.

## FORTY-SIXTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### (Permanent Injunction)

785. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 784 above as though fully set forth herein.

786. Plaintiffs seek a Permanent Injunction Enjoining and Restraining All the Defendants, including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall P.C., and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the unethical activities of McDonnell & Adels P.C.

## FORTY-SEVENTH CLAIM FOR RELIEF

## AGAINST ALL DEFENDANTS

### (Permanent Injunction)

787. The Plaintiffs repeat and re-allege the entire contents of Paragraphs 1 through 786 above as though fully set forth herein.

788. Enforcer Counsel utilizes information and material gathered by the NICB's illegal and unlicensed "Special Agents" in order to conduct Examinations Under Oath and as evidence in legal actions against the Plaintiffs and Class Members in various State and Federal Courts located within the State of New York.

789. Plaintiffs seek a Permanent Injunction enjoining and restraining all the Defendants, including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall P.C., and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the unlicensed NICB "Special Agents."

**WHEREFORE,** Plaintiffs on behalf of themselves and the putative Class demand judgment as follows:

1) Declaring this action to be a proper class action pursuant to CPLR Section 901 and that the named Plaintiffs are proper representatives of the class;

2) Declaratory relief on the First through Fortieth Claims for Relief;

3) Relief Under CPLR Article 78 in the nature of the old writ of Mandamus on the Forty-First Claim for Relief;

3) Injunctive relief on the Forty-Second to Forty-Seventh Claims for Relief:

(a) Plaintiffs seek a Permanent Injunction enjoining and restraining the Insurance Company Defendants SIU "Investigators" that are not qualified under the law from engaging in any and all investigative activity unless and until properly qualified;

(b) Plaintiffs seek a Permanent Injunction Enjoining and Restraining NICB "Agents" and/or "Investigators" From Engaging in any and all Investigative Activity Unless and Until Properly Licensed by the State of New York.

(c) Plaintiffs seek a Permanent Injunction enjoining and restraining all the Defendants, including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall P.C., and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the Insurance Company Defendants Special Investigative Units.

(d) Plaintiffs seek a Permanent Injunction Enjoining and Restraining All the Defendants, including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall P.C., and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the Suffolk County DA or the "Suffolk County Task Force" associated with Operation BORIS.

(e) Plaintiffs seek a Permanent Injunction Enjoining and Restraining All the Defendants, including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP, Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall P.C., and any other entity still unknown, from utilizing any and all information and materials obtained by and/or through the unethical activities of McDonnell & Adels P.C.

- 222 -

(f)  Plaintiffs seek a Permanent Injunction enjoining and restraining all the Defendants,

including and especially McDonnell & Adels P.C., Katten Muchin Rosenman LLP,

Rivkin Radler LLP, Iseman Cunningham Riester & Hyde LLP, Melli, Guerin and Wall

P.C., and any other entity still unknown, from utilizing any and all information and

materials obtained by and/or through the unlicensed NICB "Special Agents."

Dated: Brooklyn, New York
      May 27, 2008

                                   The Zuppa Firm PLLC

                                   By:_____
                                   Raymond J. Zuppa Esq.
                                   Attorneys for Plaintiffs
                                   33 Herbert Street
                                   Suite 1
                                   Brooklyn, NY 11222
                                   (718) 383-8812

APPENDIX

L. Rich Humpherys, #1582
Roger P. Christensen, #0648
Karra J. Porter, #5223
CHRISTENSEN & JENSEN, P.C.
175 South West Temple, Suite 510
Salt Lake City, Utah 84101
Telephone: (801) 355-3431

Lawrence H. Tribe
Kenneth J. Chesebro
1575 Massachusetts Avenue
Cambridge, Massachusetts 02138
Telephone: (617) 495-4621

Attorneys for Plaintiffs

**FILED DISTRICT COURT**
Third Judicial District

AUG 03 [1998]

IN THE THIRD JUDICIAL DISTRICT COURT
OF SALT LAKE COUNTY
STATE OF UTAH

| | |
|---|---|
| CURTIS B. CAMPBELL and INEZ PREECE CAMPBELL, <br><br> Plaintiffs, <br><br> vs. <br><br> STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, <br><br> Defendant. | COURT'S FINDINGS, CONCLUSIONS AND ORDER REGARDING PUNITIVE DAMAGES AND EVIDENTIARY RULINGS <br><br> Civil No. 890905231 <br> Judge William B. Bohling |

1. The above matter came before the Court on June 4, 1996, for Phase II of the bifurcated trial. Following 29 days of trial, on July 31, 1996, the jury returned a special verdict in favor of plaintiffs, answering all interrogatories in their favor and awarding damages as follows: $1.4 million in general compensatory damages to plaintiff Curtis Campbell; $1.2 million in general compensatory damages to plaintiff Inez Campbell; and $145 million in punitive damages to plaintiffs jointly. On August 8, 1996, the Court entered judgment against State Farm in these amounts, together with special damages of $2,086.75 ($911.25 plus $1,175.50 in prejudgment interest) plus post-judgment interest at the legal rate until paid.

2. Defendant State Farm Mutual Automobile Insurance Company (hereinafter "State Farm") then filed a variety of post-trial motions. Following exhaustive briefing of all issues, with several hundred pages of factual and legal argument submitted by each side, the Court held a two-day hearing on the motions on December 18-19, 1997. Having reviewed the parties' briefs, portions of the trial transcript and exhibits, and its own notes of the trial, at the conclusion of oral argument on each issue the Court issued a decision and preliminary bench opinion. The Court has set forth in separate orders its rulings with respect to the bulk of State Farm's motions.

3. The instant filing concerns State Farm's intertwined motions objecting to the punitive damages award and the scope of the evidence considered during Phase II. For the reasons stated below, the Court declines to grant most of the relief sought through these motions, but grants the aspect of State Farm's motion seeking a remittitur with respect to the amount of the punitive damages. For the reasons set forth herein, the Court has ordered that plaintiffs elect either a new trial or a remittitur of the punitive damages down to $25 million. The Campbells

2

have accepted a remittitur in this amount, in lieu of a new trial, through an election filed January 6, 1998. The Court sets out the basis of its rulings with respect to punitive damages in Part I. It sets out the basis of its rulings with respect to the scope of the evidence considered at trial in Part II.

I.  MOTIONS RELATING TO PUNITIVE DAMAGES AWARD

4. State Farm makes essentially four arguments with respect to the jury's award of punitive damages: (1) that it is entitled to judgment n.o.v. as to liability; (2) that, in the alternative, it is entitled to a new trial because the jury was supposedly invited to punish it for all its bad acts throughout the nation during the past two decades; (3) that it is entitled to a new trial, or at least a remittitur, because the $145 million in punitive damages awarded by the jury is excessive; and (4) that, because supposedly the only explanation for the jury's award of $145 million is that the jury was inflamed by passion and prejudice, sparked by the allegedly inflammatory summation of the Campbells' counsel, only the grant of a new trial (not a remittitur) can cure this claimed defect.

5. For the reasons explained hereafter, the Court rejects the first, second and fourth arguments, but accepts the third in part. The Court sets forth its final findings and conclusions pertinent to the issues raised by State Farm as follows:

A.  Motion for Judgment N.O.V. on Punitive Liability

6. State Farm argues for judgment n.o.v. on punitive damages on liability on the basis that, when it "had the opportunity to settle for policy limits but failed to do so, Utah law did not clearly recognize an action for bad faith failure to settle if the insurer ultimately paid the excess verdict in full," so that State Farm "manifestly lacked fair notice" that its course of action "could subject it not only to liability for compensatory damages under a bad faith theory, but also to punishment," thereby depriving it of due process of law. State Farm Opening Memorandum at 30-31. The Court denies this motion for several separate reasons.

7. First, the Court believes that this argument was waived by State Farm's failure to raise it in a Rule 50(a) motion for a directed verdict. See Pobieche v. Transamerican Ins. Co., 27 Utah 430, 433 n.1, 497 P.2d 236, 238 n.1 (1972) ("The failure of a party to make a motion for a directed verdict . . . forecloses the trial court from consideration of a motion for judgment notwithstanding the verdict"); see also First Gen. Servs. v. Perkins, 918 P.2d 480, 487 (Utah App. 1996).

8. Second, the Court believes that this argument is barred by the law-of-the-case doctrine, as the Court of Appeals, in its earlier consideration of the case, specifically held that the Campbells should be given an opportunity to prove their entitlement to punitive damages. Campbell v. State Farm, 840 P.2d 130, 142 & n.24 (Utah App. 1992).

GARY T. FYE CO.
STATE FARM EXHIBITS
001665

9.      Third, a due process objection based on the absence of notice is available, even in a criminal case, only where a court has announced "an unforeseeable judicial enlargement of a criminal statute, applied retroactively," that operates like an ex post facto law. Bouie v. City of Columbia, 378 U.S. 347, 350 (1964); see also Osborne v. Ohio, 495 U.S. 103, 117 (1990); Rose v. Locke, 423 U.S. 48, 53 (1975). State Farm's claim that it had no fair notice of possible punitive damages liability when it was handling the Campbell file in 1983 rests on an out-of-context quotation from the Court of Appeals' earlier decision in this case, namely, its observation that the existence of a bad-faith action despite the insurer's ultimate payment of the excess verdict was "one of first impression in Utah." Campbell, 840 P.2d at 137 (quoted in State Farm Opening Memorandum at 30). But the Court of Appeals went on to note that "prior Utah Supreme Court cases" dating as far back as 1969 (fourteen years before State Farm's refusal to settle the Campbell case) "compel the conclusion we reach," which the Court of Appeals described as "a natural outgrowth" of earlier precedents. Id. at 137, 140 n.19. Thus, even the Bouie test for fair notice in a criminal case is met here. Furthermore, State Farm's own inaction indicates that it was aware well before its handling of the Campbell case of its potential punitive damage exposure for the mistreatment of its insureds.

10.     Fourth and finally, even if State Farm's notice argument were accepted, by its terms it is limited to the argument that State Farm lacked notice that its bad faith toward the Campbells could lead to an award of punitive damages. The punitive damage award is separately supportable based on the other two intentional torts found by the jury: intentional infliction of

5

emotional distress and fraud. State Farm does not contend that during its handling of the Campbell case it lacked fair notice that either of these intentional torts could lead to the imposition of punitive damages.

B.      Motion for New Trial Based on Claim of Extraterritorial Punishment

11.     State Farm argues that the jury was invited to punish it in this proceeding for all its bad acts committed nationwide during the past two decades, thus assertedly interfering with the sovereignty of other States and penalizing State Farm for activities that are possibly lawful in other States. State Farm Opening Memorandum at 89-97. According to State Farm, the only permissible remedy for this asserted flaw in the trial is a new trial, as "there is no way to determine what the jury would have done had it been limited to punishing State Farm for Utah conduct alone." State Farm Opening Memorandum at 94. The Court rejects this argument for three separate reasons.

12.     First, this argument has been waived. State Farm raised no constitutional objection at trial against the testimony or statements in closing argument of which it now complains, as the Campbells have demonstrated, see Campbell Opening Memorandum at 173-75 & n.100, and State Farm concedes. See State Farm Reply Memorandum at 69 & n.35. (It should also be noted that not only did State Farm fail to raise a constitutional objection to any statements in the closing argument of plaintiffs' counsel, but State Farm made no objection of any kind to the particular statements of which it now complains).

6

13.     Second, the Campbells never requested the jury to use this proceeding to punish State Farm for bad acts occurring outside of Utah. State Farm's suggestions to the contrary, see State Farm Opening Memorandum at 89-91, rely on out-of-context quotations from the Campbells' closing argument (it is worth noting that State Farm made no objection on the closing argument statements in question), as the Campbells set out in their brief in detail, see Campbell Opening Memorandum at 174-75 n.100. Compare BMW of North America, Inc. v. Gore, 116 S. Ct. 1589, 1593-94 (1996) (plaintiffs' counsel asked jury to punish BMW in the amount of $4,000 for each of approximately 1000 cars sold nationwide without disclosure of repainting, despite the fact that only fourteen such cars had been sold within Alabama, and nondisclosure was apparently lawful in most States).

14.     Third and finally, ample precedent establishes that it was entirely proper for the jury to consider the Campbells' evidence of State Farm's wrongful claim-handling policies and practices, based on evidence from inside and outside Utah, both in evaluating the reprehensibility of State Farm's policies that led to the injuries suffered by the Campbells, and in deciding what amount of punitive damages was needed both to punish State Farm for its wrongful business policies in Utah and to deter the continuation of such policies in the future. See TXO Production Corp. v. Alliance Resources Corp., 509 U.S. 443, 450-51, 462 n.28 (1993) (plurality opinion) (observing that evidence that defendant "had engaged in similar nefarious activities in its business dealings in other parts of the country" was properly considered by the jury; "[u]nder well-settled law, . . . because such as these are typically

7

considered in assessing punitive damages."); BMW of North America, Inc. v. Gore, 116 S. Ct. 1589, 1598 nn. 19 & 21 (1996) (reaffirming TXO holding that "such [out-of-state] evidence is relevant to the determination of the degree of reprehensibility of the defendant's conduct," and noting that even "lawful conduct that bears on the defendant's character and prospects for rehabilitation" is properly considered in setting appropriate punishment). Even in the context of criminal sentences, where the interests of a defendant are greater than the interests of a defendant facing the imposition of punitive damages, see Pacific Mut. Life Ins. v. Haslip, 499 U.S. 1, 23 n.11 (1991); Browning-Ferris Indus. v. Kelco Disposal, Inc., 492 U.S. 257, 260 (1989), criminal penalties are routinely upheld despite being predicated on the consideration of out-of-state conduct, even where that conduct has not been adjudicated unlawful, and even where that conduct is in fact lawful. See, e.g., Williams v. New York, 337 U.S. 241, 247 (1949) ("fullest information possible concerning the defendant's life and characteristics" traditionally considered); United States v. Tucker, 404 U.S. 443, 446 (1972) (inquiry may be "broad in scope, largely unlimited either as to the kind of information [the court] may consider, or the source from which it may come."); Nichols v. United States, 114 S. Ct. 1921, 1928 (1994) (defendant's past criminal behavior may be considered, "even if no conviction resulted from that behavior"); United States v. Watts, 117 S. Ct. 633, 635 (1997) (per curiam) (trial judge is free to consider evidence of alleged offenses even where the defendant has already been acquitted by a jury on all the allegations, so long as trial judge believes that the offenses have been demonstrated "by a preponderance of the evidence").

8

Indeed, in its reply brief, State Farm explicitly acknowledged the controlling nature of this line of authority; agreed that it was not error for the jury to consider out-of-state evidence; and affirmatively noted that, if properly admitted under Utah R. Evid. 404(b), such evidence "may be considered in determining which amount [of punitive damages], within a range of reasonable punishments, the jury should select." State Farm Reply Memorandum at 70.

15.     For all these reasons, the Court denies State Farm's motion for a new trial on this ground.

C.     Motion for New Trial or Remittitur Based on Size of Punitive Damages Award

16.     State Farm argues at length that it is entitled to a new trial, or at least a remittitur, because the $145 million in punitive damages awarded by the jury are excessive. See State Farm Opening Memorandum at 97-112. In support of this argument, State Farm relies primarily on the Utah Supreme Court's decisions in Crookston v. Fire Ins. Exch., 817 P.2d 789 (Utah 1991) ("Crookston I"), and Crookston v. Fire Ins. Exch., 860 P.2d 937 (Utah 1993) ("Crookston II"), and the U.S. Supreme Court's decision in BMW of North America v. Gore, 517 U.S. 559, 116 S. Ct. 1589 (1996). For the reasons set forth below, the Court finds that the punitive damages awarded by the jury were excessive and therefore has granted State Farm's motion for a new trial (since accepted) or, in the alternative, for a new trial had the Campbells desired a new trial. As the Court will explain, given its interpretation of the "ratio factor" set out by the Utah Supreme Court in the Crookston decisions, the Court believes that a

9

25-to-1 ratio between the punitive damages and the compensatory damages is appropriate here, authorizing a punitive damages award, as remitted, of $25 million.

17.     Because the ratio is greater than the presumptively appropriate 3-to-1 ratio, the Court sets out in some detail here why an award of this amount is justifiable under the seven Crookston factors, as the Utah Supreme Court has required in this context. See Crookston I, 817 P.2d at 811-13; Crookston II, 860 P.2d at 940. Further, the Court explains why State Farm's objection that the amount of the jury's punitive damage award is "grossly excessive," in violation of federal substantive due process in light of BMW v. Gore, is not well taken.

I.     Jury Instructions

18.     In considering the arguments concerning the amount of the punitive damages, it is helpful to review the instructions that were given to the jury on this subject. Consistent with the law, the jury was instructed in accordance with the Crookston factors as follows. The basic charge with respect to punitive damages was instruction No. 59, which reads:

> In addition to the compensatory damages, the Campbells also seek an award of punitive damages against State Farm. Punitive damages may be awarded only if compensatory damages are awarded.
>
> Before punitive damages may be awarded against State Farm, you must find by clear and convincing evidence that the insurance company's conduct toward the Campbells was willful and malicious, or such conduct was done with a knowing and reckless indifference toward, and disregard of, the Campbells' rights and well being.
>
> If you so find, you may award, if you deem it proper to do so, such sum as in your judgment would be reasonable and proper as a punishment for such wrongs, and as a wholesome warning to others not to offend in like manner. If such punitive damages are given, you should award them with caution and you

10

should keep in mind they are only for the purpose just mentioned and not the measure of compensatory damages.

In determining the amount of punitive damages, you should consider each of the following factors:

1. the relative wealth of the defendant;
2. the nature of the defendant's misconduct;
3. the facts and circumstances surrounding the defendant's misconduct;
4. the effect of defendant's misconduct on the lives of the Campbells and others;
5. the probability of future recurrence of the misconduct;
6. the relationship between the parties; and
7. the amount of compensatory damages awarded.

Punitive damages should be more than an inconvenience to the defendant and their amount should be sufficient to discourage the defendant and others similarly situated from doing or repeating such misconduct in the future.

Instruction No. 60 added:

> You are instructed that punitive damages constitute an extraordinary remedy outside the field of usual redress remedies which should be applied with caution lest, engendered by passion or prejudice because of a wrongdoing, the award becomes unrealistic or unreasonable. Plaintiffs are not automatically entitled to punitive damages and the law does not require you to award punitive damages to plaintiffs.
>
> The law provides no fixed standard as to the amount of punitive damages, but leaves the amount to the jury's sound discretion, exercised without passion or prejudice, however, the law requires that any award for such damages must bear a reasonable relationship to the actual or potential harm resulting from the defendant's conduct.

Instruction No. 61 reads:

> A defendant's conduct must be malicious or in reckless disregard for the rights of others, although actual intent to cause injury is not necessary. That is, the defendant must either know or should know "that such conduct would, in a high degree of probability, result in substantial harm to another," and the

conduct must be "highly unreasonable conduct, or an extreme departure from ordinary care, in a situation where a high degree of harm is apparent."

19.     The principles set forth in these instructions should be kept in mind in deciding whether or not the damage awards are excessive. It is worth noting that State Farm has raised no claim of instructional error in its post-trial motions. At no time before the jury's verdict did State Farm take the position that the jury should not be instructed to consider the seven Crookston factors in deciding the amount of punitive damages.

20.     State Farm's post-trial positions are not entirely consistent with its own proposed jury instructions. For example, with respect to its post-trial motions, State Farm argues that the proper amount of punitive damages in this case cannot be evaluated, even in part, based on a corporation's wealth; indeed, State Farm argues that it is illogical to even refer to a corporation as possessing "wealth." State Farm Opening Memorandum at 105-07. State Farm's own proposed jury instruction No. 40 lists seven factors for the jury to consider in determining the amount of punitive damages. The first factor listed is: "The relative wealth of State Farm." In instruction No. 59, the jury was properly instructed, without objection, that it should "consider the relative wealth of the defendant." Accordingly, in spite of State Farm's current position, it is plain that its wealth (as well as the other six Crookston factors), may be considered in evaluating whether the jury's award is excessive.

21.     A persistent theme running through State Farm's briefing is that whether or not the punitive damages awarded are excessive must be determined solely by reference to the

evidence concerning what State Farm did to the Campbells, and what punishment is appropriate for those actions considered in isolation — ignoring the Campbells' entire institutional case and all the evidence of similar misconduct by State Farm toward other Utah consumers during the past two decades.

22.     However, beyond the objective of punishment, the jury instructions also properly allowed the jury to consider appropriate deterrence. Without objection from State Farm, the jury was directed in instruction No. 59 to set punitive damages based on "the nature of the defendant's misconduct" and "the probability of future recurrence of the misconduct." The Campbells' institutional case set forth ample evidence that the nature of State Farm's misconduct was pervasive: that it involved not an isolated instance of wrongdoing toward the Campbells or the occasional consumer, but instead a company-wide claim-handling policy of providing incentives to adjusters to systematically deny Utah consumers benefits owed to them under insurance policies (incentives that were never disclosed to consumers). There was ample evidence that this was done as part of a deliberate and wrongful effort to enhance corporate profits, a scheme that was orchestrated by top officials; that this policy caused the mishandling of the Campbell file; and that it continues to cause many other consumers to be wrongfully denied insurance benefits on a widespread basis.

23.     Further, instruction No. 59 directed the jury to focus on awarding a sum that would serve "as a wholesome warning to others not to offend in like manner," and "discourages the defendant and others similarly situated from doing or repeating such misconduct in the future."

13

North Am. Co., 900 F.2d 109, 111 n.3 (7th Cir. 1990). A punitive damages award equal to one percent of State Farm's wealth would be $347.5 million. The remitted amount of $25 million in punitive damages represents less than 1/20th of one percent of State Farm's wealth (.0457 per cent).

27.     As a benchmark, it is worth noting that the remitted amount of punitive damages in this case, expressed as a percentage of wealth, is less than one-tenth the punitive damages award upheld by the Utah Supreme Court against the insurance company defendant in Crookston (there, approximately one-half of one percent of wealth).

28.     Considerable evidence at trial from State Farm's own witnesses affirmatively established that punitive damages in the range of $145 million, about one-quarter of one percent of its wealth, appear necessary to capture the attention of top corporate officials and ensure that they monitor and change corporate policies as may be appropriate in reaction to punitive damage awards. Regional vice president, Buck Moskalski, State Farm's top official over Utah and an employee designated under Rule 30(b)(6) as knowledgeable about punitive damages against the company, testified that State Farm has no system in place to track or record punitive damage awards, or even to report them to top officials, and that he did not himself plan to report to headquarters, any punitive damages award in this case. 21 Tr. 157, 171-72. Other testimony established that, because of State Farm's lack of any monitoring of punitive damage verdicts, even a $100 million award in Texas several years ago was never learned of, much less acted on, by headquarters. 11 Tr. 107-10. Given that State Farm is so wealthy that this earlier $100

Given these various aspects of the jury instructions, State Farm's main argument against the amount of punitive damages — that it cannot be supported based on a narrow analysis of what was done to the Campbells alone, ignoring the Campbells' entire institutional case — fundamentally misguided.

24.     The Court now turns to State Farm's remaining arguments with respect to the Crookston and BMW v. Gore factors and to an explanation of why the Court has ordered a remittitur that reduces the punitive damages payable by State Farm to $25 million.

2.    Crookston Factors

25.     The Court addresses the seven Crookston factors as follows.

a.    Relative Wealth of State Farm

26.     State Farm's wealth is enormous, as no one would dispute. The evidence indicates that State Farm's surplus increased from $2.65 billion in 1977 to $25 billion in 1995. Its assets increased from $6.3 billion in 1977 to $34.75 billion in 1995, at an average increase of $4.3 million per working day in assets, and $9.3 million per working day in assets. These numbers are important in assessing what amount of punitive damages is reasonably necessary to get the attention of State Farm officials and spur action to eliminate the wrongful conduct involved. "[P]unitive damages should be more than an inconvenience" to a wrongdoer, Crro v. Morgers, 660 P.2d 723, 727 (Utah 1983), and it appears that "a typical ratio for a punitive damages award to a defendant's net worth may be around one percent." Cash v. Beltmar

14

million verdict (less than 0.18 percent of its wealth) was too small for top management even to notice, the jury's $145 million award (approximately 0.26 percent of its wealth) cannot be viewed as excessive under the wealth factor. (By contrast, there was no evidence of this sort presented to Crookston to support the award there, which was double the award of the jury here, expressed as a percentage of wealth).

b.    Nature of State Farm's Misconduct

29.     The second Crookston factor, which mirrors the BMW v. Gore "reprehensibility" factor, likewise strongly supports the punitive damages awarded by the jury. Whether a defendant's misconduct is of a reprehensible nature is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Gore, 116 S. Ct. at 1599. The U.S. Supreme Court has singled out for special condemnation schemes of "trickery and deceit," especially when they target people who are "financially vulnerable" and involve "repeated misconduct." Id. Further, the Court has identified as particularly reprehensible a defendant's use of "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive." Id. at 1601.

30.     There is ample evidence in the record from which the jury could reasonably conclude that all of these elements of reprehensibility are present in the corporate policies that were responsible for injuring the Campbells, that have injured many other Utah consumers during the past two decades, and that continue today. The evidence has been summarized in detail by

GARY T. FYE CO.
STATE FARM EXHIBITS
001668

16

the Campbells in their briefs, see Campbell Opening Memorandum at 12-143; Campbell Surreply Memorandum at 13-41, and at oral argument on the post-trial motions. The Court here briefly summarizes three key aspects of the evidence that are important to understanding its analysis of the reprehensibility of State Farm's misconduct: (i) State Farm's official policy of giving its adjusters undisclosed incentives to deny consumers benefits owed them, in order to enhance corporate profits by wrongfully turning its claim-handling process into a profit center; (ii) State Farm's use of various wrongful means to conceal this profit scheme and evade punishment for it; and (iii) the impact of these profit and evasion schemes on the Campbells specifically.

31.    i.  *State Farm's policy of using its auto insurance claims-handling process as a profit center by offering its claims adjusters undisclosed incentives to wrongfully deny benefits owed consumers.*  The record contains a large body of evidence, in the form of State Farm's own internal corporate documents, the testimony of its current and former employees, and credible expert testimony, that over a period of approximately two decades, State Farm has pursued an official policy of using its auto insurance claim-handling process as a profit center, by systematically providing its claim adjusters with unlawful incentives to wrongfully deny benefits owed consumers.

32.    At the outset, to appreciate the force of this evidence it is important to understand the well-accepted standards for what sources of profit are permissible in the insurance industry, what sources are impermissible, and how this relates to the appropriate compensation systems

17

the insurance business is to timely pay fair value in the event of a loss, so that fulfilling this function requires an insurance company to blind itself to the economic advantage it could obtain if it were to use its superior knowledge and financial leverage to pay out less than what claims are actually worth.  Thus, it is universally accepted within the industry that the compensation of claim adjusters cannot be set based on whether or not their claim payouts save the company money; if that were allowed, adjusters would be systematically induced to pay out less than is fairly due.  The public trust aspect of the insurance industry dictates that the incentives of claim adjusters must be set in line with the underlying insurance function: to timely pay out fair value on claims, no more and no less.

34.    Indeed, the slogan that State Farm purports to have its adjusters follow is that "we pay what we owe, not a penny more, not a penny less."  Unfortunately, reality does not comport with this slogan.  The record contains extensive evidence that for approximately two decades, State Farm has disregarded well-accepted industry rules by turning its claims-adjusting process into a profit center, to the point of giving its claim adjusters specific numerical targets with regard to average payouts per claim.  Meeting these targets leads to better pay and promotional prospects; missing them leads to criticism, reduced prospects at the company and, ultimately, a threat to one's continued employment.

35.    A variety of internal documents generated by State Farm during the 1970s and 1980s demonstrate the decision of top management to pursue the explicit objective of using the claims-adjustment process as a profit center.  One of the more important pieces of evidence of

19

for insurance adjusters.  The Campbells provided credible, uncontroverted expert testimony on this point.  See Campbell Opening Memorandum at 45-53.  In brief, insurance is a public trust sort of business, in which the insurance company takes in premiums to cover a pool of risk, and the customer, as well as the public generally, has to be able to trust that the insurance company, once a risk turns into a harm at a later date, will timely pay fair value on the claim after due investigation.  The claims adjuster should be allowed to handle each claim on its merits, without having incentives or pressures to underpay claims in an attempt to meet arbitrary average payment-per-claim goals designed to enhance corporate profits.  In the insurance business, it is universally accepted and was uncontroverted at trial, that insurers must not seek to enhance profits by intentionally underpaying claims, but that companies must focus on building profits by such means as enhancing their ability accurately to assess risk and then price their product appropriately, increasing their customer base by effective marketing, maximizing their investment income on premium monies prior to payout, and achieving efficiencies in their operations generally.

33.    The evidence made clear that in the insurance business it is regarded as essential that an insurance company may not properly seek to increase its profits by pressuring its claim adjusters to pay out less than is owing on claims, even if this could be easily done by taking advantage of people who have no idea what claims are worth, or who are so in need of funds that they would be forced to accept far less than is fairly owing if the only alternative were substantial delay and/or a need to institute litigation.  The reason is that the core function of

18

an unlawful policy is the document dated May 1, 1979, laying out State Farm's "Performance, Planning and Review," or "PP&R," program.  See PX-57(1), Tab 10.  (It should be noted that this important document was not produced by State Farm, which claims to have destroyed it, but was obtained by the Campbells by subpoena from a former State Farm claims manager.  The head of State Farm's document retention program, Dan Cochran, who testified at trial, would not commit that this document will not again be destroyed by State Farm at the conclusion of this case.)  As the Campbells established with the aid of credible expert testimony, this document, particularly when viewed in relation with related documents and the testimony of State Farm employees, provides valuable insights into State Farm's inherently wrongful method of running its insurance claims operation.

36.    The PP&R program explicitly covers "all levels of employees" at State Farm, including claims adjusters, and seeks to "reward merit salary-wise"; analysis of each employee's work under the PP&R program is designed to "[r]ealistically support merit salary recommendations."  "Merit," in the context of claims adjusting, is explicitly defined by the PP&R program as including the ability to meet preset targets for payouts each year — i.e., targets for payouts that are tied not to the severity and fair value of the claims that are being handled, but rather to State Farm's goals for making profits, by arbitrarily holding down payouts, for that year.  (It bears emphasis that such arbitrary payment goals are set for claims that have not yet arisen, concerning accidents that have not yet happened.)  Thus, the PP&R program requires supervisors to set goals for claim adjusters, at the start of each year, such as:

20

GARY T. FYE CO.
STATE FARM EXHIBITS
001669

"Hold BI (bodily injury) paid cost to (member) or less for (year)"; "List prior damage [i.e., report prior damage to cars involved in accidents] on x% of all estimates written by (date)"; and "Negotiate appearance allowances [i.e., a form of damage that, by definition, is made at less than the insured is entitled to receive under the policy] on x% of all estimates written by (date)."

37.    The evidence further demonstrates that, in carrying out this PPAR program, which directly pressures adjusters to keep down payouts in order to meet these sorts of preset targets having nothing to do with the merits or actual value of the specific claims that an adjuster would encounter in the coming year, top State Farm management has informed adjusters that they are the "big spenders," who pay out over 70 percent of the premium dollars paid by consumers, and that it is their responsibility to "show up the bottom line" — i.e., to keep down payouts — in order to ensure that State Farm has the "most profitable claim service in the industry." 11 Tr. 5, 6, 44, 45; PX-57.

38.    The Campbells presented specific testimony, by Fye and Prater, demonstrating that this approach of using the PPAR program to mix the claim service function with the quest for greater corporate profits is inherently wrong. These experts testified that the PPAR incentive system cannot be justified "in any way." 17 Tr. 54, given the duty to treat insureds "honestly and fairly." 17 Tr. 43. They described such an incentive system as simply "taboo in the insurance industry," 11 Tr. 6; as "grossly unfair" to consumers, "absolutely wrong," "just absolutely what you would never want to see in a claims organization," 4 Tr. 58-59; as

21

inherently fraudulent if not fully disclosed to the consumer (given that, if consumers were informed in advance of the incentive system no one would buy State Farm's policies), 11 Tr. 9; and as "creat[ing] a corporate culture that is predatory" and "take[s] advantage of the gullible and defenseless people." 4 Tr. 64; 11 Tr. 90.

39.    State Farm's defense was that the PPAR program, despite its plain wording, in no point has enforced any such incentive system; that the PPAR program's sole function with respect to adjusters has been simply to encourage the setting of non-binding "awareness goals" that had no effect on pay or performance; and that, in any event, State Farm has discontinued the practice of setting average pay per claim goals, in directives issued in 1992 and 1994. However, the Campbells presented considerable evidence, both in the form of documents and through the testimony of current and former State Farm employees, that the PPAR program, including payout goals, has functioned, and continues to function, as an unlawful scheme to provide undisclosed incentives to adjusters to deny benefits owed consumers by paying out less than fair value in order to meet preset, arbitrary payout targets designed to enhance corporate profits.

40.    The evidence also clearly established that the PPAR program, including the arbitrary claims payout goals, has applied equally to the handling of both third-party and first-party claims.

22

41.    The effect of the PPAR program's arbitrary claim payout targets on operations here in Utah, and particularly the constant pressure to reduce the money paid out on a year-to-year basis, was established by testimony that started with low-level claims adjusters, such as Felix Jensen and Ray Summers, and went up through the ranks of management. The collective picture of operations under the PPAR program presented by this evidence was one of unrelenting pressure to keep down payouts to meet arbitrary claim payment goals. For example, Felix Jensen, a current Utah State Farm employee of more than 30 years, testified as to the "many, many, many times" that high-level claims managers would pressure adjusters to revise downward their evaluation of what should be paid out on claims. Jensen went to top managers and pointed out the "intolerable situation" that was being created for adjusters, who were simply unable to run a properly functioning system in which fair value would be paid for claims. Jensen was bluntly instructed to "get out of the kitchen" if he could not stand the heat.

42.    Samantha Bird, a longtime Utah State Farm claims supervisor, also experienced pressure to reduce payouts to well below fair value as a "recurrent, running theme." She, too, went to high-level management in an attempt to do something about it. Instead of being taken seriously, her complaints led to advice that she should be "more of a team player." Bird was criticized by those higher in the management structure as being the only supervisor who argued against downward claim payout pressures. She endured for years constant criticism of her approach to claims handling. At times even she was forced to commit dishonest acts and to

GARY T. FYE CO.
STATE FARM EXHIBITS
001670

23

knowingly underpay claims. Bird ultimately tired of being forced to commit dishonest acts and resigned from the company.

43.    Although Utah managers higher than Bird such as Noxon and Brown (both of whom are still employed at State Farm) did their best to deny that their operations were in any way improperly influenced by the PPAR program — which they characterized as simply suggesting the use of non-binding "awareness goals" concerning claims payouts — compelling evidence was introduced contradicting this testimony. A number of the documents evaluating and discussing the performance of Noxon and Brown and their subordinates contained explicit, preset average payout goals. In particular, Brown's PPAR evaluations included repeated references to the need to reduce average payments on claims (in spite of inflationary pressures driving up medical bills, auto repairs, wages, etc.), with Brown boasting about his success in doing so, in the course of seeking (successfully) a transfer to a more desirable location.

44.    Further, the Campbells demonstrated, through the testimony of State Farm employees who had worked outside of Utah, and through expert testimony, that this pattern of claims adjustment under the PPAR program was not a local anomaly, but was a consistent, nationwide feature of State Farm's business operations, orchestrated from the highest levels of corporate management. Moreover, the record contains substantial evidence that, contrary to State Farm's claims that it "abandoned" average payment goals through memos circulated in 1992 and 1994, the practice was still being carried out at the time of trial in 1996. The only difference is that the arbitrary payout goals, designed to enhance bottom-line corporate profits,

24

are no longer set out in writing; to make it more difficult to prove how the program operates to injure consumers, this key element of the program is now carried out verbally.

45.  Finally, the record demonstrates in considerable detail the way in which State Farm adjusters of a wide variety of highly unfair and dishonest methods to drive down average payouts on claims, in circumstances that make it clear that the affected consumers are being routinely denied the fair benefits of the relevant insurance policies. Just the testimony of Ray Summers alone (the adjuster who handled the Campbell case and who was a State Farm employee in Utah for almost twenty years) outlined more than a dozen such methods, including the falsifying or withholding of evidence in claim files, one of the fraudulent tactics which was used, at Bill Brown's direction, in handling the Campbell case. 12 Tr. 183. Summers was praised for its effective use of unfair and dishonest claims practices and was encouraged by management to teach them to others. His supervisor told current long-term State Farm employee, Marilyn Poulson, who questioned the honesty of the practice, that Summers' falsification of documents was "good business, it helped to settle claims." 13 Tr. 162-63.

46.  A number of other witnesses and documents described additional methods used by State Farm in dishonest and unfair ways to reduce claim payments. Although State Farm denied that it has conducted claim-payout related contests, documentary evidence was presented of such contest being held, at the instance of management, which encouraged the use of unfair settlement tactics.

25

47.  ii. *State Farm's use of unlawful and unethical means to conceal its profit scheme and evade punishment for it.* The record also contains ample evidence that, throughout at least the past two decades, State Farm has resorted to a variety of wrongful means in attempt to evade detection of, and liability for, its unlawful profit scheme. Using these tactics, State Farm has managed to construct a nearly impenetrable wall of defense against punishment for its wrongdoing, one so effective that it is able to pressure its adjusters to deny consumers insurance benefits with impunity, knowing: (1) that few of its victims will even realize that they have been wronged; (2) that fewer still will ever be able to sue; (3) that only a small fraction of those who do sue will be able to weather the years of litigation needed to reach trial; and (4) that any victims who do actually reach trial will have great difficulty establishing the basis for punitive damages where met with claims that only an "honest mistake" was made, supported by a body of evidence that has been systematically sanitized, padded, purged, concealed, destroyed or rehearsed.

48.  The record indicates that these evasion tactics are so successful that State Farm trains its employees to ignore the threat of punitive damages in making their claims-handling decisions. State Farm has relied on five principal evasion tactics, each of which is reprehensible.

49.  a. *Systematic targeting of vulnerable and defenseless consumers.* The record clearly supports the conclusion that State Farm's undisclosed policy of using its claims-handling process as a profit center to systematically deny benefits owed to consumers is deliberately

26

crafted to prey on "the weakest of the herd" -- the elderly, the poor, and other consumers who are least knowledgeable about their rights and thus most vulnerable to trickery or deceit, or who have little money and hence have no real alternative but to accept an inadequate offer to settle a claim at much less than fair value. The testimony from Ray Summers, Bruce Davis and Ina DeLong on how they were trained to target such consumers, and the expert testimony from Gary Fye covering the various tactics predicated on this philosophy and the internal company documents demonstrating this philosophy in action, was especially significant.

50.  b. *Systematic destruction of documents, requested in litigation, that reveal the profit scheme.* The record contains considerable evidence concerning State Farm's aggressive efforts to "manage" documents that might damage it in bad-faith litigation, including evidence of extensive efforts to erase large portions of the corporate memory. As the Campbells urged at trial, and have reiterated at length in their post-trial briefing, the evidence of State Farm's systematic and long-running efforts to destroy internal company documents revealing its profit scheme supports an inference that State Farm was seeking to minimize the possibility that it would be punished for its underlying misconduct.

51.  State Farm's own expert witness on records management, Robert Williams, set out an appropriate benchmark for assessing the propriety of State Farm's document destruction efforts. Williams testified to three basic principles of proper records management: (1) given the large volume of information involved in transacting business, a corporation needs to have a "corporate memory," by retaining information documenting the nature of its past activities; (2)

27

it would be "abhorrent" and "absolutely" not proper for a corporation to seek out documents on corporate practices that it views as unfavorable, replace them with new versions, and destroy the original versions, so that someone who later wanted to find out what happened would get a distorted picture; and (3) it would be improper for a corporation to retrieve documents from discovery in a completed case and destroy them while they are subject to document requests in other cases, while representing in the other cases that such documents do not exist.

52.  The record reveals that State Farm violated all three of these principles on multiple occasions, in an obvious effort to evade liability for bad-faith claim handling, as summarized by two experts called by the Campbells familiar with State Farm's document management practices, Gary Fye and Steve Prater. Many documents that were critical to the Campbells' proof in this case were obtained not through discovery directed to State Farm, but through the fortuity that State Farm employees happened to retain them after leaving the company, or that Fye uncovered and retained copies during the 1970s and 1980s in the process of investigating the company's claim-handling practices, often as part of litigation against the company.

53.  One example of State Farm's document destruction efforts is noteworthy. It is undisputed that, in accordance with sound records management practices, on November 16, 1988, State Farm had at its corporate headquarters a special historical department that contained a copy of all past manuals on claim-handling practices and the dates on which each section of each manual was changed. Thus, State Farm had a "corporate memory" of its past

GARY T. FYE CO.
STATE FARM EXHIBITS
001671

28

manuals, including the manuals that applied to the claim against Curtis Campbell in 1981 through 1983, from which it could easily satisfy discovery requests with respect to such manuals). It is conceded by State Farm's own experts that given then-available and currently available compact storage mechanisms, all of this information could be stored in space the size of a desk, on microfilm, microfiche, or computer media.

54.   It is undisputed that, when the Campbells filed suit in 1989 and immediately filed document production requests for all claims-handling manuals in effect at the time the claims against Curtis Campbell were adjusted, none of this information was provided them. Instead, State Farm provided the Campbells only with copies of the subsequent, then-current manuals that were in its local Utah offices, asserting that its earlier manuals were no longer available.

55.   The record also reflects that, shortly thereafter — while this case and others alleging bad-faith claim handling remained pending and subject to outstanding discovery requests — State Farm launched elaborate efforts to destroy its existing corporate memory on its past claim-handling practices, with the explicit purpose of keeping them from discovery in bad-faith cases. Through documents retained by Samantha Bird when she left State Farm, as well as Ms. Bird's own testimony, it was established that on April 5, 1990, while this case was pending, Janet Cammack, an in-house attorney sent by top State Farm management, conducted a meeting here in Utah during which she instructed Utah claims management to search their offices and destroy a wide range of material of the sort that had proved damaging in bad-faith litigation in the past — in particular, old claim-handling manuals, memos, claim school notes,

29

procedure guides and other similar documents. These orders were followed even though least one meeting participant, Paul Short, was personally aware that these kinds of materi had been requested by the Campbells in this very case.

56.   In the meeting, Cammack stated that not even corporate headquarters would retain copy of these materials. Consistent with that evidence, State Farm concedes that it had destroy every single copy of the old claim-handling manuals that it had on file in its historical units 1988, even though these documents could have been maintained at minimal expense. In parallel effort, in 1995 State Farm sent letters to its more than 2,000 current or former outsi law firms directing them to destroy or return immediately every copy of a wide range potentially damaging documents. Further, Fye provided testimony regarding a number instances in which a plaintiff obtained access to State Farm documents subject to a protectiv order or confidentiality agreement; the cases were settled so that the documents did not becom public at trial; the documents were returned pursuant to the settlement agreement; and that when other plaintiffs requested these documents, State Farm responded that it did not hav them.

57.   As a final, related tactic to minimize the amount of information concerning its claim handling practices available to those scrutinizing the company, in recent years State Farm ha gone to extraordinary lengths to stop damaging documents from being created in the fir place. As Fye and Prater testified, State Farm takes a highly aberrant approach — inconsisten with the sound principles of corporate management and records control set out in the testimon

30

of State Farm's own expert — of keeping no records at all on excess verdicts in third-party cases, or on bad-faith claims made against State Farm or verdicts (including punitive damages verdicts) assessed against State Farm. (State Farm claims that it has no record of its punitive damage payments, even though such payments must be reported to the IRS and in some states may not be used to justify rate increases.) State Farm contends that it has in place no mechanism for even alerting top executives to such developments on a current basis. Indeed, regional vice president Buck Moskalski testified that he would not report a punitive damage verdict in this case to higher management, as such reporting was not set out as part of State Farm's management practices. This evidence strongly supports the inference that efforts by top executives to cultivate willful blindness to the effects of State Farm's corporate policies are consciously designed: (1) to deprive victims of State Farm's misconduct of information useful to proving a pattern or practice of wrongdoing, and (2) to give top management plausible deniability, making it easier for them to depict instances of wrongdoing as simply reflecting an isolated "honest mistake."

58.      c.   *Systematic manipulation of individual claim files to conceal claim mishandling.* The record also contains ample evidence that State Farm has long directed its claim adjusters to systematically "sanitize" or otherwise manipulate individual claim files to provide a false, innocent picture of how the claim was handled, in an effort to minimize exposure to later lawsuits alleging bad-faith claim handling. Fye and Prater provided numerous examples of this practice and pointed to official company documents [most of which State Farm

Farm once believed it had successfully destroyed] indicating that this practice reflects a long standing philosophy among State Farm management. Examples of this practice in action were also provided by Bruce Davis and Ina DeLong, who gave detailed testimony on how they were required systematically to improperly rewrite documents detailing and manipulating claim file and maintain important information on temporary "back slips" or "post-it" notes, to b removed later, and of how their superiors routinely engaged in successive "purges" of an negative information that might remain in a file, prior to it being handed over to opposin attorneys in discovery.

59.   A State Farm document entitled the "Excess Liability Handbook," written before th Campbell accident, contains detailed instructions on the padding and sanitizing of claim files i cases with exposure above the policy limits. Portions of this Handbook provide evidence supporting the conclusion that State Farm viewed the practice of taking a hard line as gambling in "excess cases" (when applied to many cases) as an effective method for reducing claim payments, thus enhancing corporate profits. This Handbook also contains evidence tha State Farm recognized the need to conceal that it was making conscious decisions to subject it insureds to the risk of excess verdicts. Accordingly, the Handbook has instructions on padding the file with "self-serving" documents, as well as instructions to leave certain critical items ou of files, such as evaluations of the insured's exposure. Such instructions clearly require manipulation of files to conceal State Farm's misconduct in excess cases and to make it ver difficult for an insured who is victimized by an excess verdict to ever hold State Farm

GARY T. FYE CO.
STATE FARM EXHIBITS
001672

31

32

accountable. Expert witness Fye testified that the Campbell case was a classic example of State Farm's application of the improper practices taught in the Excess Liability Handbook.

60. **d. Systematic manipulation of testimony by employees.** The record contains substantial evidence that State Farm has long had a corporate policy, in defending against cases alleging bad-faith claim handling, of aggressively "coaching" its employees to ensure that their testimony will be favorable to the company and that opposing attorneys will be hindered in their ability to obtain relevant, non-privileged information from such witnesses. The Campbells presented direct evidence of such a practice in the form of transcripts of videotapes of a company-wide claims management conference at which State Farm's claim-handling supervisors were told that they should anticipate being potential witnesses for the company in bad-faith litigation. The supervisors were taught that in courtrooms, "truth is illusory" how, through extensive coaching, a memory can be "erased" for a company witness; and how, by repeating questions and prepared answers "numerous times," State Farm attorneys and witnesses can work together to "totally frustrate" the efforts of opposing attorneys.

61. **e. Systematic efforts to intimidate opposing claimants, witnesses and attorneys.** Finally, the evidence in this case supports the conclusion that State Farm has a regular practice of working to wear down and outlast plaintiffs and opposing attorneys in lawsuits seeking to punish it for bad-faith claim handling, by using a variety of tactics to intimidate claimants, witnesses and attorneys who oppose it.

62. Regarding the intimidation of claimants, there is evidence in the record of State Farm's training of its representatives to intimidate claimants who charge it with bad-faith claim handling. State Farm's publication on "Extra Contractual Lawsuits," which was in use by 1979, instructs its outside attorneys to "ask personal questions" as part of an examination under oath of a claimant, for the apparent purpose of deterring the claimant from continuing with the process, out of a fear of embarrassment:

> Most of us consider our income, our debts, our domestic problems, how we spend our money, whether we are keeping another woman, and things of this nature to be very personal. We don't like other people asking us questions about these things, and, under normal circumstances, we don't go around asking other people these questions. However, . . . where a punitive damage count is in a lawsuit, these matters become extremely important to the successful defense of that claim.

> If the insured is paying the expenses of keeping some woman in an apartment, that may be extremely personal business, especially if he is married, but if he . . . charges that we are guilty of conduct for which we should be punished, it is also our business.

PX-121, "Extra Contractual Damage Claims: What They Are, and How to Handle Them," at 10-11. Although this document is nearly two decades old, Gary Fye testified in 1996, based on his current knowledge of State Farm's practices, that "this accurately represents the attitude toward [him] and others involved" with bad faith litigation against State Farm. 12 Tr. 69. State Farm's official training manual focuses on the use of such personal matters, in the settlement of all claims, from the beginning. It lists subjects such as "inficiity" that can be used against a claimant on a claim that is "under direct negotiation." Article 11 Claim Superintendent's Manual (April 1971), PX-57(2) Tab 9 Trial pages 382-384. Adjuster Roy

                                    33

Summers testified that a common tactic of State Farm was that of "unjustly attacking the character, reputation and credibility of a claimant and making notations to that effect in the claim file to create prejudice in the event the claim ever came before a jury." 12 Tr. 217. In fact, Bob Noxon sought to use this tactic in the Campbell case, instructing Summers to write in the file that Todd Ospital (who was killed in the accident) was speeding because he was on his way to see a pregnant girlfriend. There was no pregnant girlfriend. Expert testimony established that using such tactics as part of the insurance adjustment process is completely improper. See 12 Tr. 153 (Fraser).

63. State Farm uses similar tactics in an attempt to intimidate witnesses from opposing it in bad-faith litigation. Former long-term State Farm employee Ina DeLong has given testimony critical of State Farm in a number of cases, and testified that she has "personally been the subject of some of this kind of conduct by State Farm." 14 Tr. 116 and 207-08. State Farm has conducted an "extensive" investigation of DeLong's personal life, including her sex life (to the point of paying a maid at a hotel to reveal whether or not DeLong was having overnight guests), compiling an 88-page dossier on her. 14 Tr. 207-08. State Farm has assigned an attorney to "shadow" her in bad faith cases where she appears and to essentially harass her with unnecessarily repetitive depositions. 14 Tr. 214-15. DeLong testified:

> [They] frequently run from three to five days, where we go over the same things, the same allegations, the same unpleasantness. They're usually videoed, frequently with in excess of two or three flood lamps, for seven and eight hours at a time.

14 Tr. 214-15.

64. Gary Fye has experienced similar harassment at the hands of State Farm for his work over more than a decade to preserve copies of key documents on State Farm's internal practices. 12 Tr. 69-70.

65. Finally, with respect to the intimidation of attorneys who might be in a position to bring contingent-fee litigation against State Farm on behalf of victims who have few resources, the record reveals that State Farm has a practice of resorting to what one of its consultants (as part of the official training process) approvingly referred to as "mad dog defense tactics." At a national conference, approximately 200 of State Farm's divisional claims superintendents were instructed that "we keep plaintiffs tied up in law and motion for months. Now that's the ol' mad dog defense tactic, but it works." 17 Tr. 205. Expert witness Steve Prater testified at State Farm's methods for exploiting its superior resources to wear out opposing attorneys with unending, vexatious and expensive litigation tactics. According to Prater, State Farm focuses on making the litigation process as time-consuming, expensive and prolonged as possible by for example, making meritless objections; claiming false privileges; and destroying documents or claiming that they don't exist or would be too expensive to retrieve. 17 Tr. 163-64, 168-74.

66. The result of such tactics, Prater testified, was that many lawyers get worn down as capitalists, rather than continuing the litigation, so that it is extremely difficult to continue with the litigation long enough to develop a complete factual record and reach trial. Gary Fye also provided expert testimony on these "mad dog" litigation tactics, concluding that State Farm's

                                    34

                                    36

case of them is "extremely profitable," even in light of the cost involved for an individual case, because of their in terrorem value across a wide range of cases in intimidating claimants and attorneys not into filing lawsuits at all, or settling claims for small amounts of money rather than endure the financial drain of litigation in the face of such abusive tactics. 5 Tr. 114. (For example, by destroying or hiding the 1979 PP&R manual, State Farm has been able to keep any other court from considering this critical document. 12 Tr. 90-91 (Fye). Plaintiffs obtained it by subpoena from former State Farm employee John Crowe, who resides in Utah. It has been requested in other cases, but has never been produced. Id.) Indeed, Fye had never seen a case in which the plaintiffs' attorneys had managed to reach the advanced stage reached in this case. 12 Tr. 46.

67. iii. The impact of these profit and evasion schemes with respect to the Campbells specifically. The evidence established that prior to the 1981 accident involving Curtis Campbell, State Farm conceived and implemented the wrongful profit and evasion schemes described above. These schemes have permeated all aspects of its claim-handling practices, including its mistreatment of consumers on both third-party and first-party insurance claims. Fraud and deception are inherent parts of the success and profitability of these schemes. As these schemes were applied in the Campbells' case, State Farm was able to engage in a gamble in which the Campbells (unwittingly) had all the downside risk and State Farm had all the potential upside gain.

68. This case is a clear example of how State Farm applies its profit and evasion schemes. Nevertheless, State Farm has argued at length that the evidence about State Farm's unlawful profit schemes of giving undisclosed incentives to adjusters to underpay accounts owed to consumers on claims, and its related evasion scheme of using various unlawful and unethical tactics to escape any punishment for its profit scheme, is irrelevant to this case, and cannot be taken into account in setting punitive damages, because the Campbells assertedly were not injured as a result of these policies and practices. State Farm claims that, because (in hindsight) it seems foolish for Bill Brown and other managers in Utah not to have settled the litigation against Curtis Campbell, but instead to take it to trial, and because State Farm ultimately ended up paying out much more than the policy limits on that case, what happened to the Campbells cannot be viewed as part of any unlawful profit scheme being run by State Farm. The key contention for State Farm is that it did not, in fact, profit from what happened to the Campbells. In making these claims, State Farm ignores both the proper perspective on the PP&R program and specific evidence in the record.

69. The record fairly supports the conclusion that the bad-faith claim handling that exposed the Campbells to an excess verdict in 1983, and resulted in severe damages to them, was a product of the unlawful profit scheme that had been put in place by top management at State Farm years earlier. The Campbells presented substantial evidence showing how State Farm's improper insistence on claims-handling employees' reducing their claims payouts during the coming year, regardless of the merits of each claim, manifested itself under the PP&R program

<page 37/38>

in the Utah claims operations during the period when the decisions were made not to offer to settle the Campbell case for the $50,000 policy limits -- indeed, not to make any offer to settle at a lower amount. This evidence established that high-level managers Bill Brown was under heavy pressure from the PP&R scheme to control indemnity payouts during the time period in question. In particular, when Brown declined to pay the excess verdict against Curtis Campbell, or even post a bond, he had a special need to keep his year-end numbers down, since the State Farm incentive scheme meant that keeping those numbers down was important to helping Brown get a much-desired transfer to Colorado.

70. The Excess Liability Handbook (which Brown apparently kept in his office and used to train subordinates, as Samantha Bird's testimony indicated), contains evidence supporting the conclusion that State Farm viewed taking a hard line in "excess cases," both before and after trial, to be an effective method for reducing indemnity payments. There was ample evidence that the concepts taught in the Excess Liability Handbook, including the dishonest alteration and examination of claim files and the policy against posting any supersedeas bond for the full amount of an excess verdict, were dutifully carried out in this case.

71. Under the PP&R scheme, the actions taken by Brown and his subordinates with respect to the claims against Curtis Campbell appear to be textbook examples of the sort of behavior that is predictably rewarded by State Farm under the PP&R program. There was ample basis for the jury to find that everything that happened to the Campbells -- when State Farm repeatedly refused in bad-faith to settle for the $50,000 policy limits and went to trial, and then

72. State Farm's main response to the Campbells' explanation of how the Campbells' bad-faith claim handling was, in fact, an application of State Farm's unlawful profit scheme, is to call this an "irrational thesis," stating that it does not explain "why State Farm would adopt a corporate policy of wasting money by trying no-brainer cases." State Farm Sureply Brief at 28-29. Again, however, the essence of State Farm's claims-handling profit scheme was its disciplined insistence on having claims adjusters and employees work on a systematized basis to meet arbitrary, preset targets, one year at a time -- and then, if that strategy yields an occasional setback threatening to take money out of the corporate coffers (through a lawsuit alleging bad faith), relying on a panoply of techniques for bullying the complaining victim into backing down rather than doing to State Farm what apparently only the Campbells, in the history of bad-faith litigation against State Farm, have managed to do: get to a jury on a punitive damages claim, armed with a reasonably complete factual record concerning the nature of State Farm's unlawful policies and practices.

73. The fact that this PP&R scheme will, in isolated cases, sometimes cost State Farm money, compared with what would have happened in that isolated case if fair value had been promptly paid, is obvious but irrelevant for present purposes. The PP&R policy is crafted to increase corporate profits across a broad range of claims on a yearly basis. Pursuing a PP&R policy such as State Farm's can be perfectly rational, from a profit-maximizing perspective,

failed to pay the "excess" verdict, or at least post a bond, after trial -- was a direct application of State Farm's overall profit scheme, operating through Brown and others.

even at the price of an occasional setback. State Farm's complaints about the "bizarreness" of the Campbells' argument, see State Farm Reply Br. at 28 n.13, if accepted, would logically entail, for example, the conclusion that any investment strategy that doesn't invariably make one's stock or bond portfolio go up in value on every investment is "irrational" or "bizarre." That perspective makes no sense. What happened to the Campbells was just one more casualty of State Farm's overall approach toward claim handling, so that State Farm's argument on this point is without merit.

74.     State Farm also suggests, much more briefly, that the evidence concerning State Farm's evasion tactics also has little or nothing to do with the Campbells or with the proper amount of punitive damages in this case. Apart from the fact that consideration of this evidence, which goes to State Farm's perception of the likelihood that it would ever be punished for its wrongdoing, is essential in considering the proper amount of punishment to be assessed in the rare case that emerges and goes to trial (as set forth in the Campbells' memoranda and below), the record also shows that a variety of evasion tactics were used by State Farm, through Summers, Brown, Nokes and others, in an effort to conceal its wrongdoing toward the Campbells and evade any punishment in connection with that wrongdoing.

75.     Given all this, the Campbells' institutional case, outlining the broader corporate policies that produced both the injuries that the Campbells suffered and the efforts of State Farm employees to minimize the possibility of punishment, was properly considered in setting the appropriate amount of punitive damages.

41

76.     iv.  Other findings regarding the nature of State Farm's misconduct.  The Court listened to the evidence and carefully evaluated the credibility of the witnesses called by both sides, and believes that the jury reasonably concluded from the evidence that the above-summarized policies and practices do in fact exist at State Farm, and were in fact responsible for the injuries suffered by the Campbells. Further, the Court believes from the evidence that these policies have been followed at State Farm for the past two decades and that the means used to implement the policies are highly reprehensible. Those means certainly qualify under many of the factors referred to in BMW v. Gore as being egregious — they are callous, clandestine, fraudulent, and dishonest.

77.     Beyond the fact that State Farm's misconduct bears the characteristics of especially reprehensible behavior set out in Gore, it is the sort of misconduct that the Utah Supreme Court condemned in Crookston. There, the Court noted that "[f]rom the evidence presented at trial, the court could reasonably conclude that Fire Insurance conducted what amounted to a conscious policy of fraudulently denying its consumers the benefits of their contracts." Crookston II, 860 P.2d at 941. In this case, unlike in Crookston, the jury was presented with direct evidence, in the form of internal company documents, admissions from a number of current or former employees, and expert witnesses, from which it could reasonably find that precisely such a scheme has been pursued, and over a lengthy period of time.

78.     Further, Crookston continued:

42

It could be inferred that Fire Insurance's motive for engaging in such conduct was to substantially increase its profits. Depriving a company of the benefits of such a course of conduct and deterring it from acting in this fashion in the future may warrant an award of punitive damages that far exceeds the ratios that we have previously found reasonable. If a company could predict that its systematic fraudulent conduct would create detection in many instances and on those few occasions where it was discovered, would never result in punitive damages greater than the ratios we have historically upheld, it could carefully calculate the cost/benefit ratio of its wrongful conduct and avoid the deterrent potential of punitive damages. Frustrating this sort of calculus was one of the reasons we gave in Crookston I against adopting rigid dollar amounts or ratio ceilings on punitive damage awards.

Id. at 941 (citing Crookston I, 817 P.2d at 809).  This analysis fully applies here.

79.     Earlier in the opinion, the Court approved of certain analysis of the trial judge in Crookston that also seems highly pertinent here:

The [trial] court stated that the conduct at issue was done with the sole apparent purpose of enabling the insurance company to avoid paying out sums legitimately owed to the Crookstons.  This conduct, the court said, demonstrated the company's "calculated and calloused attitude" toward settling valid claims. . . .  Given the large volume of claims handled annually, Fire Insurance's vast financial resources, and management's active endorsement of the fraudulent conduct, the court deduced that this sort of practice would be widely engaged in unless devastatingly punished. "One may never know how many of the thousands of claims handled in Utah and elsewhere by Fire Insurance have been subjected to the same kind of fraudulent manipulation as occurred in this case . . . ."

Id. (quoting trial judge decision).

80.     The evidence on the scale of the fraud, and the need for devastating punishments, is far more extensive in this case than in Crookston.  State Farm has sold as its product "peace of mind," using an advertising slogan which promises that consumers can count on it to act "like

43

a good neighbor."  But as the trial proceeded, it became a matter of plain evidence that State Farm's corporate policies involve betraying the trust that it invites its policyholders to place in it, the trust that it has a fiduciary duty to uphold. The jury could easily find from the evidence that State Farm's claim-handling practices are predicated on exploiting the trust placed in it by its policyholders, and the Court so finds in making its own analysis of the proper amount of punitive damages in this case. In sum, in light of all the above considerations and the other points made by the Campbells in their memoranda and oral argument, the reprehensibility of State Farm's policies and practices, both generally and as they were applied to the Campbells, strongly supports a jury award of massive punitive damages.

c.      Facts and Circumstances Surrounding State Farm's Misconduct

81.     As to this factor, the Court simply refers to the facts that the Court has already commented on in determining the proper amount of compensatory damages for the Campbells, and the facts just discussed concerning the reprehensibility of State Farm's corporate policies designed to betray the trust placed in it by its policyholders and evade punishment for that wrongdoing. The Court believes that those facts speak for themselves with respect to the type of insensitive and callous behavior exhibited by State Farm toward consumers, clearly justifying a large punitive damages award.

d.      Effect of State Farm's Misconduct on the Lives of the Campbells and Others

GARY T. FYE CO.
STATE FARM EXHIBITS
001675

44

82.    The Court has already dealt in other orders with the effects of State Farm's misconduct on the Campbells. As to the lives of others, it seems to the Court, as the Campbells have detailed at length, that the very nature of State Farm's policies, and the tactics it uses to evade the imposition of punitive damages, make its misconduct extremely hard to detect and punish. The Court shares the view that the evidence demonstrates, as argued by the Campbells' counsel, that often the harm is minor to the individual but massive in the aggregate. The scheme, it seems to the Court, is pernicious. Not only does it injure large numbers of insureds, but it has the effect of corrupting employees (not that any employee wrongfully adjusts every claim, or that every employee wrongfully adjusts claims on a regular basis). It appears to the Court that under State Farm's scheme, a considerable percentage of policyholders is victimized by a wrongful denial of benefits, oftentimes when these policyholders are the most vulnerable. And it certainly appears to the Court that State Farm pursues an official corporate policy established to encourage such wrongful denial of benefits in situations where State Farm believes that it can be successfully accomplished.

83.    Another effect of State Farm's policies is that it puts non insurance companies who play by the rules at a competitive disadvantage, allowing State Farm to increase its market share or its profits (whichever it is putting the emphasis on), or a combination of both, by having an advantage that honest companies don't have: the shortchanging of policyholders on claim amounts that should be paid. As the Campbells demonstrated with expert testimony, this inevitably creates pressure on the honest companies to resort to the same sort of misconduct in

45

against any personal exposure, so long as an offer has been made to settle within the policy limits and so long as the insured cooperates in the defense of the case). But it is worth noting that other than Moskalski's self-serving testimony there was no evidence presented to the jury that either Moskalski or corporate headquarters has promulgated such a policy. There was no evidence that Mr. Moskalski did anything in writing, or in consultation with business lawyers. As the Court understands it, Mr. Moskalski was in the office of trial counsel preparing for his trial testimony and it was at that point, not long before the jury was to decide punitive damages, that Mr. Moskalski experienced a moment of enlightenment and, he testified, decided to adopt this new policy. That was the time and place when this change assertedly came into existence.

86.    The Court does not find it surprising that the jury apparently was not particularly persuaded that this repentance was genuine. And to suggest that it was a "deathbed repentance," as did the Campbells' counsel in closing argument, seems if anything an understatement of the circumstances concerning this purported change. This testimony is just one example of the implausible nature of much of the testimony elicited from State Farm's employees in this case. State Farm's unrepentant attitude was evidenced throughout the trial, during which witness after witness testified to being "proud" of how State Farm had handled the claims against Curtis Campbell, and refused to admit any flaws, ever, of any kind in any of State Farm's past or present claim-handling policies — or that even a single claimant had ever been treated unfairly during State Farm's entire existence — despite the documentation to the

47

an attempt to stay even with State Farm, extending the damage to consumers throughout the auto insurance marketplace as a whole.

    e.    Probability of Future Recurrence of State Farm's Misconduct

84.    The Court has already found that State Farm has carried out a persistent scheme of wrongful conduct. It would appear to have been extremely profitable, as the Campbells' experts on the insurance industry testified, and as various examples of the scheme in practice strongly support. Further, despite testimony from State Farm witnesses that the improper payout goals at the core of the scheme was assertedly "obsoleted" in 1992 (and again in 1994), the Campbells presented ample evidence that this incentive system (including its integrated goals) — the engine that pressures adjusters to wrongfully deny benefits to consumers on a wide range of claims — remains in operation today. Only the documentation has changed, for appearances sake; as the Campbells proved with both internal company documents and through testimony of knowledgeable witnesses, the scheme is now carried out verbally, to avoid the creation of documents that might be damaging to the company in litigation.

85.    To be sure, there was testimony from regional vice president Moskalski during Phase II that he had ordered employees in Utah and the two other States he oversees to start sending "peace of mind" letters to consumers in third-party liability situations like the one faced by the Campbells (i.e., letters to his insureds who have been sued in a third-party action, informing them that if State Farm decides to take the case to trial, State Farm will protect the insurer

46

contrary drawn from State Farm's own files. Given the absence of credible evidence that, in fact, State Farm's policies have changed, and that the misconduct carried out toward Utah consumers during the past two decades has ended, the probability of recurrence of State Farm's misconduct appears extremely high.

    f.    Relationship of the Parties

87.    The relationship of the parties, is fiduciary in nature. As noted in the Utah Court of Appeals decision in this case:

    This higher duty is imposed on the insurer because in a third-party situation, the insurer "controls the disposition of the claims against its insured, who relinquishes any right to negotiate on his own behalf." The insured is then "wholly dependent" on the insurer to see that the insured's interests are protected. . . . The insurance contract thus "creates a fiduciary relationship because of the trust and reliance placed in the insurer by the insured."

Campbell v. State Farm, 840 P.2d 130, 138 (Utah App. 1992).

88.    Indeed, State Farm spends large sums each year advertising the "peace of mind" that it promises its customers, so there is little credibility to the claim that customers should not be expected to rely on a company such as State Farm to fairly carry out its fiduciary duties and to resist the temptation to betray insureds in the pursuit of easy profits. As late Chief Justice (then Judge) Burger recognized many years ago, "[p]unitive damages are particularly apt" where the trust put in a fiduciary "is intentionally and consciously disregarded, and exploited for unwarranted gain." Brown v. Coates, 253 F.2d 36, 40 (D.C. Cir. 1958). That trust was plainly abused in this case, and was abused pursuant to what the Court believes was a

GARY T. FYE CO.
STATE FARM EXHIBITS
001676

48

conscious policy to do so on a regular basis to a wide range of insureds. In the Court's mind, this is another very substantial basis supporting the jury's award of punitive damages.

       **2.   Amount of Actual Damages Awarded**

89.    The Court is of the opinion that it should issue a remittitur reducing the amount of punitive damages to \$25 million on the basis of the seventh and final *Crookston* factor, "the amount of actual damages awarded," *Crookston I*, 817 P.2d at 808, which the Utah Supreme Court has held triggers certain presumptions based on the ratio between the punitive damages and actual damages. *Id.* at 810-12.

90.    As the Court has indicated, the ratio factor is the sole reason for the remittitur.

91.    As with the compensatory damages award, as remitted, post-judgment interest should run on this remitted punitive damages award from the date of the original judgment, August 8, 1996.

92.    The Court acknowledges that the denominator of this 25-to-1 ratio -- the \$1 million in compensatory damages, as remitted by this Court and accepted by the plaintiffs -- may be viewed as artificially low in that it does not capture the full amount of harm done to the Campbells as a result of State Farm's misconduct. For example, as a result of State Farm's bad-faith failure promptly to settle the claims against Curtis Campbell for the \$50,000 policy limits, the judgment against Curtis Campbell following the exhaustion of all appeals in 1989, was \$264,287. Arguably, at least that amount should be added to the denominator in the

calculation of the punitive/compensatory ratio. Any contrary approach, it could be argued, would leave a defendant free to engage in a course of intentional wrongdoing for years, pay up the compensatory damages just before trial, and by that means avoid the imposition of punitive damages assessed in proportion to the total history of wrongdoing. If this argument were adopted, the remitted \$25 million punitive damages award would bear a ratio of approximately 19.8 to 1 (\$25 million divided by \$1,264,287).

       **3.   Analysis Under BMW v. Gore**

93.    The framework set forth in *BMW of North America, Inc., v. Gore*, 116 S. Ct. 1589 (1996), for assessing federal substantive due process calls for analysis of three "guideposts": (1) the degree of reprehensibility of the defendant's conduct, 116 S. Ct. at 1599; (2) the ratio of punitive to actual damages, *id.* at 1601; and (3) the civil and criminal penalties that could be imposed for comparable misconduct. *Id.* at 1603.

94.    With respect to reprehensibility, as already discussed, State Farm's high-level corporate scheme implicates virtually all the hallmarks of reprehensibility noted in *Gore* and must be regarded as deeply reprehensible.

95.    With respect to the punitive/compensatory ratio, the U.S. Supreme Court has indicated that, for purposes of federal constitutional analysis, the ratio between punitive and compensatory damages does not impose a rigid cap on punitive damages awards, and that large

49

50

ratios are acceptable if a rational explanation for a given award exists. Thus in *Gore*, the Court went out of its way to reject any "categorical approach" -- any "notice that the constitutional line is marked by a simple mathematical formula," *id.* at 1602. The Court added that high ratios may be justifiable "in cases in which the injury is hard to detect," while recognizing that ratios in range of 500 to 1 should understandably trigger closer judicial scrutiny. *Id.* at 1602-03. Because at least several independent rational explanations exist in support of the punitive damage award in this case, *Gore's* ratio guidepost does not require reduction of the award based on a federal substantive due process analysis.

96.    The final *Gore* guidepost, "the civil or criminal penalties that could be imposed for comparable misconduct," 116 S. Ct. at 1603 (emphasis added), does not require reduction of the punitive damage award. The penalties that could be imposed under Utah law for the fraudulent scheme that has been pursued by State Farm are enormous. Under the Unfair Claims Practices Act, Utah Code Ann. §§ 31A-26-301, *et seq.*, State Farm could be fined \$10,000 for each fraud committed on a Utah consumer.

97.    Even more fundamentally, looking beyond the cumulative statutory fines that could be imposed in Utah based on thousands of individual instances of wrongfully denying benefits owed on claims, much greater penalties could be imposed based on the evidence of State Farm's broad pattern of consumer fraud in Utah: (1) State Farm's operations in Utah could be dissolved, or its license to operate suspended, *see* Utah Code Ann. §§ 31A-26-213, 76-3-201(2) & (3), 76-10-1602(ppp), and 76-10-1603.5(5); (2) State Farm's officers responsible for

the fraudulent scheme could be imprisoned, or at least removed for up to five years, *see* Utah Code Ann. § 76-3-303 (*Gore* noted that it is especially important, in considering comparable penalties, whether imprisonment is authorized in the criminal context); (3) State Farm could be forced to disgorge all the illicit profits from the entire scheme, plus be fined twice those illicit profits as a penalty, *see* Utah Code Ann. §§ 76-10-1602, *et seq.*; and (4) State Farm could be forced to publicize the fact that it and/or its officers had been criminally convicted of fraud, *see* Utah Code Ann. § 76-3-303, with obviously devastating effects on its business nationwide.

98.    Certainly, the Court does not believe that the statutory and regulatory sanctions that could be brought against State Farm under Utah law are minimal, nor does the fact that these sanctions have to date not been pursued by the regulatory and prosecutorial authorities support the claim that the remitted amount of punitive damages is excessive. State Farm places considerable emphasis on the argument that the analysis should concern not the civil and criminal penalties that it *could* be subjected to under existing Utah law, but instead what penalties are *likely* as a practical matter, given past enforcement practices. But in *Gore*, the Supreme Court plainly indicated that the focus, in terms of assessing whether a wrongdoer has adequate prior notice of the scale of penalty that a given course of misconduct could trigger, is properly directed to "the civil or criminal penalties that *could* be imposed for comparable misconduct." 116 S. Ct. at 1603 (emphasis added). For example, the U.S. Court of Appeals for the D.C. Circuit recently applied this aspect of *Gore* in upholding against a federal

GARY T. FYE CO.
STATE FARM EXHIBITS
001677

51

52

exhaustively attack a $37 million penalty assessed against a person who, for many years, had failed to disclose information about the control of a bank that was required to be disclosed under federal banking laws. Pharaon v. Board of Governors of the Federal Reserve, 135 F.3d 148, 156 (D.C. Cir. 1998), petition for cert. filed, July 15, 1998. The D.C. Circuit relied on the penalty that theoretically could be assessed under the relevant statute (12 U.S.C. § 1847(b)) — $299 days of noncdisclosure, at $25,000 per day for most of the period, and $1,000 a day for the remainder of the period, for a total of $111.5 million — without any showing that such maximum penalties had ever been assessed in the past, and without any contemporaneous explanation of why the regulators had picked the particular sum of $37 million as a penalty. Id. at 151-52, 156-57. If anything, the absence of any such aid from these authorities is a basis for enlarging the permissible punitive damages because of the seriousness and difficulty of parties such as the Campbells and their counsel, unassisted, taking a case of this nature all the way to trial. It requires the will of a David against a Goliath, or of a Rocky Balboa against an Apollo Creed, to stay the course and bring litigation such as this to the point where it rests today.

### D. Motion for New Trial Based on Claim of "Passion or Prejudice"

99.    State Farm's final argument on punitive damages is that, if this Court concludes that the jury's $145 million award is excessive, it must grant a new trial, as the excessiveness of the verdict can only be explained as the product of a flawed trial process that created an

53

atmosphere of passion and prejudice.  As part of this argument, State Farm points to several statements by the Campbells' counsel in closing argument (never objected to), which State Farm asserts inflamed the jury into disregarding its fact-finding function, and it suggests that the jury was not serious in its deliberations. Here, State Farm also references its objections to the jury's post-trial conduct. See State Farm Opening Memorandum at 112-17.

100.    As already indicated by this Court in separately filed orders, there is no basis for such claims. This was a well-educated jury that was extraordinarily attentive during the trial and that discharged its duty with the utmost seriousness. The jurors sacrificed most of their summer plans, and suffered through considerable delays beyond the planned trial period, serving without complaint over a two-month period. The Campbells' counsel, while providing vigorous representation of their clients — matched equally by competent and dedicated counsel for State Farm — made no effort to inflame the jury. The trial was pervaded by an overall atmosphere of fairness, with a focus on the evidence relevant to the issues rather than on appeals to emotion.

101.    The fairness of the proceedings is confirmed by the fact that State Farm's highly competent trial counsel never saw no need to raise the present objections on the competence of the Campbells' counsel while the trial was in progress.  There is every indication that the jury deliberated carefully, as illustrated by its three separate requests to examine various pieces of evidence in the case; there is no evidence that the jury was in any way careless in the discharge of its duties.  Further, the Court has issued a remittitur reducing the punitive damages award

54

by roughly 80 percent not because of any flaw in the jury or the trial process, and not because the jury's verdict was irrational or rendered based on the evidence that the jury considered, but based on the ratio factor of Crookston, in light of which the Court concludes that a 25-to-1 ratio is appropriate.

## II.    STATE FARM'S CLAIM OF ERROR ON THE SCOPE OF EVIDENCE

102.    As part of its post-trial motions, State Farm takes the position that the evidence should have been narrowly limited to its specific treatment of the Campbells and that the wide range of evidence tending to establish that the mistreatment of the Campbells was part of a broader scheme — the evidence on State Farm's general practices, policies or patterns (including specific illustrative or corroborative examples) — should have been excluded.  Because the foregoing summary of the evidence justifying the punitive damages necessarily required an extensive discussion of the types of evidence that State Farm contends should have been excluded, the Court believes that this is an appropriate place to address State Farm's claim of error with respect to this Court's rulings concerning the scope of Phase II evidence.

### A.    State Farm's Position Misconstrues the Rules of Evidence

103.    Rule 402 provides that "all relevant evidence is admissible, unless it is excluded by a specific rule or law."  Rule 401 gives a very broad definition of relevant evidence:

> "Relevant evidence" means any evidence having a tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.

55

The evidence admitted at trial concerning State Farm's improper claims-handling schemes – its improper practices, policies and patterns, including specific corroborative examples -- clearly meets the threshold standard for admissibility set by Rules 401 and 402.  As supported by Edward L. Kimball and Ronald N. Boyce in Utah Evidence Law § 4-2 (1996), the application of Rules 401 and 402 here involves simple logic.  Phase II of the trial (which followed findings of bad faith against State Farm by the jury in Phase I) involved the Campbells' claims of fraud, intentional infliction of emotional distress, punitive damages, and agency issues, along with State Farm's central assertion that the mistreatment of the Campbells was unintentional and simply the result of honest mistakes.  Phase II involved, in particular, State Farm's insistence that it had no motive to decline a reasonable opportunity to settle the claims against Mr. Campbell or to intentionally mislead the Campbells concerning their excess exposure (to get them to acquiesce in State Farm's decision to gamble on a trial).  State Farm contended, among other things, that it had no motivation to act contrary to the Campbells' best interests, and that the testimony of its former employee Ray Summers was not credible because State Farm had no motivation to act as Summers contended it had.

104.    In order to prevail in Phase I of the trial, concerning the threshold issue of bad-faith claim handling, the Campbells did not have to prove intent, motive, absence of mistake, or the like.  These subjects, however, were critical to Phase II of the trial, on the Campbells' claims of fraud, intentional infliction of emotional damages, punitive damages, and agency.

56

GARY T. FYE CO.
STATE FARM EXHIBITS
001678

Furthermore, as discussed in detail under Part I above, such evidence bears directly on several of the seven factors that the Crookston decisions require be considered in the assessment of punitive damages.

105.    Accordingly, it was apparent to this Court in making its pretrial decisions concerning the admissibility of the so-called "other acts" evidence that the jury's consideration of this evidence in Phase II was not only necessary, but essential and strongly probative of several material issues lying at the heart of this controversy. The evidence in question met the Rule 401 and 402 relevancy standards, making it admissible unless excluded by another provision of law. State Farm claims that Rule 404(b) required exclusion.

106.    Rule 404(b) provides:

> (1) Other crimes, wrongs or acts. Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. (emphasis added)

107.    Inasmuch as the evidence in question was neither offered nor admitted for a prohibited purpose, but solely for proper "other purposes" expressly recognized by Rule 404(b), the Court finds, as it has in the past, that Rule 404(b) did not require the exclusion of such evidence. (As noted in State v. Doporto, 935 P.2d 484, 490 n.4 (Utah 1997), the "other purposes" categories listed in the last sentence of Rule 404(b) are not exclusive. See also Utah Evidence Law, supra, § 4-41.)

57

108.    In its Rule 404(b) argument, State Farm urges that the only evidence that was properly admissible in Phase II was evidence relating to the details of how the Campbell file was handled. Thus, State Farm insists, any broader evidence pointing to fault in its institutional claim-handling policies can only be viewed as evidence of "bad character," inviting the very sort of inference prohibited by Rule 404(b). Specifically, State Farm complains, "plaintiffs' trial counsel . . . invited the jury to draw from this evidence precisely that inference that Rule 404(b) forbids — that State Farm must have committed an act of bad faith in the present case because it has done so in so many other cases." State Farm Reply Memorandum at 27-28. In a related point, State Farm argues that the danger that this so-called "other acts" evidence would unfairly influence the jury's determination of bad faith was so great as to violate Rule 403, thus requiring a new trial on this ground as well. See State Farm Opening Memorandum, at 56-58.

109.    The central problem with these arguments is that the question of whether State Farm acted in bad faith was decided by the first jury, months before Phase II of this trial. As set forth in jury instruction No. 25 of Phase II, without objection from State Farm:

> You are instructed that a previous jury in this case has found that a substantial likelihood exists that excess verdicts in favor of Slusher and the Ospitals would be rendered against Curtis Campbell in the Cache County case, and that State Farm acted unreasonably in not settling both of these claims against Mr. Campbell before the Cache County verdicts. This means that State Farm breached its duties of good faith and fair dealing and its fiduciary duty to Campbells to settle the claims against Curtis Campbell within the policy limits.

58

110.    Given State Farm's success in getting a bifurcated trial, and given the jury's finding of bad faith in the Phase I proceeding in which the Campbells were not permitted to introduce any institutional evidence on its claim-handling procedures, there is simply no basis for State Farm's present Rule 404(b) objection that in Phase II of the trial, "plaintiffs' trial counsel . . . invited the jury to draw from this [other acts] evidence precisely the inference that Rule 404(b) forbids — that State Farm must have committed an act of bad faith in the present case because it had done so in so many other cases." State Farm Reply Memorandum at 27-28. Such an inference was logically impossible in Phase II, as the parties stipulated in the jury (in instruction No. 25) that State Farm's breach of good faith duties had already been established in Phase I.

111.    Thus, State Farm's success in achieving bifurcation of the threshold bad faith issues from the institutional case is itself sufficient to dispose of State Farm's present arguments. However, other major points are also worth adding in putting to rest State Farm's contention that it was treated unfairly by this Court's evidentiary rulings.

**B.    State Farm Sought Bifurcation on the Premise That Phase II Would Involve a Broad Scope of Institutional Evidence**

112.    Although bifurcated trials are the exception, as State Farm's insistence and over the strenuous objections of the Campbells, the Court allowed the bifurcation order of the prior judge, Judge Rokich, to stand, requiring the Campbells' claims to be tried in a bifurcated

proceeding to separate juries. State Farm designed the bifurcation, getting precisely what it asked for in terms of what would be covered in Phase I, and what would be reserved for Phase II. Although the Court recognized that it was excluding evidence relevant to the Phase I issues, it narrowly restricted the proof to the evidence of State Farm's treatment of the Campbells, with no consideration of State Farm's general claim-handling procedures, and the Campbells were required to establish State Farm's breach of good-faith duties under these heavy evidentiary restrictions.

113.    From the Court's earliest involvement with this case, it understood that the purpose of Judge Rokich's bifurcation order was to separate the so-called "bad-faith phase" (Phase I) from what the parties termed the "institutional phase" of this trial (Phase II). Strenuously opposing bifurcation, the Campbells repeatedly urged this Court to reconsider Judge Rokich's decision. State Farm prevailed in its bifurcation arguments largely by pointing out that Phase II, covering the institutional evidence, would involve a very lengthy trial, as it would deal with State Farm's corporate policies and practices — so that bifurcation would save substantial resources in the event that the jury found no bad-faith claim handling. Thus, State Farm was fully aware, when it successfully urged this Court to retain the bifurcated trial plan and keep the threshold bad-faith issues separate from the complex institutional issues, that the Campbells' institutional case would be relevant to the issues to be decided in Phase II, if the jury returned a verdict for the Campbells in Phase I. The importance and necessity of the evidence introduced by the Campbells in their Phase II institutional case was well understood throughout

60

GARY T. FYE CO.
STATE FARM EXHIBITS
001679

59

this case. There is simply no basis for any claim of prejudice or unfairness by State Farm, and it was necessary to admit such evidence in order to afford the Campbells a full and fair opportunity to litigate their claims under applicable law.

#### C. The Institutional Evidence Was Necessary to Explore Why State Farm Would Mistreat the Campbells

114.    The central issue in Phase II, as this Court understood it from the beginning, was the question of why did State Farm do what it did to the Campbells — why it committed the bad-faith claims handling that led to the excess verdict that presented the Campbells with the possibility of financial ruin and all the attendant consequences. The possible answers were: (1) it was inexplicable, there is simply no explanation; (2) it was a foolish or honest mistake; or (3) it was a result of two corporate policies, one to encourage or enforce a requirement that State Farm's claims handling be improperly used to enhance corporate profits, and second to conceal this profitable policy to evade legal and regulatory accountability for it.

115.    Stated simply and in short form, that third possibility was the plaintiffs' institutional case, the record evidence in support of which is detailed at length in the Campbells' Statement of Facts and Memorandum Regarding Punitive Damage Issues at 12-143, and in their Surreply Memorandum at 13-41, and which the Court has summarized in Part I, above. It would be fair to say that the Campbells' ability to articulate this third theory has improved, or perhaps the Court's understanding of what they have been saying all along has been clarified. But the

essence of the institutional case has been in this case as long as this judge has been assigned to it.

#### D. The Court Invested a Great Amount of Time Carefully Crafting Evidentiary Rulings That Were Fair to Both Sides

116.    In spite of the arguments that State Farm made in successfully obtaining bifurcation (urging deferral of the institutional case until Phase II), after the Campbells prevailed in Phase I, State Farm argued that little, if any, of the institutional evidence that had been contemplated for Phase II should be admitted. As a result, during the several months between Phase I and Phase II, a large number of motions in limine and other requests were made to the Court seeking pretrial resolution of evidentiary issues concerning the scope of Phase II. These matters were thoroughly and extensively briefed and argued in numerous hearings before this Court involving multiple motions in limine and several hearings. Shortly before Phase II began, the Court conducted four days of hearings addressing, inter alia, State Farm's arguments that the institutional case was inappropriate for consideration by the jury under Rules 404(b) and 403. The Court carefully considered and ruled on each of the numerous pending motions in limine. All told in this case, the Court conducted more than ten pretrial hearings involving evidentiary issues in whole or in part, consuming more than fifteen days.

117.    Contrary to State Farm's current assertions, the Court did not permit the Campbells boundless freedom in presenting their Phase II evidence. Substantial amounts of evidence that the Campbells strongly desired to present were excluded by the Court, while the use of much

of their other evidence was markedly restricted. At the conclusion of this extensive pretrial effort, the Court issued several detailed orders that established evidentiary parameters tightly controlling the range of proof that would be allowed the Campbells in establishing their claims. Even where the Court indicated its intent to receive general categories of evidence, State Farm retained its right to object to specific items of evidence when proffered at trial, as well as its right to contest admissibility under Rule 403 of specific items of evidence. See Order Denying Various Motions of State Farm to Exclude Plaintiffs' Evidence, filed May 28, 1996 (hereinafter "Rule 404(b) Order"), at 5, ¶ 9. The trial record reflects that State Farm exercised these rights on many occasions during the trial.

118.    The Court believes that its rulings, particularly its Rule 404(b) Order, were sound and stands by them and incorporates them by reference, to the extent not modified by later orders and not inconsistent with this order. In those orders, this Court found the Campbells' institutional case, involving evidence of State Farm's overall claims handling policies and practices, to be highly probative, indeed essential to numerous material issues before the jury including: (1) intent, (2) reckless disregard, (3) absence of mistake, (4) agency, (5) existence of outrageous conduct, (6) existence of a wrongful pattern or practice underlying State Farm's torts, and (7) reprehensibility of any such wrongful pattern or practice. See Rule 404(b) Order, at 2-3 ¶ 3 (evidence "necessary" for consideration of punitive damages, as factfinder "must" consider this evidence under Crookston); id. at 3 ¶ 4 (evidence "must" be admitted to permit plaintiffs to prove "each element of fraud"); id. at 3 ¶ 5 (evidence "must" be admitted to

permit plaintiffs to prove elements of State Farm's intent relevant to claim of intentional infliction of emotional distress); id. at 3 ¶ 6 (evidence "directly bears on" State Farm's defense "that Campbell consented to the trial of the underlying case" and that it "relied in good faith on Wendell Bennett's opinions"); id. at 4 ¶ 7 (finding that evidence "is helpful to overcome the disadvantage" to plaintiffs of the evidence destroyed by State Farm, and that plaintiffs "would be prejudiced" by exclusion of such evidence); id. at 4 ¶ 8 (concluding that, on balance, "the pattern and practice evidence is of high probative value and importance to plaintiffs' claims, and that serious prejudice to plaintiffs would result if such evidence were excluded. The court further finds that the probative value is not outweighed by the danger of unfair prejudice or confusion"). As discussed above, these grounds for admission clearly fit within the "other purposes" permitted under Rule 404(b).

119.    Having made those rulings, the Court allowed State Farm to aggressively cross-examine the Campbells' witnesses, to present evidence in its own defense from a wide array of experts testifying to the absence of such policies, and otherwise to attempt to establish the baselessness of the Campbells' institutional case. For their part, the Campbells argued that the bad-faith handling of the Campbell file was best explained as a consequence of institutional policies established long ago at State Farm to enhance corporate profits by pressuring and coercing claims adjusters systematically to deny policyholders their insurance benefits, and then to seek to evade accountability for that profit scheme through a wide range of illegal and unfair tactics

GARY T. FYE CO.
STATE FARM EXHIBITS
001680

61

62

63

64

The Campbells presented compelling evidence that supported this view, as already summarized.

120.    The Court believes that the institutional case was fully and fairly tried. Both sides had an ample opportunity to present their evidence on whether the Campbells' institutional explanation of what produced the injury to them was to be believed or not to be believed. And the Court is confident that the rulings it made allowing the Campbells' institutional evidence to come in were proper.

**E.    Much of The Evidence of Which State Farm Now Complains Was Admitted Because of State Farm's Strategy at Trial**

121.    It is worth emphasizing that, in permitting the Campbells to put on their institutional case, the Court tightly controlled the range of proof that would be allowed, limiting the Campbells in their case in chief to evidence directly relevant to the nature of the same company's claim-handling policies and practices. In support of State Farm's assertions that this Court presided over a "boundless inquisition into [its] business practices," State Farm Opening Memorandum at 32, and what amounted to a "kitchen-sink" approach to the case, State Farm Surreply Memorandum at 48, State Farm points to a variety of other evidence ultimately involved by the jury which considered broader aspects of State Farm's business practices. However, State Farm does not properly acknowledge that this evidence to which it now objects was admitted: (a) only as rebuttal or impeachment evidence (to attack the credibility of State Farm experts who purported to be extremely knowledgeable and would

65

certainly have been aware if State Farm was engaging in such practices); or (b) as a result of various evidentiary doors that were opened by State Farm during trial, that the Court has previously closed (in some instances State Farm proceeded to open such doors even after being explicitly warned by the Court during the trial that such would be the consequence); or (c) because State Farm's own counsel elected to admit the evidence; or (d) without objection by State Farm when the evidence was offered.

122.    With respect to the impeachment and rebuttal evidence in particular, the Court put State Farm on notice prior to the start of Phase II that this type of evidence would be permitted in response to the testimony of expert witnesses whom State Farm planned to call, and whom had been previously deposed. See Order Regarding Evidence of Other Cases, filed May 28, 1996 at 2-4. In spite of this ruling, State Farm chose to put on several insurance regulators whose level of knowledge of State Farm's business operation was extremely open to question.

123.    The testimony offered by one of these witnesses, Mr. Rogers (from State Farm's home state of Illinois) is illustrative. Mr. Rogers testified on direct examination that if State Farm were involved in any wrongful denial of insurance benefits or other unfair practices, it would "absolutely" have come to his attention, but that it had not — so that State Farm must have blameless corporate policies. He declared: "I find it incomprehensible to come to any other conclusion." 24 Tr. 52. He asserted that he routinely reviewed pending court cases against insurance companies, including State Farm, and testified that he knew of no bad-faith verdicts, punitive damage verdicts, or class actions (except a very old California one) against State

66

Farm. 24 Tr. 66-71. He further testified that he did not know of a single claimant who had ever been treated unfairly by State Farm. 24 Tr. 63. State Farm elicited similar testimony from other regulators, who testified that, having attended a number of national meetings with regulators from around the country and having spoken by telephone with regulators from all over the country, they were unaware of any concerns over State Farm's practices or of even a single claimant who had been treated unfairly. 24 Tr. 92; 25 Tr. 108; 30 Tr. 57.

124.    In advance of Phase II, the Campbells disclosed that they had uncovered a large number of cases from around the nation involving court decisions in which State Farm had been found guilty of deceptive practices, bad faith and/or liability for punitive damages, as well as a number of class actions challenging State Farm's claim-handling practices. Being fully aware of this, State Farm still chose to present testimony from Mr. Rogers and other regulators essentially claiming that, if there were any concerns over State Farm's practices, they would be aware of them — and that they were not aware of any such concerns. Mr. Rogers, the Illinois regulator, was confronted with two recent, highly publicized class actions from Illinois involving many thousands of people who claimed to have been mistreated by State Farm's claim-handling practices, where in State Farm had agreed to make payments to members of the class. A former Texas regulator was confronted with appellate decisions from Texas in which State Farm had been found liable for fraud, bad faith, deceptive trade practices and/or had been held liable for punitive damages. 25 Tr. 128-29. Other cases were also properly used to impeach and rebut the contentions of these and other witnesses.

125.    State Farm also relied on its employees as part of its defense to the Campbells' institutional case. State Farm's own regional vice president (the highest ranking official at State Farm to testify at trial), Buck Mosklaski, gave a glowing testimonial concerning the fairness of State Farm's claim-handling practices. He also testified that in his entire career he had learned of no insured or claimant who had ever been treated unfairly by State Farm. During discovery, he had been formally designated as a Rule 30(b)(6) witness to testify about State Farm's awareness. If any, of punitive damage awards, and he swore under oath (speaking on behalf of himself and State Farm) that he was not aware of any punitive damage awards or bad faith verdicts. Much as with the regulators, this witness was impeached with appellate decisions from Texas affirming punitive damage and bad faith verdicts, which involved State Farm's conduct during the same time he was deputy regional vice president in Texas, with responsibility for claim handling.

126.    Having been fairly forewarned, State Farm chose to present such witnesses, having been alerted in advance that this evidence would be met with a considerable body of impeachment and rebuttal evidence from the Campbells. The record will reflect that nevertheless, the Court restricted the manner in which impeachment evidence came in, and how it was used.

**F.    The Court's Rulings Are Not Contrary to The Doyoung Decision**

127.    In its attack on the Court's evidentiary rulings, State Farm places great emphasis on a criminal case involving a sex offender, State v. Doyoung, 395 P.2d 484 (Utah 1997). Doyoung

GARY T. FYE CO.
STATE FARM EXHIBITS
001681

67

68

does not bear the emphasis that State Farm suggests. Doporto has been clarified in a subsequent Utah Supreme Court case, State v. Pearson, 943 P.2d 1347 (Utah 1997). In Pearson, the Utah Supreme Court upheld an aggravated murder conviction against a Rule 404(b) objection, in spite of the trial court's admission of evidence of prior involvement with the Indiana police, including references to a drug sale. The Court found such evidence properly admitted as relevant to motive and intent. Further the Utah Supreme Court has recently approved an amendment to Rule 404, effective February 11, 1998, restating the law to its pre-Doporto status. The Court addresses the Doporto point to cover any possibility that this recent change might be held to operate purely prospectively, even with respect to trials (like this one) held before Doporto was handed down.

128.    The standard for admissibility set out in Doporto, assuming that it fully applies to this civil case (which seems doubtful), has easily been met here. The Doporto opinion indicates that the Court should first determine that the "other acts" evidence is actually necessary, i.e., "it cannot be used to prove a point not really contested." Id. at 491. Second, the evidence must be strongly probative of a material issue: "a probativeness that cannot serve as a ruse for showing that the defendant's propensity is such that he is likely to have committed the kind of crime charged." Id. Such findings were at the heart of this Court's pretrial rulings. For example, in the Rule 404(b) Order of May 28, 1996, the Court made the following finding, among others:

8. Acting upon State Farm's motion, this case was bifurcated, and plaintiffs' evidence in the first trial was substantially limited. Though the Wrongful Pattern and Practice Evidence was relevant to plaintiffs' claims of bad faith under Rule 602, Utah Rules of Evidence, at State Farm's request the Court excluded the evidence with the expectation that it would be considered in the second trial. This was the primary reason for bifurcating this case for trial. Even with this restriction of evidence (which primarily benefited State Farm), the jury in the first trial found against State Farm on all questions on the verdict. In light of this verdict, the Court finds that the pattern and practice evidence is of high probative value and importance to the plaintiffs' claims and that serious prejudice would result if such evidence were excluded. The Court further finds that the probative value is not outweighed by the danger of unfair prejudice or confusion.

129.    While the Court, obviously, did not have the Doporto decision (handed down after trial) in mind in making these findings, as a result of the extensive pretrial evidentiary proceedings, this Court's consideration of the Rule 404(b) issues more than met the Doporto standard. It was this Court's view, which has only been bolstered by witnessing the evidence at trial, that the so-called "other acts" evidence was not only necessary, but essential, to the several vigorously contested material issues discussed above. This evidence was plainly neither offered nor received for a purpose prohibited under Rule 404(b), nor as a ruse for such an improper purpose, but was strongly and highly probative of the several material issues central to the resolution of this controversy previously discussed. The Court finds that its rulings and findings in this case were wholly consistent with both the letter and the spirit of Doporto. This Court's careful pretrial weighing of evidentiary issues not only satisfied, but far exceeded, anything that Doporto might require.

### G.    Individual Rulings on Evidence Must be Viewed in the Full Context of the Case and Not in Isolation

130.    In one of its orders issued on May 28, 1996, just before Phase II of the trial, the Court made observations that merit repeating in connection with this Rule 404(b) analysis:

> [None] of the court's other orders relating to motions in limine and other evidentiary matters can properly be considered in isolation. During the course of this case, the court has been called upon to decide a large number of evidentiary issues. Various means have been used by the court and the parties to present and treat these matters including numerous motions in limine, numerous hearings (including some evidentiary hearings) and extensive briefing and oral argument.

                    * * * *

> A large number of evidentiary issues have been strenuously argued and resisted on both sides of this controversy, with the court having ruled both for and against each side on numerous occasions. In doing so, the court has spent many days carefully considering the issues, the equities and the interests of justice and fairness on both sides. The court has worked very hard to exercise its best judgment and discretion in ruling on very difficult and complex issues in balancing the various interests and considerations in having this case and the parties' claims and defenses presented fairly and even-handedly. In doing so, the court has kept in mind the "big picture" in this case, has been mindful of past rulings on evidentiary issues and past positions taken by the parties, so that the specific rulings on various evidentiary issues and other issues relating to trial of this matter fit within an overall approach consistent with fairness and equity.

> Accordingly, it would not be accurate or fair to view any evidentiary or other discretionary ruling of this court in isolation or in connection with a small number of other rulings. To accurately assess this order or any other evidentiary or trial related orders, such order should be viewed in connection with all of the other evidentiary or trial-related orders that have been issued by this court in this case. (See Order Excluding Testimonies of Ivie, Glauser and Thornley.)

131.    These observations are equally applicable to the rulings made during Phase II of the trial, and to this Court's post-trial rulings, as a general matter.

132.    This Court is satisfied, particularly with the added benefit of hindsight, that its evidentiary rulings were sound, that the case was fairly tried, and that State Farm's motion for a new trial based on its evidentiary rulings concerning the scope of the Phase II evidence should be denied.

### III.    CONCLUSION

133.    It is not feasible for the Court to set forth all of the extensive evidence in the case which supports the Court's findings, conclusions and order. The record is simply too large. The Court has attempted to describe the more significant evidence in summary form with only a partial description of the mass of specific evidence.

134.    Based on the foregoing findings and conclusions, the Court is satisfied that there was substantial evidence sufficient to support a jury finding of the requisite mental state and all other elements of a punitive damage award, as well as the amount of punitive damages awarded by the jury. Additionally, the Court has independently reviewed the punitive damage award in light of the evidence, and concludes that the award is justified under the first six factors of Crookston. However, based solely upon Crookston's ratio factor, as set forth above, the Court grants State Farm's motion for a remittitur of the punitive damage award

GARY T. FYE CO.
STATE FARM EXHIBITS
001682

down to an amount of $25,000,000.00. In the event that the Campbells had chosen not to accept the remittitur, the Court would alternatively have granted State Farm's motion for a new trial.

135.    The Court also rejects State Farm's argument with respect to the scope of the evidence admitted in Phase II for the reasons stated.

### ORDER

IT IS HEREBY ORDERED, ADJUDGED AND DECREED as follows:

1.    State Farm's motion for judgment n.o.v. on punitive damages is hereby denied.

2.    State Farm's motion for a remittitur regarding the punitive damages is granted. The principal amount of the judgment entered August 8, 1996, based on the punitive damages awarded jointly to Curtis and Inez Campbell, shall be remitted and reduced to $25 million, with post-judgment interest continuing to run on this amount from August 8, 1996.

3.    State Farm's motion for new trial based on punitive damages is hereby denied.

4.    State Farm's motion for new trial based on evidentiary rulings is hereby denied.

DATED this 3 day of August 1998.

BY THE COURT:

William B. Bohling
District Judge

I CERTIFY THAT THIS IS A TRUE COPY OF AN ORIGINAL DOCUMENT ON FILE IN THE THIRD DISTRICT COURT, SALT LAKE COUNTY, STATE OF UTAH.
DATE: 8/3/98
DEPUTY COURT CLERK

73

### CERTIFICATE OF SERVICE

I do hereby certify that a copy of the Court's Findings, Conclusions and Order Regarding Punitive Damages and Evidentiary Rulings was hand delivered to:

Stuart H. Schultz
STRONG & HANNI
9 Exchange Place, Suite 600
Salt Lake City, Utah 84111

on July 31, 1998
and was mailed, postage prepaid, addressed to

W. Scott Barrett
BARRETT DAINES & WYATT
108 North Main, #200
Logan, Utah 84321

this 3rd day of August, 1998.

74

GARY T. FYE CO.
STATE FARM EXHIBITS
001683

Campbell v. State Farm Mutual Auto Ins. Co., No. 981564, Filed October 19, 2001, 2001 ... Page 1 of 48

*This opinion is subject to revision before final
publication in the Pacific Reporter.*

IN THE SUPREME COURT OF THE STATE OF UTAH

----oo0oo----

Curtis B. Campbell and Inez
Preece Campbell,
Plaintiffs, Appellees,
and Cross-Appellants,

v.

State Farm Mutual Automobile
Insurance Company,
Defendant, Appellant,
and Cross-Appellee.

No. 981564

F I L E D
October 19, 2001

2001 UT 89
- - -

Third District, Salt Lake
The Honorable William B. Bohling

Attorneys:
L. Rich Humpherys, Roger P. Christensen, Karra J. Porter, Salt Lake City, Laurence
H. Tribe, Kenneth J. Chesebro, Cambridge, MA, W. Scott Barrett, Logan, for
plaintiffs
Glenn C. Hanni, Paul M. Belnap, Stuart H. Schultz, Salt Lake City, Evan M. Tager,
Adam C. Sloane, Washington DC, for defendant
George C. Harris, Salt Lake City, amici National Association of Independent
Insurers, National Association of Mutual Insurance Companies, United Services
Automobile Association, Farmers Group of Insurance Companies, SAFECO Insurance
Company of America.

- - -

DURHAM, Justice:

INTRODUCTION

¶1 On August 24, 1989, plaintiffs Curtis B. and Inez Preece Campbell, sued State
Farm Mutual Automobile Insurance Company for damages arising from State Farm's
decision to try a third-party automobile accident case in which Mr. Campbell was
the defendant, rather than accepting offers to settle for the policy limits of Mr.
Campbell's insurance policy. The jury found in plaintiffs' favor, awarding them
$911.25 in out-of-pocket costs, $2.6 million in compensatory damages, and $145

million in punitive damages. State Farm filed several post-verdict motions challenging the jury verdict, which the trial court rejected. As a condition of denying State Farm's motion for a new trial, however, the trial court remitted the compensatory damage award from $2.6 million to $1 million and the punitive damage award from $145 million to $25 million. The Campbells also received a judgment from the trial court for attorney fees and litigation expenses in the amount of $801,582.48. State Farm has appealed from the judgment and the Campbells have cross-appealed the trial court's remittitur ruling on punitive damages.

## BACKGROUND

¶2 On May 22, 1981, while driving north on Highway 89-91 near Logan, Utah, Mr. Campbell unsafely passed a car driven by Robert Slusher (Slusher).[11] Slusher, 777 P.2d at 438-39. This unsafe maneuver forced a southbound car, driven by Todd Ospital, to veer onto the shoulder of the road and collide with Slusher's car a split second later. Id. at 439. The accident killed Todd Ospital at the scene and left Slusher disabled. Id. Although the initial investigation of the accident supported differing conclusions as to who caused the accident, a consensus was reached early on by the investigators and witnesses that Mr. Campbell's unsafe pass had indeed caused the crash.

¶3 In September 1981, Slusher filed an action against Mr. Campbell, Ospital's estate (Ospital), and Kenneth Brooks (the owner of the car driven by Todd Ospital) for damages resulting from the collision. Slusher, 777 P.2d at 439. Ospital filed a cross-claim against Mr. Campbell for wrongful death. Id. Mr. Campbell cross-claimed against Ospital for contribution. Id.

¶4 During discovery, State Farm collected evidence that blamed Mr. Campbell for the accident. At various stages throughout discovery, including as late as a month before trial, Slusher and Ospital invited State Farm to settle for the policy limits of the Campbell policy.[2] On April 23, 1983, Ospital's counsel even sent a letter to State Farm stating that State Farm "should tender its limits" because "[a] limit of $25,000 is too low to risk excess exposure by exposing its insured to personal liability." This letter also stated that if State Farm continued to oppose settlement, Ospital would seek a separate agreement with Slusher that "may not likely be favorable to [Mr.] Campbell's interests." However, State Farm never departed from its original "no settlement" stance, continuing to reject offers made following the commencement of the trial.

¶5 In choosing not to settle, State Farm superintendent Bob Noxon (Noxon) and divisional superintendent Bill Brown (Brown) rejected a report of State Farm investigator Ray Summers (Summers) that stated there was evidence of fault on Mr. Campbell's part. In particular, Brown ordered Summers to change the portion of his report describing the facts of the accident and his analysis of liability "wherein [he] had indicated an exposure [for Mr. Campbell], and that there could be a high settlement value on it." Additionally, after hearing from Bill Brown, Noxon told Summers that Noxon had "screwed up" by agreeing with Summers' initial analysis regarding Mr. Campbell's fault and demanded that Summers return to Noxon the letter Noxon had written indicating his approval. Subsequently, State Farm discontinued Summers' involvement in the case. State Farm hired Wendell Bennett (Bennett), an attorney who had done a considerable amount of work for State Farm, to represent the Campbells.

¶6 In June 1983, Ospital's estate did in fact enter into a separate settlement agreement with Slusher. Ospital had $130,000 of combined liability insurance.[3] Under the settlement agreement, Ospital's estate paid Slusher $65,000 dollars and

the Ospitals promised to assist Slusher in prosecuting claims against Mr. Campbell and his insurer, State Farm. In exchange, Slusher released all claims he had against Ospital's estate. <u>Id.</u>

¶7 Shortly thereafter, the case against Mr. Campbell went to trial. The jury found Mr. Campbell 100% at fault for the accident and a judgment for $135,000 was entered. <u>Slusher</u>, 777 P.2d at 439. The jury also awarded Ospital damages in the amount of $50,849. In light of Bennett's numerous reassurances to both Mr. and Mrs. Campbell that their assets were safe, that they had no liability for the accident, that he would represent their interests, and that they did not need to procure separate counsel, the Campbells were utterly dismayed. To their expressions of dismay, Bennett responded by telling the Campbells that "[y]ou may want to put for sale signs on your property to get things moving," making it clear that State Farm did not intend to pay the excess judgment against the Campbells. Furthermore, State Farm declined to post a supersedeas bond on appeal in excess of their $25,000 policy limit. The Campbells immediately acquired other counsel and learned that their situation was indeed grave.

¶8 In late 1984, Slusher, Ospital, and Mr. Campbell entered into an agreement in which Mr. Campbell agreed that: (1) he would pursue a bad faith action against State Farm; (2) Ospital's and Slusher's attorneys would represent him in that action; (3) Slusher and Ospital would have the right to be part of all major decisions relating to that action; (4) no settlement of any claim against State Farm could be made without Slusher's and Ospital's approval; and (5) in the event Mr. Campbell recovered any monies, Ospital and Slusher would receive 90% of the sum remaining after certain agreed-upon obligations were paid. In exchange, Slusher and Ospital agreed to not seek satisfaction of their judgment from Mr. Campbell and to inform anyone checking on Mr. Campbell's credit that their judgments were not personal obligations. <u>Id.</u>

¶9 In 1989, this court affirmed the 1983 verdict against Mr. Campbell. <u>Slusher v. Ospital</u>, 777 P.2d 437, 438-39 (Utah 1989). State Farm then paid all of the damages awarded in the 1983 action, both its policy limits and Mr. Campbell's personal liability. Shortly thereafter, the Campbells filed this action against State Farm alleging, among other things, bad faith, fraud, and intentional infliction of emotional distress. The trial court granted summary judgment to State Farm on the ground that because it had ultimately paid all of the damages awarded, there had been no bad faith as a matter of law. Plaintiffs appealed to this court, which transferred the case to the Utah Court of Appeals, which reversed and remanded, stating that although State Farm had paid the debt, the Campbells had the right to pursue their claim that there had been bad faith in the previous dealings. <u>Campbell v. State Farm Mut. Auto. Ins. Co.</u>, 840 P.2d 130, 143 (Utah Ct. App. 1992), <u>cert. denied</u>, 853 P.2d 897 (Utah 1992).

¶10 On remand, the trial court denied State Farm's motion to introduce the settlement agreement entered into by Slusher and Ospital before the original trial in Logan, Utah. However, over the Campbells' resistance, the trial court did grant State Farm's motion to bifurcate the trial. In phase I of the trial, the jury was to determine whether State Farm acted in bad faith. <u>Id.</u> Only if the jury found such bad faith would phase II, setting the compensatory damages award for State Farm's bad faith and addressing the Campbells' claims for fraud, intentional infliction of emotional distress, and punitive damages, occur.

¶11 In phase I, the jury found that State Farm had acted unreasonably and in bad faith in its decision to take the case to trial because there was a substantial likelihood of an excess judgment against Mr. Campbell. Notwithstanding this finding of bad faith, State Farm argued during phase II that its decision to take the case to trial was an "honest mistake" that did not warrant punitive damages. In

Campbell v. State Farm Mutual Auto Ins. Co., No. 981564, Filed October 19, 2001, 2001 ... Page 4 of 48

contrast, the Campbells introduced evidence that State Farm's decision to take the case to trial was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide. This scheme was referred to as State Farm's "Performance, Planning and Review," or PP&R, policy. To prove the existence of this scheme, the trial court allowed the Campbells to introduce extensive expert testimony regarding fraudulent practices by State Farm in its nation-wide operations. Although State Farm moved prior to phase II of the trial for the exclusion of such evidence and continued to object to it at trial, the trial court ruled that such evidence was admissible to determine whether State Farm's conduct in the Campbell case was indeed intentional and sufficiently egregious to warrant punitive damages.

¶12 At the close of the evidence, the jury awarded the Campbells $2.6 million[4] in compensatory damages and $145 million in punitive damages. State Farm made several post-verdict motions, including motions for a judgment notwithstanding the verdict, for a new trial, and for remittitur of the damage awards. Ultimately, the trial court denied all of State Farm's motions for a judgment notwithstanding the verdict and for a new trial. However, the trial court did order a remittitur of the damage awards to $1 million in compensatory damages[5] and $25 million in punitive damages. [6] In addition, the trial court awarded the Campbells $400,834.70 (forty percent of the compensatory damages award) for attorney fees and $400,747.78 for litigation expenses, totaling $801,582.48.

### ISSUES AND STANDARDS OF REVIEW[7]

¶13 We list the issues and applicable standards of review in the order of their treatment in the analysis portion of this opinion.

> 1. Did the trial court commit reversible error in permitting an award of $25 million in punitive damages to stand?

>> a. In particular, State Farm argues that the $25 million punitive damages award is excessive under both Utah and federal law.

Standard of Review:

Under Utah law, seven factors must be analyzed to determine whether the amount of a punitive damage award is excessive. See Crookston v. Fire Ins. Exch., 817 P.2d 789, 808 (Utah 1991) (Crookston I). We have heretofore reviewed the trial court's findings of fact regarding all but the seventh Crookston I factor under a clearly erroneous standard. See State v. Peña, 869 P.2d 932, 935 (Utah 1994). Because the seventh Crookston I factor involves the trial court's application of the law to the facts, we have in the past reviewed the trial court's determination for correctness, while at the same time affording the trial court some discretion as to the underlying facts. Seeid. at 936-39. Recently, however, the U.S. Supreme Court has imposed a new standard of review as a matter of federal constitutional law in punitive damages cases.[8] In Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 121 S.Ct 1678, 532 U.S. 424 (2001), the Supreme Court held that federal due process requires federal appellate courts to review punitive damage awards de novo when they are challenged on constitutional grounds. Id. at 1682-83. In view of the applicability of fourteenth amendment standards to state courts, we adopt the de novo standard for reviewing jury and trial court conclusions under the Crookston I factors.

Campbell v. State Farm Mutual Auto Ins. Co., No. 981564, Filed October 19, 2001, 2001 ... Page 5 of 48

2. Did the trial court commit reversible error by admitting "other acts" evidence in violation of Utah Rule of Evidence 404(b)?

Standard of Review:

"[W]e review a trial court's decision to admit evidence under rule 404(b) of the Utah Rules of Evidence under an abuse of discretion standard. We review the record to determine whether the admission of other bad acts evidence was 'scrupulously examined' by the trial judge 'in the proper exercise of that discretion.'" State v. Nelson-Waggoner, 2000 UT 59, ¶ 16, 6 P.3d 1120 (quoting State v. DeCorso, 1999 UT 57, ¶ 18, 993 P.2d 837) (footnote omitted).

3. Did the trial court commit reversible error by allowing the Campbells' experts to testify because they "usurp[ed] the function of the jury, g[a]ve irrelevant testimony, evade[ed] the hearsay rules, and testif[ied] without a proper foundation?"

Standard of Review:

A trial court's decision to admit expert testimony is reviewed for an abuse of discretion. Patey v. Lainhart, 1999 UT 31, ¶ 33, 977 P.2d 1193; State v. Larsen, 865 P.2d 1355, 1361 (Utah 1993). Furthermore, a trial court will not be reversed for an abuse of discretion unless "there is a reasonable likelihood that the verdict would have been different if the trial court had [excluded] the expert testimony." Steffensen v. Smith's Mgmt. Corp., 862 P.2d 1342, 1347 (Utah 1993).

4. Did the trial court commit reversible error in excluding evidence relating to the settlement agreement between Slusher and Ospital?

Standard of Review:

We review a trial court's decision regarding the relevancy of evidence under an abuse of discretion standard. Bambrough v. Bethers, 552 P.2d 1286, 1290 (Utah 1976) ("The trial court is given considerable discretion in deciding whether or not evidence submitted is relevant."); State v. Harrison, 805 P.2d 769, 780 (Utah Ct. App. 1991) (same).

5. Did the trial court commit reversible error by ruling that Mrs. Campbell has standing to pursue a bad faith claim?

Standard of Review:

This is a legal issue, and is reviewed for correctness. Provo City Corp. v. Willden, 768 P.2d 455, 456 (Utah 1989).

6. Did the trial court commit reversible error by allowing Mrs. Campbell to recover for fraud when the evidence was insufficient to support her claim?

Standard of Review:

> When considering challenges to jury verdicts based on
> insufficiency of the evidence, "we view the evidence in the
> light most supportive of the verdict, and assume that the jury
> believed those aspects of the evidence which sustain its
> findings and judgment." Billings v. Union Bankers Ins. Co., 918
> P.2d 461, 467 (Utah 1996) (internal quotation marks omitted).
> "If the evidence taken in the light most favorable to the
> verdict supports the verdict, we will affirm." Steenblik v.
> Lichfield, 906 P.2d 872, 875 (Utah 1995).

7a. Did the trial court commit reversible error by allowing both Mr. and
Mrs. Campbell to recover for intentional infliction of emotional distress
when the evidence was insufficient to support such claims?

Standard of Review:

See the standard of review for the previous issue.

7b. Are the remitted emotional distress awards of $600,000 to Mr.
Campbell and $400,000 to Mrs. Campbell excessive?

Standard of Review:

We consider whether there is a "reasonable basis" to support the trial
court's decision. Crookston I, 817 P.2d at 805.

8. Did the trial court commit reversible error in awarding attorney fees
to the Campbells?

Standard of Review:

> Whether attorney fees should be awarded is a legal issue that
> we review for correctness. Valcarce v. Fitzgerald, 961 P.2d
> 305, 315 (Utah 1998). The amount of attorney fees awarded is
> reviewed for abuse of discretion in making such an award. Id.

9. Did the trial court commit reversible error in awarding more than
$400,000 in litigation expenses without requiring the Campbells to
specifically demonstrate that such expenses were reasonable and necessary
to their claim for compensatory damages?

Standard of Review:

> The question of whether litigation expenses may be awarded in a
> bad faith action by an insured against an insurer is one of
> law, which we review for correctness. The standard of review as
> to the amount of such expenses is abuse of discretion. Ong
> Int'l (U.S.A.) Inc. v. 11th Ave. Corp., 850 P.2d 447, 460 (Utah
> 1993); City Consumer Servs., Inc. v. Peters, 815 P.2d 234, 240
> (Utah 1991).

### ANALYSIS

### I. PUNITIVE DAMAGES

¶14 State Farm argues that the punitive damage award is excessive under both Utah and federal law. The Campbells cross-appeal, arguing that the trial court's remittitur of the amount of the punitive damages awarded was not required under Utah law. We consider the application of both the Utah and federal standards separately below.

¶15 At the outset, we note the guidelines for trial courts contained in Crookston I, 817 P.2d 789, 811-12 (Utah 1991). In upholding a punitive damages award, "the trial judge must make a detailed and reasoned articulation of the grounds for concluding that the award is not excessive in light of the law and the facts," thereby "permit[ting] more effective and reasoned appellate review of the decision to uphold the award and to enable the appellate court to more carefully consider the various factors that may warrant punitives and the weight to be accorded them, while giving adequate deference to the advantaged position of the trial judge to appraise the witnesses and the evidence." Id. at 811. We note that pursuant to Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S. 424 (2001), we now review the factors de novo and do not defer to the trial court. When reducing an award of punitive damages, a trial court "should also explain its action" because "[t]he articulation of grounds for a remittitur . . . should serve the same salutary purpose on appeal" furthered by requiring trial courts to articulate their grounds for upholding a punitive damages award. Crookston I, 817 P.2d at 811-12.

¶16 We commend the trial judge in this case for his exemplary compliance with these guidelines, and indeed for his meticulous, extensive, and very thorough written findings of fact and conclusions of law on all issues. This work by the trial judge has greatly enhanced our ability to review and organize a lengthy and complex record.

### A. Utah Law

¶17 Both parties agree that the Utah law governing punitive damages was outlined in Crookston I, 817 P.2d 789 (Utah 1991), and Crookston v. Fire Ins. Exch., 860 P.2d 937 (Utah 1993) (Crookston II). In Crookston I, the court announced the following factors to consider when awarding punitive damages:

> (i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) the effect thereof on the lives of the plaintiff and others; (v) the probability of future recurrence of the misconduct; (vi) the relationship of the parties; and (vii) the amount of actual damages awarded.

Crookston I, 817 P.2d at 808.

¶18 In analyzing the appropriateness of the jury's punitive damage award, the trial court applied the seven factors outlined in Crookston I and remitted the award based solely upon the seventh factor, believing that the damage ratio in that case created a legal limitation. Thus, although he required remittitur of the award, the trial judge observed that $25 million "may be viewed as artificially low in that it does not capture the full amount of harm done to the Campbells as a result of State Farm's misconduct." Id. at ¶ 92.

¶19 On appeal, State Farm objects to both the jury verdict and the remitted punitive damage award, citing the following language from Crookston I: "punitive damages awards beyond a 3 to 1 ratio to actual damages have seldom been upheld and . . . where the award is in excess of $100,000, we [the Utah Supreme Court]

have indicated some inclination to overturn awards having ratios of less than 3 to 1." Crookston I, 817 P.2d at 810. Further, State Farm relies on the following elaboration from Crookston II:

> [i]t is certainly true that the punitive award here is without precedent in Utah, either as to the amount or as to the high ratio of punitive damages to hard compensatory damages. The presumption, therefore, is that the award is excessive. However, . . . ., this presumption may be overcome if the trial court explains why the case is unique in terms of one of the traditional seven factors or in terms of some other compelling factor.

Crookston II, 860 P.2d at 940 (citing Crookston I, 817 P.2d at 811).

¶20 According to State Farm, this language limits punitive damage awards to three times the amount of compensatory damages, unless the other Crookston I factors justify a higher ratio--which in this case, State Farm argues they do not. Thus, State Farm asserts that the trial court erred in not ordering a new trial or remitting the punitive damage award to an amount within the 3:1 ratio. Id.

¶21 Conversely, the Campbells argue that the trial court placed undue emphasis on the seventh Crookston I factor. Because the other factors support a large punitive damage award, they assert that the seventh factor does not mandate a remittitur. Id. Instead, awards with higher than normal ratios of punitive to compensatory damages are simply cause for heightened judicial scrutiny to ensure that other factors support the large award. Id.

¶22 To determine whether the trial court erred, we consider all of the Crookston I factors. As discussed in the issues and standards of review section, we review the trial court's conclusions under the Crookston I factors pursuant to a de novo standard. Cooper Indus., 532 U.S. 424.

1. The Relative Wealth of State Farm

¶23 The defendant's wealth is the first factor for consideration. "Punitive damages . . . should be sufficient to discourage . . . [the defendant], or anyone similarly situated, from repeating such conduct in the future." Cruz v. Montoya, 660 P.2d 723, 727 (Utah 1983), superceded by statute on other grounds. To calculate an award sufficient to punish and deter companies from future egregious behavior, some courts have compared the amount of punitive damages to the company's net worth. For example, the Seventh Circuit Court of Appeals has held that a typical punitive damage award may be around one percent of the defendant's net worth. Cash v. Beltman N. Am. Co., 900 F.2d 109, 111 n.3 (7th Cir. 1990). Although such guidelines are helpful in reviewing punitive damage awards, we emphasize that in Utah there is no pre-established mathematical formula for such awards.

¶24 State Farm argues that Utah courts have considered a corporation's wealth only to mitigate large punitive awards, and that it is not aware of "any Utah appellate decision upholding a presumptively excessive punitive exaction on the ground that the defendant happened to be wealthy." In defense of this proposition, State Farm cites Cruz and VanDyke v. Mountain Coin Machine Distrib., Inc., 758 P.2d 962 (Utah Ct. App. 1988), two cases in which the appellate courts did in fact reduce the punitive damage award based on the defendant's wealth. However, neither of these cases holds that the wealth of a company can be considered only to mitigate a punitive damage award. To the contrary, they indicate that a fact finder should consider the defendant's relative wealth when calculating a punitive damage award, and that such awards should have a proportional relationship to the defendant's

wealth. See Cruz, 660 P.2d at 726-27; VanDyke, 758 P.2d at 965-66.

¶25 Additionally, State Farm relies on two federal court cases, Continental Trend Resources., Inc. v. OXY USA, Inc., 101 F.3d 634, 641 (10th Cir. 1996), cert. denied, 520 U.S. 1241 (1997), and Utah Foam Prod. Co. v. Upjohn Co., 930 F. Supp. 513, 531 (D. Utah 1996). These cases likewise do not support State Farm's position. In particular, while stating that a defendant's wealth "cannot alone" justify a large punitive damage award, Utah Foam indicates that a defendant's wealth may be taken into account. Utah Foam, 930 F. Supp. at 531 (internal quotation marks omitted). Moreover, Continental Trend specifically states that "wealth must remain relevant" when determining punitive damage awards. Cont'l Trend, 101 F.3d at 641.

¶26 State Farm's wealth is enormous. As the trial court found, "[t]he evidence indicates that State Farm's surplus increased from $2.65 billion in 1977 to $25 billion in 1995. Its assets increased from $6.3 billion in 1977 to $54.75 billion in 1995, at an average increase of $4.3 million per working day in surplus, and $9.3 million per working day in assets. . . . A punitive damages award equal to one percent of State Farm's wealth would be $547.5 million. The remitted amount of $25 million in punitive damages represents less that 1/20th of one percent of State Farm's wealth (.0457 per cent)." Moreover, the jury's punitive damage award of $145 million is only 0.26 of one percent of State Farm's wealth as computed by the trial court, to whose judgment on this factual matter we defer. In our view, neither percentage is unreasonable, given the need to sufficiently deter and punish State Farm. See Crookston II, 860 P.2d at 940-41 (upholding punitive damage award that was 0.5 of one percent of defendant's net worth). Furthermore, the evidence showed that a larger than normal punitive damage award is necessary to attract the attention of State Farm officials and deter the company from further bad conduct because, as the trial court specifically found: (1) State Farm's corporate headquarters had never learned of, much less acted upon, a punitive damage award of $100 million in a previous case; and (2) State Farm's Regional vice-president for Utah testified that there was no system in place to inform the company's national headquarters of any punitive damage award, and that he did not plan to report the award in this case.

2. The Nature of State Farm's Misconduct

¶27 This factor specifically analyzes the nature of the defendant's conduct in terms of its maliciousness, reprehensibility, and wrongfulness. It mirrors the "reprehensibility" factor described by the United States Supreme Court in BMW of North America, Inc. v. Gore, 517 U.S. 559 (1996). There, the Supreme Court stated that the defendant's misconduct is "[p]erhaps the most important indicium of the reasonableness of a punitive damages award." Id. at 575, 576. Repeated "trickery and deceit" targeted at people who are "financially vulnerable" is especially reprehensible and worthy of greater sanctions. Id. Moreover, "deliberate false statements, acts of affirmative misconduct, or concealment of evidence of improper motive" also warrant larger awards. Id. at 579.

¶28 With these standards clearly in mind, the trial court made nearly twenty-eight pages of extensive findings concerning State Farm's reprehensible conduct. We summarize here three examples from those findings of State Farm's most egregious and malicious behavior.

¶29 First, State Farm repeatedly and deliberately deceived and cheated its customers via the PP&R scheme. See Court's Findings, Conclusions and Order Regarding Punitive Damages and Evidentiary Rulings, Campbell, at 17-27. For over two decades, State Farm set monthly payment caps and individually rewarded those insurance adjusters who paid less than the market value for claims. Id. at 18-19.

Agents changed the contents of files, lied to customers, and committed other dishonest and fraudulent acts in order to meet financial goals. Id. at 17-27. For example, a State Farm official in the underlying lawsuit in Logan instructed the claim adjuster to change the report in State Farm's file by writing that Ospital was "speeding to visit his pregnant girlfriend." Id. at 35. There was no evidence at all to support that assertion. Ospital was not speeding, nor did he have a pregnant girlfriend. Id. The only purpose for the change was to distort the assessment of the value of Ospital's claims against State Farm's insured. As the trial court found, State Farm's fraudulent practices were consistently directed to persons--poor racial or ethnic minorities, women, and elderly individuals--who State Farm believed would be less likely to object or take legal action. Id. at 26-27.

¶30 Second, State Farm engaged in deliberate concealment and destruction of all documents related to this profit scheme. Id. at 31-33. State Farm's own witnesses testified that documents were routinely destroyed so as to avoid their potential disclosure through discovery requests. Id. at 29-30. Such destruction even occurred while this litigation was pending. Id. at 30. Additionally, State Farm, as a matter of policy, keeps no corporate records related to lawsuits against it, thus shielding itself from having to disclose information related to the number and scope of bad faith actions in which it has been involved. Id. at 30.

¶31 Third, State Farm has systematically harassed and intimidated opposing claimants, witnesses, and attorneys. Id. at 33-37. For example, State Farm published an instruction manual for its attorneys mandating them to "ask personal questions" as part of the investigation and examination of claimant in order to deter litigation. Id. at 34. Several witnesses at trial, including Gary Fye and Ina DeLong, testified that these practices had been used against them. Id. at 34-35. Specifically, the record contains an eighty-eight page report prepared by State Farm regarding DeLong's personal life, including information obtained by paying a hotel maid to disclose whether DeLong had overnight guests in her room. Id. at 35. There was also evidence that State Farm actually instructs its attorneys and claim superintendents to employ "mad dog defense tactics"--using the company's large resources to "wear out" opposing attorneys by prolonging litigation, making meritless objections, claiming false privileges, destroying documents, and abusing the law and motion process. Id. at 36-37.

¶32 Taken together, these three examples show that State Farm engaged in a pattern of "trickery and deceit," "false statements," and other "acts of affirmative misconduct" targeted at "financially vulnerable" persons. BMW, 517 U.S. at 575, 576. Moreover, State Farm has strategically concealed "evidence of [its] improper motive" to shield itself from liability, which was furthered by State Farm's treatment of opposing witnesses and counsel. BMW, 517 U.S. at 579. Such conduct is malicious, reprehensible, and wrong.

¶33 State Farm responds by arguing in its brief that even if its conduct was wrong, it does not "after all, involve murder, torture, or deliberate poisoning of the environment," and thus cannot warrant millions of dollars in punitive damages. Additionally, State Farm argues that under Crookston II, willful calculated fraud was not sufficient to justify a higher than ordinary ratio of punitive to compensatory damages. Crookston II, 860 P.2d at 940.

¶34 State Farm fails to realize that, while Crookston II held that fraudulent conduct alone was insufficient to justify a large punitive damage award, it also observed that fraud combined with other factors justifies a higher award. Id. at 940-41. Specifically, Crookston II stated that "an additional unique factor justifying the punitive award, both in its dollar amount and in its proportion to the hard compensatory damages [is] . . . the company's 'calculated and calloused

attitude' toward settling valid claims." Id. at 941 (citation omitted). In this case, the jury was convinced, and the evidence shows, that State Farm engaged in a widespread pattern of fraud. Moreover, the evidence of its PP&R scheme demonstrates that State Farm specifically calculated and planned to avoid full payment of claims, regardless of their validity. Thus, the nature of State Farm's conduct supports the imposition of a higher than normal punitive damage award.

3. Facts and Circumstances Surrounding State Farm's Misconduct

¶35 This factor looks to the circumstances surrounding the illegal conduct, particularly with respect to what the defendant knew and what was motivating his or her actions. See Bundy v. Century Equip. Co., 692 P.2d 754, 759 (Utah 1984). Discussing this point, the trial court referred to its previous analysis of State Farm's conduct and stated "those facts speak for themselves with respect to the type of insensitive and callous behavior exhibited by State Farm." In addition to the trial court's findings, we note that State Farm refuses in its brief on appeal to concede any error or impropriety in the handling of the Campbell case. Rather, testimony at trial indicated that State Farm was "proud" of the way it treated the Campbells. Id. Further, State Farm asserts that it is in fact a "victim" in this case because it is the target of a secret "conspiracy" perpetrated by the Campbells, Ospital, Slusher, and their attorneys to bring this bad faith lawsuit and to share any recovery obtained.

¶36 Even if we agreed with State Farm's characterization of the agreement between the plaintiffs and Ospital and Slusher, we are unable to comprehend State Farm's logic. No behavior by those parties operates to excuse State Farm's dishonest and illicit practices over the course of many years, nor its treatment of the Campbells. In fact, without this so-called "conspiracy," which contains no illegal elements whatever, State Farm's wrongdoing would have remained unexamined and unpunished, and the direct harm to the Campbells, the indirect harm to the other parties, and the harmful effect on the larger community of all those who deal with the company, would have had no remedy. The facts and circumstances surrounding State Farm's misconduct all point to a scheme motivated by the goal of making a profit by any means necessary. We agree entirely with the trial court's conclusion that this factor supports the imposition of a higher than normal punitive damages award.

4. Effect of State Farm's Misconduct on the Campbells and Others

¶37 This factor examines how the defendant's conduct affected other people as well as the Campbells. The larger the number of people affected, the greater the justification for higher punitive damages.

¶38 Here, the effect of State Farm's conduct on the Campbells is well-documented. In particular, the Campbells lived for nearly eighteen months under constant threat of losing everything they had worked for their whole lives. This threat led to sleeplessness, heartache, and stress in the Campbells' marriage and family relationships. Id. State Farm argues that these were relatively minor impacts, and were not as severe as those punished in Crookston II, and additionally, that the alleged harms suffered by other State Farm customers cannot be considered in this case.

¶39 Even if the harm to the Campbells can be appropriately characterized as minimal, the trial court's assessment of the situation is on target: "The harm is minor to the individual but massive in the aggregate." Moreover, State Farm's assertion that the trial court erred in considering alleged harms suffered by other customers is incorrect; Crookston II specifically allows courts to consider the

effect of the defendant's conduct on others. <u>Crookston II</u>, 860 P.2d at 941. In fact, the Crookston II court justified a high punitive damage award based on the fact that the insurance company's fraudulent practices were inflicted on countless customers. <u>Id.</u>

¶40 In the present case, State Farm's conduct seriously affected the Campbells, as indicated previously, as well as many others. In particular, State Farm's conduct corrupted its employees by forcing them to engage in deceptive practices or lose their jobs. Moreover, State Farm's continuing illicit practice created market disadvantages for other honest insurance companies because these practices increased profits. As plaintiffs' expert witnesses established, such wrongfully obtained competitive advantages have the potential to pressure other companies to adopt similar fraudulent tactics, or to force them out of business. Thus, such actions cause distortions throughout the insurance market and ultimately hurt all consumers. <u>Id.</u> Because State Farm's actions have such potentially widespread effects, this factor supports a high punitive damages award.

5. Probability of Future Recurrences

¶41 This factor analyzes the likelihood that the defendant will repeat or continue engaging in its wrongful behavior. A high probability of recidivism justifies a higher than normal punitive damage award. <u>BMW</u>, 517 U.S. at 577. In light of State Farm's decades-long policy of fraudulent and dishonest practices in its handling of claims, it is difficult to imagine how such ingrained policies of corporate culture can be easily or quickly changed. This would be true even in a case where the perpetrator was fully aware of and remorseful for its conduct. State Farm has not exhibited any such self-awareness in this case. Instead, State Farm asserted at trial that its PP&R policy was "obsoleted" in 1992 and again in 1994. However, the Campbells' evidence showed that the policy was still being followed at the time of trial. <u>Id.</u>

¶42 State Farm challenged the Campbells' evidence by pointing out at trial that State Farm's regional vice president for Utah testified that he had sent "peace of mind" letters to customers assuring them that State Farm would protect them against personal exposure in third-party suits. However, as the trial court noted, "[t]he Court does not find it surprising that the jury apparently was not particularly persuaded that this repentance was genuine," especially in light of the fact that the vice president did not decide to send such letters until he "was in the office of trial counsel preparing for his trial testimony . . . not long before the jury was to decide punitive damages."

¶43 In short, we are persuaded, as was the trial court, that "[g]iven the absence of credible evidence that, in fact, State Farm's policies have changed, and that the misconduct carried out toward Utah consumers during the past two decades has ended, the probability of recurrence of State Farm's misconduct appears extremely high."

6. Relationship of the Parties

¶44 This factor analyzes the relationship between the parties, specifically, the degree of confidence and trust placed in the defendant. The greater the trust placed in the defendant, the more appropriate the imposition of a large punitive damage award for a breach of that trust. A breach of a fiduciary relationship also supports a large punitive damage award.

¶45 In <u>Beck v. Farmers Ins. Exch.</u>, we noted that a fiduciary relationship exists

between insurers and insureds like the Campbells because

> [i]n a third-party situation, the insurer controls the disposition of
> claims against its insured, who relinquishes any right to negotiate on
> his own behalf . . . . In essence, the contract itself creates a
> fiduciary relationship because of the trust and reliance placed in the
> insurer by its insured. The insured is wholly dependent upon the insurer
> to see that, in dealing with claims by third parties, the insured's best
> interests are protected.

701 P. 2d 795, 799 (Utah 1985) (citations omitted). Because State Farm breached its
duty in this fiduciary relationship, the trial court ruled that State Farm's
actions warranted high punitive damages. See Brown v. Coates, 253 F.2d 36, 40 (D.C.
Cir. 1958) (holding that punitive damages are particularly appropriate when
fiduciary duty is disregarded and exploited for gain).

¶46 State Farm argues that, although a fiduciary relationship exists, it is not an
adequate basis for imposing a multi-million dollar penalty. Its argument is that
because its breach of its fiduciary duty is the reason it is liable in tort in the
first place, the breach cannot be "double-counted" as a justification for a large
award. Id. at 86.

¶47 We disagree. The facts show that the Campbells trusted in and relied on State
Farm's promises of protection and aid. For example, State Farm affirmatively
promised the Campbells that it "would look out for their best interests" and that
they should not procure their own counsel because State Farm would take care of
them. Also, State Farm convinced the Campbells that "they had absolutely no risk,"
and even on the chance that they were found liable, they had adequate insurance to
cover any potential liability. The Campbells relied on these promises: Inez
Campbell actually transferred some of her separate property into joint ownership
with her husband after the accident upon being told that there was no risk to Mr.
Campbell of an excess judgment. The relationship of trust between State Farm and
the Campbells, and the breach of that trust, warrants a substantial punitive damage
award.

7. Ratio of Punitive to Compensatory Damages

¶48 As noted above, the trial court reduced the jury's punitive damage award from
$145 million to $25 million based solely on this factor. State Farm argues that
this number is still grossly disproportionate to the harm suffered and should be
reduced further according to the Crookston I ratio.

¶49 Applying the rationale and the language of both Crookston cases to this case,
we reject State Farm's interpretation. First, contrary to State Farm's arguments,
the ratio of punitive to compensatory damages is not determinative. It is simply
one of the factors to be considered, none of which is more important or conclusive
than another. See Crookston I, 817 P.2d at 808. Crookston I specifically stated
that: "No relative weights have been assigned them [the factors], and no standards
or formulas have been established for properly evaluating them." Id. A large award
triggers a more searching judicial analysis of the situation to ensure the
defendant's conduct warrants large punitive damages. However, if the other six
factors support a large punitive damages award, a judge should not decrease the
amount solely because of the ratio of punitive to compensatory damages. Crookston
II, 860 P.2d at 940.

¶50 Second, both Crookston I and Crookston II rejected the idea of establishing a

specific ratio or capping punitive damages, and emphasized that the guidelines for punitive damages need to be flexible enough to accomplish both the punishment and deterrent purposes of punitive damages. See Crookston II, 860 P.2d at 941; Crookston I, 817 P.2d at 809. In support of this reasoning, the Crookston II court noted that

> [i]f a company could predict that its systematic fraudulent conduct would evade detection in many instances and on those few occasions where it was discovered, would never result in punitive damages greater than the ratios we have historically upheld, it could carefully calculate the cost/benefit ratio of its wrongful conduct and avoid the deterrent potential of punitive damages.

Crookston II, 860 P.2d at 941.

¶51 Finally, Crookston II itself was a case where the ratio of punitive to compensatory damages was higher than three to one. We upheld that award because of the willful, malicious, and fraudulent conduct of the insurance company towards the Crookstons and other similarly situated Utahns. Crookston II, 860 P.2d at 941. Since State Farm's conduct is of a similar nature, we hold that a ratio of greater than three to one is permissible here, and that the trial court erred in remitting the jury award. As long as the other factors sustain a high punitive damage award, as they do here, neither Crookston I nor Crookston II bars courts from imposing punitive damage awards greater than three times the amount of compensatory damages. [9]

¶52 Based on the foregoing review of the seven Crookston I factors, we hold that, with the exception of its analysis of the seventh factor, the trial court's analysis is fully corroborated by our own. However, we conclude that the trial court erred in deciding that the seventh factor required remittitur as a matter of state law.

### B. Federal Law

¶53 State Farm asserts that the standards set forth in BMW v. Gore of North America, Inc., 517 U.S. 559 (1996), prohibit imposing the large amount of punitive damages awarded in this case. To "illuminate 'the character of the standard that will identify unconstitutionally excessive awards' of punitive damages," the BMW Court stated:

> Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition. . . . States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case. . . . Only when an award can fairly be categorized as "grossly excessive" in relation to these interests does it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth Amendment.

Id. at 568 (citations omitted). The Supreme Court then identified "[t]hree guideposts" for consideration: "[1] the degree of reprehensibility of the [conduct]; [2] the disparity between the harm or potential harm suffered . . . and [the] punitive damages award; and [3] the difference between this remedy [the punitive damage award] and the . . . penalties authorized or imposed in comparable cases." Id. at 574-575. Since the reprehensibility guidepost of the BMW test mirrors the second and third factors in Crookston I, relating to the nature and circumstances surrounding defendant's misconduct, we incorporate here our earlier

analyses of these Crookston I factors, and conclude for the reasons discussed therein that the reprehensibility guidepost is met.[110] We analyze the second and third "guideposts" separately below.

1. Disparity Between the Harm and the Punitive Award (Ratio)

¶54 The most common means of determining whether a punitive damage award is excessive under federal law is to look at the ratio of punitive to compensatory damages. See BMW, 517 U.S. at 580. However, when conducting such an analysis, there is no "simple mathematical formula," "categorical approach," or "constitutional line" for determining an appropriate punitive to compensatory damage ratio. Id. at 582. In fact,

> low awards of compensatory damages may properly support a higher ratio than high compensatory awards, if, for example, a particularly egregious act has resulted in only a small amount of economic damages. A higher ratio may also be justified in cases in which the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine.

Id. Overall, the ratio of punitive to compensatory damages needs to be reasonable considering the totality of the circumstances. Id. at 583; see also TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 458-62 (1993) (upholding punitive damage award that was 526 times amount of compensatory damage award because of potential harm that could have occurred had defendant's fraudulent scheme worked); Pac. Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 23 (1991) (upholding punitive damage award that was 200 times amount of plaintiff's out-of-pocket expenses based on reprehensibility of conduct and wealth of defendant).

¶55 Based on the language cited above, the trial court found that this BMW factor "does not impose a rigid cap on punitive damages awards" because in the Campbells' case, as in TXO, "the injury is hard to detect" and the potential for large harm is substantial. Specifically, the trial court relied on the following facts to justify the high punitive damage award: (1) State Farm never reported previous punitive damage awards to headquarters, even though prior awards included a Texas judgment of $100 million; (2) State Farm is an enormous company with massive wealth; (3) State Farm's actions, because of their clandestine nature, will be punished at most in one out of every 50,000 cases as a matter of statistical probability; and (4) State Farm's policies have affected vast numbers of other Utah customers.

¶56 While not contesting the validity of the finding that it is likely to be punished at most in one out of 50,000 cases, State Farm does challenge the other three justifications. Because State Farm's objections to considering relative wealth and the effects on other Utah customers are identical to its arguments against the punitive damage award under Crookston I, we again incorporate by reference our previous analysis of Crookston I factors one and four in section "IA" 1 and 4 of this opinion.

¶57 Turning to the remaining justification relied on by the trial court, we note that the court found that a prior $100 million punitive damage award against State Farm had not been reported to its national headquarters. State Farm argues that the award in this case need not be more severe than that award, citing Johansen v. Combustion Engineering, Inc., for the proposition that "a punitive award does not need to be large enough to 'make the company newsletter' and need 'not attract the attention of the board of directors' in order to have a deterrent effect." 170 F.3d 1320, 1338 & n.36 (11th Cir. 1999), cert. denied sub nom. Combustion Eng'g Inc. v.

McGill, 120 S. Ct. 329 (1999). State Farm's reliance on Johansen is unfounded. First, unlike this case, Johansen did not involve punishing a company that had previously been assessed punitive damages for its illicit conduct. Rather, the punitive damage award issued in Johansen against the mining company was the first and only punishment imposed for its misconduct. Id. at 1336.

¶58 More importantly, State Farm misconstrues the holding of Johansen, which in fact stands for the proposition that larger awards are necessary for large corporations, and that company executives should be aware of imposed punitive sanctions. Seeid. at 1338-39. Specifically, Johansen states that

> in promoting deterrence, the economic wealth of a tortfeasor may be considered. A bigger award is needed to "attract the . . . . attention" of a large corporation. . . . It is not unlikely that having to pay . . . punitive damages would not make the company newsletter. It should, however, attract the attention of whomever is in charge of the corporation's daily decisions . . . and would, no doubt, bear heavily upon regional or local managers where failure to regard consequences would be expected to subject their employer to loss.

Id. (citations and footnotes omitted and emphasis added).

¶59 Many large corporations are "entities too powerful to be constrained" by remedies provided by "criminal and civil law." Michael Rustad & Thomas Koenig, The Historical Continuity of Punitive Damages Awards: Reforming the Tort Reformers, 42 Am. U. L. Rev. 1269, 1329-30 & n.299 (1993). In many cases, the public's only protection against exposure to fraudulent harmful conduct by such large, powerful corporations is the threat that sanctions imposed for misconduct will be sufficiently severe. Id. If such a threat is unavailable, punitive damage awards against large entities will not serve their deterrent and punitive purposes. See Crookston II, 860 P.2d at 941.

¶60 State Farm points out that in the wake of BMW, many lower courts have held unconstitutional far lower ratios of punitive to compensatory damages than exist here. State Farm cites eighteen cases where courts have reduced punitive damage awards after conducting a BMW analysis. Id. at 77-78. In contrast, the Campbells cite nine other cases upholding punitive damage awards where the ratio of punitive to compensatory damages is larger than or the same as the ratio in this case.

¶61 All the cases agree, however, that each court must analyze the facts of each case to ensure that the defendant's acts warrant the punitive damage award imposed. [111] In fact, the BMW court made it clear that the initial punitive damage award in that case (500 times the amount of plaintiff's damages) was not automatically invalid, but that it was unconstitutional because of the specific facts of the case--i.e. the fraud was perpetrated without "trickery or deceit," the available criminal and regulatory sanctions for comparable misconduct were minor, and some of the conduct for which BMW was being punished was legal in states other than Alabama. BMW, 517 U.S. at 582-84, 576-78, 572.[112]

¶62 Like BMW, this case contains exceptional facts and circumstances. Here, however, they support a higher rather than a lower punitive damage award. State Farm's fraudulent conduct has been a consistent way of doing business for the last twenty years, directed specifically at some of society's most vulnerable groups. The likelihood of further misconduct by State Farm is great, given the fact that it has not changed its conduct despite a previous $100 million punitive damage award. Moreover, the effect on the Campbells warrants a large award, given that they had

to live in fear of complete financial ruin for over eighteen months because of
State Farm's refusal to settle their claim. Finally, the harm propagated by State
Farm is extreme when compared to the statistical probability that State Farm is
likely to be required to pay damages only once in 50,000 cases. Thus, because there
are reasonable justifications for the large punitive damage award based upon the
specific facts of this case, the ratio factor in BMW does not require the award to
be reduced simply because the ratio of punitive to compensatory damages is high.

## 2. Civil or Criminal Penalties Authorized in Comparable Cases

¶63 The final factor for determining whether a punitive award is excessive under
federal law is to "[c]ompar[e] the punitive damages award and the civil or criminal
penalties that could be imposed for comparable misconduct." BMW, 517 U.S. at 583.
Possible imprisonment for such conduct is a strong indication that the conduct
warrants high punitive damages. Id.

¶64 The trial court found that this factor "does not require reduction of the
punitive damage award" because the "penalties that could be imposed under Utah law
for the fraudulent scheme that has been pursued by State Farm are enormous."
Specifically, the trial court found that State Farm could be forced: (1) to pay a
$10,000 fine for each act of fraud under Utah Code Ann. §§ 31A-26-301 et seq.; (2)
to renounce its business license or have its Utah operations dissolved under Utah
Code Ann. §§ 31A-26-213, 76-3-201(2) and (3), 76-10-1602(ppp), and 76-10-1603.5(5);
(3) to disgorge all the illicit profits gained by the scheme, plus pay a fine of
twice the value of those profits, under Utah Code Ann. §§ 76-10-1602 et seq.; and
(4) to publically acknowledge that its officers had been convicted of fraud under
Utah Code Ann. § 76-3-303. Moreover, under Utah Code Ann. § 76-3-303, State Farm's
officers could be imprisoned or removed for up to five years, an extremely
important consideration for the BMW court. BMW, 517 U.S. at 584.

¶65 State Farm disputes these findings, arguing that since this case is the "only
bad faith action against it in the last fifteen years," there is no evidence that
it has defrauded customers or gained illicit profits. Moreover, State Farm argues
that even if it could be punished for its practices, permissible punishment is
limited by the "actual fining practice" of the Insurance Commission. Id. at 83.

¶66 State Farm's logic is unpersuasive for several reasons. First, such an
interpretation runs contrary to the clear language of BMW indicating the Court was
examining "the civil or criminal penalties that could be imposed for comparable
misconduct," not other punishments already issued against the defendant. BMW, 517
U.S. at 583 (emphasis added).

¶67 Second, State Farm's argument that there is no evidence of fraud is contrary to
the trial court's findings and to the evidence that we have reviewed supporting
those findings. It is difficult to understand how State Farm can argue that there
is no evidence that it committed fraud or acted illicitly when the record contains
volumes of such evidence. The evidence was so extensive and convincing that it took
the trial court nearly twenty-eight pages to summarize it in his findings on the
post-trial motions.

¶68 Finally, State Farm's argument that the Insurance Commission's practices in
assessing fines are applicable, rather than the maximum statutory penalties, is
contrary to BMW. The BMW court clearly indicated that the punitive award was to be
compared to legislatively set penalties, not administrative agency practices. BMW,
517 U.S. at 584. For example, the Supreme Court stated that it was examining "the
statutory fines" and "[t]he maximum civil penalty authorized by the Alabama
Legislature." Id. Moreover, BMW also stated that a "reviewing court engaged in

determining whether an award of punitive damages is excessive should accord substantial deference to legislative judgments concerning appropriate sanctions for the conduct at issue." Id. at 583 (internal quotation marks omitted and emphasis added). We conclude that the trial court correctly found that a large punitive damage award was justifiable under this third guidepost.

¶69 In conclusion, we hold that the trial court's analysis of the punitive damage award under BMW was correct. In light of the foregoing analysis of state and federal law, we vacate the trial court's remittitur order and reinstate the jury's verdict awarding $145 million in punitive damages.

## II. OTHER ACTS EVIDENCE

¶70 State Farm argues that large quantities of "other acts" evidence were admitted in violation of the Utah Rules of Evidence because such evidence had nothing to do with State Farm's handling of third-party claims in general, or State Farm's conduct toward the Campbells in particular, and therefore had no probative value. State Farm catalogs a long list of allegedly inadmissible evidence on which it bases its argument that the evidentiary process in the trial court was tainted.[131] In contrast, the Campbells argue that State Farm did not properly preserve its evidentiary objections and that, even if it had, the trial court did not exceed its discretion in admitting the "other acts" evidence.

¶71 We decline State Farm's invitation to take a piecemeal approach to the analysis of the admissibility of the "other acts" evidence in this complex and lengthy litigation. Just as any able litigator must have a "theory of the case" if he or she hopes to convince a fact finder of the merits of a particular action, it is crucial for a trial judge confronting a case with so many issues and opportunities for mistake to have an overall view of the necessary balance for fairness to the parties in the conduct of the trial, particularly as this relates to the admission and exclusion of evidence. The trial court in this case had such a vision, and we believe it achieved balance and fairness.

¶72 First and foremost, the trial court granted State Farm's request, over the Campbells' strenuous objections, to take the unusual step of bifurcating the trial.[132] The trial court imposed stringent evidentiary restrictions on the Campbells during phase I of the trial, so that only State Farm's treatment of the Campbells was at issue in establishing its bad faith in handling their claim. Id. In a post-trial ruling, the trial court stated that it "understood that the purpose of [the] bifurcation order was to separate the so-called 'bad-faith phase' (phase I) from what the parties termed the 'institutional phase' of this trial (phase II)." The trial court continued: "State Farm prevailed in its bifurcation arguments largely by pointing out that phase II, covering the institutional evidence, would involve a very lengthy trial, as it would deal with State Farm's corporate policies and practices--so that bifurcation would save substantial resources in the event that the jury found no bad-faith claim handling." (Emphasis added.)

¶73 The other major decision that the trial court made, on which State Farm's arguments regarding error in the admission of "other acts" evidence largely succeed or fail, was the admission of evidence related to its PP&R policy. This policy, initiated in 1979 by the company's highest executives, set fixed ceilings on the payment of claims in order to increase corporate profits. After phase I established that State Farm had handled the Campbells' claim in bad faith and had breached its fiduciary duty to them, State Farm defended itself in phase II by claiming that its actions were only the result of an "honest mistake" or an isolated lapse in judgment. Based on this defense, the trial court denied State Farm's request to

exclude all evidence from which the jury could infer that the Campbells were the victims of an extensive, intentional scheme to defraud State Farm's policyholders. All of the other categories of evidence State Farm challenges as being erroneously admitted during phase II of the trial, from the practice of office competitions to lower average claims paid, to the discriminatory treatment of insureds based on gender, race, economic status, educational background, and age, were part and parcel of its PP&R policy.

¶74 In this context, we conclude that we must consider the evidence in an integrated fashion and analyze whether the trial court erred in admitting the "other acts" evidence in general. State Farm's challenge to the trial court's admission of such evidence is controlled by Utah Rule of Evidence 404(b), which states:

> Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. In other words, evidence offered under this rule is admissible if it is relevant for a non-character purpose and meets the requirements of Rules 402 and 403.

Thus, "in deciding whether evidence of other crimes is admissible under rule 404(b), the trial court must determine (1) whether such evidence is being offered for a proper, noncharacter purpose under 404(b), (2) whether such evidence meets the requirements of rule 402, and (3) whether this evidence meets the requirement of rule 403." State v. DeCorso, 1999 UT 57, ¶ 20, 993 P.2d 837. When reviewing such decisions, we apply "an abuse of discretion standard . . . [and consider] the record to determine whether the admission of other bad acts evidence was 'scrupulously examined by the trial judge 'in the proper exercise of [his or her] discretion.'" State v. Nelson-Waggoner, 2000 UT 59, ¶ 16, 6 P.3d 1120 (quoting DeCorso, 1999 UT 57 at ¶ 18).

## A. Noncharacter Purpose

¶75 "Under the first part of this analysis, the proponent must demonstrate that the evidence is actually being offered for a proper, noncharacter purpose, such as those specifically listed in . . . rule [404(b)]." DeCorso, 1999 UT 57 at ¶ 21. Although the list of noncharacter purposes found in rule 404(b) is helpful, it is not exclusive. See Edward L. Kimball & Ronald N. Boyce, Utah Evidence Law 4-41 (1996).

¶76 Phase II of the trial involved the Campbells' claims of fraud, intentional infliction of emotional distress, and punitive damages, and State Farm's defense that its mistreatment of the Campbells was unintentional and simply the result of an honest mistake. In this context, the trial court found that the Campbells' evidence, which State Farm now challenges on appeal, was offered for many noncharacter purposes, including establishing State Farm's intent, reckless disregard, absence of mistake, plan, and outrageous conduct, as well as rebutting State Farm's defense. Comparing the elements necessary to establish the Campbells' claims and to rebut State Farm's defenses with the evidence State Farm finds objectionable, we conclude that the trial court was entirely correct in finding that such evidence was offered for noncharacter purposes. Moreover, based on our review of the record, which indicates that the trial court made its conclusions only after reviewing numerous motions in limine made by State Farm and conducting at least ten pretrial hearings that consumed more than fifteen days, we are satisfied that the trial court scrupulously examined the "other acts" evidence ultimately admitted at trial. Once again, we have been greatly assisted in our

review by the trial court's extended written findings in his orders on the pretrial motions. Accordingly, we conclude that the trial court did not exceed the permitted range of discretion in finding that the "other acts" evidence was offered for a proper, noncharacter purpose.[13]

### B. Rule 402

¶77 Under rule 402, "other acts" evidence, like all evidence, must be relevant or it is not admissible. Utah R. Evid. 402 ("All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible."). Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Utah R. Evid. 401. Thus, to be admissible, "other acts" evidence must tend to prove some fact that is material to the cause of action alleged--other than the defendant's propensity to engage in actions in conformity therewith. DeCorso, 1999 UT 57 at ¶ 22.

¶78 After careful consideration, the trial court specifically concluded that the "other acts" evidence to which State Farm presently objects was "relevant," "helpful," and "of high probative value" because such evidence was necessary to establish several elements of the Campbells' claims and to rebut State Farm's defenses. Our review of the record makes it clear that the trial court's statement regarding the necessity of the "other acts" evidence is amply supported therein. Notably, one of the chief concerns of rule 402 is not even present in this case, namely the need to ensure that fact-finders will not infer wrong-doing in a present scenario because an actor has done wrong in the past. Phase I of this trial conclusively established that State Farm acted in bad faith; its wrong-doing was thus determined without any reliance on past deeds or general practices. The only issue in Phase II was the nature of appropriate compensatory and punitive damages to be imposed in response to the wrong-doing. For that purpose, State Farm's intent, motive, and rationale for its wrong-doing was extremely relevant, and the evidence of its long-established methods of doing business were, as the trial court found, highly probative.

¶79 Surprisingly, even in the face of the trial court's detailed findings and analysis, State Farm asserts on appeal that the "other acts" evidence had no probative value. We find this assertion troubling. State Farm's failure to acknowledge the probative value of the "other acts" evidence is of a piece with its inability to acknowledge that it engaged in a wide-spread corporate scheme to defraud its insureds, a scheme that had far-reaching negative effects on both its insureds and society in general. Because the trial court had a reasonable basis in the evidence for its decision, we reject State Farm's assertion, and conclude that the trial court did not abuse its discretion in finding evidence of State Farm's "other acts" relevant. See Crookston II, 860 P.2d 937, 938 (Utah 1993) ("[W]e reverse only if we find an abuse of discretion, i.e., no reasonable basis for the decision.")

### C. Rule 403 Analysis

¶80 Rule 403 requires that "we weigh the probative value of the evidence with the potential for creating prejudice in the minds of the jurors." State v. Reed, 2000 UT 68, ¶ 29, 8 P.3d 1025. The rule states:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

Utah R. Evid. 403. In assessing whether prior acts evidence satisfies the requirements of rule 403,

> a variety of matters must be considered, including the strength of the evidence as to the commission of the other crime, the similarities between the crimes, the interval of time that has elapsed between the crimes, the need for the evidence, the efficacy of alternative proof, and the degree to which the evidence probably will rouse the jury to overmastering hostility.

_Reed_, 2000 UT 68 at ¶ 29.

¶81 In ruling upon State Farm's various evidentiary motions, the trial court found that in light of the phase I jury verdict against State Farm, "the pattern and practice evidence is of high probative value and importance to plaintiffs' claims, and that serious prejudice to plaintiffs would result if such evidence were excluded. The court further finds that the probative value is not outweighed by the danger of unfair prejudice or confusion." The trial court made it clear, however, that it was not precluding further rule 403 objections to exclude _specific_ evidence. Rather, it found only that objections to specific evidence based on the "general issues of wrongful pattern and practice evidence" would be improper.

¶82 We find compelling reasons under rule 403 to uphold the trial court's denial of State Farm's request to generally exclude all "other acts" evidence related to its patterns and practices. As discussed above, the alleged wide-ranging effects of State Farm's PP&R policy were crucial to the Campbells' ability to prove their fraud, intentional infliction of emotional distress, and punitive damage claims. State Farm attacks the trial court's evidentiary rulings repeatedly for allowing evidence that was "dissimilar" from the facts in the Campbells' case; this once again misses the mark. The underlying purpose of rule 403 is to assure a careful consideration of prior acts and, in the event that the evidence passes the rule 404(b) threshold, to continue to evaluate the evidence in light of its potentially prejudicial effect. Although the "similarity" language of _Reed_ and earlier cases is not particularly apt in this case, we think that its general concerns were accounted for in the trial court's reasoning underlying his determinations of the admissibility of the "other acts" evidence. State Farm's PP&R policy exposed the Campbells to an excess judgment and the accompanying risk of losing all their assets. Thus, cause and effect became very important. In other words, the relevant inquiry in phase II was: What caused the Campbells' harm? Without the evidence of State Farm's PP&R policy, and evidence of practices flowing from that policy, the Campbells would have been unable to prove the real cause of their harm. The establishment of this cause and effect link was highly dependant on the "other acts" evidence of State Farm's methods of doing business.

¶83 State Farm also contends that the time interval factor was not met here because some of the evidence detailed behavior remote in time. However, inasmuch as there was affirmative evidence adduced tending to show that State Farm's practices were ongoing at the time of the trial (which evidence was explicitly believed by the trial court and apparently by the jury), we find that contention without merit. In light of these considerations, the trial court did not abuse its discretion in ruling that the probative value of the "other acts" evidence was not outweighed by any potential prejudice.

### III. EXPERT TESTIMONY

¶84 State Farm objects that the testimony by the Campbells' experts "went far beyond the realm of permissible expert testimony, instead crossing the line into

rank advocacy," and thus violated rules 702 and 703 of the Utah Rules of Evidence. Conversely, the Campbells argue that, at most, only two of State Farm's objections were preserved for appeal and that, in any case, the trial court did not commit reversible error. "It is well established that trial courts have wide discretion in determining the admissibility of expert testimony." State v. Kelley, 2000 UT 41, ¶ 11, 1 P.3d 546. Moreover, unless "there is a reasonable likelihood that the verdict would have been different if the trial court had [excluded] the expert testimony," we will not reverse the trial court's decision. Steffensen v. Smith's Mgmt. Corp., 862 P.2d 1342, 1347 (Utah 1993). While there appears to be merit to the Campbells' argument that State Farm failed to preserve many of its objections to the experts' testimony, we deem it more efficient to analyze the substance of State Farm's challenges generally, first under rule 702, and then under rule 703.

¶85 To rebut State Farm's "honest mistake" defense, the Campbells called experts Stephen Prater and Gary Fye. These men were intimately acquainted with the intricacies of the insurance industry and with State Farm's practices in particular. Their qualifications as experts were not challenged by State Farm. Their testimony focused upon explaining State Farm's PP&R policy and demonstrating its far-reaching effects. State Farm now argues that much of this testimony was without foundation and was prejudicial. In particular, State Farm challenges the experts' testimony concerning the company's excess liability handbook, its failure to maintain statistics on excess verdicts, the profits it derived from improper claims handling, and the effects of its PP&R policy and related practices on the insurance industry in general. State Farm also argues that Mr. Prater impermissibly testified to legal conclusions.

¶86 Utah Rule 702 states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

"[T]he question that must be posed prior to the admission of any expert evidence is whether, on balance, the evidence will be helpful to the finder of fact." State v. Larsen, 865 P.2d 1355, 1361 (Utah 1993) (internal quotation marks omitted). Helpfulness depends upon "whether the subject is within the knowledge or experience of the average individual." Id. However, "[i]t is not necessary that the subject of the testimony be so erudite or arcane that the jurors could not possibly understand it without the aid of expert testimony, nor is it a requirement that the subject be beyond the comprehension of each and every juror." Id. "This 'helpfulness standard' also implicates Rule 403 considerations, since if the evidence is confusing or unfairly prejudicial it will hinder rather than aid jury decision making." Edward L. Kimball & Ronald N. Boyce, Utah Evidence Law 7-9 (1996) (clarifying that "Rule 403 is not being applied directly, so . . . the question is 'helpfulness,' not whether the probative value is greatly outweighed by confusion or prejudice"); see alsoLarsen, 865 P.2d at 1363 n.12; State v. Rimmasch, 775 P.2d 388, 398 n.8 (Utah 1989). We have reviewed the entire transcript of both Prater's and Fye's trial testimony. With the exception of the argument concerning legal conclusions, we find it unnecessary to address with particularity State Farm's specific challenges.

¶87 That the experts' testimony was helpful is evident. State Farm conceded the witness' qualifications. Although the rule does not require that the issue to which an expert testifies be arcane, the issues raised in this case were in fact quite difficult for the average person to understand. The experts' familiarity with the insurance industry in general, and State Farm in particular, must have greatly aided the jury's understanding of the issues. Moreover, our review of the record

satisfies us that the experts' testimony, given its relevance and its helpfulness, did not raise any concerns under rule 403 sufficient to warrant exclusion. Thus, because the experts' testimony was helpful to the jury, the trial court did not abuse its discretion under rule 702.

¶88 We now turn to State Farm's specific challenge under rule 702 which argues that Prater usurped the trial court's role of instructing the jury by impermissibly offering legal conclusions while testifying. Most of State Farm's objections address Prater's testimony concerning industry standards. In several instances he described "duties" and "standards" of behavior or of "care" that should dictate the practice of insurance companies generally. In every instance, and sometimes following objections by State Farm, it was made very clear to the jury by the phrasing of the question and/or by comments from counsel and the court, that the witness was testifying only to prevailing standards of conduct in the industry, and not to legal standards or rules of law. In at least one instance, the trial court clarified for the jury the role of the court in instructing them on the law, the limited role of the experts, and properly instructed the jury at the end of the trial. The trial court did not abuse its discretion in permitting the testimony in question.

¶89 Finally, State Farm objects because Prater pointed to boxes of documents in the courtroom and testified that those documents supported his conclusion that State Farm engaged in a pattern of cheating on claims. This challenge is governed by rule 703, which states

> The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

This court has held

> "[O]nce the expert is qualified by the court, the witness may base his [or her] opinion on reports, writings, or observations not in evidence which were made or compiled by others, so long as they are of a type reasonably relied upon by experts in that particular field. The opposing party may challenge the suitability or reliability of such materials on <u>cross-examination</u>, but such challenge goes to the <u>weight</u> to be given the testimony, not to its admissibility."

<u>Patey v. Lainhart</u>, 1999 UT 31, ¶ 30, 977 P.2d 1193 (quoting <u>State v. Clayton</u>, 646 P.2d 723, 725 (Utah 1982)) (emphasis added). The policy behind the current iteration of this rule is aimed at broadening the permissible bases of expert opinion. One justification driving this policy is to lessen "'the expenditure of substantial time in producing and examining various authenticating witnesses.'" <u>Id.</u> (quoting note of advisory committee to federal version of rule 703, which is identical to Utah's rule 703).

¶90 Applying rule 703, we find that Prater's testimony concerning the documents were not improper because such documents were "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Utah R. Evid. 703; <u>see also</u> <u>Am. Concept Ins. Co. v. Lochhead</u>, 751 P.2d 271, 274 (Utah Ct. App. 1988) (finding that expert in licensed property and casualty claims properly relied upon his examination of adjuster's file, since this was "material[] of a type usually relied upon by experts in his field").

¶91 Prater described the nature of the documents in his files, the means by which he had obtained them, and the fact that he had reviewed and was familiar with their contents. He testified that the vast majority of the documents were original State Farm documents or copies thereof. He further testified that his conclusions and opinions in this trial were based in part on his study of the documents.

¶92 State Farm complains that cross-examining Prater on these documents would have entailed more time than it was allotted for trial. In our view, however, extra time was not the issue. Cross-examination of Prater on the documents in the boxes was not a relevant task for State Farm. On the contrary, State Farm had a duty to locate and produce documents critical to challenging Prater's testimony and to conduct an effective cross-examination within the known time constraints. Because State Farm had itself produced most of the documents, we presume (as did the trial judge) that it knew their contents. It cannot now claim error because its own trial strategy did not produce favorable results.[116] Accordingly, we find that the trial court did not abuse its discretion in admitting Prater's testimony.

## IV. SETTLEMENT AGREEMENT

¶93 As described briefly in the background portion of this opinion, Slusher and Ospital entered into a settlement agreement prior to the trial of the initial lawsuit in Logan, Utah, to determine liability in the underlying accident. Their agreement was reflected in two separate documents, both dated June 3, 1983. In the first, entitled "Release of Claims," Slusher accepted $65,000 in return for a release of all claims against Ospital and Ospital's insurers. The release expressly preserved Slusher's claims against Campbell and his insurers (who were in any event not parties to the release). The second agreement, which we will refer to as the Bad Faith Agreement, required Ospital to "assist Slusher in the prosecution of his claim against any other party responsible for said injuries and damages, including any claim for bad faith against any insurer of the responsible party." It specifically required Ospital to remain as a party in the Logan case (in which Ospital had a cross-claim against Campbell in addition to Slusher's claims against Campbell) and provided for some sharing of any recovery over and above Slusher's damages as determined by the jury in that case. Id.

¶94 In the Logan trial and in both phase I and phase II of the trial at issue in this appeal, State Farm sought admission of the details of that agreement in evidence. State Farm's theory on all three occasions was that, because the settlement required Ospital to remain in the original lawsuit, Ospital and Slusher were permitted to "gang up" on Campbell in the liability determination process. State Farm wished to rely on the agreement as evidence of "collusion" in the Logan trial, which it wanted to argue to the jury in this trial had increased the severity of the liability percentage assigned to Campbell in the original lawsuit, and should therefore mitigate the evidence of bad faith in phase I and support its theory of "innocent mistake" in phase II. The trial judge rejected State Farm's rationale and precluded use of the settlement agreement. We agree with the trial judge.

¶95 The record in this case establishes that State Farm was informed, prior to the Logan lawsuit, that Slusher would seek a unilateral settlement with Ospital if State Farm continued to refuse to participate in a settlement. On the day the Logan trial began, counsel for Slusher told the trial court and State Farm counsel that the terms of the agreement included, in addition to a release of Slusher's claims against Ospital in return for a payment of $65,000, "cooperation" between Slusher and Ospital in the event of a future bad faith action against State Farm. State Farm's counsel immediately informed the trial court that he feared collusion at trial between Ospital and Slusher to place blame for the accident on Campbell. The

trial court declined to admit evidence of the settlement agreement.

¶96 After verdict in the Logan trial, the trial court, on Campbell's motion for a new trial, explained at length its rationale for excluding the liability release agreement from the trial. The court's memorandum decision observed specifically that Campbell's counsel had requested admission of this agreement and an instruction to the jury that "Ospital and Slusher were no longer in an adversary position with one another," and that he would be "facing the position where counsel for Ospital and Slusher were in collusion against Campbell and the way they could now conduct trial would affect the outcome to the prejudice of Campbell." This is of course exactly the argument State Farm now raises about the Bad Faith Agreement (the basic terms of which had been disclosed at the outset of the liability trial even though it was not shown to the court or counsel). Responding to that argument, the trial judge wrote:

> As to any collusion, this Court was present and observed the whole trial, observed no collusion between attorneys for Ospital and Slusher. In fact, Counsel for Slusher questioned all witnesses of both Campbell and Ospital as though adversary to his position that Slusher was not negligent, had no liability, and that he didn't know who was liable but it had to be one or the other defendant or both.

Memorandum Decision November 22, 1983

¶97 After reading the Bad Faith Agreement in its entirety for the first time, the trial court subsequently took the extraordinary step of executing an affidavit in May of 1996, containing the following assertions:

> 6. . . . I do not believe the second agreement [the Bad Faith Agreement] posed any risks or caused any alteration of the parties' positions at trial different from those already created by the first agreement [the Release of Claims].

> 7. Because of my awareness of the first agreement during the trial, I was careful to watch for any signs of improper collusion or other improper conduct by Slusher, Ospitals or their counsel at trial. I saw no such conduct. I also saw no signs of efforts by Slusher, Ospitals or their counsel to work together to gain unfair advantage over Campbell and his counsel.

> 8. The statements and finding I made after the trial in the Memorandum decision issued in November, 1983 . . . were and are accurate.

¶98 This court, on appeal of the Logan verdict in Slusher v Ospital, 777 P.2d 437, 438 (Utah 1989), concluded that the trial court erred in not "disclosing the settlement" to the jury. After analysis of the totality of circumstances at trial, however, we held that "the disclosure of the settlement agreement to the jury would not have had any effect on the outcome of trial." Id. at 445. While our reference to "the settlement agreement" arguably referred only to the Release of Claim document, there is nothing in the separate Bad Faith Agreement that would have differently affected the incentives of the parties or probabilities of collusion between Ospital and Slusher at trial.

¶99 Thus, the existence and/or prejudicial effect of alleged collusion between Ospital and Slusher at the Logan trial was effectively raised and decided in that case. Furthermore, State Farm explicitly disavowed in phase I of this trial any

intent to rely on an argument that it had been the target of collusion in the Logan trial. It stipulated to the exclusion of the settlement evidence in phase I and cannot now complain of the trial judge's ruling in that regard.

¶100 As to phase II, the trial court relied on rule 403 of the Utah Rules of Evidence to exclude the settlement agreement, finding that it had "little, if any, probative value," and "any probative value it may have is far outweighed by the unfair prejudice to plaintiffs that would result and the danger of confusion of the issues and misleading the jury." It having been conclusively established in the liability trial and subsequent appeal that there was in fact no evidence of actual collusion at the Logan trial, the settlement agreement between Slusher and Ospital simply had no relevance to the claims of Campbell against State Farm, and the trial judge was entirely correct in precluding its admission.[131]

## V. MRS. CAMPBELL'S FRAUD CLAIM

¶101 State Farm argues that there was no basis for the jury to find by clear and convincing evidence that State Farm had an intent to defraud Mrs. Campbell. When considering challenges to jury verdicts based on insufficiency of the evidence, "we view the evidence in the light most supportive of the verdict, and assume that the jury believed those aspects of the evidence which sustain its findings and judgment." Billings v. Union Bankers Ins. Co., 918 P.2d 461, 467 (Utah 1996) (internal quotation marks omitted). "If the evidence taken in the light most favorable to the verdict supports the verdict, we will affirm." Steenblik v. Lichfield, 906 P.2d 872, 875 (Utah 1995).

¶102 "To demonstrate that the evidence is insufficient to support the jury verdict, the one challenging the verdict must marshal the evidence in support of the verdict and then demonstrate that the evidence is insufficient when viewed in the light most favorable to the verdict." Crookston I, 817 P.2d 789, 799 (Utah 1991). Comparing the evidence State Farm marshals in its opening and reply briefs to the evidence the trial court summarizes in its order denying State Farm's motions for a judgment notwithstanding the verdict and a new trial regarding Mrs. Campbell's fraud claim, it is clear that all State Farm has done in this appeal is to "argue selected evidence favorable to its position." Id. at 800. As we held in Crookston I, "[t]hat does not begin to meet the marshalling burden [State Farm] must carry." Id. State Farm's failure to meet its marshalling burden is "grounds to reject [its] attack on the fraud finding." Id.

¶103 The entirety of State Farm's summary of the evidence is contained in one paragraph of its brief. By contrast, the jury, having listened to weeks of trial testimony, and having been properly instructed on the elements of fraud, found in favor of both plaintiffs. Furthermore, in its Order Denying State Farm's Motions for Judgment NOV and New Trial Regarding Fraud, the trial judge noted: "The evidence at trial supporting each of the elements of fraud is extensive, and it is not practical to set forth all of the evidence in this Order. However, the following summary highlights some of the evidence." There follow in the Order fourteen paragraphs (four-and-a-half pages) of factual summary detailing the fraud evidence. The summary ends with this paragraph:

> n. Most of the misrepresentations and non-disclosures were also made to Inez Campbell, with the intent that Mrs. Campbell would rely thereon, which she did. Even where misrepresentations were made only to Mr. Campbell, it was apparent that they would be passed on to and relied upon by Mrs. Campbell. The evidence also established that Mrs. Campbell was present with her husband, Curtis, when Wendell Bennett misrepresented that there was no need to hire separate counsel. Mr. Campbell testified

that he would gladly have hired personal counsel if he had known of a risk of an excess judgment. There was ample evidence that the Campbells were working together in making decisions in the case, that Mrs. Campbell had strong influence on Curtis Campbell's decisions with respect to the case, and that had she appreciated that there was a substantial likelihood of losing the case, she would have insisted that it be settled and she would have had a terrific bearing on Curtis' demanding that the case be settled. There is ample evidence that the misrepresentations made in Mrs. Campbells' presence induced her inaction, to her detriment. Accordingly, there is ample evidence to support a claim of fraud by Mrs. Campbell.

¶104 We conclude that State Farm has entirely failed to meet its burden of marshalling the evidence on its challenge to the finding of fraud against Mrs. Campbell, and we sustain the jury's verdict and the trial court's denial of a judgment notwithstanding the verdict and a new trial.

¶105 The trial court limited the judgment on the fraud count to $911.25, which the Campbells paid in attorney fees after the original verdict and which was the total pecuniary loss suffered by plaintiffs. It relied in doing so on Turner v. Gen. Adjustment Bureau, Inc., 832 P.2d 62 (Utah Ct. App. 1992), cert. denied, 843 P.2d 1042 (Utah 1992), which held that a fraud claim may not support emotional distress damages because fraud is an economic and not a dignitary tort. Id. at 68. We disagree with the holding in Turner, as is reflected by our opinion in Crookston v. Fire Ins. Exch., 817 P.2d 789 (Utah 1991), where we held that "all damages awarded by the jury can be sustained upon the finding of fraud." Id. at 798. We note that there is scholarly and caselaw support for this view that was apparently not considered when Turner was decided. See Nelson v. Progressive Corp., 976 P.2d 859, 867-68 (Alaska 1999) (holding that emotional distress damages are permitted under fraud theory if severe damages); Kilduff v. Adams, Inc., 593 A.2d 478, 484-85 (Conn. 1991) ("[W]e concur with those jurisdictions that allow the recovery of emotional damages that are the natural and proximate result of fraud."); Osbourne v. Capital City Mort. Corp., 667 A.2d 1321, 1328 (D.C. 1995) ("We hold that, upon proof of intentional misrepresentation, a plaintiff may recover 'emotional damages that are the natural and proximate result' of the defendant's conduct." (citation omitted)); Andrew L. Merritt, Damages for Emotional Distress in Fraud Litigation: Dignitary Torts in a Commercial Society, 42 Vand. L. Rev. 1, 10-12, 23-32 (1989) ("[A]s a general rule, emotional distress damages should be awarded in fraud actions.").

¶106 We therefore overturn Turner's holding on the availability of general and emotional distress damages for fraud. In light of Crookston I and in view of the fact that we may sustain a trial court on a ground not relied on by the trial court, see Bell Nay & Sons Excavating v. Neeley Constr. Co., 677 P.2d 1120 (Utah 1984) (citations omitted), we affirm not only the pecuniary damages assessed in this case, but also Mrs. Campbell's general damages, as well as the punitive damages, on the basis of the fraud verdict.

VI.  INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS CLAIMS

¶107 Once again, on this issue State Farm failed in its brief to adequately marshal the evidence, and its challenge is subject to rejection on that ground alone. Furthermore, it must be rejected on its merits.

¶108 To sustain a cause of action for the intentional infliction of emotional distress, a party "must show that (i) the conduct complained of was outrageous and intolerable in that it offended against the generally accepted standards of decency and morality; (ii) [the defendant] intended to cause, or acted in reckless

disregard of the likelihood of causing, emotional distress; (iii) [the plaintiff] suffered severe emotional distress; and (iv) [the defendant's] conduct proximately caused [the] emotional distress." <u>Retherford v. AT&T Comm. of the Mountain States, Inc.</u>, 844 P.2d 949, 970-71 (Utah 1992).

¶109 First, State Farm challenges the jury's finding of intentional infliction of emotional distress claiming that the evidence was "exceedingly weak" and that the Campbells "failed to establish that they suffered <u>severe</u> emotional distress." When considering such challenges, "we view the evidence in the light most supportive of the verdict, and assume that the jury believed those aspects of the evidence which sustain its findings and judgment." <u>Billings v. Union Bankers Ins. Co.</u>, 918 P.2d 461, 467 (Utah 1996) (internal quotation marks omitted). "If the evidence taken in the light most favorable to the verdict supports the verdict, we will affirm." <u>Steenblik v. Lichfield</u>, 906 P.2d 872, 875 (Utah 1995).

¶110 In discussing when the statute of limitations begins to run for the claim of the intentional infliction of emotional distress, this court stated:

> [T]he element of emotional distress is <u>specific to the plaintiff in each case</u>. Because the tort of intentional infliction of emotional distress requires actual emotional distress, see Restatement (Second) of Torts § 46(1) (1965), this element is to be gauged <u>subjectively</u>. A particularly hardy or calloused plaintiff may never accrue a cause of action for intentional infliction of emotional distress, even though he or she is subjected to outrageous conduct that no reasonable person could be expected to bear. Consequently, our task is to determine when . . . [plaintiff] experienced severe emotional distress, not when an ordinarily sensitive person would have experienced such suffering.

<u>Retherford</u>, 844 P.2d at 975-76 (footnote omitted) (emphasis added). Thus, the Campbells must only show that they <u>subjectively</u> experienced severe emotional distress regarding the situation they found themselves in, not that an "ordinary reasonable person" would have experienced it that way. State Farm's citation to cases involving the <u>negligent</u> infliction of emotional distress for the proposition that objective proof is required to show that mental or physical consequences have occurred is inapposite. <u>See Harnicher v. Univ. of Utah Med. Ctr.</u>, 962 P.2d 67, 70-72 (Utah 1998); <u>Hansen v. Mountain Fuel Supply Co.</u>, 858 P.2d 970, 973-75 (Utah 1993).

¶111 Second, State Farm argues that the general damages award for each of the Campbells was excessive. For an award of compensatory damages regarding the intentional infliction of emotional distress, the standard of review confronting State Farm is quite high. This court has stated:

> While it is true . . . that soft compensatory damages, i.e., for pain and suffering, must be awarded with caution, "when the determination of the jury has been submitted to the scrutiny and judgment of the trial judge, his [or her] action thereon should be regarded as giving further solidarity to the judgment." <u>Elkington v. Foust</u>, 618 P.2d 37, 41 (Utah 1980). Or, as we said in <u>Geary v. Cain</u>, 255 P. at 423, 69 Utah at 358, "In case of doubt, the deliberate action of the trial court should prevail. Otherwise, this court will sooner or later find itself usurping the functions of both the jury and the trial court." <u>Id.</u> These statements in <u>Elkington</u> and <u>Geary</u> are consistent with our statement of the appropriate appellate standard of review today.

<u>Crookston I</u>, 817 P.2d at 806. Despite the court noting in <u>Crookston I</u> that the

trial judge's "statements could have been more specific," it found them adequate to support its decision to uphold the compensatory damage award, and therefore to support its denial of a new trial on the issue of compensatory damages. Id.

¶112 There is ample evidence in this record from which a jury could infer that each of the Campbells suffered severe emotional distress. These include: the financial ruin that they believed they faced after the jury in the underlying action rendered its verdict for more than five times the State Farm policy limit; being told by their lawyer that they could start dealing with their exposure by putting a "For Sale" sign on their house; State Farm's refusal to post a supersedeas bond to protect their home and other assets during the pendency of the appeal; and the numerous personal issues that made the Campbells, who had each experienced other traumatic events in their lives, particularly vulnerable to the stress created by State Farm's actions.[118]

¶113 Furthermore, with respect to the amount of the award, we note that the trial court did remit the amount of compensatory damages from $1,400,000 for Curtis Campbell and $1,200,000 for Inez Campbell to $600,000 and $400,000, respectively. It might be argued, given the subjective standard enunciated by this court, that the trial court should not have so drastically reduced the jury's initial awards. The Campbells, however, do not raise this issue on appeal. As pointed out above, the deferential nature of our review requires us to uphold a jury's verdict that has been scrutinized by a trial court unless there is a clear abuse of discretion. Our review of the trial court's post-trial ruling on this issue reveals no such abuse. Therefore, we find that the award was not excessive, and note that it provides an independent basis for sustaining all of Mrs. Campbell's damages. See Part V, supra, and Crookston I, 817 P.2d at 798 ("[A]ll damages awarded by the jury can be sustained upon the finding of fraud."); see also Osbourne, 667 A.2d at 1328 (holding that plaintiff may recover emotional damages that are natural and proximate result of defendant's intentional misrepresentation).

## VII. MRS. CAMPBELL'S STANDING TO SUE FOR BAD FAITH

¶114 In view of our holding that the jury verdicts on fraud and intentional infliction of emotional distress should be sustained, and that they independently support all of the damages awarded in this case, see Parts V and VI, supra; Crookston I, 817 P.2d at 798; Osbourne, 667 A.2d at 1328, we need not address the question of Mrs. Campbell's right to sue State Farm for breach of the covenant of good faith and fair dealing. Notwithstanding the dissent's lengthy advisory opinion on the subject, the question of standing on these facts remains an open question in Utah, awaiting attention from this court in a future case. The dissent apparently offers its views in support of its conclusion that the jury's verdict on damages was somehow prejudiced by having the bad faith claim intermingled with the fraud and intentional infliction of emotional distress claims. We conclude that this notion is entirely inconsistent with the record and the jury's verdict below. This jury responded to the factual conduct of State Farm, and, in our view, rightly so. Whether the basis for recovery bore the label of "bad faith," "fraud," or "intentional infliction of emotional distress," it was the same behavior by State Farm that the jury clearly intended to compensate for and to punish. We do not believe the jury was at all affected in its decision and verdict by the legal labels applied to describe the conduct. Thus, even if the dissent were correct in its view on this question, any error would have been harmless in its effect on damages.

¶115 In addition, we do not agree with the dissent that "the punitive damages award must fail because it was awarded jointly to Mr. and Mrs. Campbell rather than separately to each plaintiff." Punitive damages, "are, by nature, not to compensate but to punish and deter future egregious conduct." Crookston I, 817 P.2d 789, 807

(Utah 1991). Therefore, the award of punitive damages is determined by the defendant's conduct and need not be separated as to plaintiff. The dissent cites Crookston I, 817 P.2d 789 (Utah 1991) for its claim that the punitive damages award should be remanded "due to its joint nature." Crookston I, however, does not support this proposition. In Crookston I, we reviewed the issue of whether punitive damages were excessive under the circumstances of that case. Id. at 793-94. The joint nature of the punitive damages award was never questioned. Id. at 811-12.

¶116 Furthermore, we do not believe that State Farm was prejudiced by the jury instructions, which referred to the Campbells jointly. The only case cited by the dissent in support of this assertion is Nielsen v. Pioneer Valley Hospital, 830 P.2d 270 (Utah 1992). That case, however, involved only one plaintiff and says nothing about separating plaintiffs in jury instructions. Rather, the instructions in Nielsen were erroneous because separate instructions were contradictory with regard to two alternate legal theories presented by plaintiff. See id. at 274. The instructions were faulty because the two theories required conflicting standards, and the jury could have found defendant liable on either theory. See id. In this case, there was no danger, as the dissent claims, of misperception that Mrs. Campbell's claims were "caused by [ ] State Farm's actions toward Mr. Campbell." As stated previously, the jury clearly awarded punitive damages based on State Farm's egregious conduct toward both Mr. and Mrs. Campbell. Just as we do not believe the jury's decision and verdict were affected by the legal labels applied to State Farm's conduct, neither do we believe that referring to the Campbells in the aggregate in the jury instructions had any effect on the damages awarded.

¶117 Finally, we note that the dissent has developed and espoused a theory requiring reversal in this case that was not raised below, briefed by the parties, or raised in oral argument before this court. That theory appears to rely on what the dissent terms a "faulty verdict" in phase I of the trial below, a verdict in favor of both plaintiffs. That verdict was not challenged at the time of its entry nor was it raised in this appeal. Our review of the record and of the briefs in this appeal demonstrate that the wording of the verdict was never mentioned or relied on as a ground for claimed error. It is a well-established rule that we will not reverse a trial court on the basis of claims and arguments not raised below, let alone those not even argued on appeal.[11]

VIII. ATTORNEY FEES

¶118 In its challenge to the trial court's award of attorney fees, State Farm raises two arguments. First, State Farm argues that fee shifting is not available under Utah law in third-party bad faith cases. Second, State Farm argues that even if some award of attorney fees is permissible in third-party cases, the amount awarded by the trial court is grossly inappropriate. We address each argument separately below.

A. Fee Shifting in Third-Party Cases

¶119 Whether attorney fees should be awarded in a particular case is a question of law reviewed for correctness. Valcarce v. Fitzgerald, 961 P.2d 305, 315 (Utah 1998). "The general rule in Utah, and . . . the traditional American rule, subject to certain exceptions, is that attorney fees cannot be recovered by a prevailing party unless a statute or contract authorizes such an award." Stewart v. Utah Pub. Serv. Comm'n, 885 P.2d 759, 782 (Utah 1994). Because the Campbells do not argue here, nor did they below, that a statute or contract authorizes them to recover attorney fees, we turn our analysis to the "certain exceptions" to the general rule.

¶120 Under Utah law, plaintiffs may recover attorney fees if they are successful in pursuing a first-party bad faith suit against their insurer. Billings v. Union Bankers Ins. Co., 918 P.2d 461, 468 (Utah 1996). Such actions fall within the rule that the damages available to plaintiffs "include both general damages, i.e., those flowing naturally from the breach, and consequential damages, i.e., those reasonably within the contemplation of, or reasonably foreseeable by, the parties at the time the contract was made." Beck v. Farmers Ins. Exch., 701 P.2d 795, 801 (Utah 1985). The rationale behind allowing recovery of both general and consequential damages in first-party, bad faith actions is "to remove any incentive for insurers to breach the duty of good faith by expanding their exposure to damages caused by such a breach beyond the predictable fixed dollar amount of coverage provided by the policy." Billings, 918 P.2d at 466. Consequential damages in first-party bad faith actions can be awarded for such things as attorney fees, loss of a home or business, damages flowing from bankruptcy, and mental anguish, provided such damages are foreseeable. Id. at 468; Beck, 701 P.2d at 802.

¶121 Extending the rationale advanced in the first-party bad faith cases to the third-party bad faith case before it, the trial court concluded that attorney fees should likewise be recoverable. The trial court offered the following in support of its conclusion:

    a. An award of attorney's fees . . . removes some of the incentive for an insurer to breach the duty of good faith and fair dealing.

    b. Such an award encourages insurers to act reasonably.

    c. The award of "actual" attorney's fees is designed to assist in fully compensating the insured for the damages caused by the breach of good faith duties, whether such good faith duties arise from a first-party or a third-party situation.

    d. For purposes of this issue, there is no reasonable basis to distinguish an insured's damages incurred in a first-party or third-party context[.]

    e. The duties of good faith arising in a third-party context include fiduciary duties and are higher duties than the duties arising under the contract theory in a first-party context.

(Citations omitted.) Because we agree with the trial court's analysis, we affirm its conclusion that plaintiffs can recover foreseeable attorney fees if they successfully pursue a third-party bad faith action against their insurer. Although the foreseeability of damages test is generally limited to the contractual realm, we note that its use to determine damages in the context of tortious third-party, bad faith claims is justified since such "claims arise only because of the contractual relationship of the parties." Savage v. Educators Ins. Co., 908 P.2d 862, 866 (Utah 1995) (holding that employee who had no contractual relationship with employer's workers' compensation insurance carrier could not sue carrier for breach of the covenant of good faith and fair dealing since such actions are predicated upon parties' contractual relationship).[20]

¶122 Finally, we note that the existence of a fiduciary relationship between insurers and insureds in the context of third-party bad faith claims, which we recognized in Beck, supports an exception to the general rule that attorney fees are not recoverable in tort actions. State Farm relies on a 1996 Colorado case, Bernhard v. Farmers Ins. Exch., 915 P.2d 1285 (Colo. 1996), holding that such fees

are not recoverable. However, <u>Bernhard</u> clearly recognized that "[a]ttorney fees may be recoverable in an action for breach of fiduciary duty as a recognized exception to the American rule." <u>Id.</u> at 1289 (citations omitted). The Colorado Supreme Court, however, concluded that insurers were only "quasi," and not "true," fiduciaries, and thus declined to apply the exception. We disagree with <u>Bernhard's</u> view of the relationship, which is contrary to the Utah position. We do, however, accept its assertion that breach of a fiduciary obligation is a well-established exception to the American rule precluding attorney fees in tort cases generally. We thus conclude that the trial court correctly held attorney fees to be a proper element of damages in this case.

¶123 Thus, the issue becomes whether, at the time State Farm issued the policy to the Campbells, State Farm could reasonably foresee that if a claim arose against it the Campbells would incur attorney fees in pursuing that claim. Review of the transcript discloses that, at a minimum, State Farm's Claims Vice-President, Frank Haynes, knew that insureds pursuing claims against State Farm typically retained attorneys on a contingency fee basis. Based on this, we hold that an award of attorney fees to the Campbells was indeed foreseeable by State Farm.

### B. Amount of Attorney Fees Award to the Campbells

¶124 State Farm argues that the trial court erred in awarding the Campbells attorney fees equal to 40% of the compensatory damages award. Instead, State Farm suggests that the attorney fees awarded, if any, should be limited to $911.25, the amount the Campbells paid to its attorneys to obtain the benefits due them under the policy. Resolution of this issue requires application of the foreseeability test discussed in the previous section. In other words, could State Farm reasonably foresee that the Campbells would agree to a contingency attorney fee of 40% of the amount recovered for compensatory damages if they found it necessary to hire counsel to pursue a claim against State Farm?

¶125 At the hearing on the Campbells' motion for a directed verdict, the trial court concluded that such a fee agreement was foreseeable to State Farm. A trial court's conclusion as to what constitutes a reasonable attorney fee award is reviewed for an abuse of discretion. <u>Valcarce v. Fitzgerald</u>, 961 P.2d 305, 315 (Utah 1998). The record contains ample support for the trial court's conclusion. Perhaps most telling was State Farm's failure to present any evidence that it could not have foreseen that the Campbells would incur a contingency fee, combined with specific evidence from Vice President Haynes that contingency fees of up to 50% were common in suits by insureds against State Farm. Moreover, the Campbells presented evidence through several witnesses that contingency fees like this one have been around for decades, are well-known, and are in fact the most likely form of attorney fee arrangement, especially in a bad faith case against an insurance company. Such evidence is similar to that presented in <u>Billings</u>, where we found that the plaintiff's contingency fee arrangement was foreseeable. <u>Billings</u>, 918 P.2d at 468. Therefore, we affirm the trial court's finding that the contingency fee agreement was foreseeable and uphold its award of attorney fees in the amount of 40% of the total compensatory damages, or $400,834.70 plus 40% of post-judgment interest on the principal amount of compensatory damages.[21]

### IX. LITIGATION EXPENSES

¶126 Finally, State Farm argues that the trial court's award of litigation expenses was manifestly unreasonable. According to its statement of the issue, State Farm challenges the legitimacy of any award for litigation expenses, as well as the actual amount awarded by the trial court.[22]

¶127 As to the legitimacy of an award of litigation expenses in a case, like this, where an insurer has breached its good-faith duties to pay third-party claims, we are asked to settle a question of law, and therefore review the trial courts' ruling for correctness. State Farm relies on the distinction this court made in Beck v. Farmers Ins. Exch., 701 P.2d 795 (Utah 1985) between first-party insurance claims, sounding in contract, and third-party claims, on which a tort action may be brought. It then argues that, like attorney fees, litigation expenses may not be awarded as damages in a tort action. For the same reasons detailed in the previous section regarding attorney fees, we conclude that litigation expenses are recoverable in this limited type of action; their availability will: (1) decrease incentives for insurers to act in bad faith; (2) encourage insurers to act reasonably; and (3) contribute to actual compensation for plaintiffs for financial cost to them of the breach. The trial court specifically found that "litigation expenses incurred by plaintiffs [were] . . . foreseeable to State Farm, particularly in light of State Farm's labored, vexatious and burdensome defense . . . . ."; "State Farm knew or should have known that its oppressive defense raised against plaintiffs' claims would be extremely costly to plaintiffs . . . . ." These observations underscore the policy reasons supporting our determination that litigation expenses may be awarded in bad faith insurance cases in which the defendant's litigation conduct has been largely responsible for them.

¶128 Because a challenge to the amount of litigation expenses awarded is similar to a challenge to the amount of attorney fees awarded or the amount of costs awarded under Utah Rule of Civil Procedure 54(d), we review such awards under an abuse of discretion standard. Ong Int'l (U.S.A.) Inc. v. 11th Ave. Corp., 850 P.2d 447, 460 (Utah 1993) ("The determination to award taxable costs is within the sound discretion of the trial court and will not be disturbed absent an abuse of that discretion."); City Consumer Servs., Inc. v. Peters, 815 P.2d 234, 240 (Utah 1991) ("The standard of review on appeal of a trial court's award of attorney fees is patent error or clear abuse of discretion." (internal quotation marks omitted)). Moreover, we note that the appropriate measure for awarding litigation expenses is whether such expenses are reasonable and necessary.

¶129 In determining that the litigation expenses awarded to Campbells were reasonable and necessary, the trial court made the following written findings:

   a. The extensive evidence, from which the litigation expenses arose, was necessary to prove each of plaintiffs' causes of action (i.e. breach of good faith duties, intentional infliction of emotional distress and fraud) as well as to refute State Farm's defenses to these causes of action.

   b. In cases of corporate fraud, intentional infliction of emotional distress and breach of good faith duties, there needs to be considerable latitude in presenting evidence to prove intent, reckless disregard, absence of mistake or innocent mistake, a plan or scheme, and outrageous conduct, and to address other elements of these causes of action and the defenses thereto such as those raised by State Farm in this case.

   c. State Farm had a policy and practice to destroy historical documents . . . and therefore could not produce very substantial relevant documentation during the time period in question. Of plaintiffs' litigation expenses, much was incurred due to this policy and practice of State Farm.

   d. At State Farm's request, the case was bifurcated, even though

plaintiffs resisted upon the grounds that it would increase the expenses.

e. There were collateral issues of agency, notice, knowledge and general corporate practices that had to be proven by extensive circumstantial evidence, resulting in the large litigation expenses.

f. Compensatory damages, particularly soft damages, are best evaluated and assessed in the context of the totality of all of the circumstances surrounding the wrongful conduct.

g. Though there may have been some overlap in the evidence that was necessary to establish plaintiffs' causes of action for compensatory damages and punitive damages, and the other collateral issues in the case, the Court finds that all of the costs were reasonably and necessarily incurred and are justified for reasons other than those exclusively related to punitive damages.

h. In numerous evidentiary hearings and orders relating thereto, this Court has set forth in more detail the reasons why the extensive evidence was probative, reasonable and necessary to the plaintiffs' case, and the Court adopts its findings and conclusions set forth in [such orders].

¶130 From these findings, it is clear that the trial court carefully considered whether the costs requested by the Campbells were reasonably and necessarily incurred during their pursuit of this case. In addition, State Farm failed to present any affidavits or contradictory evidence refuting the evidence offered by the Campbells. Finally, the trial judge himself was present throughout this lengthy and complex trial, and was in a good position to gauge the accuracy of plaintiffs' evidence. We therefore hold that the trial court did not abuse its discretion in accepting the amounts proffered by the Campbells and awarding those amounts as litigation expenses.

### CONCLUSION

¶131 In summary, we hold:

1. The trial court's analyses of the punitive damage award under both federal law and the first six Crookston I factors was correct. As to Crookston I factor seven, we reverse, and reinstate the jury's award of $145 million on the Campbells' cross-appeal.

2. The trial court did not abuse its discretion in admitting "other acts" evidence relating to State Farm's claims handling practices.

3. The trial court did not abuse its discretion in admitting the testimony of the Campbells' expert witnesses.

4. The trial court did not abuse its discretion in precluding admission of the Slusher/Ospital settlement agreement.

5. The evidence is sufficient to support the jury's finding of fraud by State Farm against Mrs. Campbell.

6. General compensatory and punitive damages may be awarded for fraud.

Campbell v. State Farm Mutual Auto Ins. Co., No. 981564, Filed October 19, 2001, 20...   Page 35 of 48

7. The evidence is sufficient to support the jury's finding of intentional infliction of emotional distress against both Mr. and Mrs. Campbell.

8. The remitted compensatory damage awards granted to Mr. and Mrs. Campbell are not excessive.

9. The trial court's award of attorney fees and litigation expenses are correct.

Therefore, we affirm the judgment against State Farm in all respects, except for the trial court's remittitur of the punitive damage award. On this issue, we reverse the trial court and reinstate the jury verdict awarding $145 million in punitive damages.

- - -

¶132 Justice Wilkins, Judge Billings, and Judge Davis concur in Justice Durham's opinion.

¶133 Having recused themselves, Chief Justice Howe and Justice Durrant do not participate herein. Judge Judith M. Billings and Judge James Z. Davis from the Court of Appeals sat.

1. The facts as stated herein are drawn from the record on appeal and from the cases of Slusher v. Ospital, 777 P.2d 437 (Utah 1989), and Campbell v. State Farm Mut. Auto. Ins. Co., 840 P.2d 130 (Ut. Ct. App. 1992), cert. denied, 853 P.2d 897 (Utah 1992).

2. Mr. Campbell's policy provided $25,000 of coverage for each person injured in an accident up to a maximum of $50,000 of coverage per accident. Campbell, 840 P.2d at 133.

3. Todd Ospital's policy provided $100,000 of coverage for each person injured in an accident up to a maximum of $300,000. Additionally, Brooks maintained $30,000 of liability coverage on the car Ospital was driving.

4. The jury awarded $1.4 million to Mr. Campbell and $1.2 million to Mrs. Campbell.

5. The reduction resulted in an award of $600,000 to Mr. Campbell and $400,000 to Mrs. Campbell.

6. The trial court initially granted State Farm a remittitur or, in the alternative, a new trial. The Campbells accepted the remittitur.

7. We note that, in discussing the applicable standards of review in this case, we found Judge Norman H. Jackson's article in the Utah Bar Journal, 12 Utah Bar J. 8 (1999), especially helpful, and we recommend it to all appellate practitioners.

8. Although State Farm indicates in its statement of issues section that it is challenging the punitive damage award under the Utah Constitution, it has not in fact made such an argument, and we do not discuss that issue.

9. It is worth noting that the trial court here issued a remittitur to $25 million, still twenty-five times the amount of the compensatory damages. Had the trial court

complied with State Farm's interpretation of the <u>Crookston I</u> ratio factor, the remittitur would have been to an amount three times the amount of the compensatory damages--$3 million. It is apparent from the trial court's written findings that it would not have remitted the amount at all except for its mistaken belief that the jury's award exceeded proper limits as a matter of law under <u>Crookston I</u>.

10. Facts relevant to other <u>Crookston I</u> factors, such as factors four and six, may also satisfy the <u>BMW</u> reprehensibility guidepost.

11. The de novo standard of appellate review imposed by <u>Cooper Industries</u> underscores this principle.

12. That courts must analyze each case's facts to determine the appropriateness of the ratio is also demonstrated by the following cases, cited by State Farm: <u>Denesha v. Farmers Ins. Exch.</u>, 161 F.3d 491, 504-05 (8th Cir. 1998) ("As an initial matter, the 24:1 ratio of punitive to compensatory damages is not unsettling as a matter of due process. . . . [However,] the nature and extent of the [defendant's] conduct does not support the jury's award [and] . . . the effect on [the plaintiff] does not warrant" such an award); <u>EEOC v. HBE Corp.</u>, 135 F.3d 543, 557 (8th Cir. 1998) (reducing punitive damage award only "[a]fter considering the nature and extent of the misconduct, the impact on the individual plaintiffs, a reasonable relation between the compensatory and punitive damages, and an amount sufficient to punish and deter under all the circumstances"); <u>Utah Foam Prods. Co. v. Upjohn Co.</u>, 930 F. Supp. 513, 532 (D. Utah 1996) (reducing punitive damage award because, upon review of evidence at trial, "the punitive damages award does not appropriately reflect the level of Upjohn's misconduct. Decidedly, no egregious conduct was presented which would justify the amount of the award based upon clear and convincing evidence"); <u>Apache Corp. v. Moore</u>, 960 S.W.2d 746, 749 (Tex. App. 1997) (noting that "the ratio that will pass constitutional muster will depend upon the facts in each case").

13. In particular, State Farm argues that the following evidence was not admissible:

- Evidence relating to first-party property claims;
- Unsubstantiated allegations in class action lawsuits;
- Verdicts in first-party cases;
- Evidence of the conduct of a non-party sister company;
- Evidence that State Farm employed predictable experts;
- Evidence that State Farm engaged in hard ball litigation tactics;
- Evidence that State Farm strongly encouraged first-contact settlements; and
- Evidence showing that State Farm discriminated on the basis of sex and race.

14. The trial judge was actually upholding an earlier bifurcation order by predecessor Judge John Rokich.

15. It is not entirely clear to us that the conceptual considerations related to "character" under rule 404 translate freely from the cases we have decided involving an individual's character to the "character" of a corporation. Both parties in this case have briefed the issue without any attention to potential distinctions, however, and so for purposes of this case, we assume (without deciding) that the analysis should be identical.

16. Additionally, we note that the trial court was very responsive to State Farm's request for additional time when it claimed the necessity of adding rebuttal

witnesses regarding a different aspect of the trial. In fact, at that juncture, the trial court doubled the amount of trial time allotted. We are confident that the trial court would have done the same had State Farm convincingly presented such a need regarding these documents.

17. Oddly, despite the trial court's ruling on this issue, the jury did in fact see the Bad Faith Agreement in phase II. State Farm's counsel conducted the following inquiry of Campbells' expert James Crandall:

> Q: . . . Just before the lunch break, I was asking you about your awareness through the documentation of an agreement in June of 1983 between Mr. Ospital, or the Ospitals, and Mr. Slusher about suing State Farm if they got an excess verdict.

> A: Okay.

> Q: And you're aware of that?

> A: I have a general recollection of it.

> Q: We have this document already in evidence, and it's on June 3rd of 1983, between Robert Slusher, Junior, and the estate of Todd Ospital and Allstate. And it said, it says here that, "Ospital and the attorneys currently retained by Ospital shall assist Slusher in the prosecution of his claim against any other party responsible for said injuries and damages, including any claim for bad faith against any insurer of the responsible party." Do you see that?

> A: Yes.

> Q: So before the case went to verdict, which was September of '83, Ospitals and Slushers agreed that they would go together and sue State Farm for bad faith.

> A: Under certain circumstances. They agreed to settle as between each other, which is common, and under certain circumstances, to proceed further.

> Q: But the important thing is, you're aware, as a law professor, that Ospital and Slusher didn't have a direct right to sue State Farm.

> A: That's right. Not for the bad faith claim, that's right. Because it only runs to the Campbells.

> Q: So when Ospital and Slusher got excess verdicts against Mr. Campbell, they needed Mr. Campbell to be the party to bring the lawsuit.

(Emphasis added).

Thus, the Bad Faith Agreement was admitted into evidence, and the jury was informed of its provisions. It came in without objection as Exhibit 41 during the cross-examination of Paul Brinkman, a witness for the plaintiffs, and its pertinent terms were read to the jury. After a subsequent objection by plaintiffs, based on the trial court's exclusion of the agreement in the

pretrial motion in limine, State Farm agreed to the withdrawal of Exhibit 41; nevertheless, counsel for State Farm referenced the agreement in closing argument:

So they confirm that again and then in June of 1983, couple of weeks later, the agreement is signed on June 3rd, 1983, where Slusher, the Ospitals, their counsel and Allstate agree down here in paragraph three that they're going to assist in prosecuting a claim for bad faith against any insurer of the responsible party. And then you get down to paragraph four and they set out how this is going to happen, how this is going to work. And when you go over to paragraph four on page two they talk about splitting up the excess recovery half and half with respect to any general and punitive damages recovered in a bad-faith claim.

Now, this is an agreement, ladies and gentlemen of the jury, a contract, I guess you could call it, whereby Ospital and the Slushers agreed to pursue a bad-faith action against State Farm, which they couldn't pursue without Mr. Campbell giving them some kind of cooperation because by law they can't pursue it.

. . . .

And so what we have is a situation where the evidence shows that even before trial there was an agreement to pursue a bad-faith action by parties who can't pursue it without Campbell helping them. And I submit to you that for that agreement to be carried out, no execution could be pursued and there was no intent to ever do that.


18. Recently, we decided <u>Schuurman v. Shingleton</u>, 2001 UT 52, 26 P.3d 227, in which we held that "the alleged suffering that plaintiff has undergone in this case [severe pain and suffering and emotional distress] is not the type of distress that no reasonable person could be expected to endure." <u>Id.</u> at ¶ 25. We noted that plaintiff's alleged distress in that case was "indistinguishable from that commonly suffered by others when an intimate personal relationship fails." <u>Id.</u>

In this case, however, no reasonable person should be expected to endure the distress suffered by the Campbells at the hands of their insurer, in which they were led to believe they would lose their home and assets and be unable to enjoy their retirement, for which they had worked their entire lives.

19. It is of course true, as the dissent notes, that State Farm argued the issue of Mrs. Campbell's standing to sue for bad faith in Point IV. A of its appellate brief. It did not, however, challenge the phase I verdict in favor of Mrs. Campbell on the fraud and intentional infliction of emotional distress claims on the same basis, since those claims were based in tort, not contract.

20. In <u>Gibbs M. Smith, Inc. v. United States Fidelity & Guaranty Co.</u>, 949 P.2d 337, 344 (Utah 1997), this court implied the same result we reach here, by holding, in a third-party claim, that attorney fees were recoverable for a breach of the implied covenant of good faith and fair dealing. Although the court observed that "a more accurate statement might be that this is a first-party action for third-party coverage," it is plain on the facts that the action involved what we described in <u>Beck</u> as a third-party claim. Thus our holding in that case, despite its scant analysis, stands for the proposition that fees are awardable in third-party bad faith claims by an insured against its insurer, a ruling we make explicit today.

21. We explicitly reject State Farm's proposal to limit the award of attorney fees to $911.25, the amount the Campbells paid to obtain the benefits of their insurance contract with State Farm. Because the very purpose of a bad faith claim is to recover extra-contractual damages--namely, the amount of the excess judgment and any compensatory damages suffered in connection with the insurer's bad faith--it would be entirely incongruent to limit attorney fee awards to those fees incurred to secure the benefits of the insurance contract.

We also reject State Farm's argument that Mr. Campbell's award of attorney fees should be limited to 4% of the total amount of compensatory damages awarded. Examination of the agreement between Mr. Campbell, Slusher, and Ospital reveals that Mr. Campbell is fully liable for all attorney fees unless there is no recovery or a recovery that is insufficient to cover the attorney fees and litigation expenses. Because the recovery here is sufficient, Mr. Campbell is obligated to pay the full contingency fee in the amount of 40% of the compensatory damages awarded.

22. With respect to State Farm's argument concerning the legitimacy of awarding any expenses, State Farm has failed to meet the requirements of Utah Rule of Appellate Procedure 24. In particular, State Farm has failed to satisfy subsection (a)(5) of rule 24 which requires it to include in its brief "[a] statement of the issues presented for review, including for each issue: the standard for appellate review with supporting authority." (Emphasis added.) Although State Farm's issue statement addresses both attorney fees and litigation expenses, State Farm only cites a case discussing the standard of review for attorney fee awards, not awards for litigation expenses, and makes no attempt to analogize awards of litigation expenses to awards for attorney fees.

--- 

RUSSON, Associate Chief Justice, concurring in part and dissenting in part:

¶134 Inez Campbell was never involved in the lawsuit underlying the action now before us, nor could she have been. She was not driving the car that caused the accident, she was never named as a defendant, and she never had any exposure to or became legally obligated to pay damages to any of the claimants. State Farm owed no duty to her under the insurance policy. Only her husband Curtis Campbell was potentially liable, was sued, and was subject to the judgment rendered in that case. State Farm's duty extended only to him.

¶135 Ignoring these crucial facts, the trial court in the second stage of the bifurcated trial in this case erroneously instructed the jury three times that State Farm had already been found liable to both Mr. and Mrs. Campbell for breaching its fiduciary duty and its duty of good faith and fair dealing. In fact, the jury in the prior stage of the trial never rendered a verdict extending liability for bad faith to Inez Campbell. As a result, the trial court's multiple jury instructions to the contrary misled the jury and, in the process, vitiated State Farm's right to a fair trial. This error was plain, and it tainted every aspect of the verdict now under review,[11] including Mrs. Campbell's independent claims for fraud and intentional infliction of emotional distress. The majority's attempt to nevertheless affirm on so-called "independent" grounds glosses over the fatal flaws explicit in the lower court's judgment and runs contrary to this court's own well-established case law.

### I. INEZ CAMPBELL'S BAD FAITH CLAIM

¶136 Although the majority declines to address the issue, it is clear under Utah law that Inez Campbell never had standing to sue State Farm for bad faith. While

Campbell v. State Farm Mutual Auto Ins. Co., No. 981564, Filed October 19, 2001, 20...    Page 40 of 48

this court has long recognized tort claims for an insurance company's breach of its
implied covenant of good faith and fair dealing, see Ammerman v. Farmers Ins.
Exch., 19 Utah 2d 261, 266, 430 P.2d 576, 577-78 (1967), we have always required
that plaintiffs wishing to bring such claims first demonstrate a contractual nexus
through which their suits arise. As we unanimously held only two years ago in
Sperry v. Sperry, "Utah law clearly limits the duty of good faith to first parties
to insurance contracts. Consequently, only a first party can sue for breach of that
duty." 1999 UT 101, ¶ 7, 990 P.2d 381. This conclusion is as natural as it is
logical, for "both first- and third-party claims arise only because of the
contractual relationship of the parties." Savage v. Educators Ins. Co., 908 P.2d
862, 866 (Utah 1995).

¶137 In this case, Curtis Campbell was a party to the insurance contract with State
Farm, and his wife Inez Campbell was not. The contract itself states:

> STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY . . . Agrees with the
> insured, named in the declarations made a part hereof, in consideration
> of the payment of the premium and in reliance upon the statements in the
> declarations and subject to all the terms of this policy . . . .

(Emphasis added.) The only person listed as a "named insured" on the declarations
to which the contract refers is Curtis Campbell. In fact, Mr. Campbell is the only
person listed on those declarations at all. Consequently, Mr. Campbell was the only
one with whom State Farm "[a]gree[d] . . . in consideration of the payment of the
premium" to provide insurance for those designated as covered by the policy. Mrs.
Campbell was simply a beneficiary of the contract, an additional insured.

¶138 Importantly, we have explicitly held that the implied covenant of good faith
and fair dealing does not extend to parties who are merely beneficiaries of an
insurance policy. In Savage v. Educators Insurance Co., 908 P.2d 862 (Utah 1995), a
school bus driver who was insured under an Educators policy purchased by her
employer sued the insurance company for allegedly acting in bad faith by resisting
to compensate her for medical expenses she had incurred. Recognizing that "the duty
of good faith and fair dealing is a contractual covenant, one that arises solely as
an incident to contractual obligations owed by an insurer to its insured," Chief
Justice Zimmerman's 4-1 opinion, from which Justice Durham dissented, flatly
rejected the plaintiff's contention that she had standing to sue. Id. at 866. We
held:

> Because Savage has no contractual relationship with Educators, she has no
> cause of action against it for breach of the covenant of good faith and
> fair dealing. This conclusion is consistent with the commentators and the
> great majority of courts in other jurisdictions . . . .

Id.¹² Nothing is different here. Just as the Jordan School District contracted with
Educators for a policy that insured Pat Savage, in this case Mr. Campbell purchased
his insurance policy from State Farm, a policy that also insured Mrs. Campbell.
Consequently, the contract states by its own terms that it is an agreement between
State Farm and Curtis Campbell--and no one else. Had Mrs. Campbell wished to be
named as a party to the contract rather than merely as a beneficiary of it, she
could have negotiated for that right. Because she did not do so, however, she had
no right under Utah law to sue for bad faith. See Savage, 908 P.2d at 866.

¶139 To this degree, Justice Durham's assertion that any conclusion reached
concerning whether Inez Campbell had standing to sue for bad faith is an "advisory"
one constitutes nothing less than hyperbolic pretense. The claim for bad faith was
the crux of the case against State Farm, and it was for this reason that the lower

court bifurcated the trial in the first place. Moreover, our decision in Savage addressed precisely the issue in question here. Accordingly, any notion that the question of whether Mrs. Campbell had standing to sue for bad faith is "an open [one] in Utah" can be characterized only as a conclusion that recklessly throws all judicial restraint, particularly in the name of stare decisis, to the wind for the sake of achieving a desired result: a binding judgment against State Farm for its, admittedly, condemnable behavior.

¶140  Importantly, however, the law has long recognized that not all actions causing injury enjoy recourse in the courts. E.g., Craftsman Builder's Supply, Inc. v. Butler Mfg. Co., 1999 UT 18, ¶ 140, 974 P.2d 1194 (Zimmerman, J., concurring) ("The law simply does not recognize that every harm suffered should be compensated."); Demman v. Star Broadcasting Co., 28 Utah 2d 50, 53, 497 P.2d 1378, 1380 (1972) (finding that lawsuits cannot be allowed "in every instance"); see also Black's Law Dictionary 398 (7th ed. 1999) ("'There are cases in which the law will suffer a man knowingly and wilfully to inflict harm upon another, and will not hold him accountable for it.'" (quoting John Salmond, Jurisprudence 372-73 (Glanville L. Williams ed., 10th ed. 1947))). This rule of damnum absque injuria applies regardless of how offensive or inappropriate society might find an actor's conduct to be, and this court has itself repeatedly barred recovery for conduct that could very well be considered condemnable but for which there is no cause of action. See, e.g., Sears v. Ogden City, 572 P.2d 1359, 1362 (Utah 1977) (holding that there is no recovery for government action making access to one's property difficult and inconvenient); Demman, 28 Utah 2d at 53, 497 P.2d at 1380 (denying recovery for slander to a losing political candidate after a radio station broadcasted "obnoxious" remarks by a caller who asserted that the candidate was unqualified and a felon); N.M. Long & Co. v. Cannon-Papanikolas Constr. Co., 9 Utah 2d 307, 310, 343 P.2d 1100, 1102 (1959) (affirming judgment for no recovery from defendants who had made unusable plaintiff's fish pond business by draining water from their property); Twenty-Second Corp. of the Church of Jesus Christ of Latter-day Saints v. Oregon Short Line R.R. Co., 36 Utah 238, 255-56, 103 P. 243, 249-50 (1909) (disallowing recovery for disruption of worship services caused by operation of a railroad near a church on Sundays). Consequently, regardless of Justice Durham's assertion to the contrary, it absolutely does matter what legal theory plaintiffs hang their damages on, because failure to sufficiently prove all elements of a given cause of action makes the difference between an injury for which the law provides recourse and one for which there is no legal remedy at all. As such, the majority opinion's curious admission that the jury was not "at all affected in its decision and verdict by the legal labels applied to describe [State Farm's] conduct" in this case both undermines the logic of the opinion itself and emphasizes the importance of whether Mrs. Campbell had standing to sue for bad faith. For if, as the majority recognizes, the jury disregarded the appropriate legal standard in an attempt to "punish" State Farm for conduct the jury found offensive, that is unrefuted evidence of error in law, passion, and prejudice on the jury's part—necessitating a new trial on the court's own motion. See, e.g., Bennion v. LeGrand Johnson Constr. Co., 701 P.2d 1078, 1084 (Utah 1985); Paul v. Kirkendall, 1 Utah 2d 1, 3, 261 P.2d 670, 671 (1953); Utah R. Civ. P. 59. Moreover, the majority's recognition that the jury disregarded the applicable legal standards in this case actually helps explain the great extent to which the trial court's erroneous instruction that State Farm had committed bad faith against Mrs. Campbell confused and inflamed the jury. See infra part III.A.

¶141  Indeed, the majority's reluctance to recognize that Mrs. Campbell never had standing to sue for bad faith only highlights the problems created at the trial level when the lower court inappropriately allowed Mrs. Campbell standing. In fact, the trial court's failure to recognize that Mrs. Campbell did not have standing to pursue a bad faith claim for State Farm's failure to settle the lawsuit against Mr. Campbell eventually led to the court's rendering a faulty verdict in the first stage of the case, and then erroneously instructing the jury in the second stage

that State Farm had already been found liable to Mrs. Campbell for bad faith when
no such verdict had ever been rendered.

## II. THE TRIAL COURT'S FAULTY VERDICT AND ERRONEOUS INSTRUCTION

¶142 This case was bifurcated, resulting in two different jury trials with
verdicts. The jury in the first stage of the bifurcated trial was asked by the
special verdict form only whether there was a likelihood of a judgment being
entered in favor of various claimants against Curtis Campbell, and whether State
Farm had "act[ed] unreasonably when it chose not to settle [the various claims]
against Curtis B. Campbell for Mr. Campbell's policy limit." (Emphasis added.)
Never was the jury in this first stage of the bifurcated trial asked to answer any
question that pertained to Inez Campbell, and the jury accordingly never entered
any such verdict in her favor.[31]

¶143 However, after reciting the jury's special verdict that addressed only State
Farm's actions with respect to Curtis Campbell, the judgment entered in the first
stage of the bifurcated trial stated, "Based on the above findings by the jury, . .
. plaintiffs are granted judgment of liability against defendant State Farm . . .
based on State Farm's breach of its duty to act in good faith in defending Curtis
Campbell." (Emphasis added.) Therefore, with no further explanation, the court
ordered that State Farm was liable to both Curtis and Inez Campbell solely on the
basis of the jury's findings that State Farm had breached its duty to Curtis
Campbell. This giant leap of faith and logic assumed that liability can arise out
of the ether for one plaintiff if a jury finds it for another, a result wholly at
odds with Utah procedure and law. See, e.g., Brigham v. Moon Lake Elec. Ass'n, 24
Utah 2d 292, 298, 470 P.2d 393, 397 (1970) (when special verdict submitted, jury
finds facts and court applies law); Colovos v. Home Life Ins. Co. of New York, 83
Utah 401, 414, 28 P.2d 607, 612 (1934) (court enters judgment on the verdict); Utah
R. Civ. P. 47(q) (jury declares verdict). To be sure, this failure to conform to
the verdict was plain error, rendering the judgment void on its face and requiring
our reversal of Mrs. Campbell's bad faith claim on appeal--especially given the
unavoidable conclusion that Mrs. Campbell never had standing to sue for bad faith
in the first place.

¶144 Moreover, the trial court's faulty judgment eventually resulted in severely
misleading the jury in the second stage of the bifurcated trial. Indeed, in the
second stage of the case, the trial court erroneously instructed the jury three
times that the previous jury had found State Farm liable to Inez Campbell for bad
faith even though no such determination had ever been made. State Farm objected to
this instruction, but the court gave the erroneous instruction nevertheless. For
instance, jury instruction 25 stated:

> You are instructed that a previous jury in this case has found . . . that
> State Farm acted unreasonably in not settling [the] claims against Mr.
> Campbell before the Cache County verdicts. This means that State Farm
> breached its duties of good faith and fair dealing and its fiduciary duty
> to Campbells to settle the claims against Curtis Campbell within the
> policy limits.

(Emphasis added.) Likewise, jury instruction 28 informed the jury that "State Farm
breached its fiduciary duties and duties of good faith and fair dealing to the
Campbells," and thus, that the jury could award "compensatory damages . . . caused
by State Farm's breaches of these duties." (Emphasis added.) Even the special
verdict questions put to the jury were prefaced with the statement that

> [i]t has previously been determined that State Farm breached its duty of

good faith and fair dealing towards the Campbells.

(Emphasis added.) As noted, however, this statement simply was not true. The jury in the first stage of the trial never found liability toward Inez Campbell. The trial court's multiple instructions to the contrary in the second stage of the trial were misleading to the jury and constituted plain and prejudicial error, for the jury's erroneous assumption that State Farm was liable to Inez Campbell for bad faith permeated every aspect of the verdict rendered in the second stage of the trial.

### III. THE PREJUDICIAL EFFECTS OF THE TRIAL COURT'S ERROR

¶145 Because the trial court erroneously instructed the jury in the second stage of the bifurcated trial that State Farm had been found liable to Mrs. Campbell for bad faith, the judgment from the trial's second stage must be vacated and remanded as to Inez Campbell's claims for fraud and intentional infliction of emotional distress, and as to the punitive damages award rendered jointly to Mr. and Mrs. Campbell. Those instructions tainted the jury's consideration of Mrs. Campbell's claims for fraud and intentional infliction of emotional distress, thus preventing any chance that State Farm would receive a fair trial on those issues or on the issue of punitive damages. Moreover, the erroneous instructions fundamentally altered the jury's consideration of punitive damages in contravention to our decision in Crookston v. Fire Insurance Exchange, 817 P.2d 789 (Utah 1991). Indeed, both independently and together, the trial court's severe missteps in this regard constituted plain error necessitating reversal on appeal--especially given that such errors occurred, not because the trial court mistakenly overlooked a matter of procedure or law, but as a result of the court's own affirmative actions in respect to the verdict in the first stage of the case and the jury instructions and special verdict form in the second.[44]

#### A. Right to a Fair Trial

¶146 All parties to litigation--plaintiff and defendant alike--are entitled to a fair trial. In Utah, this right to a fair trial has long included the right to "a presentation of the case to the jury under instructions that clearly, concisely and accurately state the issues and the law applicable thereto so that the jury will understand its duties." Hanks v. Christensen, 11 Utah 2d 8, 12, 354 P.2d 564, 566 (1960); see also, e.g., Rowley v. Graven Bros. & Co., 26 Utah 2d 448, 451, 491 P.2d 1209, 1211 (1971); Brunson v. Strong, 17 Utah 2d 364, 368, 412 P.2d 451, 454 (1966); Williams v. Lloyd, 16 Utah 2d 427, 429, 403 P.2d 166, 167 (1965); Wellman v. Noble, 12 Utah 2d 350, 352, 366 P.2d 701, 702 (1961); Utah State Nat'l Bank v. Livingston, 74 Utah 456, 458-59, 280 P. 327, 327-28 (1929). In this case, however, the instructions given by the court to the jury were anything but "clear" or "accurate," and State Farm consequently never received a fair trial.

¶147 In fact, the instructions' multiple erroneous statements that State Farm had been found liable to Inez Campbell for bad faith possessed only the possibility to confuse the jury and the issues it was to decide. Perhaps most problematically, the court's erroneous statements "took the jury's mind from the real issue" of whether State Farm was liable under Mrs. Campbell's claims for fraud and intentional infliction of emotional distress by "emphasiz[ing] [a] situation[] . . . not supported" by the facts or law--that State Farm was already liable to Inez Campbell for bad faith. Taylor v. Johnson, 15 Utah 2d 342, 349-50, 393 P.2d 382, 387-88 (1964). We have previously held that such an effect violates a party's right to a fair trial, and nothing militates to the contrary here. See id. Likewise, the court's instructions created the misperception that Mrs. Campbell's claims were inextricably bound up in, and caused by, State Farm's actions toward Mr. Campbell.

In so doing, the court impermissibly confused the jury by repeatedly referring to "the Campbells" in the aggregate, rather than by separating the two plaintiffs and their respective claims as required by law. Cf. Nielsen v. Pioneer Valley Hosp., 830 P.2d 270, 274 (Utah 1992) (holding that plaintiff had been denied her right to a fair trial when the court gave instructions confusing the two legal theories on which she was pursuing her claim); King v. Barron, 770 P.2d 975, 977 (Utah 1988) (finding severance appropriate where merging trial for plaintiff's legally unrelated claims "would invite error and confusion" by forcing jury to consider different evidence and theories in relation to separate defendants). Had the court specifically instructed the jury that Inez Campbell's claims for fraud and intentional infliction of emotional distress were entirely separate from those lodged by Curtis Campbell--or had it severed Mrs. Campbell's suit from Mr. Campbell's upon making the correct and appropriate determination that she had no standing to sue for bad faith--then the prejudicial effects of this statement arguably would have been avoided. But the court did not take such an action, and as a consequence both the entire verdict as to Mrs. Campbell and the punitive award, which was rendered jointly as to Mr. and Mrs. Campbell, were irreparably tainted by the court's denying State Farm its right to a fair trial.

¶148 Indeed, the lower court's violation of State Farm's right to a fair trial in this case is especially flagrant in view of the great care with which trial courts are required to select juries. The process of voir dire exists so that courts can ensure "a fair and impartial jury [is] chosen." 47 Am. Jur. 2d, Jury § 189, at 871 (1995). Likewise, partiality, prejudice, and bias all constitute reasons upon which a trial court may excuse a juror for cause, Utah R. Civ. P. 47(f)(6), and we have specifically held that trial "judges should err on the side of caution in ruling on for-cause challenges," as courts' discretion in this area is limited due to the "ease with which all issues of bias can be dispensed by the simple expedient of replacing a questionable juror with another whose neutrality is not open to question." State v. Saunders, 1999 UT 59, ¶ 51, 992 P.2d 951. As a result, we have further held that where a jury considers in its deliberations evidence not introduced at trial, a new trial is required to ensure fairness and impartiality of the ultimate result. See State ex rel. Road Comm'n v. White, 22 Utah 2d 102, 103, 449 P.2d 114, 115 (1969).[121] Similarly, courts uniformly require dismissal of potential jurors who have prior knowledge of facts material to the dispute, and require a new trial where such jurors were not dismissed. See, e.g., Lewis v. State ex rel. Baxley, 70 So. 2d 790, 791-92 (Ala. 1954) (affirming trial court's decision to dismiss six jurors from a disciplinary proceeding because their animals had been treated by the veterinarian under review); Barker v. Commonwealth, 337 S.E.2d 729, 733 (Va. 1985) (reversing a conviction for rape, sodomy, and malicious wounding because juror who knew of defendant's prior conviction on the same charges, which had been overturned and was being readjudicated, was not excused). And in cases where media coverage is so "extensive" that it precludes a party from "receiv[ing] a fair and impartial trial," we have held that trial courts must take protective measures, such as allowing change of venue, to ensure a fair trial. See, e.g., State v. James, 767 P.2d 549, 554 (Utah 1989). In fact, even in the face of countervailing constitutional concerns, we have allowed trial courts to issue temporary restraining orders restricting during-trial publicity so that the parties hold a greater chance of receiving a fair trial. See KUTV, Inc. v. Wilkinson, 686 P.2d 456, 461 (Utah 1984). It is for this same reason that trial judges examine potential jurors at length about any outside information they may have received concerning the case at issue and whether they have any preconceived notions about the parties or the subject matter in dispute. Upon finding that such partiality exists, a judge will properly excuse that potential juror from service, just as courts repeatedly and appropriately instruct the eventually impaneled jurors not to discuss the case with anyone or to consider any media coverage of the suit or other outside evidence. See Model Utah Jury Instructions, Civil 1.8 (Michie 1993). In this case, however, the trial court nullified any prior efforts it had made to impanel a fair and impartial jury by itself giving the jury erroneous information,

namely, that State Farm had already been found liable to Mrs. Campbell for bad faith. Had a potential juror admitted to such an erroneous belief upon reporting for duty, he or she certainly would have been excused. But here, it was the trial court's own instruction that misled the jury and, thus, encroached on State Farm's right to a fair trial.

¶149 Accordingly, the majority opinion's bare assertion that Mrs. Campbell's fraud and intentional infliction of emotional distress claims "provide[] an independent basis for sustaining all of Mrs. Campbell's damages" cannot support an affirmance of the lower court's judgment. Not only does Justice Durham fail to attempt to explain how those theories of liability account for the damages the jury actually awarded, but the judgments rendered to Mrs. Campbell on her claims for fraud and intentional infliction of emotional distress are void ab initio due to the court's breach of State Farm's right to a fair trial.

<u>B. Punitive Damages</u>

¶150 Apart from the problems created by the lower court's denying State Farm its right to a fair trial, the court's multiple erroneous instructions to the jury that liability had been found as to Inez Campbell for bad faith prejudiced State Farm further by skewing the fundamental considerations required for determining punitive damages.

¶151 The jury was asked in the second stage of the bifurcated trial to award damages to both Curtis Campbell and Inez Campbell, and in doing so awarded <u>compensatory damages</u> to Curtis Campbell in the amount of $1.4 million and to Inez Campbell in the amount of $1.2 million. The jury was also asked to award <u>punitive damages</u>, if any, which it did in the amount of $145 million but without designating which portion of the amount was awarded to Inez Campbell and which portion was awarded to Curtis Campbell.

¶152 In its determination of punitive damages, the jury had been specifically instructed by the trial court to consider, among other things, "the effect of defendant's misconduct on the lives of the Campbells," and "the relationship between the parties," and "the amount of compensatory damages awarded." This jury instruction was given in compliance with our decision in <u>Crookston v. Fire Insurance Exchange</u>, 817 P.2d 789 (Utah 1991), which held that a jury awarding punitive damages must be charged with considering seven factors in order to determine the appropriate amount of the award. These factors include "(i) the relative wealth of the defendant; (ii) the nature of the alleged misconduct; (iii) the facts and circumstances surrounding such conduct; (iv) <u>the effect thereof on the lives of the plaintiff and others</u>; (v) the probability of future recurrence of the misconduct; (vi) <u>the relationship of the parties</u>; and (vii) <u>the amount of actual damages awarded</u>." <u>Crookston</u>, 817 P.2d at 808 (emphasis added). However, because the jury was operating under the false assumption that State Farm was liable to Inez Campbell for bad faith, it could not possibly have given proper consideration to each of these factors, and the majority consequently sets dangerous precedent by reinstating the jury's original punitive award for $145 million rather than remanding to the trial court for further deliberations on punitive damages.

¶153 Indeed, the jury granted Mrs. Campbell $1.2 million in compensatory damages for her injury, and we can only assume that the jury followed the judge's instructions and based its punitive award, at least partially, on the effect of State Farm's alleged misconduct on Mrs. Campbell's life. <u>See, e.g.</u>, <u>Nielsen v. Pioneer Valley Hosp.</u>, 830 P.2d 270, 275 (Utah 1992) ("[J]urors are sworn to follow the instructions as given by the court . . . ."). As instructed by the court, the

jury understood a good portion of such misconduct to include State Farm's breach of its duty of good faith and fair dealing, but as explained, State Farm did not owe Mrs. Campbell such a duty and no jury had ever found that State Farm had breached it to her. This is enough by itself to require a reassessment of the punitive award at the trial level, since the judgment rendered to punish State Farm is inexplicably tied to "misconduct" that State Farm did not--and could not--commit.

¶154 Moreover, the punitive award does not reflect an appropriate consideration of Crookston's sixth factor, the relationship of the parties. The analysis undertaken by any jury properly employing our seven factors for punitive damages will be fundamentally altered when informed that, as a matter of law, one of the plaintiffs in the case has no standing to sue for one of the claims lodged. Especially here, where Mrs. Campbell's claim for bad faith was her only assertion of a fiduciary relationship with State Farm, it is imperative that we remand the punitive damages award for further proceedings. To be sure, even if Inez Campbell's remaining claims for fraud and intentional infliction of emotional distress survived the problems created by the unfair trial given to State Farm in this case, which they do not, they neither create nor demonstrate any relevant legal relationship between Mrs. Campbell and State Farm. The precise effect such a revelation would have had on the jury falls only within the realm of pure speculation, but given our own mandate that the jury consider, not a fictional, but the actual "relationship of the parties" in determining punitive damages, this too requires that we remand to the trial court for further proceedings.

¶155 Finally, the punitive damages award must fail because it was awarded jointly to Mr. and Mrs. Campbell rather than separately to each plaintiff. Even if the trial court had properly severed Inez Campbell's claims from her husband's, which it did not, the punitive award would have to be remanded under Crookston due to its joint nature. Mrs. Campbell's claims were entirely independent from Mr. Campbell's, but because punitive damages were awarded jointly as to both these plaintiffs, we cannot now know what portion of the award the jury intended to be owed to Inez Campbell and what portion it intended to be owed to Curtis Campbell. Accordingly, because Mrs. Campbell's claims for fraud and intentional infliction of emotional distress must be remanded while Mr. Campbell's need not--and because, as explained, the jury was inappropriately instructed to commingle the two plaintiffs in its consideration of the fourth and sixth Crookston factors--the punitive damages award must be vacated and remanded for further proceedings.[16]

IV. CONCLUSION

¶156 Inez Campbell had no standing to sue State Farm for bad faith, and the jury never found that State Farm was liable to her in that regard. Her only actionable claims were for fraud and intentional infliction of emotional distress. As a result, the trial court's multiple instructions that State Farm had been found liable to Mrs. Campbell for bad faith tainted both the entire verdict as to Mrs. Campbell and the punitive damages assessed against State Farm in behalf of Mr. Campbell. Accordingly, I would (1) reverse as to Mrs. Campbell's claim for bad faith, (2) vacate and remand for a new trial on Mrs. Campbell's claims for fraud and intentional infliction of emotional distress, (3) affirm on the issue of State Farm's liability to Mr. Campbell, and (4) vacate and remand for a new trial on the issue of punitive damages as to Mr. Campbell inasmuch as that award was rendered jointly to both Mr. Campbell and Mrs. Campbell.

--- 

1. State Farm raises the issue of Mrs. Campbell's standing to sue for bad faith in point IV.A of its appellate brief.

Campbell v. State Farm Mutual Auto Ins. Co., No. 981564, Filed October 19, 2001, 20...    Page 47 of 48

2. Indeed, the overwhelming majority of jurisdictions follow exactly the same rule Utah does: that "the duty of good faith and fair dealing derives from and exists solely because of the contractual relationship of the parties." Austero v. Nat'l Cas. Co., 133 Cal. Rptr. 107, 110 (Ct. App. 1976); see, e.g., Lowe v. Am. Med. Int'l, 494 So. 2d 413, 414 (Ala. 1986) ("The cause of action for the tort of bad faith refusal to pay was created to protect only the person for whose benefit the insurance payments should have been made."); Hatchwell v. Blue Shield of California, 244 Cal. Rptr. 249, 253 (Ct. App. 1988) ("Although [Mrs. Hatchwell] was eligible for health care benefits as a Dependent Subscriber [on Mr. Hatchwell's insurance policy], and as such may be termed a 'co-insured' or 'dependent beneficiary,' as she urges, this is not sufficient to establish standing to sue for breach of contract and bad faith based upon the denial of benefits to [Mr. Hatchwell]." (citations omitted)); Soto v. Royal Globe Ins. Co., 229 Cal. Rptr. 192, 197 (Ct. App. 1986) ("One who is not a party to the insurance contract and the accompanying implied covenant of good faith and fair dealing may not maintain an action for breach of the covenant."); Eastham v. Nationwide Mut. Ins. Co., 586 N.E.2d 1131, 1133 (Ohio Ct. App. 1990) (holding that a wife did not have standing to bring a bad faith claim against her automobile liability insurer for failing to timely pay the medical expenses of her deceased son, even though she was insured under the policy); United Fire Ins. Co. v. McClelland, 780 P.2d 193, 197-98 (Nev. 1989) ("[A] wife's coverage as a dependent under her husband's health insurance policy does not give her standing to enforce her husband's contract rights for bad faith denial of health care benefits."); Vecchiarelli v. Cont'l Ins. Co., 628 N.Y.S.2d 892, 893 (App. Div. 1995) (upholding the dismissal of a spouse's claim for bad faith where no contractual nexus was present); see also Correa v. Pa. Mfrs. Ass'n Ins. Co., 618 F. Supp. 915, 929 (D. Del. 1985) (finding that the duty of good faith and fair dealing does not extend to the spouse of someone insured under a workers' compensation policy); Transp. Ins. Co. v. Archer, 832 S.W.2d 403, 405 (Tex. Ct. App. 1992) (disallowing a spouse's suit for bad faith when her husband was denied benefit payments from his workers' compensation carrier).

3. As explained above, there was good reason the jury in the first stage of the bifurcated trial was never asked questions as to breach of duty to Inez Campbell. State Farm did not owe a duty to Inez Campbell to settle the case in her behalf. Inez Campbell was not the driver of the vehicle involved in the accident and had no exposure of liability for claims arising from the accident. For the same reason, she was not named as a defendant in the underlying case in Cache County.

4. Justice Durham, in a single paragraph, apparently takes exception to the entire dissent on the ground that the parties failed to raise the "wording" of the trial court's faulty verdict from the first stage of the case below or on appeal. Despite this bald assertion, State Farm did specifically challenge on appeal the trial court's determination that Mrs. Campbell had standing to sue for bad faith. In fact, State Farm argued that "[t]he court below" should not have "concluded that Mrs. Campbell had standing" based "solely on her marital relationship to Curtis Campbell." Moreover, this court has repeatedly held that we "may consider issues raised for the first time on appeal if the trial court committed plain error." Julian v. State, 966 P.2d 249, 258 (Utah 1998); see also, e.g., Green v. Louder, 2001 UT 62, ¶ 34, 426 Utah Adv. Rep. 25 (Durham, J.); State v. Helmick, 2000 UT 70, ¶ 8, 9 P.3d 164 (Durham, J.); Berenda v. Langford, 914 P.2d 45, 51 n.1 (Utah 1996); Salt Lake City v. Ohms, 881 P.2d 844, 847 (Utah 1994); State v. Germonto, 868 P.2d 50, 58 (Utah 1993) (Durham, J.); State v. Brown, 853 P.2d 851, 853-54 (Utah 1992) (Durham, J.). The trial court's actions in this case unequivocally constituted plain error, a point made repeatedly throughout the dissent. See supra ¶¶ 135, 140, 143, 144, 145, 149; infra ¶ 155.

5. Accord United States v. Castello, 526 F. Supp. 847, 848-50 (W.D. Tex. 1981) (granting a new trial where a juror conducted ballistic experiments and reported the results to the jury); Frede v. Downs, 428 N.E.2d 1035, 1037 (Ill. App. Ct.

1531) (remanding for a new trial a collision case in which the jury referred to a
boating handbook not admitted as evidence); Brockie v. Omo Constr., Inc., 844 P.2d
61, 63-64 (Mont. 1992) (reversing trial court's decision not to grant a new trial
where jury foreman researched physics questions at issue in the case and reported
his findings to other jurors); Arthur v. Washington Iron Works, 587 P.2d 626, 629
(Wash. 1978) (ordering a new trial where jurors went to the public library "looking
for handbooks" related to the case and "examin[ed] the yellow pages of the
telephone book concerning" witnesses that had been called during trial).

6. Contending that Crookston does not question the legitimacy of joint punitive
damage awards, the majority opinion assails the argument that the punitive award in
this case must be vacated. However, the majority's contention must fail for at
least two reasons. First, in characterizing the necessity for vacating the punitive
award solely "due to its joint nature," Justice Durham oversimplifies the reasons
stated above for why the award must fail. While Crookston did recognize the policy
objectives of punitive damages to include "punish[ment] and deter[rence]," 817 P.2d
at 807, we specifically held in Crookston that awards rendered for such purposes
must be constrained by well established "parameters" that tether punitive damages
to some sense of reasonableness in order to avoid "excessive awards." Id. at 808.
Those parameters include the seven factors listed above, which "must be considered
[by the jury] in assessing the amount of punitives." Id. (emphasis added). Because,
as explained above, the jury was unable to properly consider two of those factors
in this case due to the trial court's erroneous instruction that State Farm had
been found liable to Mrs. Campbell for bad faith, the punitive award must be
vacated and remanded. See id.; C.T. ex rel. Taylor v. Johnson, 1999 UT 35, ¶¶ 17-
26, 977 P.2d 479 (upholding a punitive award only because the trial court's failure
to instruct the jury to consider all of the seven Crookston factors was harmless
since the jury did in fact fully and properly assess each factor); Ong Int'l
(U.S.A.) Inc. v. 11th Ave. Corp., 850 P.2d 447, 458-59 (Utah 1993) (affirming a
punitive award because the jury "made a detailed finding based on the seven factors
enunciated in Crookston"). Indeed, nowhere in her opinion does Justice Durham even
attempt to address this issue. Second, there is good reason why the "joint nature
of the punitive damages award was never questioned" in Crookston. Unlike the case
now before us, neither of the parties involved in Crookston ever had their standing
to sue questioned, nor was the issue raised on appeal. Consequently, the
problematic situation created here--where one party who was awarded punitives had
every right to sue but the other party given the same award should have never been
involved in the lawsuit--simply did not exist in Crookston. See 817 P.2d at 794
(recognizing that both Mr. and Mrs. Crookston were named as insureds in their
homeowner's policy).

Cite as: 538 U. S. ____ (2003)    1

Opinion of the Court

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

No. 01–1289

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, PETITIONER *v.* INEZ PREECE CAMPBELL AND MATTHEW C. BARNECK, SPECIAL ADMINISTRATOR AND PERSONAL REPRESENTATIVE OF THE ESTATE OF CURTIS B. CAMPBELL

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF UTAH

[April 7, 2003]

JUSTICE KENNEDY delivered the opinion of the Court.

We address once again the measure of punishment, by means of punitive damages, a State may impose upon a defendant in a civil case. The question is whether, in the circumstances we shall recount, an award of $145 million in punitive damages, where full compensatory damages are $1 million, is excessive and in violation of the Due Process Clause of the Fourteenth Amendment to the Constitution of the United States.

I

In 1981, Curtis Campbell (Campbell) was driving with his wife, Inez Preece Campbell, in Cache County, Utah. He decided to pass six vans traveling ahead of them on a two-lane highway. Todd Ospital was driving a small car approaching from the opposite direction. To avoid a head-on collision with Campbell, who by then was driving on the wrong side of the highway and toward oncoming traffic, Ospital swerved onto the shoulder, lost control of his automobile, and collided with a vehicle driven by Robert

G. Slusher. Ospital was killed, and Slusher was rendered permanently disabled. The Campbells escaped unscathed.

In the ensuing wrongful death and tort action, Campbell insisted he was not at fault. Early investigations did support differing conclusions as to who caused the accident, but "a consensus was reached early on by the investigators and witnesses that Mr. Campbell's unsafe pass had indeed caused the crash." ___ P. 3d ___, 2001 WL 1246676, *1 (Utah, Oct. 19, 2001). Campbell's insurance company, petitioner State Farm Mutual Automobile Insurance Company (State Farm), nonetheless decided to contest liability and declined offers by Slusher and Ospital's estate (Ospital) to settle the claims for the policy limit of $50,000 ($25,000 per claimant). State Farm also ignored the advice of one of its own investigators and took the case to trial, assuring the Campbells that "their assets were safe, that they had no liability for the accident, that [State Farm] would represent their interests, and that they did not need to procure separate counsel." *Id.*, at ___, 2001 WL 1246676, at *2. To the contrary, a jury determined that Campbell was 100 percent at fault, and a judgment was returned for $185,849, far more than the amount offered in settlement.

At first State Farm refused to cover the $135,849 in excess liability. Its counsel made this clear to the Campbells: "'You may want to put for sale signs on your property to get things moving.'" *Ibid.* Nor was State Farm willing to post a supersedeas bond to allow Campbell to appeal the judgment against him. Campbell obtained his own counsel to appeal the verdict. During the pendency of the appeal, in late 1984, Slusher, Ospital, and the Campbells reached an agreement whereby Slusher and Ospital agreed not to seek satisfaction of their claims against the Campbells. In exchange the Campbells agreed to pursue a bad faith action against State Farm and to be represented by Slusher's and Ospital's attorneys. The Campbells also

Opinion of the Court

agreed that Slusher and Ospital would have a right to play a part in all major decisions concerning the bad faith action. No settlement could be concluded without Slusher's and Ospital's approval, and Slusher and Ospital would receive 90 percent of any verdict against State Farm.

In 1989, the Utah Supreme Court denied Campbell's appeal in the wrongful death and tort actions. *Slusher* v. *Ospital*, 777 P. 2d 437. State Farm then paid the entire judgment, including the amounts in excess of the policy limits. The Campbells nonetheless filed a complaint against State Farm alleging bad faith, fraud, and intentional infliction of emotional distress. The trial court initially granted State Farm's motion for summary judgment because State Farm had paid the excess verdict, but that ruling was reversed on appeal. 840 P. 2d 130 (Utah App. 1992). On remand State Farm moved *in limine* to exclude evidence of alleged conduct that occurred in unrelated cases outside of Utah, but the trial court denied the motion. At State Farm's request the trial court bifurcated the trial into two phases conducted before different juries. In the first phase the jury determined that State Farm's decision not to settle was unreasonable because there was a substantial likelihood of an excess verdict.

Before the second phase of the action against State Farm we decided *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559 (1996), and refused to sustain a $2 million punitive damages award which accompanied a verdict of only $4,000 in compensatory damages. Based on that decision, State Farm again moved for the exclusion of evidence of dissimilar out-of-state conduct. App. to Pet. for Cert. 168a–172a. The trial court denied State Farm's motion. *Id.*, at 189a.

The second phase addressed State Farm's liability for fraud and intentional infliction of emotional distress, as well as compensatory and punitive damages. The Utah Supreme Court aptly characterized this phase of the trial:

"State Farm argued during phase II that its decision to take the case to trial was an 'honest mistake' that did not warrant punitive damages. In contrast, the Campbells introduced evidence that State Farm's decision to take the case to trial was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide. This scheme was referred to as State Farm's 'Performance, Planning and Review,' or PP & R, policy. To prove the existence of this scheme, the trial court allowed the Campbells to introduce extensive expert testimony regarding fraudulent practices by State Farm in its nation-wide operations. Although State Farm moved prior to phase II of the trial for the exclusion of such evidence and continued to object to it at trial, the trial court ruled that such evidence was admissible to determine whether State Farm's conduct in the Campbell case was indeed intentional and sufficiently egregious to warrant punitive damages." ___ P. 3d, at ___, 2001 WL 1246676, at *3.

Evidence pertaining to the PP&R policy concerned State Farm's business practices for over 20 years in numerous States. Most of these practices bore no relation to third-party automobile insurance claims, the type of claim underlying the Campbells' complaint against the company. The jury awarded the Campbells $2.6 million in compensatory damages and $145 million in punitive damages, which the trial court reduced to $1 million and $25 million respectively. Both parties appealed.

The Utah Supreme Court sought to apply the three guideposts we identified in *Gore, supra*, at 574–575, and it reinstated the $145 million punitive damages award. Relying in large part on the extensive evidence concerning the PP&R policy, the court concluded State Farm's conduct was reprehensible. The court also relied upon State

Opinion of the Court

Farm's "massive wealth" and on testimony indicating that "State Farm's actions, because of their clandestine nature, will be punished at most in one out of every 50,000 cases as a matter of statistical probability," ___ P. 3d, at ___, 2001 WL 1246676, at *15, and concluded that the ratio between punitive and compensatory damages was not unwarranted. Finally, the court noted that the punitive damages award was not excessive when compared to various civil and criminal penalties State Farm could have faced, including $10,000 for each act of fraud, the suspension of its license to conduct business in Utah, the disgorgement of profits, and imprisonment. *Id.*, at ___, 2001 WL 1246676, at *17. We granted certiorari. 535 U. S. 1111 (2002).

II

We recognized in *Cooper Industries, Inc.* v. *Leatherman Tool Group, Inc.*, 532 U. S. 424 (2001), that in our judicial system compensatory and punitive damages, although usually awarded at the same time by the same decision-maker, serve different purposes. *Id.*, at 432. Compensatory damages "are intended to redress the concrete loss that the plaintiff has suffered by reason of the defendant's wrongful conduct." *Ibid.* (citing Restatement (Second) of Torts §903, pp. 453–454 (1979)). By contrast, punitive damages serve a broader function; they are aimed at deterrence and retribution. *Cooper Industries, supra,* at 432; see also *Gore, supra,* at 568 ("Punitive damages may properly be imposed to further a State's legitimate interests in punishing unlawful conduct and deterring its repetition"); *Pacific Mut. Life Ins. Co.* v. *Haslip,* 499 U. S. 1, 19 (1991) ("[P]unitive damages are imposed for purposes of retribution and deterrence").

While States possess discretion over the imposition of punitive damages, it is well established that there are procedural and substantive constitutional limitations on

6          STATE FARM MUT. AUTOMOBILE INS. CO.
                        *v.* CAMPBELL
                     Opinion of the Court

these awards. *Cooper Industries, supra; Gore,* 517 U. S.,
at 559; *Honda Motor Co.* v. *Oberg,* 512 U. S. 415 (1994);
*TXO Production Corp.* v. *Alliance Resources Corp.,* 509
U. S. 443 (1993); *Haslip, supra.* The Due Process Clause
of the Fourteenth Amendment prohibits the imposition of
grossly excessive or arbitrary punishments on a tortfeasor.
*Cooper Industries, supra,* at 433; *Gore,* 517 U. S., at 562;
see also *id.,* at 587 (BREYER, J., concurring) ("This consti-
tutional concern, itself harkening back to the Magna
Carta, arises out of the basic unfairness of depriving citi-
zens of life, liberty, or property, through the application,
not of law and legal processes, but of arbitrary coercion").
The reason is that "[e]lementary notions of fairness en-
shrined in our constitutional jurisprudence dictate that a
person receive fair notice not only of the conduct that will
subject him to punishment, but also of the severity of the
penalty that a State may impose." *Id.,* at 574; *Cooper
Industries, supra,* at 433 ("Despite the broad discretion
that States possess with respect to the imposition of
criminal penalties and punitive damages, the Due Process
Clause of the Fourteenth Amendment to the Federal
Constitution imposes substantive limits on that discre-
tion"). To the extent an award is grossly excessive, it
furthers no legitimate purpose and constitutes an arbi-
trary deprivation of property. *Haslip, supra,* at 42
(O'CONNOR, J., dissenting) ("Punitive damages are a pow-
erful weapon. Imposed wisely and with restraint, they
have the potential to advance legitimate state interests.
Imposed indiscriminately, however, they have a devas-
tating potential for harm. Regrettably, common-law pro-
cedures for awarding punitive damages fall into the latter
category").

   Although these awards serve the same purposes as
criminal penalties, defendants subjected to punitive dam-
ages in civil cases have not been accorded the protections
applicable in a criminal proceeding. This increases our

Opinion of the Court

concerns over the imprecise manner in which punitive damages systems are administered. We have admonished that "[p]unitive damages pose an acute danger of arbitrary deprivation of property. Jury instructions typically leave the jury with wide discretion in choosing amounts, and the presentation of evidence of a defendant's net worth creates the potential that juries will use their verdicts to express biases against big businesses, particularly those without strong local presences." *Honda Motor, supra,* at 432; see also *Haslip, supra,* at 59 (O'CONNOR, J., dissenting) ("[T]he Due Process Clause does not permit a State to classify arbitrariness as a virtue. Indeed, the point of due process—of the law in general—is to allow citizens to order their behavior. A State can have no legitimate interest in deliberately making the law so arbitrary that citizens will be unable to avoid punishment based solely upon bias or whim"). Our concerns are heightened when the decisionmaker is presented, as we shall discuss, with evidence that has little bearing as to the amount of punitive damages that should be awarded. Vague instructions, or those that merely inform the jury to avoid "passion or prejudice," App. to Pet. for Cert. 108a–109a, do little to aid the decisionmaker in its task of assigning appropriate weight to evidence that is relevant and evidence that is tangential or only inflammatory.

In light of these concerns, in *Gore, supra,* we instructed courts reviewing punitive damages to consider three guideposts: (1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases. *Id.,* at 575. We reiterated the importance of these three guideposts in *Cooper Industries* and mandated appellate courts to conduct *de novo* review of a trial court's application of them to

8    STATE FARM MUT. AUTOMOBILE INS. CO.
*v.* CAMPBELL
Opinion of the Court

the jury's award.  532 U. S., at 424.  Exacting appellate
review ensures that an award of punitive damages is
based upon an "'application of law, rather than a deci-
sionmaker's caprice.'"  *Id.,* at 436 (quoting *Gore, supra,* at
587 (BREYER, J., concurring)).

### III

Under the principles outlined in *BMW of North America,
Inc.* v. *Gore,* this case is neither close nor difficult.  It was
error to reinstate the jury's $145 million punitive damages
award.  We address each guidepost of *Gore* in some detail.

### A

"[T]he most important indicium of the reasonableness of
a punitive damages award is the degree of reprehensibility
of the defendant's conduct."  *Gore, supra,* at 575.  We have
instructed courts to determine the reprehensibility of a
defendant by considering whether: the harm caused was
physical as opposed to economic; the tortious conduct
evinced an indifference to or a reckless disregard of the
health or safety of others; the target of the conduct had
financial vulnerability; the conduct involved repeated
actions or was an isolated incident; and the harm was the
result of intentional malice, trickery, or deceit, or mere
accident.  517 U. S., at 576–577.  The existence of any one
of these factors weighing in favor of a plaintiff may not be
sufficient to sustain a punitive damages award; and the
absence of all of them renders any award suspect.  It
should be presumed a plaintiff has been made whole for
his injuries by compensatory damages, so punitive dam-
ages should only be awarded if the defendant's culpability,
after having paid compensatory damages, is so reprehen-
sible as to warrant the imposition of further sanctions to
achieve punishment or deterrence.  *Id.,* at 575.

Applying these factors in the instant case, we must
acknowledge that State Farm's handling of the claims

Opinion of the Court

against the Campbells merits no praise. The trial court found that State Farm's employees altered the company's records to make Campbell appear less culpable. State Farm disregarded the overwhelming likelihood of liability and the near-certain probability that, by taking the case to trial, a judgment in excess of the policy limits would be awarded. State Farm amplified the harm by at first assuring the Campbells their assets would be safe from any verdict and by later telling them, postjudgment, to put a for-sale sign on their house. While we do not suggest there was error in awarding punitive damages based upon State Farm's conduct toward the Campbells, a more modest punishment for this reprehensible conduct could have satisfied the State's legitimate objectives, and the Utah courts should have gone no further.

This case, instead, was used as a platform to expose, and punish, the perceived deficiencies of State Farm's operations throughout the country. The Utah Supreme Court's opinion makes explicit that State Farm was being condemned for its nationwide policies rather than for the conduct direct toward the Campbells. ___ P. 3d, at ___, 2001 WL 1246676, at *3 ("[T]he Campbells introduced evidence that State Farm's decision to take the case to trial was a result of a national scheme to meet corporate fiscal goals by capping payouts on claims company wide"). This was, as well, an explicit rationale of the trial court's decision in approving the award, though reduced from $145 million to $25 million. App. to Pet. for Cert. 120a ("[T]he Campbells demonstrated, through the testimony of State Farm employees who had worked outside of Utah, and through expert testimony, that this pattern of claims adjustment under the PP&R program was not a local anomaly, but was a consistent, nationwide feature of State Farm's business operations, orchestrated from the highest levels of corporate management").

The Campbells contend that State Farm has only itself

to blame for the reliance upon dissimilar and out-of-state conduct evidence. The record does not support this contention. From their opening statements onward the Campbells framed this case as a chance to rebuke State Farm for its nationwide activities. App. 208 ("You're going to hear evidence that even the insurance commission in Utah and around the country are unwilling or inept at protecting people against abuses"); *id.*, at 242 ("[T]his is a very important case. . . . [I]t transcends the Campbell file. It involves a nationwide practice. And you, here, are going to be evaluating and assessing, and hopefully requiring State Farm to stand accountable for what it's doing across the country, which is the purpose of punitive damages"). This was a position maintained throughout the litigation. In opposing State Farm's motion to exclude such evidence under *Gore*, the Campbells' counsel convinced the trial court that there was no limitation on the scope of evidence that could be considered under our precedents. App. to Pet. for Cert. 172a ("As I read the case [*Gore*], I was struck with the fact that a clear message in the case . . . seems to be that courts in punitive damages cases should receive more evidence, not less. And that the court seems to be inviting an even broader area of evidence than the current rulings of the court would indicate"); *id.*, at 189a (trial court ruling).

A State cannot punish a defendant for conduct that may have been lawful where it occurred. *Gore, supra,* at 572; *Bigelow* v. *Virginia,* 421 U. S. 809, 824 (1975) ("A State does not acquire power or supervision over the internal affairs of another State merely because the welfare and health of its own citizens may be affected when they travel to that State"); *New York Life Ins. Co.* v. *Head,* 234 U. S. 149, 161 (1914) ("[I]t would be impossible to permit the statutes of Missouri to operate beyond the jurisdiction of that State . . . without throwing down the constitutional barriers by which all the States are restricted within the

Opinion of the Court

orbits of their lawful authority and upon the preservation
of which the Government under the Constitution depends.
This is so obviously the necessary result of the Constitu-
tion that it has rarely been called in question and hence
authorities directly dealing with it do not abound");
*Huntington* v. *Attrill,* 146 U. S. 657, 669 (1892) ("Laws
have no force of themselves beyond the jurisdiction of the
State which enacts them, and can have extra-territorial
effect only by the comity of other States"). Nor, as a gen-
eral rule, does a State have a legitimate concern in im-
posing punitive damages to punish a defendant for unlaw-
ful acts committed outside of the State's jurisdiction. Any
proper adjudication of conduct that occurred outside Utah
to other persons would require their inclusion, and, to
those parties, the Utah courts, in the usual case, would
need to apply the laws of their relevant jurisdiction.
*Phillips Petroleum Co.* v. *Shutts,* 472 U. S. 797, 821–822
(1985).

Here, the Campbells do not dispute that much of the
out-of-state conduct was lawful where it occurred. They
argue, however, that such evidence was not the primary
basis for the punitive damages award and was relevant to
the extent it demonstrated, in a general sense, State
Farm's motive against its insured. Brief for Respondents
46–47 ("[E]ven if the practices described by State Farm
were not malum in se or malum prohibitum, they became
relevant to punitive damages to the extent they were used
as tools to implement State Farm's wrongful PP&R pol-
icy"). This argument misses the mark. Lawful out-of-
state conduct may be probative when it demonstrates the
deliberateness and culpability of the defendant's action in
the State where it is tortious, but that conduct must have
a nexus to the specific harm suffered by the plaintiff. A
jury must be instructed, furthermore, that it may not use
evidence of out-of-state conduct to punish a defendant for
action that was lawful in the jurisdiction where it oc-

curred. *Gore*, 517 U. S., at 572–573 (noting that a State
"does not have the power . . . to punish [a defendant] for
conduct that was lawful where it occurred and that had no
impact on [the State] or its residents"). A basic principle
of federalism is that each State may make its own rea-
soned judgment about what conduct is permitted or pro-
scribed within its borders, and each State alone can de-
termine what measure of punishment, if any, to impose on
a defendant who acts within its jurisdiction. *Id.*, at 569
("[T]he States need not, and in fact do not, provide such
protection in a uniform manner").

For a more fundamental reason, however, the Utah
courts erred in relying upon this and other evidence: The
courts awarded punitive damages to punish and deter
conduct that bore no relation to the Campbells' harm. A
defendant's dissimilar acts, independent from the acts upon
which liability was premised, may not serve as the basis for
punitive damages. A defendant should be punished for the
conduct that harmed the plaintiff, not for being an unsavory
individual or business. Due process does not permit courts,
in the calculation of punitive damages, to adjudicate the
merits of other parties' hypothetical claims against a
defendant under the guise of the reprehensibility analysis,
but we have no doubt the Utah Supreme Court did that
here. __ P. 3d, at __, 2001 WL 1246676, at *11 ("Even if
the harm to the Campbells can be appropriately charac-
terized as minimal, the trial court's assessment of the
situation is on target: 'The harm is minor to the individual
but massive in the aggregate'"). Punishment on these
bases creates the possibility of multiple punitive damages
awards for the same conduct; for in the usual case nonpar-
ties are not bound by the judgment some other plaintiff
obtains. *Gore, supra*, at 593 (BREYER, J., concurring)
("Larger damages might also 'double count' by including in
the punitive damages award some of the compensatory, or
punitive, damages that subsequent plaintiffs would also

Opinion of the Court

recover").

The same reasons lead us to conclude the Utah Supreme Court's decision cannot be justified on the grounds that State Farm was a recidivist. Although "[o]ur holdings that a recidivist may be punished more severely than a first offender recognize that repeated misconduct is more reprehensible than an individual instance of malfeasance," *Gore, supra,* at 577, in the context of civil actions courts must ensure the conduct in question replicates the prior transgressions. *TXO,* 509 U. S., at 462, n. 28 (noting that courts should look to "'the existence and frequency of similar past conduct'") (quoting *Haslip,* 499 U. S., at 21–2).

The Campbells have identified scant evidence of repeated misconduct of the sort that injured them. Nor does our review of the Utah courts' decisions convince us that State Farm was only punished for its actions toward the Campbells. Although evidence of other acts need not be identical to have relevance in the calculation of punitive damages, the Utah court erred here because evidence pertaining to claims that had nothing to do with a third-party lawsuit was introduced at length. Other evidence concerning reprehensibility was even more tangential. For example, the Utah Supreme Court criticized State Farm's investigation into the personal life of one of its employees and, in a broader approach, the manner in which State Farm's policies corrupted its employees. ___ P. 3d, at ___, 2001 WL 1246676, at *10; *id.,* at ___, 2001 WL 1246676, at *12. The Campbells attempt to justify the courts' reliance upon this unrelated testimony on the theory that each dollar of profit made by underpaying a third-party claimant is the same as a dollar made by underpaying a first-party one. Brief for Respondents 45; see also ___ P. 3d, at ___, 2001 WL 1246676, at *12 ("State Farm's continuing illicit practice created market disadvantages for other honest insurance companies because

these practices increased profits. As plaintiffs' expert witnesses established, such wrongfully obtained competitive advantages have the potential to pressure other companies to adopt similar fraudulent tactics, or to force them out of business. Thus, such actions cause distortions throughout the insurance market and ultimately hurt all consumers"). For the reasons already stated, this argument is unconvincing. The reprehensibility guidepost does not permit courts to expand the scope of the case so that a defendant may be punished for any malfeasance, which in this case extended for a 20-year period. In this case, because the Campbells have shown no conduct by State Farm similar to that which harmed them, the conduct that harmed them is the only conduct relevant to the reprehensibility analysis.

### B

Turning to the second *Gore* guidepost, we have been reluctant to identify concrete constitutional limits on the ratio between harm, or potential harm, to the plaintiff and the punitive damages award. *Gore, supra,* at 582 ("[W]e have consistently rejected the notion that the constitutional line is marked by a simple mathematical formula, even one that compares actual *and potential* damages to the punitive award"); *TXO, supra,* at 458. We decline again to impose a bright-line ratio which a punitive damages award cannot exceed. Our jurisprudence and the principles it has now established demonstrate, however, that, in practice, few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process. In *Haslip,* in upholding a punitive damages award, we concluded that an award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety. 499 U. S., at 23–24. We cited that 4-to-1 ratio again in *Gore.* 517 U. S., at 581. The Court further

Opinion of the Court

referenced a long legislative history, dating back over 700 years and going forward to today, providing for sanctions of double, treble, or quadruple damages to deter and punish. *Id.*, at 581, and n. 33. While these ratios are not binding, they are instructive. They demonstrate what should be obvious: Single-digit multipliers are more likely to comport with due process, while still achieving the State's goals of deterrence and retribution, than awards with ratios in range of 500 to 1, *id.*, at 582, or, in this case, of 145 to 1.

Nonetheless, because there are no rigid benchmarks that a punitive damages award may not surpass, ratios greater than those we have previously upheld may comport with due process where "a particularly egregious act has resulted in only a small amount of economic damages." *Ibid.;* see also *ibid.* (positing that a higher ratio *might* be necessary where "the injury is hard to detect or the monetary value of noneconomic harm might have been difficult to determine"). The converse is also true, however. When compensatory damages are substantial, then a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee. The precise award in any case, of course, must be based upon the facts and circumstances of the defendant's conduct and the harm to the plaintiff.

In sum, courts must ensure that the measure of punishment is both reasonable and proportionate to the amount of harm to the plaintiff and to the general damages recovered. In the context of this case, we have no doubt that there is a presumption against an award that has a 145-to-1 ratio. The compensatory award in this case was substantial; the Campbells were awarded $1 million for a year and a half of emotional distress. This was complete compensation. The harm arose from a transaction in the economic realm, not from some physical assault or trauma; there were no physical injuries; and State Farm

16        STATE FARM MUT. AUTOMOBILE INS. CO.
                        *v.* CAMPBELL
                     Opinion of the Court

paid the excess verdict before the complaint was filed, so
the Campbells suffered only minor economic injuries for
the 18-month period in which State Farm refused to re-
solve the claim against them. The compensatory damages
for the injury suffered here, moreover, likely were based
on a component which was duplicated in the punitive
award. Much of the distress was caused by the outrage
and humiliation the Campbells suffered at the actions of
their insurer; and it is a major role of punitive damages to
condemn such conduct. Compensatory damages, however,
already contain this punitive element. See Restatement
(Second) of Torts §908, Comment *c*, p. 466 (1977) ("In
many cases in which compensatory damages include an
amount for emotional distress, such as humiliation or
indignation aroused by the defendant's act, there is no
clear line of demarcation between punishment and com-
pensation and a verdict for a specified amount frequently
includes elements of both").

The Utah Supreme Court sought to justify the massive
award by pointing to State Farm's purported failure to
report a prior $100 million punitive damages award in
Texas to its corporate headquarters; the fact that State
Farm's policies have affected numerous Utah consumers;
the fact that State Farm will only be punished in one out
of every 50,000 cases as a matter of statistical probability;
and State Farm's enormous wealth. ___ P. 3d, at ___,
2001 WL 1246676, at *15. Since the Supreme Court of
Utah discussed the Texas award when applying the ratio
guidepost, we discuss it here. The Texas award, however,
should have been analyzed in the context of the reprehen-
sibility guidepost only. The failure of the company to
report the Texas award is out-of-state conduct that, if the
conduct were similar, might have had some bearing on the
degree of reprehensibility, subject to the limitations we
have described. Here, it was dissimilar, and of such mar-
ginal relevance that it should have been accorded little or

no weight. The award was rendered in a first-party law-suit; no judgment was entered in the case; and it was later settled for a fraction of the verdict. With respect to the Utah Supreme Court's second justification, the Campbells' inability to direct us to testimony demonstrating harm to the people of Utah (other than those directly involved in this case) indicates that the adverse effect on the State's general population was in fact minor.

The remaining premises for the Utah Supreme Court's decision bear no relation to the award's reasonableness or proportionality to the harm. They are, rather, arguments that seek to defend a departure from well-established constraints on punitive damages. While States enjoy considerable discretion in deducing when punitive dam-ages are warranted, each award must comport with the principles set forth in *Gore*. Here the argument that State Farm will be punished in only the rare case, coupled with reference to its assets (which, of course, are what other insured parties in Utah and other States must rely upon for payment of claims) had little to do with the actual harm sustained by the Campbells. The wealth of a defen-dant cannot justify an otherwise unconstitutional punitive damages award. *Gore*, 517 U. S., at 585 ("The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice of the demands that the several States impose on the conduct of its business"); see also *id.*, at 591 (BREYER, J., concurring) ("[Wealth] provides an open-ended basis for inflating awards when the defendant is wealthy . . . . That does not make its use unlawful or inappropriate; it simply means that this factor cannot make up for the failure of other factors, such as 'reprehensibility,' to constrain sig-nificantly an award that purports to punish a defendant's conduct"). The principles set forth in *Gore* must be im-plemented with care, to ensure both reasonableness and proportionality.

18    STATE FARM MUT. AUTOMOBILE INS. CO.
         *v.* CAMPBELL
         Opinion of the Court

### C

The third guidepost in *Gore* is the disparity between the punitive damages award and the "civil penalties authorized or imposed in comparable cases." *Id.*, at 575. We note that, in the past, we have also looked to criminal penalties that could be imposed. *Id.*, at 583; *Haslip*, 499 U. S., at 23. The existence of a criminal penalty does have bearing on the seriousness with which a State views the wrongful action. When used to determine the dollar amount of the award, however, the criminal penalty has less utility. Great care must be taken to avoid use of the civil process to assess criminal penalties that can be imposed only after the heightened protections of a criminal trial have been observed, including, of course, its higher standards of proof. Punitive damages are not a substitute for the criminal process, and the remote possibility of a criminal sanction does not automatically sustain a punitive damages award.

Here, we need not dwell long on this guidepost. The most relevant civil sanction under Utah state law for the wrong done to the Campbells appears to be a $10,000 fine for an act of fraud, ___ P. 3d, at ___, 2001 WL 1246676, at *17, an amount dwarfed by the $145 million punitive damages award. The Supreme Court of Utah speculated about the loss of State Farm's business license, the disgorgement of profits, and possible imprisonment, but here again its references were to the broad fraudulent scheme drawn from evidence of out-of-state and dissimilar conduct. This analysis was insufficient to justify the award.

### IV

An application of the *Gore* guideposts to the facts of this case, especially in light of the substantial compensatory damages awarded (a portion of which contained a punitive element), likely would justify a punitive damages award at or near the amount of compensatory damages. The puni-

Cite as: 538 U. S. ____ (2003)          19

Opinion of the Court

tive award of $145 million, therefore, was neither reasonable nor proportionate to the wrong committed, and it was an irrational and arbitrary deprivation of the property of the defendant.  The proper calculation of punitive damages under the principles we have discussed should be resolved, in the first instance, by the Utah courts.

The judgment of the Utah Supreme Court is reversed, and the case is remanded for proceedings not inconsistent with this opinion.

*It is so ordered.*

Cite as: 538 U. S. ____ (2003)          1

Scalia, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 01–1289

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, PETITIONER *v.* INEZ PREECE CAMPBELL
AND MATTHEW C. BARNECK, SPECIAL ADMINISTRATOR
AND PERSONAL REPRESENTATIVE OF THE ESTATE OF
CURTIS B. CAMPBELL

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF UTAH

[April 7, 2003]

JUSTICE SCALIA, dissenting.

I adhere to the view expressed in my dissenting opinion
in *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559,
598-99 (1996), that the Due Process Clause pro-
vides no substantive protections against "excessive" or
"'unreasonable'" awards of punitive damages. I am also of
the view that the punitive damages jurisprudence which
has sprung forth from *BMW* v. *Gore* is insusceptible of
principled application; accordingly, I do not feel justified in
giving the case *stare decisis* effect. See *id.,* at 599. I would
affirm the judgment of the Utah Supreme Court.

Cite as: 538 U. S. \_\_\_\_ (2003)          1

THOMAS, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 01–1289

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, PETITIONER *v.* INEZ PREECE CAMPBELL
AND MATTHEW C. BARNECK, SPECIAL ADMINISTRATOR
AND PERSONAL REPRESENTATIVE OF THE ESTATE OF
CURTIS B. CAMPBELL

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF UTAH

[April 7, 2003]

JUSTICE THOMAS, dissenting.

I would affirm the judgment below because "I continue to believe that the Constitution does not constrain the size of punitive damages awards." *Cooper Industries, Inc.* v. *Leatherman Tool Group, Inc.,* 532 U. S. 424, 443 (2001) (THOMAS, J., concurring) (citing *BMW of North America, Inc.* v. *Gore,* 517 U. S. 559, 599 (1996) (SCALIA, J., joined by THOMAS, J., dissenting)). Accordingly, I respectfully dissent.

GINSBURG, J., dissenting

# SUPREME COURT OF THE UNITED STATES

No. 01–1289

STATE FARM MUTUAL AUTOMOBILE INSURANCE
COMPANY, PETITIONER *v.* INEZ PREECE CAMPBELL
AND MATTHEW C. BARNECK, SPECIAL ADMINISTRATOR
AND PERSONAL REPRESENTATIVE OF THE ESTATE OF
CURTIS B. CAMPBELL

ON WRIT OF CERTIORARI TO THE SUPREME COURT OF UTAH

[April 7, 2003]

JUSTICE GINSBURG, dissenting.

Not long ago, this Court was hesitant to impose a federal check on state-court judgments awarding punitive damages. In *Browning-Ferris Industries of Vt., Inc.* v. *Kelco Disposal, Inc.*, 492 U. S. 257 (1989), the Court held that neither the Excessive Fines Clause of the Eighth Amendment nor federal common law circumscribed awards of punitive damages in civil cases between private parties. *Id.*, at 262–276, 277–280. Two years later, in *Pacific Mut. Life Ins. Co.* v. *Haslip*, 499 U. S. 1 (1991), the Court observed that "unlimited jury [or judicial] discretion . . . in the fixing of punitive damages may invite extreme results that jar one's constitutional sensibilities," *id.*, at 18; the Due Process Clause, the Court suggested, would attend to those sensibilities and guard against unreasonable awards, *id.*, at 17–24. Nevertheless, the Court upheld a punitive damages award in *Haslip* "more than 4 times the amount of compensatory damages, . . . more than 200 times [the plaintiff's] out-of-pocket expenses," and "much in excess of the fine that could be imposed." *Id.*, at 23. And in *TXO Production Corp.* v. *Alliance Resources Corp.*, 509 U. S. 443 (1993), the Court affirmed a state-court award "526 times greater than the actual

damages awarded by the jury." *Id.*, at 453;[1] cf. *Browning-Ferris*, 492 U. S., at 262 (ratio of punitive to compensatory damages over 100 to 1).

It was not until 1996, in *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559 (1996), that the Court, for the first time, invalidated a state-court punitive damages assessment as unreasonably large. See *id.*, at 599 (SCALIA, J., dissenting). If our activity in this domain is now "well-established," see *ante*, at 5, 17, it takes place on ground not long held.

In *Gore*, I stated why I resisted the Court's foray into punitive damages "territory traditionally within the States' domain." 517 U. S., at 612 (dissenting opinion). I adhere to those views, and note again that, unlike federal habeas corpus review of state-court convictions under 28 U. S. C. §2254, the Court "work[s] at this business [of checking state courts] alone," unaided by the participation of federal district courts and courts of appeals. 517 U. S., at 613. It was once recognized that "the laws of the particular State must suffice [to superintend punitive damages awards] until judges or legislators authorized to do so initiate system-wide change." *Haslip*, 499 U. S., at 42 (KENNEDY, J., concurring in judgment). I would adhere to that traditional view.

I

The large size of the award upheld by the Utah Supreme Court in this case indicates why damage-capping legislation may be altogether fitting and proper. Neither the amount of the award nor the trial record, however, justi-

---

[1] By switching the focus from the ratio of punitive to compensatory damages to the potential loss to the plaintiffs had the defendant succeeded in its illicit scheme, the Court could describe the relevant ratio in *TXO* as 10 to 1. See *BMW of North America, Inc.* v. *Gore*, 517 U. S. 559, 581, and n. 34 (1996).

GINSBURG, J., dissenting

fies this Court's substitution of its judgment for that of
Utah's competent decisionmakers. In this regard, I count
it significant that, on the key criterion "reprehensibility,"
there is a good deal more to the story than the Court's
abbreviated account tells.

Ample evidence allowed the jury to find that State
Farm's treatment of the Campbells typified its "Perform-
ance, Planning and Review" (PP&R) program; imple-
mented by top management in 1979, the program had "the
explicit objective of using the claims-adjustment process
as a profit center." App. to Pet. for Cert. 116a. "[T]he
Campbells presented considerable evidence," the trial
court noted, documenting "that the PP&R program . . . has
functioned, and continues to function, as an unlawful
scheme . . . to deny benefits owed consumers by paying out
less than fair value in order to meet preset, arbitrary
payout targets designed to enhance corporate profits." *Id.*,
at 118a–119a. That policy, the trial court observed, was
encompassing in scope; it "applied equally to the handling
of both third-party and first-party claims." *Id.*, at 119a.
But cf. *ante*, at 13, 17 (suggesting that State Farm's han-
dling of first-party claims has "nothing to do with a third-
party lawsuit").

Evidence the jury could credit demonstrated that the
PP&R program regularly and adversely affected Utah
residents. Ray Summers, "the adjuster who handled the
Campbell case and who was a State Farm employee in
Utah for almost twenty years," described several methods
used by State Farm to deny claimants fair benefits, for
example, "falsifying or withholding of evidence in claim
files." *Id.*, at 121a. A common tactic, Summers recounted,
was to "unjustly attac[k] the character, reputation and
credibility of a claimant and mak[e] notations to that
effect in the claim file to create prejudice in the event the
claim ever came before a jury." *Id.*, at 130a (internal
quotation marks omitted). State Farm manager Bob

Noxon, Summers testified, resorted to a tactic of this order in the Campbell case when he "instruct[ed] Summers to write in the file that Todd Ospital (who was killed in the accident) was speeding because he was on his way to see a pregnant girlfriend." *Ibid.* In truth, "[t]here was no pregnant girlfriend." *Ibid.* Expert testimony noted by the trial court described these tactics as "completely improper." *Ibid.*

The trial court also noted the testimony of two Utah State Farm employees, Felix Jensen and Samantha Bird, both of whom recalled "intolerable" and "recurrent" pressure to reduce payouts below fair value. *Id.,* at 119a (internal quotation marks omitted). When Jensen complained to top managers, he was told to "get out of the kitchen" if he could not take the heat; Bird was told she should be "more of a team player." *Ibid.* (internal quotation marks omitted). At times, Bird said, she "was forced to commit dishonest acts and to knowingly underpay claims." *Id.,* at 120a. Eventually, Bird quit. *Ibid.* Utah managers superior to Bird, the evidence indicated, were improperly influenced by the PP&R program to encourage insurance underpayments. For example, several documents evaluating the performance of managers Noxon and Brown "contained explicit preset average payout goals." *Ibid.*

Regarding liability for verdicts in excess of policy limits, the trial court referred to a State Farm document titled the "Excess Liability Handbook"; written before the Campbell accident, the handbook instructed adjusters to pad files with "self-serving" documents, and to leave critical items out of files, for example, evaluations of the insured's exposure. *Id.,* at 127a–128a (internal quotation marks omitted). Divisional superintendent Bill Brown used the handbook to train Utah employees. *Id.,* at 134a. While overseeing the Campbell case, Brown ordered adjuster Summers to change the portions of his report indi-

Cite as: 538 U. S. ____ (2003)                    5

GINSBURG, J., dissenting

cating that Mr. Campbell was likely at fault and that the settlement cost was correspondingly high. *Id.*, at 3a. The Campbells' case, according to expert testimony the trial court recited, "was a classic example of State Farm's application of the improper practices taught in the Excess Liability Handbook." *Id.*, at 128a.

The trial court further determined that the jury could find State Farm's policy "deliberately crafted" to prey on consumers who would be unlikely to defend themselves. *Id.*, at 122a. In this regard, the trial court noted the testimony of several former State Farm employees affirming that they were trained to target "the weakest of the herd"—"the elderly, the poor, and other consumers who are least knowledgeable about their rights and thus most vulnerable to trickery or deceit, or who have little money and hence have no real alternative but to accept an inadequate offer to settle a claim at much less than fair value." *Ibid.* (internal quotation marks omitted).

The Campbells themselves could be placed within the "weakest of the herd" category. The couple appeared economically vulnerable and emotionally fragile. App. 3360a–3361a (Order Denying State Farm's Motion for Judgment NOV and New Trial Regarding Intentional Infliction of Emotional Distress). At the time of State Farm's wrongful conduct, "Mr. Campbell had residuary effects from a stroke and Parkinson's disease." *Id.*, at 3360a.

To further insulate itself from liability, trial evidence indicated, State Farm made "systematic" efforts to destroy internal company documents that might reveal its scheme, App. to Pet. for Cert. 123a, efforts that directly affected the Campbells, *id.*, at 124a. For example, State Farm had "a special historical department that contained a copy of all past manuals on claim-handling practices and the dates on which each section of each manual was changed." *Ibid.* Yet in discovery proceedings, State Farm failed to

6        STATE FARM MUT. AUTOMOBILE INS. CO.
*v.* CAMPBELL
GINSBURG, J., dissenting

produce any claim-handling practice manuals for the years relevant to the Campbells' bad-faith case. *Id.*, at 124a–125a.

State Farm's inability to produce the manuals, it appeared from the evidence, was not accidental. Documents retained by former State Farm employee Samantha Bird, as well as Bird's testimony, showed that while the Campbells' case was pending, Janet Cammack, "an in-house attorney sent by top State Farm management, conducted a meeting . . . in Utah during which she instructed Utah claims management to search their offices and destroy a wide range of material of the sort that had proved damaging in bad-faith litigation in the past—in particular, old claim-handling manuals, memos, claim school notes, procedure guides and other similar documents." *Id.*, at 125a. "These orders were followed even though at least one meeting participant, Paul Short, was personally aware that these kinds of materials had been requested by the Campbells in this very case." *Ibid.*

Consistent with Bird's testimony, State Farm admitted that it destroyed every single copy of claim-handling manuals on file in its historical department as of 1988, even though these documents could have been preserved at minimal expense. *Ibid.* Fortuitously, the Campbells obtained a copy of the 1979 PP&R manual by subpoena from a former employee. *Id.*, at 132a. Although that manual has been requested in other cases, State Farm has never itself produced the document. *Ibid.*

"As a final, related tactic," the trial court stated, the jury could reasonably find that "in recent years State Farm has gone to extraordinary lengths to stop damaging documents from being created in the first place." *Id.*, at 126a. State Farm kept no records at all on excess verdicts in third-party cases, or on bad-faith claims or attendant verdicts. *Ibid.* State Farm alleged "that it has no record of its punitive damage payments, even though such pay-

GINSBURG, J., dissenting

ments must be reported to the [Internal Revenue Service] and in some states may not be used to justify rate increases." *Ibid.* Regional Vice President Buck Moskalski testified that "he would not report a punitive damage verdict in [the Campbells'] case to higher management, as such reporting was not set out as part of State Farm's management practices." *Ibid.*

State Farm's "wrongful profit and evasion schemes," the trial court underscored, were directly relevant to the Campbells' case, *id.,* at 132a:

> "The record fully supports the conclusion that the bad-faith claim handling that exposed the Campbells to an excess verdict in 1983, and resulted in severe damages to them, was a product of the unlawful profit scheme that had been put in place by top management at State Farm years earlier.  The Campbells presented substantial evidence showing how State Farm's improper insistence on claims-handling employees' reducing their claim payouts . . . regardless of the merits of each claim, manifested itself . . . in the Utah claims operations during the period when the decisions were made not to offer to settle the Campbell case for the $50,000 policy limits—indeed, not to make any offer to settle at a lower amount.  This evidence established that high-level manager Bill Brown was under heavy pressure from the PP&R scheme to control indemnity payouts during the time period in question.  In particular, when Brown declined to pay the excess verdict against Curtis Campbell, or even post a bond, he had a special need to keep his year-end numbers down, since the State Farm incentive scheme meant that keeping those numbers down was important to helping Brown get a much-desired transfer to Colorado. . . . There was ample evidence that the concepts taught in the Excess Liability Handbook, in-

8           STATE FARM MUT. AUTOMOBILE INS. CO.
                      *v.* CAMPBELL
                GINSBURG, J., dissenting

cluding the dishonest alteration and manipulation of claim files and the policy against posting any supersedeas bond for the full amount of an excess verdict, were dutifully carried out in this case. . . . There was ample basis for the jury to find that everything that had happened to the Campbells—when State Farm repeatedly refused in bad-faith to settle for the $50,000 policy limits and went to trial, and then failed to pay the 'excess' verdict, or at least post a bond, after trial—was a direct application of State Farm's overall profit scheme, operating through Brown and others." *Id.*, at 133a–134a.

State Farm's "policies and practices," the trial evidence thus bore out, were "responsible for the injuries suffered by the Campbells," and the means used to implement those policies could be found "callous, clandestine, fraudulent, and dishonest." *Id.*, at 136a; see *id.*, at 113a (finding "ample evidence" that State Farm's reprehensible corporate policies were responsible for injuring "many other Utah consumers during the past two decades"). The Utah Supreme Court, relying on the trial court's record-based recitations, understandably characterized State Farm's behavior as "egregious and malicious." *Id.*, at 18a.

II

The Court dismisses the evidence describing and documenting State Farm's PP&R policy and practices as essentially irrelevant, bearing "no relation to the Campbells' harm." *Ante*, at 12; see *ante*, at 14 ("conduct that harmed [the Campbells] is the only conduct relevant to the reprehensibility analysis"). It is hardly apparent why that should be so. What is infirm about the Campbells' theory that their experience with State Farm exemplifies and reflects an overarching underpayment scheme, one that caused "repeated misconduct of the sort that injured them," *ante*, at 13? The Court's silence on that score is

Cite as: 538 U. S. ____ (2003)    9

GINSBURG, J., dissenting

revealing: Once one recognizes that the Campbells did show "conduct by State Farm similar to that which harmed them," *ante*, at 14, it becomes impossible to shrink the reprehensibility analysis to this sole case, or to maintain, at odds with the determination of the trial court, see App. to Pet. for Cert. 113a, that "the adverse effect on the State's general population was in fact minor," *ante*, at 17.

Evidence of out-of-state conduct, the Court acknowledges, may be "probative [even if the conduct is lawful in the state where it occurred] when it demonstrates the deliberateness and culpability of the defendant's action in the State where it is tortious. . . ." *Ante*, at 11; cf. *ante*, at 8 (reiterating this Court's instruction that trial courts assess whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident"). "Other acts" evidence concerning practices both in and out of State was introduced in this case to show just such "deliberateness" and "culpability." The evidence was admissible, the trial court ruled: (1) to document State Farm's "reprehensible" PP&R program; and (2) to "rebut [State Farm's] assertion that [its] actions toward the Campbells were inadvertent errors or mistakes in judgment." App. 3329a (Order Denying Various Motions of State Farm to Exclude Plaintiffs' Evidence). Viewed in this light, there surely was "a nexus" between much of the "other acts" evidence and "the specific harm suffered by [the Campbells]." *Ante*, at 11.

### III

When the Court first ventured to override state-court punitive damages awards, it did so moderately. The Court recalled that "[i]n our federal system, States necessarily have considerable flexibility in determining the level of punitive damages that they will allow in different classes of cases and in any particular case." *Gore*, 517 U. S., at 568. Today's decision exhibits no such respect and restraint. No longer content to accord state-court judgments

10 STATE FARM MUT. AUTOMOBILE INS. CO.
*v.* CAMPBELL
GINSBURG, J., dissenting

"a strong presumption of validity," *TXO,* 509 U. S., at 457, the Court announces that "few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process." *Ante,* at 14.[2] Moreover, the Court adds, when compensatory damages are substantial, doubling those damages "can reach the outermost limit of the due process guarantee." *Ante,* at 15; see *ante,* at 18–19 ("facts of this case ... likely would justify a punitive damages award at or near the amount of compensatory damages"). In a legislative scheme or a state high court's design to cap punitive damages, the handiwork in setting single-digit and 1-to-1 benchmarks could hardly be questioned; in a judicial decree imposed on the States by this Court under the banner of substantive due process, the numerical controls today's decision installs seem to me boldly out of order.

\*   \*   \*

I remain of the view that this Court has no warrant to reform state law governing awards of punitive damages. *Gore,* 517 U. S., at 607 (GINSBURG, J., dissenting). Even if I were prepared to accept the flexible guides prescribed in *Gore,* I would not join the Court's swift conversion of those guides into instructions that begin to resemble marching orders. For the reasons stated, I would leave the judgment of the Utah Supreme Court undisturbed.

---

[2] *TXO Production Corp.* v. *Alliance Resources Corp.,* 509 U. S. 443, 462, n. 8 (1993), noted that "[u]nder well-settled law," a defendant's "wrongdoing in other parts of the country" and its "impressive net worth" are factors "typically considered in assessing punitive damages." It remains to be seen whether, or the extent to which, today's decision will unsettle that law.

HAMMEL V. STATE FARM: " ⊃ EXHIBIT #4                               Page 1 of 2

The Progress of this case will be followed from a

in chronological order with links to appropriate documents.

Top of Memorandum on the

for which this is an exhibit.

Exhibit 4

Bird, Samantha F. / GRLY/38- HPDESK Print.

Message Dated: 04/06/90 at 1504.

Subject: PURGNG OLD FILES Contents: 2

Sender: Samantha F. Bird/ GRYL/38

Cc: Samantha F. Bird/ GRYL/38

Part 1.

To: Clark Davis /GRYL/38
Marcia Daybell/GRYL/38
Felix Jensen/GRYL/38
Susan E. More/GRYL/38
Jerry L. Stevenson/GRYL/04
Paul L. West/GRYL/38
Carol J. Young/GRYL/38

CC: Samantha F. Bird/GRYL/38
Robert Dean Noxon/GRYL/38

Part 2.

Yesterday in the staff meeting, we talked about the need to purge our
desks of all old memo's, notes and procedural guides. With the
increase of bad faith suits bieng filed against State Farm, it is
important that you get rid of all your old stuff: Know you have
lurking around in your drawers and filing cabinets.

Please get rid of any old memo's, claim school notes, old seminar or
claim conference notes, and any old procedure guides you may have.
They are trying to avoid having to come up with old records when the
"request for production of documents" comes in and they request "all
training manuals, memos, procedural guides, etc. that are in the
possession of your claims reps and management". Apparently, they had a
request like this in Texas and each person had to surrender all their
old junk. I guess corporate is not even going to keep old CPG guides,

old claim manuals, etc. We will only have what is currently in effect.
That way if they subpoena our claim manual for U claims for 1987, for
example, we will say we dont have it. This should be easier than
trying to produce it or having to defend it.

So, look through all your old stuff and dump it. You wont ever miss
it.

Also we discussed that every employee has the right to look at his or
her personnel file without recrimination. There should be nothing in
your personnel file that you dont already have a copy of. But if you
feel the need to see something in your file, it is open to you.

---

The URL for this document is:
http://graham.main.nc.us/~bhammel/RICO/SFexh4.html
Created: February 4, 2000
Last Updated: May 28, 2000

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

---------------------------------------------------------------- x

AVA ACUPUNCTURE P.C., OKSLEN ACUPUNCTURE P.C. )
Individually and as Assignee of Leona Deleston, MODEL SUPPLY )
INC. and KINGS COUNTY CHIROPRACTIC P.C. )
　)
　　　　　　　　　Plaintiffs, )
　)
　　　　　　　-against- )
　)
STATE FARM MUTUAL AUTOMOBILE INSURANCE )
COMPANY, AUTOONE INSURANCE COMPANY, GENERAL )
ASSURANCE COMPANY, ONE BEACON INSURANCE )
COMPANY, MCDONNELL ADELS P.C., KATTEN MUCHIN )
ROSENMAN LLP, RIVKIN RADLER LLP, ISEMAN )
CUNNINGHAM RIESTER & HYDE LLP , MELLI GUERIN & )
WALL P.C. and THE JOHN DOE INSURANCE COMPANIES )
　)
　　　　　　　　　Defendants. )
---------------------------------------------------------------- x

SUMMONS AND COMPLAINT
The Zuppa Firm PLLC
By: _____
Raymond J. Zuppa Esq.
Attorneys for Plaintiffs
53 Herbert Street
Brooklyn, NY 11222
(718) 383-8812

To:

Attorney(s) for

Service of a copy of the within is hereby admitted

Dated:.........................................................

.........................................................

RECEIVED
JUN 0 2 2008

- 224 -